**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BOUCHARD TRANSPORTATION CO., INC., *et al*.,[1] | ) Case No. 20-34682 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DECLARATION OF MATTHEW RAY OF PORTAGE POINT PARTNERS, LLC**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Matthew Ray, founder and managing partner of Portage Point Partners, LLC, proposed restructuring advisor, and proposed chief restructuring officer to Bouchard Transportation Co., Inc. (together with its debtor affiliates, "Bouchard", the "Debtors", or the "Company"), hereby declare under penalty of perjury:

**Preliminary Statement**

1.      Bouchard is one of the nation's largest independently-owned ocean-going petroleum barge companies with 50 vessels servicing the Eastern Seaboard and Gulf Coast of the United States.  Bouchard traces its origins to 1916 and the heroic actions of Captain Frederick E. Bouchard during the infamous Black Tom explosion in New York Harbor in World War I.  The U.S. government bestowed upon Captain Bouchard a monetary award for salvaging two ships and for his personal bravery.  Captain Bouchard used this money to found the Bouchard Transportation Company.  Bouchard is now a fourth-generation, family-owned industry leader.

---

[1]      Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/bouchard.  The location of the Debtors' service address is:  58 South Service Road, Suite 150, Melville, NY 11747.

2.     Despite its rich history, Bouchard's current challenges proved insurmountable on an out-of-court basis.  Those challenges began in October 2017 with a tragic explosion off the coast of Port Aransas, Texas, that claimed the lives of two crewmembers.  Bouchard fully cooperated with regulatory authorities as part of several health, safety, and environmental inspections and proceedings thereafter.  That process led to several operational improvements that enhanced the Company's reporting, training, inspections, oversight, and overall compliance with rules and regulations relating to health, safety, and environmental matters, including the ISM Code.[2]  Despite those best efforts, in December 2019, the Company's classification society, the American Bureau of Shipping ("ABS"), cancelled its longstanding contract with Bouchard.  The United States Coast Guard (the "Coast Guard") subsequently lifted Bouchard's document of compliance certification (the "DOC Certificate" or "DOC").  Bouchard's major customers require a DOC.

3.     Without requisite regulatory certifications, Bouchard could not service customers or generate positive cash flow.  Out-of-court funding sources were tapped and then dried up.  Non-core asset sales could not close on the necessary timeline.  COVID-19 adversely impacted Bouchard's efforts and industry demand.  The Bouchard family stepped up with a series of loans to Bouchard in the aggregate amount of approximately $10.1 million in 2020, but even that new money injection proved insufficient.  Bouchard's financial and liquidity profile deteriorated precipitously, leaving the Debtors unable to sustain even idle operations or otherwise satisfy payment obligations to crewmembers, suppliers, trade vendors, and other core business partners—many of which resorted to self-help maritime remedies throughout the U.S.  Bouchard's challenges

---

[2]   The International Safety Management ("ISM") Code was created by the International Maritime Organization to provide an international standard for the safe management and operation of ships and for pollution prevention as part of the Convention for Safety of Life at Sea.

reached a crescendo with multiple vessels being scheduled for foreclosure sales in New Orleans, Florida, Texas, and New York during the September 2020 to November 2020 timeframe, with the first foreclosure sale for two vessels scheduled to occur on September 29, 2020.

4.      Accordingly, the Debtors commenced these chapter 11 cases on September 28, 2020, to obtain much-needed "breathing space" with the automatic stay, raise incremental financing to pay crew members, hire employees, secure their vessels, fund operations, hire a classification society to perform a requisite safety management audit and issue a new DOC, and otherwise execute on their operational turnaround. ***The Debtors' goal is to pay creditors in full in cash on account of allowed claims***. The majority of the Debtors' fleet of barges and tugs, one of the largest in the United States, is unencumbered. There is approximately $229.5 million of funded debt relative to approximately $930 million of asset value,[3] primarily as reported via an appraisal dated August 2018. The Debtors believe there is equity value in excess of outstanding liabilities. During the 2013 to 2018 period, the Company averaged approximately $180 million of revenue and produced positive operating cash flow on an annual basis. Bouchard has 100-year-old roots, an industry-leading fleet of 50 vessels, and a loyal customer base around which it can reorganize. But the Debtors acknowledge there is significant work and focus required to unlock value for the benefit of all parties in interest.

5.      Filing these chapter 11 cases was a difficult and necessary first step. The prospective appointment of a chief restructuring officer, recent hiring of experienced restructuring professionals, and an ongoing competitive marketing process to secure DIP commitments for ***new capital*** have each created positive momentum for the turnaround in these chapter 11 cases. The

---

[3]     This asset value is ***exclusive*** of Bouchard's two newest-built vessels—the barge B. No. 252 and the tug Evening Breeze—and ***inclusive*** of the estimated fair market value of Bouchard's aircraft as of September 2020.

Debtors intend to rehire, as soon as practicable, critical safety and accounting managers to support Bouchard's efforts to regain regulatory certification, including experienced personnel in tugs and barges operations, ISM compliance, and record keeping and training. The Debtors intend to resolve pending collection proceedings with maritime lienholders and refocus the business on operational excellence. And the Debtors will work closely with the Coast Guard and other regulatory authorities to show them a path for sustainable health, safety, and environmental compliance. Bouchard believes it continues to have one of the best safety and loss records in the industry and will improve upon that further in the near term.

6. The Debtors intend to secure a commitment for DIP financing and request approval of such DIP financing and other customary "first day" relief in the very near term. The DIP financing will provide the Debtors with adequate working capital and the means to implement their operational restructuring initiatives. The Debtors will continue to market test any DIP financing after any interim hearing in furtherance of a value-maximizing foundation that best positions these chapter 11 cases for paid-in-full success. The Debtors intend to move through these chapter 11 cases expeditiously yet responsibly, engaging all stakeholders in good faith to deliver the best available outcome. Bouchard's recent challenges—including those amplified by COVID-19—will not dictate its path forward. Chapter 11, together with the turnaround tools Congress made available for situations like this one, best positions the Debtors to do right for their employees, creditors, equity holder, and all other parties in interest. The Debtors acknowledge and agree that change is necessary and will occur.

**Background**

7. I am the founder and managing partner of Portage Point Partners, LLC and proposed chief restructuring officer to the Debtors. Prior to founding Portage Point, I co-founded

Victory Park Capital where I served as Senior Partner and Member of the Investment, Valuation and Management Committees.  I hold a B.S. in Finance from the Kelley School of Business at Indiana University and I am a Certified Turnaround Professional.

8.       On September 28, 2020 and September 29, 2020, (as applicable to each Debtor, the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").  To minimize any disruption resulting from the filing of these chapter 11 cases, as well as other possible adverse effects on their businesses, the Debtors have filed, and will subsequently file, various motions and pleadings seeking certain "first day" relief (collectively, the "First Day Motions").

9.       In my capacity as proposed Chief Restructuring Officer, I am generally familiar with Bouchard's financial affairs and books and records.  I am above eighteen years of age and I am competent to testify.

10.      I submit this Declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of Bouchard's chapter 11 petitions and the relief requested pursuant to the motions and applications described herein, some of which, as set forth below, were filed on the Petition Date, and others of which have been filed substantially contemporaneously herewith.

11.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon:  information supplied to me by members of Bouchard's management and their advisors; my initial understanding of Bouchard's finances; information learned from my review of relevant documents; or my opinion based on my experience, knowledge, and information concerning Bouchard's financial condition.  I am authorized to submit this declaration on behalf of the

Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

12.     To familiarize the Court with the Company, its businesses, and the circumstances leading to these chapter 11 cases, I have organized this Declaration as follows:

- **Part I** provides a general overview of the Company's corporate history and operations;

- **Part II** describes the Company's prepetition corporate and capital structure;

- **Part III** describes the circumstances leading to the commencement of these chapter 11 cases;

- **Part IV** describes the Debtors' proposed debtor-in-possession financing; and

- **Part V** provides evidentiary support for the Debtors' first day motions.

*      *      *

## Declaration

### I.     General Background.

#### A.     Corporate History.

13.     The Company was born from an act of heroism by its

founder, Captain Frederick E. Bouchard.    While aboard the tug

C. Gallagher of the Goodwin, Captain Fred Bouchard witnessed the

infamous Black Tom explosion in the New York Harbor—an act of



sabotage by German agents to destroy U.S.-made munitions that were

to be supplied to the Allies in World War I.   Rushing into danger,

Captain Fred Bouchard rescued two vessels—the 4,000-ton Brazilian

steamer Tijoca Rio and the schooner George E. Elezy—and pulled



several ammunition scows to safety.   The U.S. District Court honored

Captain Fred Bouchard with a salvage award, as well as an award for

personal bravery, which together totaled $9,000.     Captain Fred

Bouchard invested this money to create his own company, the

Bouchard Transportation Company, incorporated in 1918.

14.     Since its inception, four generations of Bouchard family members have carried on

a philosophy of innovation, investing the Company's profits into new barges and tugs to expand

its fleet.  In 1931, Frederick Bouchard acquired the Company's first oil barge—a sunken vessel—

for $100.  By 1989, the Company had grown to include nineteen barges and eight tugs, with routes

that covered the entire eastern seaboard, Gulf Coast, and Great Lakes ports.  Notably, in 1992, the

Company overcame industry-wide challenges caused by the Oil Pollution Act of 1990 by

becoming the first company to build several new 138,000 barrel double hull, flat-deck barges and

state-of-the-art 6,140 horsepower tugboats, strong enough to maneuver the 400 plus foot barges.

15.     Mirroring its heroic beginnings, Bouchard played a key role in the 2009 rescue of the passengers onboard U.S. Airways flight 1549, following its crash-landing in the Hudson River by Captain "Sully" Sullenberger.  Answering the Coast Guard's call to action, multiple Bouchard vessels participated in the rescue, with one of Bouchard's larger tugs creating a barrier around the airplane to keep passengers out of harms way as they were rescued from the water.

16.     In 2010, the Company invested approximately $500 million in a major fleet expansion plan to construct the most advanced articulated tug barge vessels ("<u>ATB Units</u>") to be traded within the Jones Act Market.  Today, Bouchard's fleet includes 25 double-hulled barges (the "<u>Barges</u>") and 25 tugs (the "<u>Tugs</u>," and together with the Barges and the ATB Units, the "<u>Vessels</u>") of various sizes, capacities, and capabilities.

**B.     Business Operations.**

17.     Bouchard maintains an industry-leading fleet of 25 Barges and 25 Tugs of various sizes, capacities, and capabilities—each of which features state-of-the-art equipment and fuel efficient technologies—with services operating throughout the Eastern Seaboard and Gulf Coast of the United States.  The Company is a leading provider of petroleum transportation services to a variety of customers in its core markets and elsewhere.   The Company's  primary customers are major domestic and international oil companies.  The Company enjoys its role as a key component of the domestic and international oil trade ecosystem.  Additionally, the Company provides critical services including the transport of heating oil to the Northeast region

of the United States during the winter months.  When the Company is operating at full capacity, its office is staffed 24 hours a day, 365 days a year, with qualified operational personnel.  In spite of the Company's recent operational challenges, as more fully described herein, the Company believes it maintains one of the best safety records within the barge transportation industry.

18.    The Company's revenue is comprised of charter and spot revenue.  Charter revenue is earned when a vessel is chartered by a customer (while still operated by the Company) for a pre-specified period of time, ranging from days to weeks to months to years.  A daily or monthly charter rate is paid by customers up front—typically seven to eight days prior to the start of the next month.  Employment or voyage specific costs are typically borne by the charterer (for example, 100% of fuel costs are reimbursed), while the Company is responsible for general vessel operating expenses, including crew.  Spot revenue is earned when a customer requests short-term, ad hoc services, ranging from weeks to months in duration.  Revenue is collected during or after the vessel's services are provided depending on the customer and situation, but it is not collected up front.  Fuel costs are not reimbursed and are therefore are factored into price.  For fiscal year 2018, Bouchard reported revenue of approximately $166 million.

19.    Bouchard's marine operations are subject to various international, federal, state, and local laws and regulations governing the operation and maintenance of vessels and other environmental protection laws, including the Oil Pollution Act of 1990, the Act for the Prevention of Pollution From Ships ("APPS"), the Clean Water Act, the Merchant Marine Act of 1920 (as amended, the "Jones Act"), and additional rules and regulations that were adopted by the Coast Guard and Environmental Protection Agency and the laws and regulations of other areas where the Company operates.  The Vessels are subject to the jurisdiction of the Coast Guard and Environmental Protection Agency.

### C.   Fleet Overview.

20.    For the last century, Bouchard has offered its customers a variety of premium Barges, Tugs, and ATB Units to service their unique transportation needs.  The Company believes it currently maintains one of the largest, safest, and most modern ocean-going petroleum barging fleet in the coastal United States.  Over four generations, the Bouchard family has continued to manage the company and its fleet based on the founding fathers' philosophy that, as tug captains, the Company must invest profits in the newest, highest quality vessels available, maintain those vessels to the highest standards, and hire and train the best seagoing employees available.  Consequently, the Company's fleet has earned a reputation for being faster, larger, and better equipped than the competition, with industry-leading operation by its dedicated employees.  The Company's fleet is comprised of two different types of vessels: Barges and Tugs.  As further explained below, certain of the Barges and Tugs comprise an articulated tug-barge unit, also known as "ATB Units."

### a.  The Barges.

21.    The Company owns and operates a fleet of 25 double-hulled Barges of various sizes and carrying capacities.  The double-hulled Barges are all flat-deck, as opposed to trunk tank, and built between 1993 and 2019, with B. No. 252 the latest addition to the fleet.  The Barges are all ocean-going and have various carrying  capacities to meet its customer's needs, ranging from small Barges with 35,000 barrels ("BBLs") of carrying capacity to large Barges with 255,000 BBLs of carrying capacity.  The Barges operate in both the clean oil market (i.e., gasoline, diesel, and jet fuel) and the black oil market (i.e., asphalt, crude oil bunkers, and residential fuel oil).  Each of the Barges include topline equipment and

fuel-efficient technologies that both exceed industry standards and enable the Company to more effectively support the needs of its customers.

22.     When operating, the Barges are primarily maneuvered by Tugs as a component part of an ATB Unit.  The Company is one, if not the only, company in the United States to exclusively operate ***manned*** Barges, which, although more expensive to operate than unmanned barges, are a safer and more reliable option.  The Barges enable the Company to provide various services for its customers, including, but not limited to, the large-scale, long-distance transport of oil and clean petroleum products.

### b.  The Tugs.

23.     The Company owns and operates 25 ocean-going Tugs (also known as tugboats).  The Tugs are used to maneuver the Barges.  The Tugs were built between 1970 and 2019, and possess horsepower ranging from 3,000 up to 10,000.  The range of Tugs offered by the Company provides its customers with tailored  transportation and shipment solutions to traverse and maneuver a wide array of water ways.

24.     Four of the Tugs are used to tow Barges via wire tow lines.  The other twenty-one Tugs are ATB-capable and equipped with an intercon connecting system that allows each Tug to connect to the Barge by slotting into a notch in the stern of the Barge.  When the Tug and Barge are connected, they form an ATB Unit, as further described below.  Each ATB-capable Tug is married to a specific Barge.  Although the intercon connecting system is more expensive than other competitive connecting systems, the Company believes it is the safest and most reliable connecting system available.

### c.   The ATB Units.

25.    To meld the efficiency of the
Tugs and Barges with the power and speed of
a large, unified ship, the Company's Tugs and
Barges are designed as component parts of the
ATB Units.   The ATB Units consists of an
independent Tug, acting as a detachable



power module, that is connected into the stern notch of a Barge designed to fit the Tug.  The Tug

and Barge are "locked" together by an articulated, or "hinged," connection system.  ATB Units

provide various competitive advantages when compared to a traditional towing barge, including

increased operational flexibility, improved speed and endurance, and safety.

### D.    Industry Landscape.

26.    The Company operates domestic coastal and ocean-going vessels under the

protection of the Merchant Marine Act of 1920, otherwise known as the Jones Act, which requires

assets operating cabotage trade to meet strict criteria, including American-built assets that are

owned and operated by American citizens.  The primary purpose of the Jones Act is to maintain

national maritime defense readiness and promote domestic maritime-related industry.

27.    Bouchard's Jones Act compliant tankers and barges operate within U.S. inland

waterways, as well as coastwise and offshore to move oil, clean petroleum products, gas, and other

related oil-products from major production venues (i.e., U.S. Gulf) to major refinery or

consumption destinations (i.e., U.S. East Coast).  Historically, Jones Act tanker and barge earnings

and valuations have tended to move in-step with both domestic economic trends as well prospects

within the oil and gas industry.  Most recently, the Jones Act tanker and barge industry witnessed

a significant period of outperformance during the development and expansion of the U.S. shale

industry.  However, this period of success was ultimately followed by a significant trough in earnings and valuations driven by shale boom new vessel orders (supply) and a precipitous drop in the price of oil and related commodities, along with other ongoing economic pressures (demand).

28.     Today, Newbuild pricing for Jones Act eligible tanker and barge assets are multiples above comparable assets constructed in the international markets.  Due to limited U.S. yard capacity and the materially higher asset costs, the forward orderbook and corresponding supply-demand dynamics appear to support a tighter market in the future.

29.     Within the coastal tank barge sector, key competitors to Bouchard include Kirby Corp, Crowley, Reinauer Transportation, and Vane Brothers.

**E.     Regulatory Compliance Overview.**

30.     The Coast Guard requires a DOC for companies or responsible persons who own U.S. vessels engaged on foreign voyages, carrying more than twelve passengers, or a vessel that is a tanker, bulk freight vessel, freight vessel, or a self-propelled mobile offshore drilling unit of 500 gross tons or more.  33 C.F.R. § 96.330(a).  A DOC constitutes evidence that the responsible party has completed a thorough safety management audit administered by a classification society to verify that the responsible party is operating in accordance with the ISM Code.  For such reasons, the Company's major customers require that the Company maintain a DOC to conduct business.  A DOC is not required for companies or responsible persons who operate vessels solely in U.S. territorial waters so long as the companies or responsible persons otherwise maintain a Coastwise Load Line Certificate issued by a recognized classification organization.

31.     Pursuant to 46 C.F.R. § 8.200, *et seq.*, and 33 C.F.R. § 96, Subpart D, *et seq.*, the Coast Guard delegates to recognized classification societies the authority to perform safety management audits and other related surveys or inspections to ensure that vessels are in

compliance with the ISM Code and the safety management system requirements. A classification society is a non-governmental organization that establishes and maintains technical standards for the construction and operation of ships and offshore structures. For a classification society to become recognized by the Commandant of the Coast Guard as a "recognized organization," it must meet certain criteria pursuant to 46 C.F.R. § 8.220, *et seq*., and 33 C.F.R. § 96, Subpart D, *et seq*.

32. Recognized organizations are empowered by the Coast Guard to issue DOCs. 33 C.F.R. § 96.400, *et. seq.*; 46 C.F.R. § 8.200, *et. seq*. Only the Coast Guard may revoke a DOC. 33 C.F.R. § 96.330(g). A classification society, however, may recommend that the Coast Guard revoke a DOC. The Coast Guard has discretion to either accept or reject such a recommendation. When a company's valid DOC is revoked by the Coast Guard, the Coast Guard or a recognized organization must complete a satisfactory management audit of the vessels before a new DOC for the company's safety management system can be reissued. 33 C.F.R. § 96.330(h).

**F.      Geographic Footprint.**

33.      The Company has historically operated its Vessels predominately in the Eastern Seaboard, and Gulf Coast of the United States.  As of the date hereof, the Company's Vessels are not operating.  The Vessels are anchored, moored, or otherwise stationed at or outside of various ports across the United States, as illustrated below.



| Tugs | | | | Barges | | | |
|---|---|---|---|---|---|---|---|
| # | City | State | Port | # | City | State | Port |
| 1 | Staten Island | NY | Caddells | 1 | Staten Island | NY | Staten Island Homeport |
| 2 | Staten Island | NY | Caddells | 2 | Staten Island | NY | Caddells |
| 3 | Staten Island | NY | Staten Island Homeport | 3 | Staten Island | NY | Staten Island Homeport |
| 4 | Staten Island | NY | Staten Island Homeport | 4 | Staten Island | NY | Staten Island Homeport |
| 5 | Staten Island | NY | Caddells | 5 | Staten Island | NY | Staten Island Homeport |
| 6 | Staten Island | NY | Caddells | 6 | Staten Island | NY | Staten Island Homeport |
| 7 | Staten Island | NY | Staten Island Homeport | 7 | Brooklyn | NY | South Brooklyn Marine |
| 8 | Staten Island | NY | Caddells | 8 | Brooklyn | NY | South Brooklyn Marine |
| 9 | Staten Island | NY | Staten Island Homeport | 9 | Brooklyn | NY | South Brooklyn Marine |
| 10 | Staten Island | NY | Caddells | 10 | Brooklyn | NY | Brooklyn Piers 7 |
| 11 | Staten Island | NY | Caddells | 11 | Brooklyn | NY | Brooklyn Piers 7 |
| 12 | Brooklyn | NY | Brooklyn Piers 7 | 12 | Brooklyn | NY | BayRidge Anchorage |
| 13 | Brooklyn | NY | Brooklyn Piers 7 | 13 | Brooklyn | NY | Brooklyn Piers 7 |
| 14 | Brooklyn | NY | Brooklyn Piers 7 | 14 | Newark | NJ | APM Terminal |
| 15 | Brooklyn | NY | BayRidge Anchorage | 15 | Newark | NJ | Port Newark |
| 16 | Leeville | LA | Cheveron Leaville | 16 | Newark | NJ | Port Newark |
| 17 | Point Celeste | LA | Point Celeste Anchorage | 17 | Newark | NJ | Port Newark |
| 18 | Belle Chasse | LA | Belle Chasse Anchorage | 18 | Leeville | LA | Cheveron Leaville |
| 19 | New Orleans | LA | Martin Midstream | 19 | Point Celeste | LA | Point Celeste Anchorage |
| 20 | Port Fourchon | LA | Martin Midstream | 20 | Belle Chasse | LA | Belle Chasse Anchorage |
| 21 | Pascagoula | MS | VT Halter Pasaguala MS | 21 | Tampa | FL | ISR Tampa |
| 22 | St. Petersburg | FL | GMR | 22 | Tampa | FL | ISR Tampa |
| 23 | St. Petersburg | FL | GMR | 23 | Tampa | FL | ISR Tampa |
| 24 | Port Arthur | TX | Gulf Copper Rowan Dock | 24 | Port Arthur | TX | Gulf Copper Rowan Dock |
| 25 | Aransas Pass | TX | Martin Energy Harbor Island | 25 | Aransas Pass | TX | Martin Energy Harbor Island |

## II.    The Company's Corporate and Capital Structure.

### A.    The Company's Corporate Structure.

34.    As of the Petition Date, the Debtors' corporate structure is set forth below and attached hereto as **Exhibit A**.  Debtor Bouchard Transportation Co., Inc. is the 100% owner of 52 corporate entities.  Each Debtor subsidiary owns a single Vessel, except for Tug Captain Fred Bouchard Inc., the prior owner of the Tug Captain Fred Bouchard, which was sold in July 2020. Bouchard Transportation Co., Inc. serves as the operating agent of the individual vessel corporations.  Substantially all of the Bouchard corporate entities are Debtors in these chapter 11 cases.



**B.** **The Company's Capital Structure.**

35.     As of the Petition Date, Bouchard reported approximately $229.5 million in aggregate principal amount of funded debt obligations.

| Funded Debt | Agent / Lenders | Maturity | Approx. Principal Amount Outstanding (in USD millions) |
|---|---|---|---|
| Secured Debt | | | |
| Prepetition Revolving Credit Facility ($165 million) | Wells Fargo, N.A. | February 7, 2020 | $164.1 million |
| Prepetition Aircraft Loan ($25 million) | Fortress Credit Co LLC | March 10, 2021 | $25 million |
| Total Secured Debt | | | $189.1 million |
| Unsecured Bouchard Promissory Notes | | | |
| Unsecured Promissory Notes | Morton S. Bouchard III and Morton S. Bouchard III 2017 Family Trust (Exempt Share) | December 31, 2025 | $40.4 million |
| Total Unsecured Debt | | | $40.4 million |
| Total Outstanding Funded Debt | | | $229.5 million |

### a. Prepetition Revolving Credit Facility.

36.     On October 30, 2013, Bouchard entered into a $100 million revolving credit facility (the "Prepetition Revolving Credit Facility"), pursuant to the loan agreement by and among Bouchard, as borrower, and Wells Fargo Bank, National Association ("Wells Fargo"), as lender, as amended and supplemented from time to time (the "Wells Fargo Loan Agreement"). The parties agreed to increase the Prepetition Revolving Credit Facility size to $165,000,000 on February 4, 2015. The Prepetition Revolving Credit Facility matured as of February 7, 2020. It is guaranteed by certain of Bouchard's subsidiaries and secured by ship mortgages on the following Barges and Tugs: B. No. 210; B. No. 215; B. No. 225; B. No. 242; B. No. 245; B. No. 250; B. No. 252; B. No. 260; B. No. 262; B. No. 270; B. No. 295; Bouchard Girls; Morton S. Bouchard, IV; Kim M Bouchard; Jane A. Bouchard; Brendan J. Bouchard; Danielle M. Bouchard; Evening Breeze; Evening Star. Interest under the Prepetition Revolving Credit Facility is payable as follows:

(a) with respect to Eurodollar Loans (as defined thereunder), such loans bear interest at the variable market LIBOR rate, plus an Applicable Margin of 2.50% and (b) with respect to each Prime Rate Loan (as defined thereunder), such loans bear interest at the variable market Prime Rate (as established by Wells Fargo), plus an Applicable Margin of 0.00%, in either case, payable monthly.

37.    As of the date hereof, there is approximately $164.1 million in outstanding principal amount of borrowings under the Prepetition Revolving Credit Facility, in addition to approximately $6.9 million of accrued and unpaid interest.

### b. Prepetition Aircraft Loan.

38.    On March 10, 2020, Bouchard entered into a $25 million term loan (the "Prepetition Aircraft Loan"), pursuant to the loan and aircraft security agreement by and among Bouchard, as borrower, and Fortress Credit Co LLC ("Fortress"), as initial lender and agent, as amended and supplemented from time to time (the "Loan and Aircraft Security Agreement"). The Prepetition Aircraft Loan will mature on March 10, 2021. The Prepetition Aircraft Loan was made for the benefit of Bouchard in connection with the refinancing of a loan secured by a certain aircraft (the "Company Aircraft") and is secured by a lien on (a) the Company Aircraft, including the airframe, the engines, and certain other parts and records; (b) any and all associated rights secured by or associated with the airframe and/or the engines, together with any related international interests and prospective international interests; (c) all of the other collateral described or referred to in the Loan and Aircraft Security Agreement or any of the other related loan documents; and (d) all proceeds of the foregoing. The proceeds of the Prepetition Aircraft Loan were used to, among other things, pay all outstanding employee back-pay, pay certain hull insurance premiums, pay P&I insurance installment obligations, and ultimately secure a temporary 90-day DOC to restart operations.

39.     As of the date hereof, there is $25 million in outstanding principal amount of borrowings under the Loan and Aircraft Security Agreement, in addition to approximately $250,000 in accrued and unpaid interest.

### c.     Unsecured Bouchard Promissory Notes.

40.     Members of the Bouchard family have supported the Company financially during these challenging times.  For example, from first quarter of 2019 to third quarter of 2020, the Bouchard family made a series of loans to the Company pursuant to unsecured promissory notes, approximately $40.4 million of which remains outstanding (the "Unsecured Bouchard Promissory Notes").  Each of the promissory notes has a scheduled maturity of December 31, 2025, and carries an interest rate equal to the applicable Federal rate for the month in which loans were advanced with a range of 0.35% to 2.63% per annum.

### III.     Events Leading to These Chapter 11 Cases.

### A.     Operational Issues and Liquidity Challenges.

### a.     The October 2017 Incident.

41.     The Company's path to the commencement of these chapter 11 cases can be traced back to a tragedy in October 2017.  While preparing to get under way from anchorage to proceed into the Port of Corpus Christi, Texas, the ATB Unit Buster Bouchard/B. No. 255, caught fire and exploded off the coast of Port Aransas, Texas.  Tragically, the accident resulted in the death of two crewmembers.  Approximately 2,000 barrels of crude oil were also released from the Barge into the water or consumed by the fire and released into the atmosphere.  The resulting litigation, environmental costs, and public hearings conducted by the Coast Guard, exacerbated by general industry headwinds, ultimately precipitated a steady decline in both revenue and liquidity, severely straining operations throughout 2017 and 2018.

42. Following the incident, the Company purchased the ATB Unit M/V Evening Breeze & B. No. 252 in an effort to modernize the fleet and continue to mitigate the possibility of future safety incidents. The new Vessels are equipped with safety equipment exceeding regulatory standards and other best-in-class technical attributes.

43. Furthermore, the Coast Guard and the Company's classification society at the time, the American Bureau of Shipping ("ABS") initiated technical oversight of the Vessels in the wake of the incident. The Company fully complied with all applicable inspections and proceedings, and took proactive measures to improve the Company's policies and procedures. In a 2019 survey performed by the National Transportation Safety Board ("NTSB") regarding the October 2017 incident, however, the NTSB recommended that the Company evaluate their safety management systems with a third party to identify possible deficiencies. Consequently, the Company engaged ECM Maritime Services LLC ("ECM") to support the Company with technical and operational management services. Despite all of the steps the Company asserts it took to restore its industry-leading reputation for the safety and regulatory compliance of its Vessels, customers began to cancel key contracts and the ABS dropped the Company as a client. Revenue declined dramatically. Ultimately, the Company reported operating losses in 2017, 2018, and 2019 for the first times in its 100-plus year history.

**b.      The Coast Guard Lifts the Company's DOC.**

44. The Company's financial and operational challenges, which persisted through 2019, amplified in late 2019 when their classification society, ABS, recommended that the Coast Guard lift Company's DOC. Upon ABS's recommendation, the Coast Guard lifted the Company's DOC because the Company had failed to properly maintain certain office records and certain of its policies and practices were not sufficiently followed in the field. Since the inception of the ISM DOC requirements, the Company had never lost its DOC. ABS subsequently cancelled its

21

contract with the Company, leaving the Company without a classification society to perform the requisite safety management audit that could restore the Company's DOC.

45.    Importantly, a tug and barge may still operate within the territorial waters of the United States without a DOC if the operator otherwise maintains a Coastwise Load Line Certificate issued by a recognized operator.  However, the Company's key and longstanding customers in the industry—who require transportation services for international cargo—would not accept the Company's services absent a DOC because a DOC attests that the tug and barge operator is operating within the guidelines of the governing ISM Code.  The Company was rendered functionally unable to charter or otherwise operate its fleet, and therefore, generate revenue.

46.    Although the Company remained and still remains balance-sheet solvent, the Company's liquidity constraints had a material adverse impact on the Company's operations and ability to comply with all applicable laws and regulations to which the Vessels are subject. Without the requisite liquidity to maintain and operate its fleet at industry-leading safety standards and pay applicable docking fees, the Coast Guard issued multiple Captain of the Port Orders ("COPT Orders") throughout February 2020 in New York, Louisiana, and Texas.  The COPT Orders created further liquidity hurdles for the Company.  The Company attempted to restore regulatory compliance through hiring DNV/GL as its new classification society and fully complied with a safety management audit and all technical and other regulatory inspections.  Dissatisfied with the safety management audit, DNV/GL recommended that the Coast Guard lift the Company's DOC, which the Coast Guard did.  DNV/GL canceled its contract with the Company, again leaving the Company without a classification society.  The Company believes that DNV/GL cancelled the contract because it did not have the resources within the U.S. to service the Company's Vessels.

47.     To restore regulatory compliance, the Company intends to use the breathing space provided by chapter 11 and the liquidity from the DIP financing to prepare a plan of action to deal with any major and/or minor deficiencies that currently may exist in respect to its operated Vessels and the governing ISM Code.  As part of the plan, the Company will examine its compliance program and, if necessary, strengthen such areas as reporting, training, inspections, oversight, ISM compliance, and overall compliance with rules and regulations relating to environmental and operational issues.  Once the DIP Facility is in place, the Company will hire (and/or rehire) experienced personnel in tugs and barge operations and ISM compliance—including record keeping and training—to assist in preparing the plan of action, including any revisions that may be required in the safety management system, and to oversee that such plan is implemented and adhered to on a go-forward basis.  Further, the Company intends to hire a classification society as soon as practicable.  The Company will work constructively with the classification society to satisfy the safety management audit required by 33 C.F.R. § 96.330 and regain its DOC.

**B.     Maritime Liens.**

48.     The loss of the Company's DOC certification also led to severe liquidity constraints, which impaired the Company's ability to fulfill all monetary obligations to its trade vendors.  As of the Petition Date, various vendor parties have asserted maritime lien claims against the Debtors' assets, including more than $10 million in recorded maritime claims.  Certain of these vendors have also asserted more than $6 million of asserted *custodia legis* expenses.

49.     A number of the Company's trade vendors that asserted maritime liens against Vessels initiated self-help collection proceedings.  Two Vessels were arrested in federal district court and subject to interlocutory sales scheduled to take place on September 29, 2020, precipitating the urgency of the Company's decision to seek the protections of chapter 11.  Two other Vessels were scheduled for interlocutory sales on November 9, 2020.  Accordingly, the

Company proactively commenced these chapter 11 cases, in part, to stay the value-destructive and uncoordinated sale of its core assets and obtain a breathing spell from further collection actions while the Company undertakes comprehensive restructuring and operational restart initiatives.

### C.   Prepetition Efforts to Increase Liquidity.

50.     Prior to the commencement of these chapter 11 cases, the Company took proactive steps to attempt to increase liquidity. The Company searched extensively for further debt financing as its liquidity profile further deteriorated in early 2020. For example, the Company proactively engaged its prepetition lender, Wells Fargo, to provide the Company with sufficient liquidity to pay its debt obligations to its employees and trade vendors. Wells Fargo was unwilling to lend further. The Company engaged with at least twelve other commercial and investment banks as potential lenders to seek financing that would allow the Company to pay its employees' wages and satisfy maritime liens. None of these lenders, however, would provide financing outside of an in-court process.

51.     In February 2020, the Company engaged in extensive negotiations with Fortress to raise capital through refinancing of the Company's aircraft, a Gulfstream Aerospace Corporation model GVI (G650). Those efforts led to a new $25 million facility being funded in March 2020 that provided incremental capital for, among other things, paying all outstanding employee back-pay, paying certain hull insurance premiums, P&I insurance instalment payments, and ultimately secure a temporary 90-day DOC to restart operations.

52.     In late February 2020, the Company entered into a purchase agreement for the sale of two, 35,000 BBL barges for approximately $12 million. Despite the Company's offer to lower the price of the barges, however, the asset sale ultimately failed to close due to changed circumstances caused by the COVID-19 global pandemic. On March 14, 2020, the Company consummated a sale of tug Captain Fred Bouchard. The tug Captain Fred Bouchard sale generated

net proceeds of approximately $1 million, approximately all of which was used to pay employee wages and benefits obligations.

53.     Additionally, from March through September 2020, the Bouchard family loaned the Company an incremental $8.2 million that enabled the Company to, among other things, pay all outstanding back-pay to its dedicated employees, pay off various maritime liens that allowed it to retake possession of certain Vessels, and secure a temporary 90-day DOC to restart operations. In total, the Bouchard family loaned the Company approximately $10.1 million in 2020.  After the expiration of the temporary DOC, however, the Company's inability to generate revenue exacerbated a liquidity crisis that functionally halted substantially all operations in Q3 2020.

54.     On September 6, 2020, the Company entered into a purchase agreement for the sale of tug Evening Mist for approximately $400,000.  Although the requisite survey was complete and the asset purchase agreement had been signed by the parties, the prospective buyer never signed the escrow agreement and eventually backed out of the transaction.

55.     Immediately prior to the Petition Date, the Company undertook a process to market and sell the Company Aircraft.  The Company received initial indications of interest of more than $40 million, well in excess of the obligations outstanding in respect of the Fortress Aircraft Loan. The Company was unable, however, to consummate a transaction in advance of the maritime lienholder foreclosure sales or the commencement of these chapter 11 cases.  Nevertheless, the Company continues to market the Company Aircraft and intends to seek appropriate relief under section 363 of the Bankruptcy Code if and when it secures commitments for a value-maximizing transaction.

56.     Further, immediately prior to the Petition Date, the Company engaged in extensive negotiations with its secured lenders regarding an out-of-court financing arrangement that would

provide the Company with liquidity in the near term to satisfy maritime lien obligations and undertake key restructuring initiatives.  No party was willing to provide new money on an out-of-court basis.  Accordingly, the Company commenced these chapter 11 cases, in part, to access necessary near-term liquidity through potential DIP financing—liquidity that the Company otherwise would have been unable to attain.

### D. Hiring of Restructuring Professionals.

57.     On September 22, 2020, the Debtors engaged Jefferies LLC ("Jefferies") as their investment banker.  On September 24, 2020, the Debtors engaged Portage Point Partners LLC ("Portage Point") as their financial and restructuring advisor.  And on September 28, 2020, the Debtors engaged Kirkland & Ellis LLP ("Kirkland & Ellis") as restructuring counsel.  Since that time, the Debtors' professionals have worked diligently with the Company and its key stakeholders in relation to these chapter 11 cases, DIP financing, and a value-maximizing operational turnaround.

58.     For example, during the prepetition and postpetition periods, professionals from Portage Point have been on-site at the Company to initiate a comprehensive review and analysis of the Company's books and records to, among other things, assist in the preparation of "first day" motions.  Meanwhile, Kirkland & Ellis engaged various stakeholders, including the secured lenders, maritime lienholders, and the Coast Guard regarding operational matters and the path forward for these chapter 11 cases.  Jefferies solicited proposals from parties inside and outside of the existing capital structure—ultimately engaging with 18 banks, credit funds, and other interested parties—regarding postpetition financing.   Additionally, the Debtors' primary prepetition maritime counsel, Chalos & Co. P.C., assisted Portage Point, Jefferies, and Kirkland & Ellis in navigating various maritime matters.  Each of Portage Point, Kirkland & Ellis, Chalos & Co., and Jefferies have been actively involved in the preparation of customary "first day" relief to

help the Company transition into chapter 11 and launch its operational restructuring initiatives as seamlessly as possible.

### E.     Recent Postpetition Developments.

59.     The Debtors' efforts in the first weeks of these chapter 11 cases have already resulted in positive operational developments.  For example, following an inspection of the tug Frederick E. Bouchard on September 28, 2020, the Coast Guard determined that the restoration of safe levels of fuel and stores, as well as the Debtors commitment to maintain a minimum fuel level of 15%, provide sufficient food store every fifteen days, and conduct crew reliefs in accordance with the Debtor's policy, warranted that the Coast Guard rescind COPT Order 693-20 on October 7, 2020.   By rescinding the COPT Order 693-20, the Coast Guard acknowledged that tug Frederick E. Bouchard and B. No. 220 no longer posed a safety or environmental pollution threat to the port and was thus in compliance with applicable regulations.

60.     The filing of these chapter 11 cases has also brought much-needed order to the disparate legal proceedings pending against certain of the Debtors and Vessels.  For example, the interlocutory sale of the Tug Bouchard Girls and the Barge B. No 295, set for September 29, 2020, was canceled.  Another case pending in the Eastern District of Louisiana was administratively closed.  In still more cases pending across multiple jurisdictions, proceedings have been stayed and a motion for default judgment against the Debtors has been denied.  As a result, claims against the Debtors will be able to be fairly and equitably administered in the bankruptcy court.

## IV.    DIP Financing.

61.     The Debtors engaged their prepetition lenders prior to and immediately following the Petition Date regarding potential DIP financing.  While the Debtors continue to canvass the market for potential DIP financing, the Debtors hope to unlock incremental liquidity in the interim via consummation of a sale of the Company Aircraft collateralizing the Aircraft Loan.

62.     As of the commencement of the chapter 11 cases, the Company has limited liquidity and, aside from the proposed sale of the aircraft and any eventual DIP financing, no additional sources of liquidity.  Without access to DIP financing to fund these chapter 11 cases, the Debtors will be unable to make critical past due obligations and cover their capital expenditures and operating expenses in the ordinary course of business—including most critically the investment required to obtain Coast Guard certification necessary to operate their businesses—let alone fund the projected costs of these cases.  Accordingly, the Company hopes to secure a commitment for DIP financing in the near term and expects to seek approval of such DIP financing and use of cash collateral (the "Cash Collateral") shortly thereafter.

63.     The Debtors believe that, once a commitment to provide DIP financing is secured, immediate access to such DIP financing and Cash Collateral will be essential for at least three reasons.  *First*, the Debtors believe that a significant injection of liquidity is essential to give the Debtors time to undertake certain key operational initiatives to ensure their fleet is in full compliance with all operating regulations, which includes hiring or rehiring necessary personnel to oversee compliance and otherwise exceed safety standards and emerge as a stronger enterprise. DIP financing and use of Cash Collateral will further unlock the value of the Debtors' assets and position the Debtors for success within and beyond these chapter 11 cases.  *Second*, the Debtors do not expect to be able to generate sufficient levels of cash flow to cover their operating needs and the projected costs of these chapter 11 cases because they are not presently operational and serving customers.  And *third*, access to DIP financing will send a clear signal to the market, the Debtors' customers and vendors, and the Debtors' former and future employees that the Debtors' operations can and will resume on a business-as-usual basis.

64.     The Company will use the proceeds of any DIP financing, if approved, to, among other things, pay former employee wages and benefits, pay undisputed trade and maritime lienholder claims, hire new or rehire former employees, procure goods and services, fund general and corporate operating needs, and fund the administration of these chapter 11 cases.   The Company believes that its ability to continue making such payments during these chapter 11 cases is essential to the its continued operation and the preservation of its assets during its stay in chapter 11.   Moreover, the Company and its stakeholders will suffer immediate and irreparable harm if not permitted to access DIP financing.

**V.     Evidentiary Support for First Day Motions.**

65.     On the Petition Date, the Debtors filed the following First Day Motions, seeking orders granting various forms of relief intended facilitate the efficient administration of these chapter 11 cases:

- "<u>First Joint Administration Motion</u>":  *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief.*

- "<u>Second Joint Administration Motion</u>":  *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief.*

- "<u>Creditor Matrix Motion</u>":  *Debtors' <u>Emergency</u> Motion for Entry of an Order (A) Authorizing the Debtors to (I) File a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, and (II) Redact Certain Personal Identification Information and (B) Granting Related Relief.*

- "<u>SOFAs and Schedules Extension Motion</u>":  *Debtors' <u>Emergency</u> Motion for Entry of an Order (A) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (B) Granting Related Relief.*

66.     Shortly following the date hereof, the Debtors intend to file additional First Day Motions, seeking orders granting various forms of relief intended to stabilize the Debtors' business

operations, facilitate the efficient administration of these chapter 11 cases, and expedite the restructuring of Debtors' operations and balance sheet, including the following:

- "Claims and Noticing Agent Retention Application": *Debtors' Emergency Application for Entry of an Order (A) Authorizing the Retention and Appointment of Stretto as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date and (B) Granting Related Relief.*

- "Cash Management Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (II) Maintain Existing Books and Records, and (III) Continue to Perform Intercompany Transactions and (B) Granting Related Relief.*

- "DIP Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief.*

- "Wages Motion": *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs and (B) Granting Related Relief.*

- "Comprehensive Vendors Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (A)(I) Authorizing the Debtors to Pay Certain Prepetition Claims of Trade Claimants, (II) Confirming the Procedures Related Thereto, and (III) Granting Administrative Priority for Outstanding Orders, and (B) Granting Related Relief.*

- "Insurance Motion": *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (B) Granting Related Relief.*

- "Utilities Motion": *Debtors' Emergency Motion for Entry of an Order (A) (I) Approving the Debtors' Proposed Adequate Assurance of Payment For Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing,*

*or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests and (B) Granting Related Relief.*

- "<u>Taxes Motion</u>":   *Debtors' <u>Emergency</u> Motion for Entry of an Order (A) Authorizing the Payment of Certain Taxes and Fees and (B) Granting Related Relief.*

67.     I have reviewed and am familiar with the content of each of the First Day Motions, and I have consulted with the Debtors' advisors regarding and understand each of the First Day Motions and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

68.     Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

69.     I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximum value preservation during the pendency of these chapter 11 cases.  Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtors, their businesses, and their estates. Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  October 12, 2020                    /s/ *Matthew Ray*
          Houston, Texas                    Matthew Ray
                                        Proposed Chief Restructuring Officer

## Exhibit A

### Corporate Structure



## BOUCHARD TRANSPORTATION CO., INC.

| BARGES (25) | TUGS (26) |
|---|---|
| B NO. 205 CORPORATION | TUG EVENING TIDE CORP. |
| B NO. 210  CORPORATION | TUG EVENING LIGHT CORP. |
| B NO. 215 CORPORATION | TUG BOUCHARD BOYS CORP. |
| B NO. 220 CORPORATION | TUG BUSTER BOUCHARD CORP. |
| B NO. 225 CORPORATION | TUG MARION C. BOUCHARD CORP. |
| B NO. 230 CORPORATION | TUG CAPTAIN FRED BOUCHARD INC. |
| B NO. 231 CORPORATION | TUG ELLEN S. BOUCHARD CORP. |
| B NO. 233 CORPORATION | TUG RHEA I. BOUCHARD CORP. |
| B NO. 235 CORPORATION | TUG RALPH E BOUCHARD CORP. |
| B NO. 240 CORPORATION | TUG BOUCHARD GIRLS CORP. |
| B NO. 242 CORPORATION | TUG EVENING MIST CORP. |
| B NO. 245 CORPORATION | TUG BARBARA E. BOUCHARD CORP. |
| B NO. 250 CORPORATION | TUG EVENING STAR CORP. |
| B NO. 252 CORPORATION | TUG BRENDAN J. BOUCHARD CORPORATION |
| B NO. 260 CORPORATION | TUG DANIELLE M. BOUCHARD CORPORATION |
| B NO. 262 CORPORATION | TUG J. GEORGE BETZ CORPORATION |
| B NO. 264 CORPORATION | TUG ROBERT J. BOUCHARD CORPORATION |
| B NO. 265 CORPORATION | TUG JANE A. BOUCHARD CORPORATION |
| B NO. 270 CORPORATION | TUG MORTON S. BOUCHARD IV CORPORATION |
| B NO. 272 CORP. | TUG LINDA LEE BOUCHARD CORPORATION |
| B NO. 280 CORPORATION | TUG DENISE A. BOUCHARD CORP. |
| B NO. 282 CORPORATION | TUG KIM M. BOUCHARD CORP. |
| B NO. 284 CORPORATION | TUG DONNA J. BOUCHARD CORP. |
| B NO. 285 CORPORATION | TUG MORTON S. BOUCHARD JR. CORP. |
| B NO. 295 CORPORATION | TUG FREDERICK E. BOUCHARD CORP. |
| | TUG EVENING BREEZE CORP. |