## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| BOUCHARD TRANSPORTATION CO., INC., *et al.*,[1] | ) | Case No. 20-34682 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY
## MOTION FOR ENTRY OF INTERIM AND
## FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO
## OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE
## DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS
## AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
## EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE
## PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,
## (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF

**Emergency relief has been requested. A hearing will be conducted on this matter on October 22, 2020 at 9:30 a.m. (Central Time) in Courtroom 400, 4th Floor, 515 Rusk Avenue, Houston, TX 77002. You may participate in the hearing either in person or by audio/video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long-distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691.**

**You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "judgejones" in the GoToMeeting app or click the link on Judge Jones's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/bouchard. The location of the Debtors' service address is: 58 South Service Road, Suite 150, Melville, NY 11747.

> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **Relief is requested not later than October 22, 2020.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully state as follows in support of this motion (this "<u>Motion</u>"):[2]

## **Preliminary Statement**

1.      The Debtors commenced these chapter 11 cases to, among other things, raise necessary capital to fund their operational restructuring initiatives and breathe new life into the business.  Absent such new money, the Debtors have been unable to sustain even idle operations or otherwise satisfy payment obligations to crewmembers, suppliers, trade vendors, and other core business partners—let alone maintain core certifications necessary to service major customers— on a prepetition basis.  The Debtors hired Jefferies LLC ("<u>Jefferies</u>") to conduct a robust, competitive marketing process to raise such DIP financing on the best available terms in these chapter 11 cases.

2.      Over the past month, Jefferies engaged at least eighteen financial and strategic parties in interest, both inside and outside the capital structure, regarding potential DIP financing. Eight parties signed non-disclosure agreements.  Two parties submitted term sheet proposals.  The Debtors worked closely with both parties that submitted proposals to improve upon the economic and legal terms for the benefit of the Debtors and their estates.  Those negotiations culminated with the proposed twelve-month, $60 million financing (the "<u>DIP Facility</u>" and the loans thereunder, the "<u>DIP Loans</u>"), approximately $29 million of which will be made available on an

---

[2]      Capitalized terms used but not immediately defined have the meanings given to them elsewhere in this Motion or in the First Day Declaration or the Interim DIP Order (each as defined herein), as applicable.

interim basis on the terms set forth in **Exhibit A** attached hereto (the "DIP Term Sheet").  The proposed DIP Facility represents the best available financing at this time for the Debtors to source essential liquidity that will fund these chapter 11 cases, provide adequate runway to undertake their operational restructuring initiatives, and otherwise help unlock the value of the business—including the Debtors' fleet of 50 vessels, the majority of which are outside the prepetition secured lenders' collateral package—for the benefit of all stakeholders.  The DIP Facility is primarily secured by a first lien on 9 vessels that are unencumbered by funded debt.

3.     As set forth in the First Day Declaration, the Debtors' goal is to pay creditors in full in cash on account of allowed claims.  The Debtors require immediate access to new capital to re-start the business.  Such timing considerations necessitate a DIP lender willing to move quickly and commit to funding the interim draw, on a term-sheet-only basis.  No party has offered committed postpetition financing on better terms than the DIP Term Sheet.  The Debtors, together with Jefferies and their other advisors, will nonetheless continue to market test the DIP Facility after the interim hearing to ensure they have obtained the most competitive financing terms available.

4.     Meanwhile, the Debtors and their advisors engaged with their prepetition secured lenders—each of which is materially oversecured—regarding an appropriate adequate protection package.  By this Motion, the Debtors also seek authority to grant the proposed adequate protection package, which is reasonable and appropriate under the circumstances of these chapter 11 cases.

5.     It is critical that the Debtors obtain immediate approval of the DIP Facility and continued access to cash collateral.  First, approval of the DIP Facility will inject much-needed liquidity into the business and send a crucial signal to the Debtors' employees, vendors, suppliers, customers, and regulators.  The Debtors intend, and will have the ability, to satisfy past due

obligations to employees, pay certain undisputed maritime lienholder claims, and begin the process of returning to ordinary course operations, among other priority items in these chapter 11 cases. Second, without authority to use Cash Collateral, the Debtors could face additional operational and liquidity challenges at a time when the focus should be on their operational turnaround early in these cases. Third, immediate access to the Initial Draw of the DIP Facility will facilitate the Debtors' expeditious return to ordinary course operations. As detailed in the Morgner Declaration, the proposed DIP Facility represents the best and most feasible currently available source of financing for the Debtors under the circumstances.

6.      For the reasons set forth herein, in the Morgner Declaration, and in the First Day Declaration, approval of the DIP Facility will maximize the value of the Debtors' estates for the benefit of all the Debtors' stakeholders and is a sound exercise of the Debtors' business judgment. Accordingly, the Debtors respectfully request that the Court grant the Motion.

### Jurisdiction and Venue

7.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rule(s) 2002 and 4001, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules").

**Background**

10.     The Debtors comprise one of the nation's largest independently-owned ocean-going petroleum barge companies.  Since their establishment over 100 years ago, the Debtors have expanded their fleet to encompass 25 barges and 25 tugs, all with state-of-the-art equipment and fuel-efficient technologies.  Headquartered in Melville, New York, the Debtors provide extensive oil and petroleum product transportation along the Eastern Seaboard and Gulf Coast of the United States.

11.     On September 28, 2020 and September 29, 2020 (as applicable to each Debtor, the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Matthew Ray of Portage Point Partners, LLC in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 79] (the "First Day Declaration"), filed on October 12, 2020.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On September 30, 2020, the Court entered orders [Docket Nos. 30, 31] authorizing procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

12.     The Debtors also respectfully submit the *Declaration of Richard W. Morgner in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the*

5

*Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "Morgner

Declaration"), attached hereto as **Exhibit B**.

**Relief Requested**

13.     The Debtors seek entry of an interim order, substantially in the form attached hereto

(the "Interim DIP Order") and a final order (the "Final DIP Order," and, together with the Interim

DIP Order, the "DIP Orders"):

| DIP Facility Terms | Relief Requested |
|---|---|
| **DIP Facility** | Authorizing the Debtors to enter into a $60 million DIP Facility, pursuant to the terms and conditions of that certain DIP Term Sheet consisting of: <br><br> (a)  an initial draw of $28.8 million (the "Initial DIP Draw") in new money financing upon receipt of interim approval from the Bankruptcy Court; and <br><br> (b)  one or more draws of up to $31.2 million (the "Final DIP Draw") which shall be subject to (x) the execution of the DIP Documents (as defined herein) and (y) the receipt or satisfaction of: (i) entry of the Final DIP Order (acceptable to the DIP Lenders in all respects), (ii) a business plan and the Budget (as defined herein) (acceptable to the DIP Lenders in all respects) providing for the licensing and operation of the Debtors' vessels during such 13-week period, and (iii) other conditions set forth and as agreed in the DIP Credit Agreement (as defined herein). |
| **DIP Documents** | Authorizing the Debtors to (i) enter into the DIP Term Sheet, substantially in the form attached hereto as **Exhibit A** (as the same may be amended, restated, supplemented, or otherwise modified from time to time) and (ii) negotiate, execute, and deliver a credit agreement in respect of the DIP Facility that is consistent in all respects with the DIP Term Sheet and otherwise acceptable to the DIP Secured Parties (as defined herein) (such credit agreement, as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), and any other agreements, instruments, collateral agreements, pledge agreements, guarantees, security agreements, mortgages, control agreements, notes and other documents related thereto (as amended, restated, supplemented, waived or modified from time to time) (all of the foregoing, together with the DIP Credit Agreement, the Interim DIP Order, the Final DIP Order and the DIP Term Sheet, collectively, the "DIP Documents") and all of the Debtors' secured obligations arising thereunder (the "DIP Obligations"). |
| **Cash Collateral** | Authorizing the Debtors to continue to use, as defined by section 363(a) of the Bankruptcy Code, Cash Collateral, subject to the restrictions set forth in the DIP Documents and the DIP Orders, and the granting of adequate protection to Wells Fargo Bank, N.A. ("Wells Fargo") and Fortress Credit Co LLC ("Fortress") (together with the Aircraft Lenders (as defined in the Interim DIP Order), the "Aircraft Secured Parties" and collectively with Wells Fargo, the "Prepetition Secured Parties"). |

| Intercompany Loan | Authorizing: |
|---|---|
| | (a) Bouchard Transportation Co., Inc. ("BTC") to incur, and the Borrowers (as defined herein) to use the proceeds of the DIP Facility to fund, an intercompany loan to BTC (the "BTC Loan"), which shall be an allowed superpriority claim of the Borrowers against BTC; and |
| | (b) the Borrowers to direct the proceeds of the DIP Facility to be funded directly to a deposit account of BTC for purposes of funding such BTC Loan. |
| Security and Priority | Authorizing the Debtors to grant, subject to the Carve Out, liens and superpriority administrative expense status to the DIP Agent (as defined herein), for themselves and for and on behalf of the DIP Lenders (as defined herein), including: |
| | (a) Liens on Unencumbered Property: a perfected first priority security interest in and lien upon (a) the barges and tugs identified on **Annex A** of the DIP Term Sheet (the "Specified Vessels"), (b) subject to and effective only upon entry of the Final DIP Order, all proceeds of claims and causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions"), (c) the BTC Loan, and (d) all proceeds and products of each of the foregoing that are not subject to liens that were existing, valid, enforceable, properly perfected and non-avoidable as of the Petition Date (collectively, the "DIP Collateral"); |
| | (b) BTC Loan Superpriority Claim: super-priority administrative expense claim of the Borrowers against BTC, subject only to the Carve Out and the Adequate Protection Obligations (as defined in the Interim DIP Order); and |
| | (c) DIP Superpriority Claims: super-priority administrative expense claims against each of the DIP Obligors (as defined herein). |
| Adequate Protection | Authorizing the Debtors to grant adequate protection to the Prepetition Secured Parties as follows: |
| | **Fortress Adequate Protection** |
| | (a) valid, binding, continuing, enforceable, fully-perfected, and non-avoidable replacement liens on and security interests in and on all Aircraft Collateral (the "Fortress Replacement Liens") solely as and to the extent necessary to adequately protect Fortress from any diminution in the value of its interests in the Aircraft Collateral as a result of the entry of the Interim DIP Order, the use of Cash Collateral authorized thereby, and the imposition of the automatic stay in the Chapter 11 Cases. Notwithstanding anything to the contrary, the Fortress Replacement Liens shall not attach to the Specified Vessel Collateral or the Avoidance Action Proceeds (each as defined in the Interim DIP Order). The Fortress Replacement Liens shall be subject only to (i) valid, binding, enforceable, perfected, and non-avoidable liens on and security interests in such property or assets existing as of the Petition Date or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, and (ii) the Carve Out; |
| | (b) to the extent the Fortress Replacement Liens granted to Fortress do not provide Fortress with adequate protection of its interests in the Aircraft Collateral, Fortress shall have a super-priority administrative expense claim under section 507(b) of the Bankruptcy Code solely as and to the extent necessary to fully compensate Fortress for any diminution in the value of the Aircraft Collateral occurring as a result of the entry of the Interim DIP Order, the use of Cash Collateral authorized thereby, and the imposition of |

the automatic stay in these chapter 11 cases (the "Fortress Superpriority Claim"), *provided* that the Fortress Superpriority Claim shall be shall be pari passu with the DIP Superpriority Claim and subject and subordinate to the Carve Out;

(c) as additional adequate protection, Fortress shall receive from the Debtors cash payment of all interest accrued on or after the Petition Date under, and at the non-default rates provided for in, the Loan and Aircraft Security Agreement (as defined in the Interim DIP Order), as and when due;

(d) the Debtors shall reimburse Fortress for the Aircraft Insurance Advance (as defined in the Interim DIP Order) immediately upon receiving the proceeds of the Initial DIP Draw (or as soon as reasonably practicable thereafter);

(e) the Debtors shall comply with all reasonable diligence requests from Fortress or its representatives with respect to the Aircraft Collateral; and

(f) as additional adequate protection, the Debtors are authorized and directed to pay all reasonable and documented fees (*provided*, *however*, that such documentation may be abridged for attorney-client privilege and related issues), costs, and expenses for the professionals of Fortress incurred in connection with these chapter 11 cases (whether incurred before or after the Petition Date). The use of Cash Collateral to make such adequate protection payments for the fees, costs, and expense of the professionals for Fortress shall not constitute a diminution in the value of the Aircraft Collateral giving rise to any additional adequate protection obligation.

**Wells Fargo Adequate Protection**

(a) valid, binding, continuing, enforceable, fully-perfected, and non-avoidable replacement liens on and security interests in and on all property and assets of each Prepetition Guarantor (as defined in the Interim DIP Order) and their respective estates, including property and assets acquired by such Debtors and their respective estates after the Petition Date, except for causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds thereof (collectively, the "Wells Fargo Replacement Liens"), solely as and to the extent necessary to adequately protect Wells Fargo from any diminution in the value of its interests in the Wells Fargo Collateral as a result of entry of the Interim DIP Order, the use of Wells Fargo Cash Collateral authorized thereby, and the imposition of the automatic stay in these Chapter 11 Cases. Notwithstanding anything to the contrary, the Wells Fargo Replacement Liens shall not attach to the Specified Vessel Collateral or the Avoidance Action Proceeds. The Wells Fargo Replacement Liens shall be subject only to (i) valid, binding, enforceable, perfected, and non-avoidable liens on and security interests in such property or assets existing as of the Petition Date or perfected after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code, and (ii) the Carve Out;

(b) to the extent the Wells Fargo Replacement Liens do not provide Wells Fargo with adequate protection of its interests in the Wells Fargo Collateral (as defined in the Interim DIP Order), Wells Fargo shall have a super-priority administrative expense claim under section 507(b) of the Bankruptcy Code as necessary to fully compensate Wells Fargo for any diminution in the value of the Wells Fargo Collateral occurring as a result of the entry of the Interim DIP Order, the use of Cash Collateral authorized thereby, and the imposition of the automatic stay in these chapter 11 cases (the "Wells Fargo

| | | |
|---|---|---|
| | | Superpriority Claim"), *provided* that the Wells Fargo Superiority Claim shall be pari passu with the DIP Superpriority Claim and subject and subordinate to the Carve-Out; |
| | (c) | as additional adequate protection, Wells Fargo shall have an administrative expense claim under section 503(b) of the Bankruptcy Code to the extent of the payment by Wells Fargo of (such administrative claim, the "Wells Fargo Administrative Claim"): (i) any Insurance Premiums; (ii) any Substitute Custodianship Expenses; and (iii) any other Maintenance Expenses, *provided* that such other Maintenance Expenses under this clause (iii) shall not be included in the Wells Fargo Adequate Protection Claim unless Wells Fargo provided written notice of such other Maintenance Expenses to the Debtors and the Debtors failed to object to the inclusion of such other Maintenance Expenses in the Wells Fargo Adequate Protection Claim within one (1) Business Day following receipt of such written notice. The Wells Fargo Administrative Claim shall be due and payable in full immediately upon the earlier to occur of (i) the initial draw of the DIP Facility and (ii) the Wells Fargo Termination Date (as defined in the Interim DIP Order); |
| | (d) | as additional adequate protection, Wells Fargo shall receive from the Debtors cash payment of all interest accrued on or after the Petition Date under, and at the non-default rates provided for in, the Wells Fargo Loan Documents (as defined in the Interim DIP Order), as and when due; and |
| | (e) | as additional adequate protection, the Debtors are authorized and directed to pay all reasonable and documented fees (*provided*, *however*, that such documentation may be abridged for attorney-client privilege and related issues), costs, and expenses for the professionals of Wells Fargo incurred in connection with these chapter 11 cases (whether incurred before or after the Petition Date). The use of Cash Collateral to make such adequate protection payments for the fees, costs, and expense of the professionals for Wells Fargo shall not constitute a diminution in the value of Wells Fargo's interests in the Wells Fargo Collateral giving rise to any additional adequate protection obligation. |
| **Automatic Stay** | | Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and conditions of the DIP Orders. |
| **Final Hearing** | | Scheduling a final hearing to consider entry of the Final DIP Order. |

### Concise Statement Pursuant to
### Bankruptcy Rule 4001 and the United States Bankruptcy
### Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases

14.     The following chart contains a summary of the material terms of the proposed

DIP Facility, together with references to the applicable sections of the relevant source documents,

as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the *Procedures for*

*Complex Chapter 11 Cases in the Southern District of Texas* (the "Complex Case Procedures").[3]

Ahead of the hearing to approve the DIP Facility, the Debtors will file an updated chart and concise

statement with cross-references to the applicable provisions of the DIP Order, if needed.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| **Parties to the DIP Credit Agreement** Bankruptcy Rule 4001(c)(1)(B) | **Borrowers**: B. No. 272 Corp., B. No. 205 Corp., B. No. 284 Corp., B. No. 282 Corp., Tug Donna J. Bouchard Corp., Tug Morton S. Bouchard Corp., Tug Frederick E. Bouchard Corp., Tug Linda Lee Bouchard Corp., and Tug Denise A. Bouchard Corp., as co-borrowers (collectively, the "Borrowers").<br><br>**Guarantors**: Each of Borrowers' affiliated debtors other than BTC (collectively with the Borrowers, the "DIP Obligors").<br><br>**DIP Agent**: A DIP Lender or other entity reasonably satisfactory to the DIP Lenders and Borrowers. The initial DIP Agent is Hartree Partners, LP.<br><br>**DIP Lenders**: Hartree Partners, LP ("Hartree") (and/or one or more of its designated affiliates and/or related funds) (individually or collectively, the "DIP Lenders" and together with the DIP Agent, the "DIP Secured Parties"). The sole initial DIP Lender is Hartree.<br><br>*See* Interim DIP Order, Preamble |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The maturity date with respect to the DIP Facility (the "Termination Date") shall be 12 months, with a 6 month extension at the DIP Lenders' sole discretion.<br><br>*See* DIP Term Sheet, p. 1 |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) | (a) $60 million superpriority senior secured term loan, consisting of<br><br>    (i) Initial DIP Draw: $28.8 million to be available (the "Interim Availability") upon receipt of interim approval from the Bankruptcy Court; and<br><br>    (ii) Final DIP Draw: one or more draws of up to $31.2 million which shall be available (the "Full Availability") subject to (x) the execution of the DIP Documents and (y) the receipt or satisfaction of: (i) entry of the Final DIP Order (acceptable to the DIP Lenders in all respects), (ii) a business plan and the Budget (acceptable to the DIP Lenders in all respects) providing for the licensing and operation of the Debtors' vessels during such 13-week period, and (iii) other conditions set forth and as agreed in the DIP Credit Agreement.<br><br>*See* Interim DIP Order, Preamble; DIP Term Sheet, p. 1 |
| **Conditions of Borrowing** | The DIP Orders and DIP Documents include standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Lender to provide the DIP Facility. |

---

[3]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim DIP Order, as applicable.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | *See* DIP Term Sheet, p. 2 |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility shall bear interest at a rate *per annum* calculated as follows: (a) LIBOR + 7% (with LIBOR to be determined by the DIP Lenders) subject to a 1% LIBOR floor, compounded monthly and payable monthly in kind. *See* DIP Term Sheet, p. 3 |
| **Use of DIP Facility and Cash Collateral** **Bankruptcy Rule 4001(b)(l)(B)(ii)** | The proceeds of the DIP Facility will be used only (a) for disbursements expressly permitted in the Sources and Uses (as defined herein) with respect to the Initial DIP Draw and Interim Availability, and the then-approved Budget with respect to the Final DIP Draw and Full Availability, subject in each case to the DIP Orders and the DIP Documents and (b) for such other purposes as are consented to in advance in writing by the DIP Lenders. *See* Interim DIP Order ¶ 9; DIP Term Sheet, p. 3 |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | The following secured parties have an interest in certain Cash Collateral: (a) Wells Fargo; and (b) Fortress *See* Interim DIP Order, ¶ F(x), F(xiii). |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | Structuring Fee: 1% of the aggregate principal amount of the DIP Commitments, payable in kind at the closing. Original Issue Discount: 5% of the aggregate principal amount of the DIP Commitments, structured as an original issue discount of the DIP Loans and payable in kind on each draw date. Exit Fee: $3 million, payable upon repayment in full of the DIP Loans, subject to a rebate to be agreed upon if the DIP Lenders provide exit financing. *See* Interim DIP Order, ¶ 2; DIP Term Sheet, p. 3 |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) | The use of cash and cash proceeds from the DIP Facility is subject to a budget, which the Borrowers shall prepare in a form acceptable to the DIP Lenders in all respects and shall be delivered, with a business plan, to the DIP Lenders and their advisors prior to the Final DIP Draw.  Prior to the Initial DIP Draw, the Debtors shall deliver to the DIP Lenders an initial list of sources and uses (the "Sources and Uses") and attached to the DIP Term Sheet as **Annex B**. The Debtors will use proceeds from the DIP Facility consistent with (a) following the Initial Draw during the Interim Availability, the Sources and Uses, and (b) from and after the Final DIP Draw and Full Availability, the Budget, in each case subject to Permitted Deviations (as defined in the Interim DIP Order).  The Debtors shall provide the DIP Lenders with a heightened reporting package customary for DIP facilities of this kind, with due regard to the Debtors' industry acceptable to the DIP Lenders. *See* Interim DIP Order, ¶ 9; DIP Term Sheet, p. 2 |
| **Chapter 11 Milestones** | The Debtors shall implement the restructuring transactions in accordance with the following milestones: |

11

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | (a) no later than October 21, 2020, the motion and proposed form of Interim DIP Order shall be filed;<br><br>(b) no later than 5 business days after the filing of the Motion and proposed form of Interim DIP Order, the Bankruptcy Court shall have entered the Interim DIP Order;<br><br>(c) no later than November 30, 2020, (i) each Specified Vessel shall be secured by first lien mortgages in form and substance satisfactory to the DIP Lenders and (ii) the Borrowers and DIP Lenders shall enter into the DIP Credit Agreement;<br><br>(d) no later than 45 business days following entry of the Interim DIP Order, the Bankruptcy Court shall have entered the Final DIP Order; and<br><br>(e) such additional chapter 11 case milestones as may be required by the DIP Lenders and agreed by the Debtors shall be included in the Final DIP Order.<br><br>*See* DIP Term Sheet, p. 2 |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) | The liens contemplated by the DIP Term Sheet will follow the following priority until the Termination Date, in each case subject to the Carve Out in all respects: (a) first priority liens on the nine Specified Vessels, (b) subject to entry of the Final DIP Order, first priority liens on the proceeds of Avoidance Actions, (c) first priority liens on the BTC Loan; and (d) first priority liens on the proceeds of each of the foregoing.<br><br>*See* Interim DIP Order ¶ 8. |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders provide a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code.<br><br>*See* Interim DIP Order, ¶ 4. |
| **Challenge Period** Bankruptcy Rule 4001(c)(l)(B) | The Interim DIP Order provides for a standard and customary challenge period no later than:<br><br>(a) if a Creditors' Committee is not appointed, 75 days after entry of the Interim DIP Order;<br><br>(b) if a Creditors' Committee is appointed, 60 days after appointment of such Creditors' Committee; and<br><br>(c) any later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this provision.<br><br>*See* Interim DIP Order, ¶ 24. |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | The adequate protection provided to the Prepetition Secured Parties shall be in accordance with the Interim DIP Order, including the granting of replacement liens, superpriority claims, professional fee reimbursement, and current pay of postpetition interest at the non-default contract rate.<br><br>*See* Interim DIP Order, ¶ 16. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| **Events of Default** <br> Bankruptcy Rule 4001(c)(l)(B) | The Interim DIP Order contain events of default that are usual and customary for debtor-in-possession financings, including without limitation, the failure to timely comply with the milestones, entry of an order converting the Chapter 11 Cases to a Chapter 7, and an order appointing a chapter 11 trustee in the Chapter 11 Cases.. <br><br> *See* Interim DIP Order, ¶ 10. |
| **Waiver / Modification of the Automatic Stay** <br> Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim DIP Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim DIP Order. <br><br> *See* Interim DIP Order, ¶ 10, 16, 22. |

## Statement Regarding Significant Provisions

15. The Interim DIP Order contains certain of the provisions (the "Significant Provisions")[4] identified in section J, paragraph 27 of the Complex Case Procedures as detailed below:

   a. ***Liens on Proceeds of Avoidance Actions.***  Subject to entry of the Final DIP Order.

   b. ***Default Provisions and Remedies***.  Notwithstanding the automatic stay, the DIP Agent or the Required DIP Lenders are permitted to, immediately upon the occurrence and during the continuance of any Event of Default send written notice of an Event of Default to the Debtors, the U.S. Trustee, counsel for the Prepetition Secured Parties, and any statutory committee appointed in these cases.  Upon the delivery of such notice, the DIP Agent may (i) immediately terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (ii) declare all DIP Obligations to be immediately due and payable; (iii) invoke the right to charge interest at the default rate under the DIP Documents; and (iv) one business day after delivery of the notice of an Event of Default, foreclose on the BTC Loan (subject to any appropriate remedy the Court may fashion at the Stay Relief Hearing (as defined in the Interim DIP Order)).

   c. ***Release of Claims***.  Subject to the limitations set forth in paragraph 20 of the Interim DIP Order and entry of the Final DIP Order, the Debtors shall release claims

---

[4]   Significant Provisions refer to those provisions that contain:   (a) sale or plan confirmation milestones; (b) cross-collateralization; (c) roll ups; (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies; (f) releases of claims against lenders or others; (g) limitations on fees for advisors to official committees; (h) priming liens; or (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

existing prior to entry of the Interim DIP Order against the Prepetition Secured Parties related to the Prepetition Secured Claims, the Prepetition Liens, the Prepetition Loan Documents (each as defined in the Interim DIP Order) or any of the transactions contemplated thereby, or the relationship between BTC and the Prepetition Secured Guarantors, on the one hand, and the applicable Prepetition Secured Party, on the other hand.

d.  ***Limitations on Use of DIP Financing Proceeds and Collateral***.  As more fully set forth in the Interim DIP Order, the DIP Loans, the DIP Collateral, the Cash Collateral, and the Prepetition Collateral, as the case may be, may not be used by the Debtors, any committee (if appointed), or any trustee to, among other things:  (i) use or seek to use Cash Collateral other than as provided in the Interim DIP Order of the Final DIP Order, except as expressly  permitted by the terms of the DIP Documents, selling or otherwise disposing of DIP Collateral; (ii) seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens, the DIP Superpriority Claims, the Wells Fargo Liens, the Wells Fargo Replacement Liens, the Wells Fargo Superpriority Claim, or the Wells Fargo Administrative Claim, as applicable; or (iii) prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the DIP Secured Parties or Prepetition Secured Parties, as the case may be, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof).

16.     The DIP Facility is critical to the Debtors' plan to restart operations and essential to facilitating a successful restructuring.  In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the Interim DIP Order and the Final DIP Order should be approved.

<u>**The Debtors' Prepetition Capital Structure.**</u>

17.     As of the Petition Date, the Debtors have approximately $229.5 million in aggregate principal amount of funded debt obligations.

| Funded Debt | Agent / Lenders | Maturity | Principal Amount Outstanding (in USD millions) |
|---|---|---|---|
| Secured Debt | | | |
| Prepetition Revolving Credit Facility ($165 million) | Wells Fargo, N.A. | February 7, 2020 | $164.1 million |
| Prepetition Aircraft Loan ($25 million) | Fortress Credit Co LLC | March 10, 2021 | $25 million |
| *Total Secured Debt* | | | $189.1 million |
| Unsecured Bouchard Promissory Notes | | | |
| Unsecured Promissory Notes | Morton S. Bouchard III, and Morton S. Bouchard III 2017 Family Trust (Exempt Share) | December 31, 2025 | $40.4 million |
| *Total Unsecured Debt* | | | $40.4 million |
| *Total Outstanding Funded Debt* | | | **$229.5 million** |

### A.    Prepetition Revolving Credit Facility.

18.    On October 30, 2013, Bouchard entered into a $100 million revolving credit facility (the "Prepetition Revolving Credit Facility"), pursuant to the loan agreement by and among Bouchard, as borrower, and Wells Fargo Bank, National Association ("Wells Fargo"), as lender, as amended and supplemented from time to time (the "Wells Fargo Loan Agreement").  The parties agreed to increase the Prepetition Revolving Credit Facility size to $165,000,000 on February 4, 2015.  The Prepetition Revolving Credit Facility matured as of February 7, 2020.  It is guaranteed by certain of Bouchard's subsidiaries and secured by ship mortgages (the "Prepetition Guarantors").

19.    As of the date hereof, there is approximately $164.1 million in outstanding principal amount of borrowings under the Prepetition Revolving Credit Facility, in addition to approximately $6.9 million of accrued and unpaid interest.

15

**B.      Prepetition Aircraft Loan.**

20.     On March 10, 2020, Bouchard entered into a $25 million term loan (the "Aircraft Loan"), pursuant to the loan and aircraft security agreement by and among Bouchard, as borrower, a syndicate of lenders, and Fortress Credit Co LLC, as initial lender and agent (the "Loan and Aircraft Security Agreement").  The Aircraft Loan will mature on March 10, 2021.  The prepetition Aircraft Loan was made for the benefit of Bouchard in connection with the re-financing of a certain aircraft (the "Company Aircraft") and is secured by a lien on, among other things, the Company Aircraft and all of the other collateral described or referred to in the Loan and Aircraft Security Agreement or any of the other related loan documents, and all proceeds of the foregoing.  The proceeds of the Prepetition Aircraft Loan were used to, among other things, pay all outstanding employee back-pay, pay certain hull insurance premiums, pay P&I insurance installment obligations, and ultimately secure a temporary 90-day document of compliance certification to restart operations.

21.     As of the date hereof, there is $25 million in outstanding principal amount of borrowings under the Loan and Aircraft Security Agreement, in addition to approximately $258,333.33 million in unpaid, matured prepetition interest.

**C.      Unsecured Bouchard Promissory Notes.**

22.     From the first quarter of 2019 to the third quarter of 2020, the Bouchard family made a series of loans to the Debtors pursuant to unsecured promissory notes, approximately $40.4 million of which remains outstanding (the "Unsecured Bouchard Promissory Notes").  Each of the promissory notes has a scheduled maturity of December 31, 2025, and carries an interest rate equal to the applicable Federal rate for the month in which loans were advanced with a range of 0.35% to 2.63% per annum.

**The Debtors Have an Immediate Need for
Debtor-in-Possession Financing and Use of Cash Collateral.**

23.     In order to fund these chapter 11 cases and restart operations, the Debtors require immediate access to the DIP Facility and the continued use of Cash Collateral.  The Debtors' business is cash intensive, with significant costs required to fund projects and the Debtors' expansive operations, once resumed, and to satisfy obligations to vendors and employees.  As such, the Debtors will need immediate use of Cash Collateral and, more critically, access to the additional liquidity provided by the DIP Facility (through the new money financing provided upon entry of the DIP Orders) to, among other things, pay former employee wages and benefits, pay undisputed trade and maritime lienholder claims, hire new or rehire former employees, procure goods and services, fund general and corporate operating needs, and fund the administration of these chapter 11 cases.  *See* First Day Decl. ¶ 64.  The Debtors' ability to make such payments during these chapter 11 cases is essential to their operational restart and the preservation of their assets.  *See id*.  Accordingly, the proposed DIP Facility will provide much-needed stabilization to the Debtors' business operations and maximize the likelihood of the Debtors' ability to implement a comprehensive restructuring and revitalize their business.

**Alternative Sources of Financing Are Not Available on Better Terms.**

24.     In connection with the Debtors' determination that chapter 11 proceedings would be required to accomplish their restructuring, the Debtors, with the assistance of their advisors, began to evaluate the size of the required postpetition financing facility for these chapter 11 cases and the state of the market in which the Debtors would be seeking financing.  *See* Morgner Decl. ¶ 6.  Recognizing that the Debtors would need daily access to liquidity to fund their operations, the Debtors, with the assistance of Jefferies, engaged in good faith, arm's-length negotiations with the DIP Lenders after Jefferies engaged in initial outreach for postpetition financing sources.

Morgner Decl. ¶ 9.  The Debtors, with the assistance of Jefferies, moved expeditiously to continue these efforts, commencing negotiations on DIP proposals the same week Jefferies was engaged. *Id.*

25.     Despite moving quickly, the Debtors also sought financing from numerous third-party sources prior to agreeing to the DIP Term Sheet.  To that end, Jefferies solicited proposals from parties outside the Debtors' existing prepetition capital structure.  The prospective third-party lenders were comprised of eighteen banks, credit funds, and other interested parties, in addition to the prepetition secured lenders, that are in the business of extending postpetition financing under similar circumstances.  Of these institutions, eight executed non-disclosure agreements and began conducting due diligence.  Morgner Decl. ¶11.

26.     Ultimately, of the foregoing parties, only two, including Hartree, submitted a proposed term sheet.  The Debtors decided to focus their efforts on these proposals and negotiated the economics, milestones, covenants, and other provisions of each proposed financing.  Both parties submitted multiple financing proposals with improved terms.  These efforts ultimately culminated with the DIP Lenders' proposal, which is currently the best available financing under the circumstances.  Given the Debtors urgent need for liquidity, the Debtors and the DIP Lenders have worked expeditiously to negotiate the terms of the DIP Term Sheet in advance of the Debtors' "first day" hearing.  Morgner Decl. ¶13.  Despite there being substantial unencumbered value in the Debtors' assets, no potential lender was willing to provide a better offer than the DIP Facility. Morgner Decl. ¶14.

27.     Concurrently with the marketing efforts, the Debtors, with the assistance of Jefferies, engaged in discussions with Wells Fargo regarding their interest in providing debtor-in-possession financing.  They declined to provide financing to the Debtors, but are

supportive of the Debtors' efforts to obtain financing in exchange for the adequate protection measures set forth in the Interim DIP Order.  Morgner Decl. ¶ 12.  The Interim DIP Order contains terms agreed upon between the Debtors and Wells Fargo regarding adequate protection of its interest in the collateral under the Revolving Credit Facility, including replacement liens, a superpriority claim to the extent of any diminution in value of the Wells Fargo Collateral, payment of professional fees, and an allowed administrative expense claim for certain expenditures made by Wells Fargo for the benefit of the Debtors.[5]

28.     In light of the marketing process for postpetition financing, the Debtors, in consultation with their advisors, determined that the DIP Lenders' financing proposal was the best financing option presently available to the Debtors under the circumstances.  The economic terms of the DIP Facility (such as the contemplated pricing, fees, and interest rate) were negotiated at arm's length and are consistent with the terms of debtor-in-possession financings in comparable circumstances.  Morgner Decl. ¶ 18.  The DIP Facility provides the Debtors and their creditor constituencies with the best financing option presently available to the Debtors and the terms of the DIP Facility are reasonable under the circumstances.  Morgner Decl. ¶ 19.

29.     Accordingly, the terms of the DIP Facility are reasonable, and approval of the DIP Facility is in the best interests of the Debtors' estates and the Debtors respectfully request entry of the DIP Orders approving the DIP Facility.

---

[5]     For example, on September 29, 2020, Wells Fargo advanced $530,634 to the Debtors' insurance broker to pay the premium and avoid cancellation of coverage under the Debtors' hull and machinery insurance policy.

## Basis for Relief

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

A.    **Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

30.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

31.    To determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

32.     To evaluate whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

33.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following an efficient but thorough process and careful evaluation of alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require additional postpetition financing to support the restart of their operations and the administration of their chapter 11 cases, and to provide additional flexibility during these chapter 11 cases.  The Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available under the circumstances.  As discussed, the Debtors, through negotiations, ultimately determined that the DIP Facility was the best available alternative given the time constraints.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders and the Borrowers.**

34.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code.

Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors'
unencumbered assets as well as junior perfected liens on all of the Prepetition Collateral.

35.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit
allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code,
section 364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt
> (1) with priority over any or all administrative expenses of the kind
> specified in section 503(b) or 507(b) of [the Bankruptcy Code];
> (2) secured by a lien on property of the estate that is not otherwise
> subject to a lien; or (3) secured by a junior lien on property of the
> estate that is subject to a lien.

See also In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under
section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that
unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine
whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code.
Specifically, courts look to whether:

> a.     the debtor is unable to obtain unsecured credit under section
> 364(b) of the Bankruptcy Code, i.e., by allowing a lender
> only an administrative claim;
>
> b.     the credit transaction is necessary to preserve the assets of
> the estate; and
>
> c.     the terms of the transaction are fair, reasonable, and
> adequate, given the circumstances of the debtor-borrower
> and proposed lenders.

See In re Ames Dep't Stores, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); see also In re St. Mary
Hosp., 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988).

36.     As noted above, no other party was interested in providing, or willing to provide,
postpetition financing to the Debtors on an unsecured basis.  Despite there being substantial
unencumbered value in the Debtors' assets, no potential lender was willing to provide a better

offer than the DIP Facility, taking into account the Debtors' competitive and commercial concerns. In addition, the Debtors and the DIP Lenders specifically negotiated for the Borrowers to fund an intercompany loan with superpriority claim status (*i.e.*, the BTC Loan) to BTC—a non-DIP Obligor that, as discussed more fully in the Debtors' cash management motion [Docket No. 93], is the primary entity through which the Debtors make operating disbursements—to facilitate the Debtors' ability to use proceeds of the DIP Facility to fund operations. Accordingly, the DIP Facility's structure is appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives.

37.      Accordingly, the Debtors submit that granting liens and superpriority claims pursuant to section 364(c) of the Bankruptcy Code to secure the DIP Facility is both warranted and appropriate under the circumstances.

**C.      No Comparable Alternative to the DIP Facility Is Reasonably Available.**

38.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

39.     Here, the Debtors conducted a pre- and post-petition debtor-in-possession marketing process that confirmed the best actionable option under the circumstances was the DIP Facility.  The DIP Facility will avoid expensive litigation at the outset of these cases, enable the Debtors to pursue an operational restart and comprehensive restructuring, and represents the lowest cost alternative available to the Debtors.

## II.     The Debtors Should Be Authorized to Continue to Use the Cash Collateral.

40.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[6] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

41.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic

---

[6]     Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

stay.  *See In re 52 Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, generally, what constitutes adequate protection is decided on a case-by-case basis.  *See In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

42.  Wells Fargo and Fortress will inherently benefit from the Debtors' proposed use of property of their estates, including the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral, and enhance the likelihood of preserving the Debtors' overall going concern value as the Debtors continue to negotiate with all of their key stakeholders.  Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes.  *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

43.     As set forth in the Interim DIP Order, the Debtors propose to provide Wells Fargo and Fortress with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral (as well as the Prepetition Collateral) resulting from the use of the Cash Collateral by the Debtors and the imposition of the automatic stay.  The Debtors believe that the adequate protection in the proposed Interim DIP Order is necessary and sufficient for the Debtors to continue to use Cash Collateral.  Accordingly, the Debtors submit that the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

### III.    The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents.

44.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay:

a.      *Interest Rate*. LIBOR plus 7%, with LIBOR to be determined by the DIP Lenders (1% LIBOR floor), *per annum* and compounded and payable monthly in kind.

b.      *Structuring Fee*:  1% of the aggregate principal amount of the DIP Commitments, payable in kind at the closing.

c.      *Original Issue Discount*:  5% of the aggregate principal amount of the DIP Commitments, structured as an original issue discount of the DIP Loans and payable in kind on each draw date.

d.      *Exit Fee*:  $3 million, payable upon repayment in full of the DIP Loan, subject to a rebate to be agreed upon if the DIP Lenders provide exit financing.

45.     As set forth in the Morgner Declaration, the Debtors believe that the interest and fees to be paid under the DIP Facility are consistent with the market and appropriate, particularly in light of the circumstances of these chapter 11 cases and the marketing process undertaken, and represent the best financing option presently available to the Debtors.  *See* Morgner Decl. ¶¶ 18-19.

26

The Debtors considered the initial draw fees and exit fee described above when determining in their sound business judgment that the DIP Facility is reasonable and constitutes the best actionable terms on which the Debtors can obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates. Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

## IV. The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).

46. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

47. The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (ii) extensive arm's-length, good-faith negotiations between the Debtors and the DIP Secured Parties. The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, the Debtors market-tested the terms of the DIP Facility before determining that the DIP Facility provided the best terms available under the circumstances. Accordingly, the Court should find that the obligations arising

under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

48.      The Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders.  The proposed Interim DIP Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Interim DIP Order.

**VI.     Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

49.      Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rule 4001(b)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "[o]n

motion by the debtor(s), a hearing . . . will routinely be conducted within three business days to consider . . . cash collateral use[.]" Complex Case Procedures, § I, ¶ 20.

50.     For the reasons noted above, the Debtors have an immediate postpetition need to access Cash Collateral and the DIP Facility. Prior to the Petition Date, the Debtors, in consultation with their advisors, began to evaluate the size of the required postpetition financing facility for these chapter 11 cases. *See* Morgner Decl. ¶ 6. As of the commencement of the chapter 11 cases, the Debtors had approximately $170,000 of remaining liquidity. Without the requisite liquidity to maintain and operate its fleet at its usual industry-leading safety standards, their operations came to a grinding halt upon the U.S. Coast Guard's revocation of the Debtors' requisite Document of Compliance. *See* First Day Decl. ¶¶ 44-45. The Debtors thus believe that immediate access to Cash Collateral and the DIP Facility is essential for at least three reasons:

51.     ***First***, the Debtors believe that a significant injection of liquidity is essential to give the Debtors time to undertake certain key operational initiatives to ensure their fleet is in full compliance with all operating regulations, which includes hiring necessary personnel to oversee compliance and otherwise exceed safety standards and emerge as a stronger enterprise. The DIP Facility and use of Cash Collateral will further unlock the value of the Debtors' unencumbered assets and position the Debtors for success within and beyond these chapter 11 cases. *See* First Day Decl. ¶ 63.

52.     ***Second***, the Debtors do not expect to be able to generate sufficient levels of cash flow to cover their operating needs and the projected costs of these chapter 11 cases because they are not presently operational and serving customers. *See id.*

53. **Third**, access to the proposed DIP Facility will send a clear signal to the market, including the Debtors' employees, customers, and vendors, that the Debtors' operations can and will return to a business-as-usual basis. *See id.*

54. In short, the Debtors believe that access to Cash Collateral and the DIP Facility will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, responsibly administer these chapter 11 cases to implement and effectuate their restructuring, and pursue their restructuring goals to ensure the Debtors operate a safe and go-forward operation.

55. Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this Motion, and enter the proposed Interim DIP Order authorizing the Debtors to enter into the DIP Facility and use the Cash Collateral.

## Request for Final Hearing

56. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

57. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

58. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of

any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **Notice**

59.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a

consolidated basis); (c) Wells Fargo Bank, National Association, and counsel thereto; (d) Fortress Credit Co LLC, and counsel thereto; (e) the DIP Lenders and counsel thereto; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (j) the state attorneys general for states in which the Debtors conduct business; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

The Debtors respectfully request that the Court enter the the Interim DIP Order and Final DIP Order, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
October 21, 2020

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com
                      ggraham@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (*pro hac* vice pending)
W. Benjamin Winger (*pro hac* vice pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:          ryan.bennett@kirkland.com
                      benjamin.winger@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh

**Certificate of Service**

I certify that on October 21, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh

# **EXHIBIT A**

## **DIP Term Sheet**

Execution Version

### Senior Secured Super-Priority
### Debtor-in-Possession Credit Facility

### Summary of Principal Terms and Conditions

### October 21, 2020

| | |
|---|---|
| **Borrower:** | "Borrower" has the meaning set forth in the DIP Order. |
| **DIP Guarantors:** | "DIP Guarantors" has the meaning set forth in the DIP Order. |
| **DIP Agent:** | A DIP Lender (as defined below) or other entity reasonably satisfactory to the DIP Lenders and Borrower.  The initial DIP Agent is Hartree Partners, LP. |
| **DIP Lenders:** | Hartree Partners, LP (and/or one or more of its designated affiliates and/or related funds) (individually or collectively, the "DIP Lenders"). The sole initial DIP Lender is Hartree Partners, LP. |
| **Term** | The DIP Loan will have a 12 month maturity, with a 6 month extension at Lender's sole discretion. |
| **Collateral:** | Subject to the Carve Out (as defined in the DIP Order) and as more fully set forth in the DIP Order, secured by (i) a first-priority lien on the (A) barges and tugs identified on Annex A hereto (the "Specified Vessels") and any and all proceeds thereof or received in connection therewith, (B) subject to entry of the Final Order, proceeds of avoidance actions, none of which are subject to any prepetition liens and (C) the BTC Loan (as defined in the DIP Order) (the foregoing clauses (A) through (C) collectively, the "DIP Collateral"); and (ii) super-priority administrative expense claims against the Debtors. |
| **Adequate Protection:** | Customary adequate protection packages for Wells Fargo and Fortress Credit Co LLC acceptable to the DIP Lenders, including current payment of postpetition interest at non-default rate and current payment of professionals' fees. |
| **Type and Amount of the DIP Facility; Availability:** | A multi-draw secured debtor-in-possession term loan facility (the "DIP Facility" and the loans thereunder, the "DIP Loans"), consisting of a new money multiple draw term loan in an aggregate principal amount of up to $60 million, with $28.8 million (the "Initial DIP Draw") to be available ("Interim Availability") following the entry of the Interim Order and $31.2 million (the "Final DIP Draw") to be available ("Full Availability") subject to (x) the execution of the DIP Credit Agreement (as defined below) and (y) the receipt or satisfaction of: (i) entry of a final order (acceptable to the DIP Lenders in all respects) by the Bankruptcy Court approving the DIP Loan on a final basis; (ii) a business plan and the Budget (as defined below) (acceptable to the DIP Lenders in all respects) providing for, with respect to each of the Company's barges and tugs, the licensing and operation of such vessel during such 13-week period; and (iii) other conditions set forth and as agreed in the DIP Credit Agreement  The commitments to make the DIP |

| | |
|---|---|
| | Loans are referred to herein as the "DIP Commitments".  Once repaid or prepaid, no portion of the DIP Loans may be reborrowed. |
| **Chief Restructuring Officer:** | In connection with the Borrower's chapter 11 filing, Borrower to appoint Matthew Ray, of Portage Point Partners, as the chief restructuring officer ("CRO") with customary duties and responsibilities.  The CRO shall report directly to Morton S. Bouchard III, who shall have final decision making authority on all matters. |
| **Milestones:** | Borrower to file a DIP motion no later than October 21, 2020, interim DIP order ("Interim Order") entered within 5 business days of the DIP motion, final DIP order ("Final Order"; the Final Order and/or the Interim Order, as applicable, referred to herein as the "DIP Order") entered within 45 days of entry of the Interim Order. By not later than November 30, 2020, (i) each Specified Vessel shall be secured by first lien mortgages in form and substance satisfactory to the DIP Lenders and (ii) the Borrower and DIP Lenders shall enter into the DIP credit agreement. Additional chapter 11 case milestones as required by the DIP Lenders and agreed by the Borrower shall be included in the Final Order. |
| **Asset Sales:** | DIP Collateral sales subject to approval by the DIP Lenders. |
| **Technical and Commercial Managers:** | Borrower to hire necessary personnel to manage the vessels and their operations. |
| **Thirteen Week Cash Flow Budget; Business Plan:** | Prior to the Initial DIP Draw, the Borrower shall deliver to the DIP Lenders an initial list of sources and uses (the "Sources and Uses") (acceptable to the DIP Lenders in all respects) and attached hereto as Annex B. Prior to the Final DIP Draw, the Borrower shall deliver a business plan and 13-week budget (the "Budget") (in each case acceptable to Lender in all respects) and provide immediate access to the DIP Lenders and their advisors. |
| **Budget & Reporting:** | The Borrower will use proceeds from the DIP Loan consistent with (A) following the Initial DIP Draw and during Interim Availability, the Sources and Uses, and (B) from and after the Final DIP Draw and Full Availability, the Budget, in each case subject to Permitted Deviations (as defined in the DIP Order). The Borrower shall provide the DIP Lenders with a heightened reporting package customary for DIP facilities of this kind, with due regard to the Company's industry acceptable to the DIP Lenders. |
| **Financial Covenants:** | Budget variance covenants, in each case that are acceptable to the DIP Lenders, including without limitation, adherence to the Sources and Uses or the then-approved Budget, as applicable, in each case subject to Permitted Deviations (as defined in the DIP Order). |
| **Affirmative & Negative Covenants** | Usual and customary for facilities of this kind, with due regard to the Company's industry and as set forth in the DIP Order. |
| **Carve Out** | "Carve Out" has the meaning set forth in the DIP Order. |
| **Use of Proceeds:** | The proceeds of the DIP Loan will be used only (a) for disbursements expressly permitted in the Sources and Uses (with respect to the Initial |

| | |
|---|---|
| | DIP Draw and Interim Availability) and the then-approved Budget (with respect to the Final DIP Draw and Full Availability), subject in each case to the DIP Orders and the DIP Loan Documents and (b) for such other purposes as are consented to in advance in writing by the DIP Lenders. |
| **Expenses:** | Borrower to pay the DIP Lender's and Debtors' professional fees and expenses, including restructuring, local and maritime counsel, financial advisor, and shipping consultant, including funding of retainers upon Initial DIP Draw. |
| **Amortization:** | None. |
| **Interest:** | L + 7.00%, per annum, with LIBOR to be determined by the DIP Lender, compounded monthly and payable monthly in kind, subject to a 1.00% LIBOR floor. |
| **Fees:** | Structuring Fee:  1.00% of the aggregate principal amount of the DIP Commitments, payable in kind at the closing (the "Structuring Fee").<br><br>Original Issue Discount:  5.00% of the aggregate principal amount of the DIP Commitments, structured as an original issue discount of the DIP Loans and payable in kind on each draw date (the "Original Issue Discount").<br><br>Exit Fee:  $3.0 million, payable upon repayment in full of the DIP Loans but subject to rebate to be agreed if the DIP Lenders provide exit financing (the "Exit Fee"). |
| **DIP Order:** | The terms herein are subject in all respects to the terms and conditions set forth in the DIP Order. |
| **KEIP:** | TBD – standard and customary, acceptable to the DIP Lenders and in accordance with the then-approved budget. |
| **Commercial Arrangements:** | The Borrower will offer arms' length and competitive rates for hire to the DIP Agent. |
| **Governing Law:** | The Debtors submit to the exclusive jurisdiction and venue of the United States Bankruptcy Court for the Southern District of Texas and waive any right to trial by jury. New York law shall govern the DIP Facility (other than security documents to be governed by local law, as determined by the DIP Lenders). |

**Annex A**

**Specified Vessels**

|    | Vessel Description | Legal Owner |
|----|-------------------|-------------|
| 1. | B. NO. 272, OFFICIAL NO. 1257375 | B. NO. 272 CORP. |
| 2. | B NO 205, OFFICIAL NO. 1191747 | B. NO. 205 CORP. |
| 3. | B NO 284, OFFICIAL NO. 1216341 | B. NO. 284 CORP. |
| 4. | B NO 282, OFFICIAL NO. 1204610 | B. NO. 282 CORP. |
| 5. | DONNA J. BOUCHARD, OFFICIAL NO. 1257374 | TUG DONNA J. BOUCHARD CORP. |
| 6. | MORTON S. BOUCHARD JR., OFFICIAL NO. 1265315 | TUG MORTON S. BOUCHARD JR. CORP. |
| 7. | FREDERICK E. BOUCHARD, OFFICIAL NO. 1265316 | TUG FREDERICK E. BOUCHARD CORP. |
| 8. | LINDA LEE BOUCHARD, OFFICIAL NO. 1189191 | TUG LINDA LEE BOUCHARD CORP. |
| 9. | DENISE A. BOUCHARD, OFFICIAL NO. 1251312 | TUG DENISE A. BOUCHARD CORP. |

## Annex B

## Sources & Uses

| Interim Period Disbursements Summary ($USD) | | Initial Draw Estimate |
|---|---|---|
| Employees [1] | $ | 4,583,135 |
| Insurance [2] | | 1,679,378 |
| Maritime Liens [3] | | 10,470,455 |
| Other Expenses [4] | | 5,403,478 |
| Bankruptcy Cost Reserve [5][6] | | 4,600,000 |
| **Total Estimated Disbursements** | **$** | **26,736,446** |
| DIP Facility OID and Structuring Fees [7] | | 2,038,760 |
| **Initial DIP Draw** | **$** | **28,775,206** |

1. Includes accrued pre-petition employee wages and benefits.  Assumes one payroll cycle for office and vessel employees (approximately two weeks) due and paid within the month of October. Office employees paid bi-weekly; vessel employees paid twice per month. Office payroll includes select new hires related to finance functions start in October. Represents same quantum as the current office bi-weekly payroll as incurred, not cash payment.

2. Represents Hull, MGL, War, Bumbershoot, Healthcare, D&O and other insurance premiums. Includes two quarterly premium payments for Hull insurance due in June and September 2020, which may be paid to parties who made protective advances on the Company's behalf.

3. Maritime lienholder payments reflect discussions with management regarding outstanding amounts owed, inclusive of ongoing negotiations related to settlement payments and installment plans estimated to be due during the Interim Period.

4. Other Expenses include, but are not limited to, general operational restart costs such as rent, utilities and office expenses, as well as adequate protection for Wells Fargo and Fortress, insurance brokerage fees, repayment of custodian bills, and additional expenses which may be necessary in categories listed herein.

5. Estimated bankruptcy costs include professional fees & expenses incurred within the bankruptcy period for Debtor professionals, including Kirkland, Jefferies, Portage Point, Stretto, Chalos & Co, P.C. as Special Maritime Counsel and other related bankruptcy costs.

6.  Estimated Bankruptcy Costs for Initial Draw include 45 days of accrued fees, beginning from Petition Date, for the above listed professional services firms. A portion of the bankruptcy costs may be paid out of exit financings or sale proceeds, including accrued & unpaid professional fees.

7.  Initial DIP Draw calculated to include Structuring Fee of 1% of total DIP Commitment of $60 million and Original Issue Discount ("OID") of 5% of Initial DIP Draw.

## EXHIBIT B

**Morgner Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| BOUCHARD TRANSPORTATION CO., INC., *et al.*,[1] | ) | Case No. 20-34862 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

**DECLARATION OF RICHARD W. MORGNER
IN SUPPORT OF THE DEBTORS' <u>EMERGENCY</u>
MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS
AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,
(F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

I, Richard W. Morgner, hereby declare under penalty of perjury as follows:

1.      I submit this declaration (this "<u>Declaration</u>") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Lenders, and (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "<u>Motion</u>"),[2] which seeks approval of a $60 million new money postpetition DIP Facility.  Pursuant to the Interim Order, the Debtors seek to access approximately $29 million

---

[1]      Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/bouchard.  The location of the Debtors' service address is:  58 South Service Road, Suite 150, Melville, NY 11747.

[2]      Capitalized terms used but not defined herein have the meanings given to such terms in the Motion or the DIP Term Sheet, as applicable.

of the DIP Facility, subject to the terms of the DIP Term Sheet, and authority for the postpetition use of Cash Collateral.[3]

2.      The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have from the Debtors' advisors or employees working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of business.  I am not being specifically compensated for this testimony other than through payments received by Jefferies LLC ("<u>Jefferies</u>") as a professional proposed to be retained by the Debtors (including certain financing fees).  If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis.  I am authorized to submit this Declaration on behalf of the Debtors.

<u>**Professional Background and Qualifications**</u>

3.      I am a Managing Director and Joint Global Head of the Debt Advisory & Restructuring Group at Jefferies, a global investment banking firm founded over 50 years ago, with its principal office located at 520 Madison Avenue, 17th Floor, New York, New York 10022.  Jefferies is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.  Jefferies, together with its investment banking advisory affiliates, has approximately 3,900 employees located in more than 30 offices around the world.  Jefferies and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers, and other

---

[3]     The material terms of the proposed DIP Facility are set forth in detail in the Motion.  For the avoidance of doubt, any description of the proposed terms of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Term Sheet.

constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.

4.       I have more than 28 years of investment banking and restructuring experience. Since joining Jefferies in 2009, I have provided investment banking expertise, and distressed mergers and acquisition and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings.  Prior to joining Jefferies, I was a Managing Director and Co-Head of the mergers and acquisitions group at Miller Buckfire, where my primary responsibilities included advising companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations.

### The Debtors' Need for the DIP Facility and Access to Cash Collateral[4]

5.       The Debtors engaged Jefferies less than one week before the Petition Date as their investment banker to provide advice regarding obtaining financing and pursuing strategic alternatives, including initiating chapter 11 cases, in the midst of an increasingly dire liquidity situation.  In the days prior to the Petition Date, it became increasingly clear that the Debtors would likely need to file these chapter 11 cases to obtain a breathing spell and pursue a reorganization through an in-court process.

6.       As part of the Debtors' preparations for these chapter 11 cases, Jefferies assisted the Debtors with an evaluation of the Debtors' immediate financing needs and funding alternatives. Jefferies also assessed the state of the market in which the Debtors would be seeking financing. As part of its evaluation, Jefferies worked with the Debtors, their proposed chief restructuring officer (the "CRO"), and their proposed restructuring advisor, Portage Point Partners ("Portage

---

[4]      Further detail on the Debtors' background and operations and need for capital is set forth in the *Declaration of Matthew Ray of Portage Point Partners, LLC in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 79] and is incorporated by reference herein.

Point"), in connection with their development and analysis of the Debtors' immediate and longer term financing needs, which take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the necessary funding required to restart operations and obtain recertification from the US Coast Guard and the effect of a potential chapter 11 filing on the operations of the business, fees, and interest expenses associated with the DIP Facility, professional fees, customer and vendor relationships, and required operational payments.

7.     Based on discussions with the Debtors' management, the CRO, and Portage Point, I understand that without access to new money financing to fund these chapter 11 cases, the Debtors will be unable to make critical past due obligations and cover their capital expenditures and operating expenses in the ordinary course of business—including critically the investment required to obtain US Coast Guard certification necessary to operate their businesses—let alone fund the projected costs of these cases.  I understand that this funding need is acute, and that the Debtors need access to financing imminently to ensure their ongoing viability while pursuing an operational turnaround and maximize the value of the estates.  Indeed, I understand the Debtors commenced these chapter 11 cases with approximately $170,000 of remaining liquidity.

8.     The Debtors also believe that the DIP Facility and access to Cash Collateral will provide a clear, strong message to their customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the Debtors have adequate liquidity to meet their current and future obligations, including ordinary course expenditures necessary to restart the Debtors' business operations.  Specifically, access to liquidity should communicate that the Debtors are able to complete their operational turnaround, invest in obtaining necessary operating certifications to continue meeting the needs of their customers, provide

4

compensation to their employees, and that the Debtors are working expeditiously to return their businesses as close to the ordinary course as possible.  Access to cash collateral and the proposed DIP Facility, moreover, should provide the Debtors with sufficient funds to administer these chapter 11 cases and thereby enable the Debtors to continue their efforts to preserve and maximize the value of their estates through these cases.

**The Debtors' Efforts to Obtain Postpetition Financing**

9.      The Debtors (advised by Jefferies) engaged in good faith, arm's-length negotiations with the DIP Lenders in the period after the Petition Date, recognizing that the Debtors would need daily access to liquidity to fund their operations.  I understand that the Debtors previously had on-going negotiations regarding additional financing with the lender under the Debtors' prepetition Aircraft Loan (the "Aircraft Lender") for several months prior to the commencement of these chapter 11 cases.  The Debtors, with the assistance of Jefferies, capitalized on the prior negotiations with the Aircraft Lender and moved expeditiously to continue these efforts, commencing negotiations on the Aircraft Lender's proposal the same week Jefferies was engaged.

10.     Recognizing the need to move quickly while also securing the best available financing under the circumstances, the Debtors also sought financing from numerous third-party sources.  The Debtors and Jefferies recognized that it would be difficult to secure financing because of the very limited timeframe available before the Debtors ran out of cash.  Moreover, the Debtors' business circumstances presented a number of additional challenges that limited the universe of potential lenders.  Specifically, Jefferies sought lenders that (a) would be able to fund on an expedited timeline, including providing funding on a term sheet-only basis, (b) had capacity to fund a loan of the size required by the Debtors, (c) were prepared to fund into an operationally challenged company in a depressed industry without the benefit of an extended due diligence timeline, and (d) had experience lending in the highly-regulated and volatile Jones Act marine

sector.  Moreover such a lender would have to be prepared to fund based only on proposed interim sources and uses of the funding, without an agreed upon 13-week budget, a highly uncustomary funding arrangement for a company of the size and complexity of the Debtors.[5]

11.     With these considerations, Jefferies contacted and received inbound interest from 18 banks, credit funds and other interested parties, in addition to the Aircraft Lender, that are in the business of extending postpetition financing under similar circumstances.  Of these institutions, 8 executed non-disclosure agreements and began conducting due diligence.  Jefferies responded to several requests for information and facilitated the due diligence process with the potential lenders.

12.     Concurrently with the marketing efforts referenced above, the Debtors, with the assistance of Jefferies, engaged in discussions with Wells Fargo, the lender under the Debtors' prepetition revolving credit facility, regarding their interest in providing debtor-in-possession financing.  Wells Fargo declined to provide new financing to the Debtors, but I understand are supportive of the Debtors' efforts to obtain financing in exchange for the adequate protection measures set forth in DIP Order.

13.     Ultimately, of the foregoing parties, only two, including Hartree Partners, LP ("Hartree"), submitted a proposed term sheet.  The Debtors decided to focus their efforts on these proposals and negotiated the economics, milestones, covenants, and other provisions of the proposed financing.  Following this competitive process, the Debtors, with Jefferies' advice, ultimately determined that the Hartree proposal was superior and the best available financing under the circumstances.  Over the next few days, the Debtors and Hartree finalized the terms of the DIP

---

[5]     As described in the Motion and DIP Term Sheet, the Debtors and the DIP Lenders will work to reach an agreed upon budget as a condition to the Final Draw.

Term Sheet and as a result of the final negotiations, the Debtors were able to improve certain terms of the financing in comparison to the initial proposals. Given the Debtors' urgent need for liquidity, the Debtors and Hartree worked expeditiously to negotiate the terms of the DIP Term Sheet in advance of the Debtors' "first day" hearing.

14.     Despite there being substantial unencumbered value in the Debtors' assets, no potential lender was willing to provide a better offer than the DIP Facility. Accordingly, I believe the DIP Facility represents the best available postpetition financing under the circumstances. Nonetheless, given the Debtors' attractive asset base against which parties can lend, the Debtors intend to conduct a robust marketing process pending the final hearing on the DIP Facility, during which time the Debtors will solicit alternative proposals with the goal of securing financing for the Debtors on the best available terms given the circumstances.

15.     Lastly, no party that Jefferies spoke to as part of the marketing process, and indeed no party Jefferies is aware of, was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis. Ultimately, the Debtors and the DIP Lenders agreed to a set of terms that should provide the Debtors with necessary access to liquidity during the pendency of these chapter 11 cases at fees and rates that the Debtors and their advisors consider to be reasonable under the circumstances. Accordingly, for the reasons set forth herein and in the Motion, I believe the DIP Facility is the best financing option available to the Debtors.

## The Terms and Fees in Connection with the DIP Facility

16.     Jefferies assisted the Debtors in their review and negotiation of the principal economic terms of the DIP Facility. The Debtors and Jefferies vigorously negotiated the terms of the DIP Term Sheet, exchanged numerous proposals with the DIP Lenders and its advisors, and ultimately secured more favorable terms than originally contemplated by the DIP Lenders. In the

lead-up to the Debtors' first day hearing, the Debtors and the DIP Lenders finalized the terms of the DIP Term Sheet; key points of the term sheet are summarized below.

17.     As described in the Motion and DIP Term Sheet, the DIP Facility contemplates postpetition financing in the form of a multi-draw term loan facility.  Approximately $29 million of the DIP Facility will be available to the Debtors following entry of the Interim Order (the "Interim Draw").  The remaining approximately $31 million of the DIP Facility will be available in one or more draws following entry of the Final Order and satisfaction of other conditions set forth in the DIP Term Sheet, including the provision of an updated business plan and Budget (the "Final Draw or "Final Draws," as applicable).  The proceeds of the DIP Facility will be used in accordance with the Sources and Uses (with respect to the Interim Draw) and in accordance with the applicable Budget (with respect to the Final Draw(s)).

18.     In exchange for the DIP Facility, I understand that the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders pursuant to the DIP Term Sheet.  These terms are summarized below:

| Fee | Amount |
|---|---|
| Interest Rate | LIBOR + 7.00% per annum, compounded monthly and payable monthly in kind (subject to 1.00% LIBOR floor) |
| Draw Fees | Upon execution (and Court approval of the Initial Draw or Final Draws, as applicable):<br><br>• Structuring Fee:  1.00% of the aggregate amount of the DIP Commitments, payable in kind at the closing of the DIP Facility<br><br>• Original Issue Discount:  5.00% of the aggregate principal amount of the DIP Commitments, structured as an original issue discount of the DIP Loans and payable in kind on each draw date |

| Fee | Amount |
|---|---|
| Exit Fee | $3.0 million, payable upon repayment in full of the DIP Facility but subject to rebate to be agreed if the DIP Lenders provides exit financing to the go-forward Company |
| Expenses | Debtors to pay the DIP Lenders' professional fees and expenses, including restructuring, local and maritime counsel, financial advisor, and shipping consultant, including funding of retainers upon Initial Draw. |
| Term | 12 month maturity with a 6 month extension at the DIP Lenders' option. |

Given the lack of other feasible alternatives under the Debtors' circumstances, and based on my knowledge of similar financings in the market, I believe that the interest rate and fees reflected in the DIP Facility are reasonable under the circumstances.

## Conclusion

19.    Given the financing efforts and process described above and based on my experience as a restructuring professional and involvement in other financing transactions, I believe that the DIP Facility is the best financing option presently available to the Debtors and that the terms of the DIP Facility are reasonable under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 21, 2020
New York, New York

/s/ Richard W. Morgner
Richard W. Morgner
Managing Director and Joint Global Head of the Recapitalization & Restructuring Group
Jefferies LLC