## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
10/22/2020

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BOUCHARD TRANSPORTATION CO., INC., *et al.*,[1] | ) | Case No. 20-34682 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### INTERIM ORDER (A) AUTHORIZING
### THE DEBTORS TO OBTAIN POSTPETITION
### FINANCING, (B) AUTHORIZING THE DEBTORS
### TO USE CASH COLLATERAL, (C) GRANTING LIENS AND
### PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
### EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE
### PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,
### (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF

(Docket No. 102)

Upon the motion (the "**Motion**")[2] of Bouchard Transportation Co., Inc. ("**BTC**"), B. No. 272 Corp., B. No. 205 Corp., B. No. 284 Corp., B. No. 282 Corp., Tug Donna J. Bouchard Corp., Tug Morton S. Bouchard Corp., Tug Frederick E. Bouchard Corp., Tug Linda Lee Bouchard Corp. and Tug Denise A. Bouchard Corp. (collectively, the "**Borrower**"), and each of their affiliated debtors other than BTC (collectively with the Borrower, the "**DIP Guarantors**") (the Borrower and the DIP Guarantors, collectively, the "**DIP Obligors**"), each as a debtor and debtor-in-possession (collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**") and pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(e), 503, 506(c), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/bouchard.  The location of the Debtors' service address is:  58 South Service Road, Suite 150, Melville, NY 11747.

[2]   Capitalized terms used but not immediately defined have the meanings given to them in the Motion.

"**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 1075-1, 2002-1, 4001-1(b), 4002-1(i) and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "**Local Bankruptcy Rules**") and the Procedures for Complex Chapter 11 Chapter 11 Cases promulgated by the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"), seeking, among other things:

(i)     authorization for the Debtors to obtain a senior secured superpriority debtor-in-possession term loan credit facility (the "**DIP Facility**"), consisting of a new money multiple draw term loan in the aggregate principal amount of up to $60 million (the loans made thereunder, the "**DIP Loans**"), with an initial draw of up to $28.8 million (the "**Initial DIP Draw**") to be drawn following entry of this Interim Order (as defined herein) and satisfaction of the other requirements set forth in the DIP Term Sheet (as defined herein) and, thereafter, one or more draws of up to an additional $31.2 million to be drawn subject to execution of the DIP Credit Agreement (defined below) and following satisfaction of the "Full Availability Conditions" set forth on Schedule 2 attached hereto and entry of a Final Order (as defined herein) that is acceptable to the DIP Lenders in all respects, pursuant to the terms and conditions set forth in this Interim Order and the term sheet attached hereto as **Exhibit A** (the "**DIP Term Sheet**") and the DIP Credit Agreement to be entered into following entry of this Interim Order and other DIP Documents (as defined herein), by and among the Borrower, as co-borrowers, the DIP Guarantors, as guarantors, Hartree Partners, LP, as administrative agent and collateral agent (in such capacities, the "**DIP Agent**") and the financial institutions party thereto from time to time as lenders (the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**");

(ii)    authorization for the Debtors to negotiate, execute, and deliver a credit agreement in respect of the DIP Facility that is consistent in all respects with the DIP Term Sheet and otherwise acceptable to the DIP Secured Parties (such credit agreement, as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**"), and any other agreements, instruments, collateral agreements, pledge agreements, guarantees, security agreements, mortgages, control agreements, notes and other documents related thereto (as amended, restated, supplemented, waived or modified from time to time) (all of the foregoing, together with the DIP Credit Agreement, the Interim Order, the Final Order and the DIP Term Sheet, collectively, the "**DIP Documents**"), and to perform their respective obligations thereunder

and all such other and further acts as may be necessary, appropriate or desirable in connection with the DIP Documents;

(iii)     authorization for the DIP Obligors to guarantee on a joint and several basis the Borrower's obligations in respect of the DIP Facility;

(iv)     authorization for (a) BTC to incur, and the Borrower to use the proceeds of the DIP Facility to fund, an intercompany loan to BTC (the "**BTC Loan**"), which shall be an allowed superpriority claim of the Borrower against BTC pursuant to section 364(c)(1) of the Bankruptcy Code and administrative expense of BTC and its estate pursuant to section 503(b)(1) of the Bankruptcy, and (b) the Borrower to direct the proceeds of the DIP Facility to be funded directly to a deposit account of BTC for purposes of funding such BTC Loan;

(v)     authorization for the Debtors to use the proceeds of the DIP Facility solely in accordance with the Sources and Uses (as defined below), subject to Permitted Deviations (as defined herein), and subject to the terms and conditions set forth in this Interim Order and the DIP Documents;

(vi)     subject to the restrictions set forth in the DIP Documents and this interim order (the "**Interim Order**"), authorization for the Debtors to use, from the date hereof until entry of the Final Order (such period, the "**Interim Period**"), the Prepetition Collateral (as defined herein), including "cash collateral" as defined in Section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), subject to the Sources and Uses (subject to Permitted Deviations), and provide adequate protection to the Prepetition Secured Parties (as defined herein) on the terms set forth herein;

(vii)     authorization for the Debtors to incur and pay all DIP Obligations (as defined herein) including the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(viii)    authorization for the Debtors to make certain Stipulations with respect to the Prepetition Debt Documents (as defined herein) and the liens and security interests arising therefrom;

(ix)     the granting to the DIP Secured Parties of allowed superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code, payable from and having recourse to all assets of the Borrower and the DIP Guarantors, subject and subordinate to the Carve Out and the Adequate Protection Obligations;

(x)     the granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, and authorizing the Borrower and the DIP Guarantors to incur, valid, enforceable, non-avoidable, automatically and fully perfected

3

liens on and security interests in all DIP Collateral (as defined below) to secure the DIP Obligations, which liens and security interests shall be subject to the rankings and priorities set forth herein;

(xi)     modification of the automatic stay to the extent set forth herein;

(xii)    a waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

(xiii)   the scheduling of a final hearing (the "**Final Hearing**") to be held within 45 days of the date hereof (as defined herein) to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"), as set forth in the Motion and the DIP Documents filed with this Court.

The Court having considered the relief requested in the Motion, the exhibits attached thereto, the *Declaration of Richard W. Morgner in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "**DIP Declaration**"), the *Declaration of Matthew Ray of Portage Point Partners, LLC in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 79] (the "**First Day Declaration**"), the DIP Documents, and the evidence submitted and arguments made by the Debtors at the Interim Hearing held on October [22], 2020 (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm

to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into and/or performance under the DIP Term Sheet and other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:** [3]

A.      *Petition Date*.  On September 28, 2020 and September 29, 2020 (as applicable to each Debtor, the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.  On September 30, 2020, this Court entered orders approving the joint administration of the Chapter 11 Cases [Docket Nos. 30, 31].

B.      *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      *Jurisdiction and Venue*.  This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C.

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

§§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 363(m) 364(c), 364(d)(1), 364(e), 503, 506, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rules 2002-1, 4001-1(b), 4002-1(i) and 9013-1.

D.     *Committee Formation*.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

E.     *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this Interim Order shall be required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

F.     *Debtors' Stipulations*.  Subject to entry of the Final Order and without prejudice to the rights of the Debtors' estates or any other party in interest (but subject to the limitations thereon contained in paragraph 23 below), and after consultation with their attorneys and financial advisors, the Debtors acknowledge, admit, stipulate and agree that:

(i)     *Prepetition Revolving Credit Facility*.  Wells Fargo Bank, National Association ("**Wells Fargo**") and BTC are parties to that certain Loan Agreement, dated as of October 30, 2013, as amended by:  (i) that certain First Amendment to Loan Agreement, Note and Guaranty, dated as of February 4, 2015; (ii) that certain Second Amendment and Waiver, dated as of May 15, 2015; (iii) that certain Second Amendment to Loan Agreement, Note and Guaranty,

dated as of October 30, 2018; (iv) that certain Third Amendment to Loan Agreement, dated as of April 29, 2019; and (v) that certain Fourth Amendment, Forbearance, Waiver and Joinder to Loan Agreement, dated as of November 5, 2019 (collectively, the "**Wells Fargo Loan Agreement**"), pursuant to which Wells Fargo made a revolving credit facility in the maximum principal amount of $163,450,000 available to BTC (the "**Prepetition Revolving Credit Facility**").   Wells Fargo:  (x) and BTC are parties to that certain Business Direct Credit Application – Agreement dated on or about November 12, 2013 (the "**Wells Fargo BTC P-Card Agreement**") pursuant to which Wells Fargo provided certain purchase cards to BTC; and (y) and B. No. 200 Corp. are parties to that certain Business Direct Credit Application – Agreement dated on or about November 12, 2013 (the "**Wells Fargo B. No. 200 P-Card Agreement**" and, together with the Wells Fargo BTC P-Card Agreement, the "**Wells Fargo P-Card Facilities**") pursuant to which Wells Fargo provided certain purchase cards to B. No. 200 Corp.

        (ii)     B. No. 210 Corp., B. No. 215 Corp., B. No. 225 Corp., B. No. 245 Corporation, B. No. 250 Corp., B. No. 260 Corporation, Tug Brendan J. Bouchard Corp., Tug Danielle M. Bouchard Corp., Tug Jane A. Bouchard Corp., Tug Evening Star Corp., B. No. 242 Corp., B. No. 262 Corp., B. No. 295 Corp., Tug Bouchard Girls Corp., Tug Morton S. Bouchard, IV Corp., B. No. 270 Corp., Tug Kim M. Bouchard Corp., B. No. 252 Corp., and Tug Evening Breeze Corp. (collectively, the "**Prepetition Guarantors**") are parties to that certain Guaranty, dated as of October 30, 2013, in favor of Wells Fargo (the "**Prepetition Guaranty**"), pursuant to which the Prepetition Guarantors, among other things, guaranteed the punctual payment of all indebtedness, liabilities, and obligations of BTC to Wells Fargo under the Wells Fargo Loan Agreement.

(iii)     In connection with the Prepetition Revolving Credit Facility and the Prepetition Guaranty (and, with respect to the B. No. 252 Collateral and the Evening Breeze Collateral (each as defined herein), the Wells Fargo P-Card Facilities), BTC and the Prepetition Guarantors delivered, or caused to be delivered, to Wells Fargo, among other things (collectively and as amended, the "**Wells Fargo Security Documents**"):

(a)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 210 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 210 (Official Number 1037844), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 210 Vessel-Related Property (collectively, the "**B. No. 210 Collateral**"). "**Vessel-Related Property**" shall mean, with respect to any Wells Fargo Vessel:  all engines, boilers, machinery, derricks, cranes, masts, boats, anchors, cables, chains, rigging, tackle, apparel, furniture, winches, capstans, outfit, tools, pumps, gears, furnishings, appliances, fittings, navigation and communications equipment, computers, stores, spare and replacement parts, and all other appurtenances thereto appertaining or belonging; and all equipment related thereto; and any and all additions improvements and replacements thereof or any part thereof; and all products and proceeds of all of the foregoing;

(b)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 215 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 215 (Official Number 1064767), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 215 Vessel-Related Property (collectively, the "**B. No 215 Collateral**");

(c)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 225 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 225 (Official Number 1139764), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 225 Vessel-Related Property (collectively, the "**B. No 225 Collateral**");

(d)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 242 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest

in and lien upon the whole (100%) of B. No. 242 (Official Number 1154327), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 242 Vessel-Related Property (collectively, the "**B. No 242 Collateral**");

(e)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 245 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 245 (Official Number 1050073), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 245 Vessel-Related Property (collectively, the "**B. No 245 Collateral**");

(f)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 250 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 250 (Official Number 1235496), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 250 Vessel-Related Property (collectively, the "**B. No 250 Collateral**");

(g)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 252 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 252 (Official Number 1292046), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 252 Vessel-Related Property (collectively, the "**B. No 252 Collateral**");

(h)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 260 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 260 (Official Number 1210060), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 260 Vessel-Related Property (collectively, the "**B. No 260 Collateral**");

(i)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 262 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 262 (Official Number 1216336), a documented vessel of the United States, whose records are maintained at the

National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 262 Vessel-Related Property (collectively, the "**B. No 262 Collateral**");

(j)    that certain First Preferred Ship Mortgage, dated as of November 27, 2017, pursuant to which B. No. 270 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 270 (Official Number 1257373), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 270 Vessel-Related Property (collectively, the "**B. No 270 Collateral**");

(k)    that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 295 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 295 (Official Number 955449), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 295 Vessel-Related Property (collectively, the "**B. No 295 Collateral**");

(l)    that certain First Preferred Ship Mortgage, dated as of November 27, 2017, pursuant to which Tug Kim M. Bouchard Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Kim M. Bouchard (Official Number 1257372), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Kim M. Bouchard Vessel-Related Property (collectively, the "**Kim M. Bouchard Collateral**");

(m)    that certain First Preferred Ship Mortgage, dated as of November 5, 2019, pursuant to which Tug Evening Breeze Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Evening Breeze (Official Number 1282121), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Evening Breeze Vessel-Related Property (collectively, the "**Evening Breeze Collateral**");

(n)    that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Evening Star Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Evening Star (Official Number 1234828), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together

with all Evening Star Vessel-Related Property (collectively, the "**Evening Star Collateral**");

(o)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Morton S. Bouchard, IV Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Morton S. Bouchard IV (Official Number 1154328), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Morton S. Bouchard IV Vessel-Related Property (collectively, the "**Morton S. Bouchard IV Collateral**");

(p)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Jane A. Bouchard Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Jane A. Bouchard (Official Number 1139762), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Jane A. Bouchard Vessel-Related Property (collectively, the "**Jane A. Bouchard Collateral**");

(q)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Brendan J. Bouchard Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Brendan J. Bouchard (Official Number 1086926), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Brendan J. Bouchard Vessel-Related Property (collectively, the "**Brendan J. Bouchard Collateral**");

(r)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Danielle M. Bouchard Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Danielle M. Bouchard (Official Number 1053010), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Danielle M. Bouchard Vessel-Related Property (collectively, the "**Danielle M. Bouchard Collateral**");

(s)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Bouchard Girls Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Bouchard Girls (Official Number 955450), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Bouchard Girls Vessel-Related Property (collectively, the "**Bouchard Girls Collateral**");

(t)     that certain First Earnings Assignment, dated as of October 30, 2013, as amended by that certain First Amendment to First Earnings Assignment, dated as of February 4, 2015, and that certain Second Amendment to First Earnings Assignment, dated as of March 12, 2020, pursuant to which B. No. 210 Corp., B. No. 215 Corp., B. No. 225 Corp., B. No. 245 Corp., B. No. 250 Corp., B. No. 260 Corp., Tug Brendan J. Bouchard Corp., Tug Danielle M. Bouchard Corp., Tug Jane A. Bouchard Corp., Tug Evening Star Corp., B. No. 242 Corp., B. No. 262 Corp., B. No. 295 Corp., Tug Bouchard Girls Corp., Tug Morton S. Bouchard, IV Corp., B. No. 270 Corp., Tug Kim M. Bouchard Corp., B. No. 252 Corp., and Tug Evening Breeze Corp. sold, assigned, transferred, and set over unto Wells Fargo, and conferred upon Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon, all accounts and contract rights consisting of, and all monies or claims for monies, due or to become due to such Debtors and all liens therefor under or arising out of any bill of lading, contract of affreightment or other contract or arrangement whatsoever (excluding charter contracts and the revenue therefrom), whether expressed or implied, made or issued for or in connection with the service, use or operation of the United States flag vessels (as described above) (collectively, the "**Wells Fargo Vessels**") owned by, and chartered to, such Debtors for the carriage of goods or passengers or for any other purpose whatsoever relating to the service, use or operation of any Wells Fargo Vessel for or as charter hire, freight, demurrage or otherwise thereunder, or as compensation for the modification, termination or breach thereof, and any proceeds of the foregoing; and any and all monies and claims for monies, due or to become due to such Debtors with respect to the requisition for use or requisition of title, by seizure, condemnation, confiscation, sequestration or compulsory acquisition or otherwise, by act of any country or any governmental authority or otherwise, of any Wells Fargo Vessel, and all claims for damages or compensation with respect, and any proceeds of the foregoing (collectively, the "**Earnings Collateral**"); and

(u)     that certain Assignment of Insurances, dated as of October 30, 2013, as amended by that certain First Amendment to Assignment of Insurances, dated as of February 4, 2015, and that certain Second Amendment to Assignment of Insurances, dated as of March 12, 2020, pursuant to which B. No. 210 Corp., B. No. 215 Corp., B. No. 225 Corp., B. No. 245 Corp., B. No. 250 Corp., B. No. 260 Corp., Tug Brendan J. Bouchard Corp., Tug Danielle M. Bouchard Corp., Tug Jane A. Bouchard Corp., Tug Evening Star Corp., B. No. 242 Corp., B. No. 262 Corp., B. No. 295 Corp., Tug Bouchard Girls Corp., Tug Morton S. Bouchard, IV Corp., B. No. 270 Corp., Tug Kim M. Bouchard Corp., B. No. 252 Corp., and Tug Evening Breeze Corp. granted, bargained, assigned, transferred, conveyed, mortgaged, pledged and confirmed to Wells Fargo, and granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon, all moneys and claims for moneys due and to become due to such Debtors with respect to any loss of a Wells Fargo Vessel, including, without limitation, requisition for title, seizure, condemnation, confiscation, sequestration or compulsory acquisition or otherwise of a Wells Fargo Vessel, and all claims for damages or compensation with respect thereto; and all policies and contracts of

insurance of whatsoever nature and all entries with protection and indemnity clubs or societies (to the fullest extent that the rules of the relevant insurance company club or society allow such assignment) taken out in respect of such Debtors' interests in the Wells Fargo Vessels, including, without limitation, all machinery, materials, equipment, appurtenances, and outfits thereon, including, without being limited to, hull and machinery, war risks, protection and indemnity, and title requisition or otherwise howsoever and all the benefits thereof, including all claims of whatsoever nature and return of premiums, together with the income payments and proceeds of any and all of the foregoing (collectively, the "**Insurance Collateral**").

(iv)    In connection with the Wells Fargo Security Documents, Wells Fargo, among other things, filed the items described on **Schedule 1** attached hereto.

(v)    The prepetition loan documents described in this paragraph F, as amended, supplemented, or otherwise modified prior to the Petition Date, together with all collateral and ancillary documents executed in connection therewith are collectively referred to herein as the "**Wells Fargo Loan Documents**," and the principal, interest, costs, expenses, fees, and other amounts owing under the Wells Fargo Loan Documents are collectively referred to herein as the "**Wells Fargo Indebtedness**."

(vi)    *Prepetition Aircraft Loan.*  Fortress Credit Co, LLC ("**Fortress**"), as agent and initial lender, the lenders party thereto from time to time (collectively, the "**Aircraft Lenders**" and collectively with Fortress, the "**Aircraft Secured Parties**" (the Aircraft Secured Parties together with Fortress and Wells Fargo, the "**Prepetition Secured Parties**"), and BTC are parties to that certain Loan and Aircraft Security Agreement, dated as of March 10, 2020 (the "**Loan and Aircraft Security Agreement**" and collectively with the Wells Fargo Loan Documents, the "**Prepetition Loan Documents**"), pursuant to which the Aircraft Lenders made a loan in the principal amount of $25 million (the "**Aircraft Loan**" and together with the Prepetition Revolving Credit Facility and the Wells Fargo P-Card Facilities, the "**Prepetition Facilities**") available to BTC.  As of the Petition Date, not less than $25,258,333.33 was due and owing under the Aircraft

Loan (inclusive of principal and accrued interest), plus certain fees and expenses, and reimbursement of that certain $140,767.00 protective advance made by Fortress on or about October 9, 2020 with respect to insurance of the Aircraft Collateral (the "**Aircraft Insurance Advance**").

(vii)   Subject to the Challenge Period set forth in paragraph 23 the Debtors admit, stipulate, and agree that (a) they are liable to Wells Fargo for (collectively, the "**Wells Fargo Secured Claim**"):  (1) Wells Fargo Indebtedness as of the Petition Date in an aggregate amount of at least $163,469,952.06 (the "**WF Stipulated Amount**"); and (2) interest, fees, costs, expenses, and other amounts accruing under the Wells Fargo Loan Documents after the Petition Date, including, without limitation, reimbursable costs and expenses incurred by Wells Fargo in connection with maintaining the collateral security for the Wells Fargo Indebtedness (collectively, the "**Maintenance Expenses**"), including, without limitation, the payment of (A) insurance premiums on behalf of the Debtors and their affiliates (collectively, the "**Insurance Premiums**") and (B) the necessary fees, costs, and expenses of continuing the prepetition substitute custodianships of the Wells Fargo Vessels (as described in the First Day Declaration) (collectively, the "**Substitute Custodianship Expenses**"); and (b) the Wells Fargo Secured Claim constitutes an allowable, legal, valid, binding, enforceable, and non-avoidable obligation of the Debtors.

(viii)   Subject to the Challenge Period set forth in paragraph 23, the Debtors admit, stipulate, and agree that, as security for repayment of the Wells Fargo Secured Claim, Wells Fargo holds valid, binding, enforceable, perfected, and non-avoidable first-priority (subject only to Permitted Liens, as defined in the Prepetition Credit Agreement) liens upon and security interests in (collectively, the "**Wells Fargo Liens**"):  (a) the B. No. 210 Collateral; (b) the B. No. 215 Collateral; (c) the B. No. 225 Collateral; (d) the B. No. 242 Collateral; (e) the B. No. 245

Collateral; (f) the B. No. 250 Collateral; (g) the B. No. 252 Collateral; (h) the B. No. 260 Collateral; (i) the B. No. 262 Collateral; (j) the B. No. 270 Collateral; (k) the B. No. 295 Collateral; (l) the Kim M. Bouchard Collateral; (m) the Evening Breeze Collateral; (n) the Evening Star Collateral; (o) the Morton S. Bouchard IV Collateral; (p) the Jane A. Bouchard Collateral; (q) the Brendan J. Bouchard Collateral; (r) the Danielle M. Bouchard Collateral; (s) the Bouchard Girls Collateral; (t) the Earnings Collateral, and (u) the Insurance Collateral (collectively, the "**Wells Fargo Collateral**").

(ix)     Subject to the Challenge Period set forth in paragraph 23, the Debtors admit, stipulate, and agree that:  (a) no portion of the Wells Fargo Secured Claim, no Wells Fargo Loan Document, and no Wells Fargo Lien is subject to any cause of action, contest, attack, objection, recoupment, defense, offset, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined in the Bankruptcy Code), impairment, subordination or other challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law (any of the foregoing, a "**Challenge**"); and (b) there are no existing Challenges against Wells Fargo arising from the relationship between BTC and the Prepetition Guarantors, on the one hand, and Wells Fargo, on the other hand.

(x)     Subject to the Challenge Period set forth in paragraph 23, the Debtors admit, stipulate, and agree that the Wells Fargo Collateral includes "cash collateral" as defined in Section 363(a) of the Bankruptcy Code and any and all of the Debtors' cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents that are proceeds, products, offspring, rents, or profits of the Wells Fargo Collateral constitute "cash collateral" as defined in Section 363(a) of the Bankruptcy Code (collectively, the "**Wells Fargo Cash Collateral**").

(xi)   *Aircraft Secured Claim*.   Subject to the Challenge Period set forth in paragraph 23 the Debtors admit, stipulate, and agree that they are liable to the Aircraft Secured Parties for (the "**Aircraft Secured Claim**" and together with the Wells Fargo Secured Claim, the "**Prepetition Secured Claims**") principal (in an amount not less than $25,000,000.00), interest (in an amount not less than $258,333.33), costs, expenses, fees, and other amounts owing under the Loan and Aircraft Security Agreement (including the Aircraft Insurance Advance).

(xii)   Subject to the Challenge Period set forth in paragraph 23, the Debtors admit, stipulate, and agree that, as security for repayment of the Aircraft Secured Claim, the Aircraft Secured Parties hold valid, binding, enforceable, perfected, and non-avoidable first-priority liens upon and security interests in (collectively, the "**Aircraft Liens**" and collectively with the Wells Fargo Liens, the "**Prepetition Liens**") the Collateral (as defined in the Loan and Aircraft Security Agreement) (the "**Aircraft Collateral**" and collectively with the Wells Fargo Collateral, the "**Prepetition Collateral**").

(xiii)   Subject to the Challenge Period set forth in paragraph 24, the Debtors admit, stipulate, and agree that the Aircraft Collateral includes "cash collateral" as defined in Section 363(a) of the Bankruptcy Code and any and all of the Debtors' cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents that constitute the traceable proceeds, products, offspring, rents, or profits of the Aircraft Collateral (including, for the avoidance of doubt, the proceeds of any sale of the Aircraft Collateral) constitute "cash collateral" of the Aircraft Secured Parties as defined in Section 363(a) of the Bankruptcy Code.

(xiv)   *Value of Prepetition Liens and Prepetition Claims*.   The aggregate value of the Prepetition Collateral exceeds the aggregate amount of the Prepetition Secured Claims and the

claims of the Prepetition Secured Parties arising under, and secured by, the applicable Prepetition

Debt Documents (together with all interest, fees, costs and other charges allowable under section

506(b) of the Bankruptcy Code) constitute allowed, secured claims within the meaning of sections

502 and 506 of the Bankruptcy Code.

(xv)     *No Control*.  None of the Prepetition Secured Parties control the Debtors or

their properties or operations, have authority to determine the manner in which any Debtor's

operations are conducted or are control persons or insiders of the Debtors by virtue of any of the

actions taken with respect to, in connection with, related to or arising from any of the Prepetition

Debt Documents.

G.     *Findings Regarding the DIP Facility and Use of Cash Collateral*.

(i)     Good and sufficient cause has been shown for the entry of this Interim

Order.

(ii)     The Debtors have an immediate and critical need to obtain the DIP Facility

and to use Prepetition Collateral (including Cash Collateral) in each case on an interim basis to

permit, among other things, the orderly continuation of the operation of their businesses, to

maintain business relationships with vendors, suppliers, employees and customers, to make

payroll, to make capital expenditures, to satisfy other working capital and operational needs and

to fund expenses of these Chapter 11 Cases.  The Debtors' access to sufficient working capital and

liquidity through the use of Cash Collateral and other Prepetition Collateral and the incurrence of

new indebtedness under the DIP Facility is necessary and vital to the preservation and maintenance

of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(iii)     The Debtors are unable to obtain financing on more favorable terms from

sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate

unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain unsecured and/or secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors (x) granting to the DIP Secured Parties, subject to the Carve Out, the DIP Liens (as defined herein) and, subject to the Carve Out, the Prepetition Liens, and the Adequate Protection Obligations, the DIP Superpriority Claims (as defined herein) and (y) subject to the Carve Out, incurring the Adequate Protection Obligations, in each case, under the terms and conditions set forth in this Interim Order and the DIP Documents.

(iv)     Based on the Motion, the DIP Declaration, the First Day Declaration and the record presented to the Court at the Interim Hearing, the terms of the DIP Facility, the terms of the Adequate Protection Obligations and the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(v)     To the extent such consent is required, the Prepetition Secured Parties have consented or are deemed to have consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral and the Debtors' entry into the DIP Term Sheet and this Interim Order.

(vi)     The DIP Facility, the Adequate Protection Obligations and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Debtors, the Prepetition Secured Parties, and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Documents, including, without limitation, all DIP Loans made to the

Debtors pursuant to the DIP Documents and any DIP Obligations shall be deemed to have been extended by the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(vii)    The Prepetition Secured Parties are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral.

(viii)    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) and the Local Bankruptcy Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and the use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties. The Motion and this Interim Order comply with the requirements of Local Bankruptcy Rule 4001-1(b).   Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) and the Local Bankruptcy Rules.

H.     _Good Faith of the DIP Agent and the DIP Lenders_.

(i)     *Willingness to Provide Financing*.  The DIP Lenders have indicated a willingness to provide postpetition financing to the Debtors subject to, among other things:  (a) the entry by the Court of this Interim Order and the Final Order; (b) approval by the Court of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by the Court that such financing is essential to the Debtors' estates, that the DIP Agent and the DIP Lenders are extending postpetition credit to the Debtors pursuant to the DIP Documents and this Interim Order in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Facility, including the extension of credit, the fees and other amounts paid and to be paid thereunder:  (a) are fair and reasonable; (b) are the best available to the Debtors under the circumstances; (c) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; and (d) are supported by reasonably equivalent value and fair consideration.  The DIP Facility was negotiated in good faith and at arms' length among the Debtors, the DIP Agent, and the DIP Lenders.  The credit to be extended under the DIP Facility shall be deemed to have been so advanced, made, used and/or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. *Interim Access to Financing Approved.*  The Motion is hereby granted on an interim basis, on the terms and conditions set forth in this Interim Order and the DIP Documents.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2. *Authorization of the DIP Facility and the DIP Documents.*

   (a)   The Debtors are hereby authorized to execute, deliver, enter into and perform all of their obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  To prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to borrow the DIP Loans from the DIP Lenders under the DIP Facility (and the DIP Guarantors are hereby authorized to unconditionally guarantee, on a joint and several basis, the repayment of the DIP Facility) up to an aggregate principal amount of $28,800,000 (to be funded net of the Original Issue Discount (as defined in the DIP Term Sheet) and the Structuring Fee (as defined in the DIP Term Sheet) as provided for in the DIP Documents) (the "**Interim Financing**"), subject to the terms and conditions set forth in this Interim Order and the DIP Documents.  All DIP Loans shall be borrowed with the Original Issue Discount as provided for in the DIP Documents, which is hereby approved. The Structuring Fee and the Exit Fee (as defined in the DIP Term Sheet) and payment of the Structuring Fee from the proceeds of any DIP Loans, are hereby approved.  The DIP Lenders shall have no obligation to

make any loan or advance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived in accordance with the DIP Documents.  Notwithstanding anything to the contrary contained herein, the Debtors are not authorized by this Interim Order to borrow any DIP Loans in excess of the Interim Financing.

        (b)    On the Closing Date, the Initial DIP Draw shall be available prior to entry into the DIP Credit Agreement, following the satisfaction of the "Interim Conditions" set forth on Schedule 2 attached hereto.  Prior to entry into the DIP Credit Agreement, the provisions of the DIP Term Sheet, this Interim Order and any other executed DIP Documents shall govern the parties' rights with respect to the DIP Loans.  As soon as practicable, but before November 30, 2020, (as such date may be extended by the agreement of the Debtors and the DIP Agent, at the direction of the Required DIP Lenders) (the "**Credit Agreement Deadline**"), the Debtors, the DIP Agent and the DIP Lenders shall enter into the DIP Credit Agreement and related DIP Documents, in each case, in form and substance satisfactory to the Debtors, the DIP Agent, and the DIP Lenders.  The Debtors, the DIP Agent and the DIP Lenders shall negotiate the terms of the DIP Credit Agreement in good faith, and such DIP Credit Agreement shall be in form and substance substantially similar to the [Wells Fargo Loan Agreement], with such modifications (i) as set forth herein and in the DIP Term Sheet, (ii) necessary to reflect the terms of this Interim Order and/or the Final Order, as applicable, (iii) usual and customary for debtor-in-possession financings of this kind and/or otherwise necessary or desirable to effectuate the financing contemplated hereby with due regard to the capital structure, operational requirements and industry of the Debtors and the existence and continuance of the Chapter 11 Cases (including customary representations and warranties, covenants and events of default for debtor-in-

possession financings of this kind) and (iv) as required by the DIP Lenders.  The DIP Credit Agreement shall include usual and customary yield protection provisions in respect of compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes).  The parties shall also enter into DIP Documents usual and customary for debtor-in-possession financings of this type and/or reasonably necessary or desirable to effectuate the financing contemplated hereby, including, without limitation, security agreements and ship mortgages related to certain assets.  The DIP Documents shall include, at the sole discretion of the Required DIP Lenders, usual and customary restrictions on alienation of the Specified Vessels and DIP Collateral, including, but not limited to, limitations on certain forms of charter arrangements, a requirement for the subordination of interests of charter parties, required insurance and endorsements, navigation limits and other operational requirements for the Specified Vessels.  Notwithstanding the foregoing or any other provision hereof, thresholds, grace periods, cure periods, materiality qualifiers and definitions of "Material Adverse Effect" shall be removed or otherwise modified in the manner customary for debtor-in-possession facilities of this kind or as agreed by the DIP Lenders and the Borrower. The foregoing shall be collectively referred to herein as the "**DIP Documentation Principles**."

(c)      The Debtors shall file on the docket of these Chapter 11 Cases a copy of the executed DIP Credit Agreement within one day following the execution thereof.  Upon execution of the DIP Credit Agreement, (i) the DIP Term Sheet shall no longer be in force and effect and (ii) the DIP Credit Agreement will be binding and enforceable against the Debtors, as of the date of the entry of this Interim Order, as if the DIP Credit Agreement was executed upon entry of this Interim Order.  Any actions taken in accordance with the DIP Term Sheet will be deemed to have been in taken in accordance with the DIP Credit Agreement or other applicable DIP Documents.

If the DIP Credit Agreement is not executed by the Credit Agreement Deadline, the DIP Facility shall terminate without further notice or Court order (with such event being deemed an Event of Default hereunder).  Upon an Event of Default occurring prior to the execution of the DIP Credit Agreement, the DIP Secured Parties shall, subject to the Remedies Notice Period (as defined herein), have all rights and remedies under this Interim Order and under applicable law for a transaction of this type under these facts and circumstances and the Debtors, without prejudice to any other position or argument the Debtors may take, shall not, in any court or other forum, defend against any rights or remedies asserted by the DIP Secured Parties based of the absence of a formal executed credit agreement, security agreement or other ancillary document at the time of an Event of Default.

(d)     The DIP Facility is hereby approved.  In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments, certificates, agreements and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees and expenses in connection with or that may be reasonably required, necessary, or desirable for the Debtors' performance of their obligations under or related to the DIP Facility, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents, supplements or other modifications to and under the DIP Documents, in each case, in such form as the Debtors and the DIP Agent may agree, it being understood that no further approval of the

Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents that do not shorten the scheduled maturity of the extensions of credit thereunder or increase the aggregate DIP Commitments (as defined in the DIP Term Sheet) under the DIP Facility or the rate of interest or fees payable thereunder or add additional collateral;

(iii)   the non-refundable payment to the DIP Secured Parties of all fees, including the Original Issue Discount, the Structuring Fee and the Exit Fee (which fees shall be, and shall be deemed to have been, approved upon entry of this Interim Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification obligations and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders, in each case in their respective capacities as such, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party, except as expressly set forth herein; and

(iv)     the making and the incurrence of the BTC Loan and the execution and delivery of, and performance under, such documents as may be necessary or desirable in connection therewith;

(v)      the performance of all other acts necessary, appropriate and/or desirable under or in connection with the DIP Documents.

3.      *DIP Obligations*.  For purposes hereof, the term "DIP Obligations" means, without limitation, for the avoidance of doubt, any and all principal, interest, fees (including the Original Issue Discount, the Structuring Fee and the Exit Fee), fees of the DIP Agent, payments, costs, expenses, charges, any obligations in respect of indemnity claims, whether contingent or absolute, due under the DIP Documents and any other amounts that are or may become due under the DIP Documents, in each case, whether or not such fees arose before or after the Petition Date, as such amounts become earned, due and payable under the DIP Documents, without the need to obtain further Court approval.  The DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable against each Debtor and their estates in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). The DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Secured Parties, in each case, under, or secured by, the DIP Documents or this Interim Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the DIP Documents.  The DIP Obligors shall be jointly and severally liable for the DIP

Obligations.  No obligation, payment, transfer or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens) shall be stayed, restrained, voidable, avoidable or recoverable, under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.      *Carve Out*.

(a)      Carve Out.  As used in this Interim Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below) in an aggregate amount not to exceeds $100,000; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Creditors' Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent or the Required DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by

the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional

Fees of Professional Persons in an aggregate amount not to exceed $3,500,000 incurred after the

first business day following delivery by the DIP Agent or the Required DIP Lenders of the Carve

Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order,

or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice**

**Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice

delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead

restructuring counsel, the U.S. Trustee, counsel to the Prepetition Secured Parties, and counsel to

the Creditors' Committee, which notice may be delivered following the occurrence and during

the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP

Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.  Upon the receipt

of the Carve Out Trigger Notice, the Debtors shall provide immediate notice to all Estate

Professionals informing them that such notice was delivered and further advising them that the

Debtors' ability to pay such Estate Professionals is subject to and limited by the Carve Out.

(b)     Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is

given by the DIP Agent or the Required DIP Lenders to the Debtors with a copy to counsel to the

Prepetition Secured Parties and counsel to the Creditors' Committee (the "**Termination**

**Declaration Date**"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice

of borrowing by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on

the then outstanding DIP Commitments), in an amount equal to the then unpaid amounts of the

Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and

(ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any

available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then

unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter (excluding the proceeds referred to in paragraph 17 hereof) held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims.  On the third business day after the DIP Agent gives such notice to the DIP Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding DIP Commitment (on a pro rata basis based on the then outstanding DIP Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the

obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay, as applicable, Wells Fargo, Fortress, or the DIP Agent for the benefit of the DIP Lenders on a *pro rata* basis based on their respective funding of the Post-Carve Out Trigger Notice Reserve.  Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 4, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 4, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  For the avoidance of doubt, notwithstanding anything to the contrary contained herein, nothing herein shall require the DIP Secured Parties to advance or fund DIP Loans in an aggregate amount greater than $60,000,000, after taking into account any DIP Loans previously advanced, the Structuring Fee, the Original Issue Discount and any netted fees or other amounts payable to the DIP Secured Parties.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, Wells Fargo, and Fortress shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets but excluding cash proceeds described in paragraph 17 hereof) of the Debtors until

the Carve Out Reserves have been fully funded, but shall have a fully perfected, non-avoidable security interest in any residual interest in any residual cash after any excess of the Carve Out Reserves is paid to the DIP Agent, Wells Fargo, or Fortress, as applicable, for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Sources and Uses, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens (as defined below), the Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Claims (except liens on the proceeds referred to in paragraph 17 hereof).

(c)      Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)      No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent,

the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out by DIP Loans shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(f)     *Objection Rights*.  Nothing contained herein is intended to constitute, nor shall be construed as consent to, the allowance of any Professional Person's fees, costs or expenses by any party and shall not affect the rights of the DIP Secured Parties or the Prepetition Secured Parties to object to the allowance of any such amounts incurred or requested.

5.     *DIP Superpriority Claims*.  Subject only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims (the "**DIP Superpriority Claims**") against each of the DIP Obligors (without the need to file any proof of claim) (a) with priority over any and all any and all administrative expense claims, unsecured claims and all other claims against the DIP Obligors or their estates in any of the Chapter 11 Cases or any Successor Cases (other than the Carve Out), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses, unsecured claims, or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c) (subject

32

to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment and (b) which shall at all times be senior to the rights of the DIP Obligors or their estates, and any trustee appointed in the Chapter 11 Cases or any Successor Cases to the extent permitted by law; provided that the DIP Superpriority Claim shall be *pari passu* with the Wells Fargo Superpriority Claim and the Fortress Superpriority Claim.  The DIP Superpriority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each DIP Obligor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral and all other prepetition and postpetition assets and property of the DIP Obligors and all proceeds thereof, including, subject to entry of the Final Order, Avoidance Action Proceeds (as defined herein).  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

6.      *BTC Loan Superpriority Claim*.  Subject only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, the BTC Loan shall constitute an allowed superpriority administrative expense claim (the "**BTC Superpriority Claim**") of the Borrower against BTC (without the need to file any proof of claim) with priority over any and all any and all administrative expense claims, unsecured claims and all other claims against BTC or its estate in the BTC Chapter 11 Case or any Successor Cases (other than the Carve Out), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses, unsecured claims, or other claims of the kinds specified in or ordered pursuant to

sections 105, 326, 327, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, provided that the BTC Superpriority Claim shall be *pari passu* with the Wells Fargo Superpriority Claim and the Fortress Superpriority Claim. The BTC Superpriority Claim shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code.

7.     *DIP Liens*.  As security for the DIP Obligations, immediately upon, and effective as of, the date of this Interim Order, the DIP Agent, for the benefit of itself and each of the other DIP Secured Parties, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on (collectively, the "**DIP Liens**") all DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all of the DIP Obligations, without the necessity of the execution, recordation or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent.

The term "**DIP Collateral**" means all of the DIP Obligors' rights, title and interests in, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the DIP Obligors, or leased from or to, the DIP Obligors, and regardless of wherever located:  (a) the barges and tugs identified on Annex A to the DIP Term Sheet (the "**Specified Vessels**", and together with the items set forth clause (d) below the "**Specified Vessel Collateral**") and any and all proceeds thereof or received in connection therewith, (b) subject to entry of the Final Order, all proceeds of

Case 20-34682   Document 141   Filed in TXSB on 10/22/20   Page 35 of 98

claims and causes of action arising under chapter 5 of the Bankruptcy Code ("**Avoidance Action Proceeds**"), (c) the BTC Loan and the related loan, collateral and ancillary documents executed in connection therewith, and (d) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing, including any and all proceeds of any insurance, indemnity, warrant or guaranty payable to such DIP Obligor from time to title with respect to any of the foregoing.

(a)     To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the DIP Obligors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any DIP Obligor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Documents and this Interim Order or in favor of the Prepetition Secured Parties in accordance with this Interim Order.

8.     *Priority of DIP Liens.*  The DIP Liens shall have the following priorities:

(a)     *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, fully perfected first priority security interest in and lien upon all DIP Collateral that is not subject to liens that were existing, valid, enforceable, properly perfected and non-avoidable as of the Petition Date (the "**Unencumbered DIP Collateral**"), which Unencumbered DIP Collateral shall, for the avoidance of doubt, include the Specified Vessel Collateral, the BTC Loan and, subject to entry

of the Final Order, Avoidance Action Proceeds, subject and subordinate only to the Carve Out; provided, however, that to the extent any of the Specified Vessel Collateral is subject to a valid, enforceable, properly perfected and non-avoidable lien as of the Petition Date, the DIP Liens on such Specified Vessel Collateral shall, pursuant to section 364(c)(3) of the Bankruptcy Code, be junior liens, subject only to such existing valid, enforceable, properly perfected and non-avoidable liens and the Carve-Out;

(b)    Except as expressly set forth herein, the DIP Liens and the DIP Superpriority Claims:  (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code.

9.    Use of DIP Facility Proceeds.  From and after the Closing Date, the Debtors shall be permitted to draw upon the Interim Financing and use the proceeds of the DIP Facility only for the following purposes set forth in the "Use of Proceeds" section of the DIP Term Sheet, in each case, solely in accordance with and subject to this Interim Order, the DIP Documents and the Sources and Uses (subject to Permitted Deviations).  A "**Permitted Deviation**" means, when used in respect of the Sources and Uses, 25%, which shall only apply to expenses relating to (a) employees, (b) insurance, (c) maritime liens and (d) other expenses.  Permitted Deviation,

36

when used in respect of the Budget, shall be agreed by the DIP Lenders and the Debtors in good faith prior to entry of the Final Order.  No deviation (including a Permitted Deviation) from the Sources and Uses and/or the Budget shall cause a change to the aggregate amount of the DIP Loan Commitments, the Initial DIP Draw, or the Final DIP Draw.  Prior to entry of the Final Order, the Debtors shall provide the DIP Secured Parties a business plan and 13-week budget (acceptable to the DIP Secured Parties in all respects) providing for, with respect to each of the Debtors' barges and tugs, the licensing and operation of such vessel during such 13-week period.

      10.    *DIP Events of Default.*

      (a)    Without requiring further order from the Court and without the need for filing any motion for relief from the automatic stay or any other pleading, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent or the Required DIP Lenders (as defined in the DIP Term Sheet or the DIP Credit Agreement, the "**Required DIP Lenders**"), immediately upon the occurrence and during the continuance of any Event of Default (as defined in the DIP Documents or as otherwise provided herein, in either case, an "**Event of Default**"), to send written notice of the occurrence of an Event of Default (such notice, the "**Event of Default Notice**") to the Debtors, the U.S. Trustee, counsel for the Prepetition Secured Parties, and any statutory committee appointed in these cases.  Upon the delivery of the Event of Default Notice, the DIP Agent (acting at the direction of the Required DIP Lenders, if applicable) may (a) after giving effect to paragraph 4 hereof with respect to the Carve Out, immediately terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (b) declare all DIP Obligations to be immediately due and payable; (c) invoke the right to charge interest at

the default rate under the DIP Documents; and (d) one (1) business day after delivery of the Event of Default Notice, foreclose on the BTC Loan (subject to any appropriate remedy the Court may fashion at the Stay Relief Hearing (as defined herein)).  Five (5) business days after delivery of an Event of Default Notice, which period shall run concurrently with any notice required to be provided under the DIP Documents (the "**Remedies Notice Period**"), the DIP Agent (acting at the direction of the Required DIP Lenders, if applicable) may file a motion on shortened notice seeking relief from the automatic stay (the "**Stay Relief Motion**").  Pending the hearing on the Stay Relief Motion (the "**Stay Relief Hearing**"), the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of an Event of Default) or Cash Collateral to (a) fund expenses necessary to preserve the business in accordance with the DIP Documents and the Sources and Uses (subject to Permitted Deviations) or otherwise agreed to in writing by the DIP Agent (acting at the direction of the Required DIP Lenders) and (b) to fund the Carve Out Reserves.  Upon the Court's ruling at the Stay Relief Hearing, the Court may fashion any appropriate remedy, including, without limitation, permitting the DIP Secured Parties to (a) enforce any and all rights against the DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral, collection of accounts receivable, occupying the Debtors' premises, sale or disposition of the DIP Collateral; and (b) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents or applicable law.  If the DIP Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral following the hearing on the Stay Relief Motion, the Debtors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security interests in the

DIP Collateral.  Notwithstanding the occurrence of an Event of Default, the Maturity Date, and/or termination of the DIP Commitments under the DIP Facility, all of the rights, remedies, benefits, and protections provided to the DIP Secured Parties under the DIP Documents and this Interim Order, as applicable, shall survive.

(b)     For purposes of this Interim Order, each of the following, unless waived or consented to by the DIP Agent or the Required DIP Lenders, shall constitute an "Event of Default":  (i) the twelve (12) month anniversary of the date of entry of this Interim Order, subject to a six (6) month extension agreed to in writing at the sole discretion of the DIP Lenders; (ii) the date that is forty five (45) days after entry of this Interim Order if the Final Order, in form and substance acceptable to the Required DIP Lenders, is not entered by the Bankruptcy Court on or before such date; (iii) the consummation of a sale of substantially all of the DIP Obligors' assets pursuant to section 363 of the Bankruptcy Code; (iv) the substantial consummation or effective date of any chapter 11 plan; (v) a failure of the Debtors to (x) observe or perform in any material respect any of the terms or provisions contained in this Interim Order or (y) comply with any covenant or agreement in this Interim Order, in each case, in any material respect; (vi) any modification, amendment or extension of this Interim Order that is adverse to the DIP Lenders; (vii) an order converting to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases; (viii) an order appointing a chapter 11 trustee in the Chapter 11 Cases; (ix) an order appointing an examiner with enlarged powers in the Chapter 11 Cases (beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code); (x) on November 30, 2020 if each of the Specified Vessels shall not be secured by a valid and enforceable, and duly recorded, first lien mortgage in favor of the DIP Agent for the benefit of the DIP Secured Parties, on terms and conditions satisfactory to the DIP Agent; (xi) prior to execution of the DIP Credit Agreement, the

occurrence of any "Specified Event of Default" set forth on <u>Schedule 2</u> attached hereto; or (xii) after entry into the DIP Credit Agreement, the occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement.

(c)     Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or that otherwise is at any time entered:  (x) the DIP Superpriority Claims, the DIP Liens, the Adequate Protection Liens, and the Carve Out shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash, and such DIP Superpriority Claims, DIP Liens, and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest; (y) the other rights granted by this Interim Order shall not be affected; and (z) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(d)     Subject to entry of the Final Order:  (i) in no event shall the DIP Secured Parties or Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral; and (ii) the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Liens, the Adequate Protection Liens, the Prepetition Secured Claims, or the Prepetition Collateral or any proceeds, products, offspring or profits thereof.

(e)     No rights, protections or remedies of the DIP Secured Parties or the Prepetition Secured Parties granted by the provisions of this Interim Order or any DIP Documents,

as applicable, shall be limited, modified or impaired in any way by (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

11.     *Limitation on Charging Expenses against Collateral*.  Except to the extent of the Carve Out and subject to entry of the Final Order, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders) (for any time period prior to entry of the Final Order) and the Prepetition Secured Parties, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment or claim against the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

12.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Agent (on its own behalf or on behalf of the DIP Lenders) or the Prepetition Secured Parties pursuant to the provisions of the DIP Orders or any subsequent order of the Court shall, subject to the reservation of rights set out in paragraph 23 of this Interim Order with respect to the Prepetition Secured Parties, be irrevocably received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly

or indirectly, section 506(c) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors.

13.    *Use of Cash Collateral*.  Pursuant to section 363(c) of the Bankruptcy Code, the Debtors shall be, and hereby are authorized to use Cash Collateral, if any, on an interim basis, upon (and only upon) the terms and conditions set forth in this Interim Order.

14.    *Wells Fargo Termination Date*.  Unless extended with the written consent of Wells Fargo (confirmed by the entry of a further order of this Court), or by further order of this Court, the authorization granted to the Debtors to use Wells Fargo Collateral that constitutes Wells Fargo Cash Collateral under this Interim Order shall terminate immediately upon the *earliest* to occur of the following unless waived in writing by Wells Fargo (the date of such termination being the "Wells Fargo Termination Date"):  (i) the entry of an order dismissing any of the Chapter 11 Cases; (ii) the entry of an order converting any of the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code; (iii) the entry of an order appointing a trustee or an examiner with expanded powers for any of the Debtors' estates or with respect to any of the Wells Fargo Collateral; (iv) entry of an order reversing, vacating, or otherwise amending, supplementing, or modifying this Interim Order with respect to any provisions that materially and adversely impact Wells Fargo; (v) the date that is forty-five (45) days after entry of this Interim Order, if the Final Order on the Motion has not been entered by this Court on or before such date; (vi) the entry of an order granting relief from the automatic stay to any creditor (other than Wells Fargo) holding or asserting a lien in the Wells Fargo Collateral in an amount in excess of $4,500,000; (vii) the filing by the Debtors of any motion in any of the Chapter 11 Cases, without Wells Fargo's prior written consent, to obtain financing under Section 364 of the Bankruptcy Code from any person or entity, if the terms of such financing seek a lien on any Wells Fargo Collateral senior or equal to the Wells Fargo

42

Liens; (viii) entry of an order for relief under Section 506(c) of the Bankruptcy Code with respect to the Wells Fargo Collateral; (ix) the effective date of any confirmed chapter 11 plan in any of the Chapter 11 Cases; (x) the date of the consummation of a sale or other disposition of all or substantially all of the Wells Fargo Collateral; (xi) any such date set forth in the Final Order that is not thereafter extended by a subsequent order of this Court; and (xii) the failure of the Debtors to comply with the terms and conditions of this Interim Order.   Notwithstanding any such termination, the rights and obligations of the Debtors and the rights, benefits, and protections afforded to Wells Fargo under this Interim Order shall remain unimpaired and unaffected by any such termination and shall survive any such termination.

15.     *Disposition of DIP Collateral/Mandatory Prepayments.*

(a)     Unless the DIP Obligations are indefeasibly paid in full, in cash, upon the closing of a sale or other disposition of the DIP Collateral, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral (other than any such transactions permitted under the terms of DIP Credit Agreement, including dispositions of equipment that is obsolete or worn out or that is no longer useful in the ordinary course of business and consistent with past practices or that is replaced or to be replaced in the ordinary course of business and consistent with past practices (it being agreed and understood that any such equipment which replaces equipment that constitutes DIP Collateral shall also constitute DIP Collateral) (collectively, "**Permitted Dispositions**")) without the prior written consent of the Required DIP Lenders (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Secured Parties, or from any order of this Court), except as otherwise permitted under the DIP Documents or otherwise ordered by the Court.

(b)      The following mandatory prepayments shall be required:  (1) Prepayments of the DIP Facility in an amount equal to 100% of the net cash proceeds of sales or other dispositions of the DIP Collateral without the prior written consent of the Required DIP Lenders; (2)  Prepayments of the DIP Facility in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any part of the DIP Collateral (other than any such proceeds received prior to the Closing Date); and (3) Prepayments of the DIP Facility in an amount equal to 100% of the net cash proceeds received from the incurrence of indebtedness by any of the DIP Obligors (other than such other indebtedness otherwise permitted under the DIP Documents, otherwise consented to by the DIP Lenders, or secured by the Wells Fargo Collateral).  Mandatory Prepayments will result in a dollar-for-dollar permanent reduction of the then-outstanding DIP Loans in accordance with an application waterfall in a manner consistent with the Prepetition Revolving Credit Agreement.  The mandatory prepayment requirements in the DIP Credit Agreement will include the foregoing and will be consistent with the DIP Documentation Principles.

16.      *Adequate Protection of Prepetition Secured Parties*.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral from and after the Petition Date, for any diminution in the value of their interests in the Prepetition Collateral occurring as a result of the entry of this Interim Order, the use of Cash Collateral authorized hereby, and the imposition of the automatic stay in the Chapter 11 Cases.  In consideration of the foregoing, as adequate protection, the Prepetition Secured Parties are hereby granted the following, in each case, subject and subordinate to the Carve Out, solely to the extent of such diminution in value (collectively, the "**Adequate Protection Obligations**"):

(a)    <u>Wells Fargo Replacement Liens</u>.  Notwithstanding anything in Section 552 of the Bankruptcy Code to the contrary, Wells Fargo shall have, and is hereby granted, pursuant to Sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, and non-avoidable replacement liens on and security interests in and on all property and assets of each Prepetition Guarantor and their respective estates, including property and assets acquired by such Debtors and their estates after the Petition Date, except for Avoidance Actions and proceeds thereof (the "**Wells Fargo Replacement Liens**"), solely as and to the extent necessary to adequately protect Wells Fargo from any diminution in the value of its interests in the Wells Fargo Collateral occurring as a result of the entry of this Interim Order, the use of Wells Fargo Cash Collateral authorized hereby, and the imposition of the automatic stay in the Chapter 11 Cases.  Notwithstanding anything to the contrary contained herein, the Wells Fargo Replacement Liens shall not attach to the Specified Vessel Collateral or the Avoidance Action Proceeds.  The Wells Fargo Replacement Liens shall be subject only to (i) valid, binding, enforceable, perfected, and non-avoidable liens on and security interests in such property or assets existing as of the Petition Date or perfected after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code, and (ii) the Carve Out.

(b)    <u>No Impairment of Priority of Wells Fargo Replacement Liens</u>.  The Wells Fargo Replacement Liens shall not be made subject to or *pari passu* with any lien or security interest by any other order entered by the Court in any of the Chapter 11 Cases.  Furthermore, unless and until the Wells Fargo Secured Claim has been indefeasibly satisfied and paid in full, the Wells Fargo Replacement Liens shall remain enforceable and maintain their priority as provided by this Interim Order in any successor Chapter 7 case(s) or any subsequently filed bankruptcy case under any Chapter of the Bankruptcy Code regardless of whether such

successor/subsequent cases are filed in this Court or any other bankruptcy court of competent jurisdiction.

      (c)    <u>Wells Fargo Replacement Lien Perfection</u>.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Wells Fargo Replacements Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, notice of lien, or other similar instrument or document that may otherwise be required under the law of any jurisdiction, or the taking of any other action, to validate or perfect the Wells Fargo Replacement Liens in order to entitle the Wells Fargo Replacement Liens to the priorities granted under this Interim Order.  Notwithstanding the foregoing, Wells Fargo may, in its sole and absolute discretion, file such financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents and is hereby granted relief from the automatic stay imposed by Section 362 of the Bankruptcy Code for the limited purpose of making such filings.  All financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents filed in accordance with this provision shall be deemed to have been filed or recorded at the time and on the date of this Interim Order.  The Debtors shall execute and deliver to Wells Fargo all such financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents as Wells Fargo may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the Wells Fargo Replacement Liens.  Wells Fargo, in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry or recorder of deeds or similar office in any jurisdiction in which any Prepetition Guarantor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

(d)     Wells Fargo Superpriority Claim.     To the extent the Wells Fargo Replacement Liens granted to Wells Fargo in this Interim Order do not provide Wells Fargo with adequate protection of its interests in the Wells Fargo Collateral, Wells Fargo shall have a super-priority administrative expense claim under Section 507(b) of the Bankruptcy Code as necessary to fully compensate Wells Fargo for any diminution in the value of the Wells Fargo Collateral occurring as a result of the entry of this Interim Order, the use of Cash Collateral authorized hereby, and the imposition of the automatic stay in the Chapter 11 Cases (the "**Wells Fargo Superpriority Claim**").   The Wells Fargo Superpriority Claim shall have priority over all administrative expenses of any kind incurred in any of the Chapter 11 Cases, any successor Chapter 7 cases, or any subsequently filed bankruptcy case under any Chapter of the Bankruptcy Code regardless of whether such successor/subsequent cases are filed in this Court or any other bankruptcy court of competent jurisdiction, including such administrative expenses of the kinds specified in, or allowable under, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code; *provided* that the Wells Fargo Superpriority Claim shall be *pari passu* with the DIP Superpriority Claim and shall be subject and subordinate to the Carve Out.

(e)     Wells Fargo Administrative Claim.   As additional adequate protection, Wells Fargo shall have an allowed administrative expense claim under Section 503(b) of the Bankruptcy Code to the extent of the payment by Wells Fargo of (such administrative claim, the "**Wells Fargo Administrative Claim**"):   (i) any Insurance Premiums, (ii) any Substitute Custodianship Expenses, and (iii) any other Maintenance Expenses, provided that such other Maintenance Expenses under this clause (iii) shall not be included in the Wells Fargo Administrative Claim, unless Wells Fargo provided written notice of such other Maintenance Expenses to the Debtors, and the Debtors failed to object to the inclusion of such other Maintenance Expenses to the Debtors, and the Debtors failed to object to the inclusion of such other

47

Maintenance Expenses in the Wells Fargo Administrative Claim within one (1) Business Day following receipt of such written notice. The Wells Fargo Administrative Claim shall be due and payable in full immediately upon the *earlier* to occur of (i) the initial draw of the DIP Facility and (ii) the Wells Fargo Termination Date.

(f)     Fortress Replacement Liens. Notwithstanding anything in Section 552 of the Bankruptcy Code to the contrary, Fortress shall have, and are hereby granted, pursuant to Sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, and non-avoidable replacement liens on and security interests in and on all Aircraft Collateral (the "**Fortress Replacement Liens**" and together with the Wells Fargo Replacement Liens, the "**Adequate Protection Liens**"), solely as and to the extent necessary to adequately protect Fortress from any diminution in the value of its interests in the Aircraft Collateral as a result of the entry of this Interim Order, the use of Cash Collateral authorized hereby, and the imposition of the automatic stay in the Chapter 11 Cases. Notwithstanding anything to the contrary contained herein, the Fortress Replacement Liens shall not attach to the Specified Vessel Collateral or the Avoidance Action Proceeds. The Fortress Replacement Liens shall be subject only to (i) valid, binding, enforceable, perfected, and non-avoidable liens on and security interests in such property or assets existing as of the Petition Date or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, and (ii) the Carve Out.

(g)     No Impairment of Priority of Fortress Replacement Liens. The Fortress Replacement Liens shall not be made subject to or *pari passu* with any lien or security interest by any other order entered by the Court in any of the Chapter 11 Cases. Furthermore, unless and until the Aircraft Loan has been indefeasibly satisfied and paid in full, the Fortress Replacement

48

Liens shall remain enforceable and maintain their priority as provided by this Interim Order in any successor Chapter 7 case(s) or any subsequently filed bankruptcy case under any Chapter of the Bankruptcy Code regardless of whether such successor/subsequent cases are filed in this Court or any other bankruptcy court of competent jurisdiction.

(h)     Fortress Replacement Lien Perfection.   This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Fortress Replacements Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, notice of lien, or other similar instrument or document that may otherwise be required under the law of any jurisdiction, or the taking of any other action, to validate or perfect the Fortress Replacement Liens in order to entitle the Fortress Replacement Liens to the priorities granted under this Interim Order.  Notwithstanding the foregoing, Fortress may, in its sole and absolute discretion, file such financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents and is hereby granted relief from the automatic stay imposed by section 362 of the Bankruptcy Code for the limited purpose of making such filings. All financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents filed in accordance with this provision shall be deemed to have been filed or recorded at the time and on the date of this Interim Order.  The Debtors shall execute and deliver to Fortress all such financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents as Fortress may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the Fortress Replacement Liens.

(i)     Fortress Superpriority Claim.  To the extent the Fortress Replacement Liens granted to Fortress in this Interim Order do not provide Fortress with adequate protection of its interests in the Aircraft Collateral, Fortress shall have a super-priority administrative expense

claim under Section 507(b) of the Bankruptcy Code solely as and to the extent necessary to fully compensate Fortress for any diminution in the value of the Aircraft Collateral occurring as a result of the entry of this Interim Order, the use of Cash Collateral authorized hereby, and the imposition of the automatic stay in the Chapter 11 Cases (the "**Fortress Superpriority Claim**").  The Fortress Superpriority Claim shall have priority over all administrative expenses of any kind incurred in any of the Chapter 11 Cases, any successor Chapter 7 cases, or any subsequently filed bankruptcy case under any Chapter of the Bankruptcy Code regardless of whether such successor/subsequent cases are filed in this Court or any other bankruptcy court of competent jurisdiction, including such administrative expenses of the kinds specified in, or allowable under, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code; *provided* that the Fortress Superpriority Claim shall be shall be *pari passu* with the DIP Superpriority Claim and subject and subordinate to the Carve Out.

(j)     Cash Payment of Postpetition Interest.  As additional adequate protection, the applicable Prepetition Secured Parties shall each receive from the Debtors cash payment of all interest accrued on or after the Petition Date under, and at the non-default rates provided for in, the applicable Prepetition Loan Documents, as and when due.  Each of the Prepetition Secured Parties reserves and preserves its rights to seek additional interest at the default rate as provided for in the applicable Prepetition Loan Documents.

(k)     Reimbursement of Aircraft Insurance Advance.  The Debtors shall reimburse Fortress for the Aircraft Insurance Advance immediately upon receiving the proceeds of the Interim Financing (or as soon as reasonably practicable thereafter).

(l)     _Information Rights_.  The Debtors shall comply with all reasonable diligence requests from Fortress or its representatives with respect to the Aircraft Collateral and from Wells Fargo or its representatives with respect to the Wells Fargo Collateral.

(m)     _Maintenance of Aircraft Collateral_.  The Debtors shall maintain, secure, and insure the Aircraft Collateral in a commercially reasonable manner consistent with historical practice.

(n)     _Payment of Attorneys' Fees_.  As additional adequate protection, the Debtors are authorized and directed to pay all reasonable and documented fees (provided, however, that such documentation may be abridged for attorney-client privilege and related issues), costs, and expenses for the respective professionals of Wells Fargo and Fortress incurred in connection with the Chapter 11 Cases (whether incurred before or after the Petition Date) (the "**Adequate Protection Fees and Expenses**"); _provided_, _however_, that the payment of any such professional fees shall accord with the procedures set forth in paragraph 21, and copies of any invoices submitted in accordance with paragraph 21 shall be provided to counsel to the DIP Lenders concurrently with such invoices being provided to the Debtors.  The use of Cash Collateral to make such adequate protection payments for the fees, costs, and expenses of the respective professionals of Wells Fargo and Fortress shall not constitute a diminution in the value of the their interests in Wells Fargo Collateral or the Fortress Collateral, respectively, giving rise to any additional Adequate Protection Obligations.

(o)     _Modification of the Automatic Stay_.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to:  (i) permit the Debtors to grant the Adequate Protection Liens and to incur all liabilities and obligations to the Prepetition

Secured Parties under this Interim Order; and (ii) authorize the Prepetition Secured Parties to retain and apply payments made to it pursuant to the terms of this Interim Order.

17.     *Sales and Insurance Proceeds*.  Upon the closing of any sale outside of the ordinary course of business of any of the Prepetition Collateral pursuant to Section 363 of the Bankruptcy Code or under a plan of reorganization, the proceeds of such sale shall be paid to the applicable Prepetition Secured Party for immediate application to its allowed Secured Claim, without the need to obtain any further approval from the Court.  Upon the occurrence of any insurable event with respect any of the Prepetition Collateral, the insurance proceeds thereof shall be segregated, pending further order of the Court.

18.     *Section 506(c) Waiver*.  Subject to entry of the Final Order, the Debtors, on behalf of themselves and their estates, waive any and all claims, rights, and powers to surcharge the Prepetition Secured Parties, the Prepetition Collateral, or any property or assets of the Debtors subject to Adequate Protection Liens, pursuant to section 506(c) or section 105(a) of the Bankruptcy Code.  The foregoing waiver shall be binding upon any trustee or examiner with expanded powers appointed for any of the Debtors' estates or with respect to any of the Debtors' property or assets.

19.     *No Admissions / Waiver by Wells Fargo*.  Notwithstanding any other provision in this Interim Order to the contrary, this Interim Order is without prejudice to, and does not constitute a waiver, expressly or implicitly, or relinquishment, of Wells Fargo's rights with respect to any person or entity or any other collateral owned or held by any person or entity. The rights of Wells Fargo are expressly reserved and entry of this Interim Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, or relinquishment, of:

(a)     Wells Fargo's rights to bring or be heard on any matter brought before this Court;

(b)     Wells Fargo's rights under the Prepetition Credit Agreement, the Bankruptcy Code or applicable non-bankruptcy law;

(c)     Wells Fargo's rights to seek any other or supplemental relief in respect of the Debtors;

(d)     Wells Fargo's rights to seek modification of the grant of adequate protection provided under this Interim Order so as to provide different or additional adequate protection or, in the alternative, seek termination of the authorization granted to the Debtors to use Wells Fargo Cash Collateral under this Interim Order; or

(e)     any other respective rights, claims, or privileges (whether legal, equitable, or otherwise) of Wells Fargo.

20.     *Release of Claims*.  Subject to entry of the Final Order and the Challenge Period set forth in paragraph 23, the Debtors and their estates, on their own behalf and on behalf of their past, present, and future predecessors, successors, trustees, examiners, heirs, affiliates, subsidiaries, shareholders, assigns, and other representatives (collectively, "**Debtor Representatives**") hereby release, acquit, and forever discharge the Prepetition Secured Parties, their respective successors and assigns, officers, directors, employees, representatives, trustees, attorneys, agents and affiliates (collectively the "**Released Parties**" and individually a "**Released Party**") from any and all Challenges of any kind and nature whatsoever, direct and/or indirect, at law or in equity, whether now existing or hereafter asserted, whether absolute or contingent, whether due or to become due, whether disputed or undisputed, whether known or unknown, for or because of any matters or things occurring, existing or actions done, omitted to be done, or suffered to be done by

any of the Released Parties, in each case, on or prior to the date of this Interim Order and are in any way directly or indirectly arising out of or in any way connected to any of the Prepetition Secured Claims, the Prepetition Liens, the Prepetition Loan Documents or any of the transactions contemplated thereby, or the relationship between BTC and the Prepetition Guarantors, on the one hand, and the applicable Prepetition Secured Party, on the other hand.

21.     *Payment of Fees and Expenses*.  The Debtors are authorized and directed to pay the reasonable and documented fees, costs, disbursements and expenses of the DIP Secured Parties in accordance with the DIP Documents (the "**DIP Fees and Expenses**") incurred at any time, to the extent provided by the DIP Documents and this Interim Order, whether or not the transactions contemplated hereby are consummated, including, without limitation, legal, accounting, collateral examination, monitoring and appraisal fees and expenses, financial advisory fees and expenses, fees and expenses of other consultants and indemnification and reimbursement of fees and expenses (including, without limitation, the reasonable and documented prepetition and postpetition fees, costs and expenses of Stroock & Stroock & Lavan LLP, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard LLP and any other necessary or appropriate counsel, advisors, professionals or consultants in connection with advising the DIP Secured Parties (collectively the "**DIP Secured Party Advisors**").  Subject to the review procedures set forth in this paragraph 20, payment of all DIP Fees and Expenses and Adequate Protection Fees and Expenses shall not be subject to allowance by the Court.  Professionals to be paid in respect of the DIP Fees and Expenses and the Adequate Protection Fees and Expenses shall not be required to comply with the U.S. Trustee fee guidelines; *provided*, *however*, that any time that any professional seeks payment of fees and expenses from the Debtors, such professional shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the

extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the Debtors, the Creditors' Committee (if appointed) and the U.S. Trustee.  Any objections raised by the Debtors, the U.S. Trustee or a Creditors' Committee (if appointed) with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) days of the receipt of such invoice (the "**Review Period**").  If, after the Review Period, an objection remains unresolved, it will be subject to resolution by the Court.  Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors.  No professional to be paid in respect of the DIP Fees and Expenses and the Adequate Protection Fees and Expenses shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date the fees and expenses of the DIP Secured Party Advisors incurred on or prior to such date (including the funding of retainers) without the need to provide notice to any other party or otherwise comply with the procedures set forth in this paragraph 21.

      22.    *Perfection of DIP Liens*.

      (a)    Without in any way limiting the automatically effective perfection of the DIP Liens granted hereunder, the DIP Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in

order to validate and perfect the liens and security interests granted to them hereunder.  Whether

or not the DIP Secured Parties shall, in their sole discretion, choose to file such financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments,

or take possession of or control over any cash or securities, or otherwise confirm perfection of the

liens and security interests granted to them hereunder, such liens and security interests shall be

deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge,

dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the

reasonable request of the DIP Agent (acting at the direction of the Required DIP Lenders), each

of the Debtors, without any further consent of any party, is authorized and directed to take,

execute, deliver and file such instruments (in each case, without representation or warranty of any

kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens, in

accordance with the DIP Documents.  All such documents will be deemed to have been recorded

and filed as of the Petition Date.

        (b)     A certified copy of this Interim Order may, in the discretion of the DIP

Agent (acting at the direction of Required DIP Lenders), be filed with or recorded in filing or

recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien

or similar instruments, and all filing offices are hereby authorized and directed to accept such

certified copy of this Interim Order for filing and/or recording, as applicable.  The automatic stay

of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the

DIP Agent to take all actions, as applicable, referenced in this subparagraph (b) and the

immediately preceding subparagraph (a).

        (c)     If any or all of the provisions of this Interim Order are hereafter reversed,

modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect:  (i) the

validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt by each of the DIP Agent, Wells Fargo, or Fortress, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any such reversal, modification, vacatur or stay or any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Secured Parties, Wells Fargo, or Fortress, as the case may be, prior to the actual receipt by the DIP Agent, Wells Fargo, or Fortress, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, the DIP Secured Parties, Wells Fargo, and Fortress shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Documents.

(d)     Except as provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate

Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Prepetition Secured Claims are indefeasibly paid in full in cash (other than, with respect to the Prepetition Secured Claims, contingent obligations in respect of unasserted claims), as set forth herein and in the DIP Documents and the Prepetition Debt Documents, as applicable, and the DIP Commitments under the DIP Facility have been terminated.

23.     <u>Proceeds of Subsequent Financing</u>.   Without limiting the provisions of the immediately preceding paragraph, if the Debtors, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the DIP Documents at any time prior to the indefeasible payment in full in cash of all of the DIP Obligations, the satisfaction of the DIP Superpriority Claims, and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility and this Interim Order, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, then unless otherwise agreed by the Required DIP Lenders, all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied to any liquidated and non-contingent DIP Obligations then outstanding pursuant to the DIP Documents; *provided*, *however*, that, with respect to credit obtained or debt incurred pursuant to section 364(d) of the Bankruptcy Code and secured by the Prepetition Collateral, the foregoing sentence shall not apply.

24.     *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, and releases contained in this Interim Order shall be binding upon the Debtors and their respective

Debtor Representatives in all circumstances and, only subject to any Challenge Action (as defined herein) timely commenced by an Investigating Party (as defined herein) before the expiration of the Challenge Period (as defined herein), upon each of the Debtors' estates, all creditors thereof, any Committees appointed or formed in these Chapter 11 Cases, and all other parties in interest, including, without limitation, any trustee or other representative appointed by the Court, whether such trustee or representative is appointed in cases under Chapter 11 or Chapter 7 of the Bankruptcy Code.  With regard to all other:  (a) creditors, including, but not limited to, any Creditors Committee appointed or formed in these Chapter 11 Cases, (b) parties-in-interest, or (c) other non-Debtor parties, in each case, who have requisite standing and wish to object to, challenge, or seek to avoid or subordinate the amount, validity, enforceability, perfection, extent or priority of any of the Prepetition Secured Claims or the Prepetition Liens (collectively, the "**Investigating Parties**"), such Investigating Parties must, by way of adversary proceeding, commence such objection to, challenge to, or action to avoid or subordinate the applicable Prepetition Secured Claims or Prepetition Liens (a "**Challenge Action**") no later than the later of (i) the date that is seventy-five (75) days after the date of entry of the Interim Order, provided that if a Creditors' Committee is appointed prior to the expiration of such seventy-five (75) day period, such Creditors' Committee shall have sixty (60) days from the date of its appointment to file such a Challenge Action, (ii) any such later date agreed to in writing by the applicable Prepetition Secured Party, in its sole and absolute discretion, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served prior to the expiration of the deadline to commence a Challenge Action (the time period established by the later of the foregoing clauses (i), (ii), and (iii), the "**Challenge Period**").  If no Challenge Action to a Prepetition Secured Claim or Prepetition Lien is timely filed prior to the expiration of the Challenge Period by an Investigating

Party, without further order of this Court, (i) the applicable Prepetition Secured Claim shall constitute an allowed secured claim for all purposes in these Chapter 11 Cases, any successor Chapter 7 cases, or any subsequently filed bankruptcy case under any Chapter of the Bankruptcy Code regardless of whether such successor/subsequent cases are filed in this Court or any other bankruptcy court of competent jurisdiction; and (ii) the stipulations, admissions, and releases of the Debtors contained in this Interim Order shall be binding upon each of the Debtors' estates, all creditors thereof, any Creditors Committee or other statutory committee appointed or formed in these Chapter 11 Cases, and all other parties in interest, including, without limitation, any trustee or other representative appointed by the Court, whether such trustee or representative is appointed in cases under Chapter 11 or Chapter 7 of the Bankruptcy Code.  If a Challenge Action is timely filed prior to the expiration of the Challenge Period by an Investigating Party, the stipulations, admissions, and releases of the Debtors contained in this Interim Order shall nevertheless be binding upon each of the Debtors' estates, all creditors thereof, any Creditors Committee or other statutory committee appointed or formed in these Chapter 11 Cases, and all other parties in interest, including, without limitation, any trustee or other representative appointed by the Court, whether such trustee or representative is appointed in cases under Chapter 11 or Chapter 7 of the Bankruptcy Code, except as to any such stipulations, admissions, and releases that were expressly and successfully challenged in such Challenge Action.  Nothing in this Interim Order vests or confers on any person or entity standing or authority to pursue any Challenge Action belonging to the Debtors or their estates.  The filing by any person or entity of any motion seeking to obtain authority and/or standing to commence a Challenge Action shall not toll or extend the Challenge Period.  Notwithstanding anything to the contrary in this Interim Order, in the event there is a

successful Challenge Action by any party in interest in accordance with the terms of this Interim Order, this Court may fashion an appropriate remedy as applicable.

25.     *Indemnification*.   Each of the Debtors (with respect to itself and each of its Subsidiaries) agrees to the indemnification and expense reimbursement provisions set forth in the Wells Fargo Loan Agreement to be applicable to the DIP Lender and DIP Agent on a *mutatis mutandis* basis. The indemnification and expense reimbursement provisions in the DIP Documents will include the foregoing and customary exclusions for fraud, willful misconduct, and gross negligence, and will be consistent with the DIP Documentation Principles.  To the extent that any of the DIP Obligors fails for any reason to indefeasibly pay any amount pursuant to such indemnification and expense reimbursement provisions to the DIP Agent, each DIP Lender shall severally agree to pay such amounts to the DIP Agent, as more fully set forth in the DIP Documents.

26.     *Limitation on Use of DIP Facility Proceeds and Collateral*.   Notwithstanding anything herein or in any other order by this Court to the contrary, none of the DIP Loans, the DIP Collateral, the Cash Collateral, the Prepetition Collateral, the proceeds of any of the foregoing, or the Carve Out may be used, directly or indirectly, by any of the Debtors, any Official Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):  (a) to use or seek to use Cash Collateral other than as provided pursuant to this Interim Order or the Final Order or, except to the extent expressly permitted by the terms of the DIP Documents, selling or otherwise disposing of DIP Collateral without the consent of the Required DIP Lenders; (b) solely with respect to the DIP Collateral (including Cash Collateral that constitutes DIP Collateral) and proceeds thereof, to seek

authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the DIP Superpriority Claims; (c) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the DIP Secured Parties with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the amount, validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, or the DIP Documents, (D) any action seeking to challenge, invalidate, modify, set aside, avoid, marshal, recharacterize or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, or the DIP Collateral, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either the DIP Agent or the DIP Lenders hereunder or under any of the DIP Documents, (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Documents and this Interim Order and/or the Final Order (as applicable)), or (F) objecting to, contesting, or interfering with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Credit Agreement or the DIP Term Sheet) and so long as the Court has entered an appropriate order in connection

therewith; (d) solely with respect to the Wells Fargo Collateral (including the Wells Fargo Cash Collateral) and proceeds thereof, to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the Wells Fargo Liens, the Wells Fargo Replacement Liens, the Wells Fargo Superpriority Claim, or the Wells Fargo Administrative Claim; or (e) solely with respect to the Wells Fargo Collateral (including the Wells Fargo Cash Collateral) and proceeds thereof, to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against Wells Fargo with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the amount, validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Wells Fargo Loan Documents, the Wells Fargo Secured Claim, the Wells Fargo Liens, the Wells Fargo Collateral, the Wells Fargo Replacement Liens, the Wells Fargo Superpriority Claim, or the Wells Fargo Administrative Claim, (D) any action seeking to challenge, invalidate, modify, set aside, avoid, marshal, recharacterize or subordinate, in whole or in part, the Wells Fargo Loan Documents, the Wells Fargo Secured Claim, the Wells Fargo Liens, the Wells Fargo Collateral, the Wells Fargo Replacement Liens, the Wells Fargo Superpriority Claim, or the Wells Fargo Administrative Claim.

27.     *Loss or Damage to Collateral.*  Nothing in this Interim Order, the DIP Documents or any other documents related to these transactions shall in any way be construed or interpreted

63

to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business or in connection with their restructuring efforts.  Except to the extent of the DIP Secured Parties' gross negligence or willful misconduct, neither the DIP Secured Parties nor the Prepetition Secured Parties shall, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtors.

28.  *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Creditors' Committee, any other statutory or non-statutory committee appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns; *provided* that the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

29.     *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, none of the DIP Secured Parties or the Prepetition Secured Parties shall (a) be deemed to be in "control" of the operations or participating in the management of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).  Nothing in this Interim Order or in any of the DIP Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from any and all activities by the Debtors in the operation of their businesses in connection with the Debtors' postpetition restructuring efforts.

30.     *Proofs of Claim*.  The DIP Secured Parties and the Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim of the DIP Secured Parties and the Prepetition Secured Parties, and the stipulations and findings set forth in this Interim Order shall constitute an informal proof of claim in respect thereof. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, each of Wells Fargo and Fortress is hereby authorized and entitled, in its sole discretion, but not required, (x) to file (and amend and/or supplement, as it sees fit) proofs of claim and/or an aggregate proof of claim in each of the Chapter 11 Cases or Successor Cases for any claim allowed herein and (y) to file a single master

65

proof of claim in Case No. 20-34682 (DRJ), and such master proof of claim shall be deemed filed as a claim against each of the Debtors.  No such proof of claim filed by Wells Fargo or Fortress shall be required to attach any of the Prepetition Loan Documents.  Any proof of claim filed by Wells Fargo or Fortress shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases shall not apply to any claim of any of the DIP Secured Parties or the Prepetition Secured Parties. Notwithstanding anything to the contrary herein, the Debtors reserve the right to estimate or object to the quantum of any contingent, unliquidated, or disputed portion of the Prepetition Secured Claims (other than the WF Stipulated Amount).

31.     *Insurance*.  The DIP Agent is deemed to be the loss payee under the DIP Obligors' insurance policies with respect to the DIP Collateral.

32.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rule 4001(a)(3), 6004(h), 6006(d), 7062 or 9014, any Local Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

33.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

34.     *Credit Bidding*.  In connection with any sale or other disposition of all or any portion of the DIP Collateral or the Prepetition Collateral,  the DIP Secured Parties and, subject to entry of the Final Order, the Prepetition Secured Parties, respectively, shall have the unqualified

right to credit bid up to the full amount of the applicable outstanding DIP Obligations or Prepetition Secured Claims (as applicable), in each case including any accrued interest and expenses (each a "**Credit Bid**"), including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, subject in each case to the rights and duties of the parties under the DIP Documents and the Prepetition Debt Documents.

35.     *Discharge Waiver/Release.*  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization or the DIP Agent otherwise consents.

36.     *Interim Order Controls.*  In the event of any inconsistency between the DIP Term Sheet and the DIP Credit Agreement and/or any other DIP Documents, the provisions of the DIP Credit Agreement and/or any other DIP Documents control.  In the event of any inconsistency between the terms and conditions of the DIP Documents and/or this Interim Order, the provisions of this Interim Order shall govern and control.

37.     *No Modification to Interim Order.*  Until and unless the DIP Obligations have been or are proposed to be indefeasibly paid in full in cash (or the Required DIP Lenders otherwise agree in writing), the Debtors irrevocably waive the right to seek and shall not seek or consent to,

directly or indirectly:  without the prior written consent of the DIP Agent (at the direction of the Required DIP Lenders), (a) a priority claim for any administrative expense or unsecured claim against the Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, other than the Carve Out, the Wells Fargo Superiority Claim or the Fortress Superpriority Claim (each on the terms set forth in this Interim Order); (b) any order authorizing the use of Cash Collateral resulting from the DIP Collateral that is inconsistent with this Interim Order; or (c) any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents or this Interim Order.  The Debtors irrevocably waive any right to seek any amendment, vacatur, stay, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the Required DIP Lenders.

38.    *Survival.*  The provisions of this Interim Order and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of the Chapter 11 Cases, (b) converting any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of the Chapter 11 Cases, or (d) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Secured Parties pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of the Chapter 11 Cases, following dismissal of any of the Chapter 11 Cases, or any Successor Cases, and shall maintain their priority as provided by this Interim Order.  The

rights, privileges, benefits and protections afforded herein and in the DIP Documents, including the DIP Liens, the DIP Superpriority Claims, as well as the terms and provisions concerning the indemnification of the DIP Secured Parties shall continue in any of the Chapter 11 Cases following dismissal of any of the Chapter 11 Cases, termination of the provisions of this Interim Order, and/or the indefeasible payment in full of the DIP Obligations.

39.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

40.     *Necessary Action*.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

41.     *Retention of Jurisdiction*.  The Court shall retain jurisdiction to implement, interpret and enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

42.     *Final Hearing*.  The Final Hearing is scheduled for November 17, 2020 at 3:00 p.m., prevailing Central Time, before this Court.

43.     *Objections.*  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections on or before November 10**, 2020 at 4:00 p.m., prevailing Central Time**.

44.     The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under section 552(b) of the

Bankruptcy Code) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court.

**Signed:  October 22, 2020.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**Exhibit A**

**DIP Term Sheet**

**Senior Secured Super-Priority**
**Debtor-in-Possession Credit Facility**

**Summary of Principal Terms and Conditions**

**October 21, 2020**

| | |
|---|---|
| **Borrower:** | "Borrower" has the meaning set forth in the DIP Order. |
| **DIP Guarantors:** | "DIP Guarantors" has the meaning set forth in the DIP Order. |
| **DIP Agent:** | A DIP Lender (as defined below) or other entity reasonably satisfactory to the DIP Lenders and Borrower.  The initial DIP Agent is Hartree Partners, LP. |
| **DIP Lenders:** | Hartree Partners, LP (and/or one or more of its designated affiliates and/or related funds) (individually or collectively, the "DIP Lenders"). The sole initial DIP Lender is Hartree Partners, LP. |
| **Term** | The DIP Loan will have a 12 month maturity, with a 6 month extension at Lender's sole discretion. |
| **Collateral:** | Subject to the Carve Out (as defined in the DIP Order) and as more fully set forth in the DIP Order, secured by (i) a first-priority lien on the (A) barges and tugs identified on Annex A hereto (the "Specified Vessels") and any and all proceeds thereof or received in connection therewith, (B) subject to entry of the Final Order, proceeds of avoidance actions, none of which are subject to any prepetition liens and (C) the BTC Loan (as defined in the DIP Order) (the foregoing clauses (A) through (C) collectively, the "DIP Collateral"); and (ii) super-priority administrative expense claims against the Debtors. |
| **Adequate Protection:** | Customary adequate protection packages for Wells Fargo and Fortress Credit Co LLC acceptable to the DIP Lenders, including current payment of postpetition interest at non-default rate and current payment of professionals' fees. |
| **Type and Amount of the DIP Facility; Availability:** | A multi-draw secured debtor-in-possession term loan facility (the "DIP Facility" and the loans thereunder, the "DIP Loans"), consisting of a new money multiple draw term loan in an aggregate principal amount of up to $60 million, with $28.8 million (the "Initial DIP Draw") to be available ("Interim Availability") following the entry of the Interim Order and $31.2 million (the "Final DIP Draw") to be available ("Full Availability") subject to (x) the execution of the DIP Credit Agreement (as defined below) and (y) the receipt or satisfaction of: (i) entry of a final order (acceptable to the DIP Lenders in all respects) by the Bankruptcy Court approving the DIP Loan on a final basis; (ii) a business plan and the Budget (as defined below) (acceptable to the DIP Lenders in all respects) providing for, with respect to each of the Company's barges and tugs, the licensing and operation of such vessel during such 13-week period; and (iii) other conditions set forth and as agreed in the DIP Credit Agreement  The commitments to make the DIP |

| | |
|---|---|
| | Loans are referred to herein as the "DIP Commitments". Once repaid or prepaid, no portion of the DIP Loans may be reborrowed. |
| **Chief Restructuring Officer:** | In connection with the Borrower's chapter 11 filing, Borrower to appoint Matthew Ray, of Portage Point Partners, as the chief restructuring officer ("CRO") with customary duties and responsibilities. The CRO shall report directly to Morton S. Bouchard III, who shall have final decision making authority on all matters. |
| **Milestones:** | Borrower to file a DIP motion no later than October 21, 2020, interim DIP order ("Interim Order") entered within 5 business days of the DIP motion, final DIP order ("Final Order"; the Final Order and/or the Interim Order, as applicable, referred to herein as the "DIP Order") entered within 45 days of entry of the Interim Order. By not later than November 30, 2020, (i) each Specified Vessel shall be secured by first lien mortgages in form and substance satisfactory to the DIP Lenders and (ii) the Borrower and DIP Lenders shall enter into the DIP credit agreement. Additional chapter 11 case milestones as required by the DIP Lenders and agreed by the Borrower shall be included in the Final Order. |
| **Asset Sales:** | DIP Collateral sales subject to approval by the DIP Lenders. |
| **Technical and Commercial Managers:** | Borrower to hire necessary personnel to manage the vessels and their operations. |
| **Thirteen Week Cash Flow Budget; Business Plan:** | Prior to the Initial DIP Draw, the Borrower shall deliver to the DIP Lenders an initial list of sources and uses (the "Sources and Uses") (acceptable to the DIP Lenders in all respects) and attached hereto as Annex B. Prior to the Final DIP Draw, the Borrower shall deliver a business plan and 13-week budget (the "Budget") (in each case acceptable to Lender in all respects) and provide immediate access to the DIP Lenders and their advisors. |
| **Budget & Reporting:** | The Borrower will use proceeds from the DIP Loan consistent with (A) following the Initial DIP Draw and during Interim Availability, the Sources and Uses, and (B) from and after the Final DIP Draw and Full Availability, the Budget, in each case subject to Permitted Deviations (as defined in the DIP Order). The Borrower shall provide the DIP Lenders with a heightened reporting package customary for DIP facilities of this kind, with due regard to the Company's industry acceptable to the DIP Lenders. |
| **Financial Covenants:** | Budget variance covenants, in each case that are acceptable to the DIP Lenders, including without limitation, adherence to the Sources and Uses or the then-approved Budget, as applicable, in each case subject to Permitted Deviations (as defined in the DIP Order). |
| **Affirmative & Negative Covenants** | Usual and customary for facilities of this kind, with due regard to the Company's industry and as set forth in the DIP Order. |
| **Carve Out** | "Carve Out" has the meaning set forth in the DIP Order. |
| **Use of Proceeds:** | The proceeds of the DIP Loan will be used only (a) for disbursements expressly permitted in the Sources and Uses (with respect to the Initial |

| | |
|---|---|
| | DIP Draw and Interim Availability) and the then-approved Budget (with respect to the Final DIP Draw and Full Availability), subject in each case to the DIP Orders and the DIP Loan Documents and (b) for such other purposes as are consented to in advance in writing by the DIP Lenders. |
| **Expenses:** | Borrower to pay the DIP Lender's and Debtors' professional fees and expenses, including restructuring, local and maritime counsel, financial advisor, and shipping consultant, including funding of retainers upon Initial DIP Draw. |
| **Amortization:** | None. |
| **Interest:** | L + 7.00%, per annum, with LIBOR to be determined by the DIP Lender, compounded monthly and payable monthly in kind, subject to a 1.00% LIBOR floor. |
| **Fees:** | Structuring Fee:  1.00% of the aggregate principal amount of the DIP Commitments, payable in kind at the closing (the "Structuring Fee").

Original Issue Discount:  5.00% of the aggregate principal amount of the DIP Commitments, structured as an original issue discount of the DIP Loans and payable in kind on each draw date (the "Original Issue Discount").

Exit Fee:  $3.0 million, payable upon repayment in full of the DIP Loans but subject to rebate to be agreed if the DIP Lenders provide exit financing (the "Exit Fee"). |
| **DIP Order:** | The terms herein are subject in all respects to the terms and conditions set forth in the DIP Order. |
| **KEIP:** | TBD – standard and customary, acceptable to the DIP Lenders and in accordance with the then-approved budget. |
| **Commercial Arrangements:** | The Borrower will offer arms' length and competitive rates for hire to the DIP Agent. |
| **Governing Law:** | The Debtors submit to the exclusive jurisdiction and venue of the United States Bankruptcy Court for the Southern District of Texas and waive any right to trial by jury. New York law shall govern the DIP Facility (other than security documents to be governed by local law, as determined by the DIP Lenders). |

**Annex A**

**Specified Vessels**

|    | Vessel Description | Legal Owner |
|----|----|----|
| 1. | B. NO. 272, OFFICIAL NO. 1257375 | B. NO. 272 CORP. |
| 2. | B NO 205, OFFICIAL NO. 1191747 | B. NO. 205 CORP. |
| 3. | B NO 284, OFFICIAL NO. 1216341 | B. NO. 284 CORP. |
| 4. | B NO 282, OFFICIAL NO. 1204610 | B. NO. 282 CORP. |
| 5. | DONNA J. BOUCHARD, OFFICIAL NO. 1257374 | TUG DONNA J. BOUCHARD CORP. |
| 6. | MORTON S. BOUCHARD JR., OFFICIAL NO. 1265315 | TUG MORTON S. BOUCHARD JR. CORP. |
| 7. | FREDERICK E. BOUCHARD, OFFICIAL NO. 1265316 | TUG FREDERICK E. BOUCHARD CORP. |
| 8. | LINDA LEE BOUCHARD, OFFICIAL NO. 1189191 | TUG LINDA LEE BOUCHARD CORP. |
| 9. | DENISE A. BOUCHARD, OFFICIAL NO. 1251312 | TUG DENISE A. BOUCHARD CORP. |

**Annex B**

**Sources & Uses**

| Interim Period Disbursements Summary ($USD) | | Initial Draw Estimate |
|---|---|---|
| Employees [1] | $ | 4,583,135 |
| Insurance [2] | | 1,679,378 |
| Maritime Liens [3] | | 10,470,455 |
| Other Expenses [4] | | 5,403,478 |
| Bankruptcy Cost Reserve [5][6] | | 4,600,000 |
| **Total Estimated Disbursements** | $ | **26,736,446** |
| DIP Facility OID and Structuring Fees [7] | | 2,038,760 |
| **Initial DIP Draw** | $ | **28,775,206** |

1. Includes accrued pre-petition employee wages and benefits.  Assumes one payroll cycle for office and vessel employees (approximately two weeks) due and paid within the month of October. Office employees paid bi-weekly; vessel employees paid twice per month. Office payroll includes select new hires related to finance functions start in October. Represents same quantum as the current office bi-weekly payroll as incurred, not cash payment.

2. Represents Hull, MGL, War, Bumbershoot, Healthcare, D&O and other insurance premiums. Includes two quarterly premium payments for Hull insurance due in June and September 2020, which may be paid to parties who made protective advances on the Company's behalf.

3. Maritime lienholder payments reflect discussions with management regarding outstanding amounts owed, inclusive of ongoing negotiations related to settlement payments and installment plans estimated to be due during the Interim Period.

4. Other Expenses include, but are not limited to, general operational restart costs such as rent, utilities and office expenses, as well as adequate protection for Wells Fargo and Fortress, insurance brokerage fees, repayment of custodian bills, and additional expenses which may be necessary in categories listed herein.

5. Estimated bankruptcy costs include professional fees & expenses incurred within the bankruptcy period for Debtor professionals, including Kirkland, Jackson Walker, Jefferies, Portage Point, Stretto, Chalos & Co, P.C. as Special Maritime Counsel and other related bankruptcy costs.

6. Estimated Bankruptcy Costs for Initial Draw include 45 days of accrued fees, beginning from Petition Date, for the above listed professional services firms. A portion of the bankruptcy costs may be paid out of exit financings or sale proceeds, including accrued & unpaid professional fees.

7. Initial DIP Draw calculated to include Structuring Fee of 1% of total DIP Commitment of $60 million and Original Issue Discount ("OID") of 5% of Initial DIP Draw.

**<u>Exhibit B</u>**

**Sources and Uses**

## Sources & Uses

| Interim Period Disbursements Summary ($USD) | | Initial Draw Estimate |
|---|---|---|
| Employees [1] | $ | 4,583,135 |
| Insurance [2] | | 1,679,378 |
| Maritime Liens [3] | | 10,470,455 |
| Other Expenses [4] | | 5,403,478 |
| Bankruptcy Cost Reserve [5][6] | | 4,600,000 |
| **Total Estimated Disbursements** | $ | 26,736,446 |
| DIP Facility OID and Structuring Fees [7] | | 2,038,760 |
| **Initial DIP Draw** | $ | 28,775,206 |

1. Includes accrued pre-petition employee wages and benefits.  Assumes one payroll cycle for office and vessel employees (approximately two weeks) due and paid within the month of October. Office employees paid bi-weekly; vessel employees paid twice per month. Office payroll includes select new hires related to finance functions start in October. Represents same quantum as the current office bi-weekly payroll as incurred, not cash payment.

2. Represents Hull, MGL, War, Bumbershoot, Healthcare, D&O and other insurance premiums. Includes two quarterly premium payments for Hull insurance due in June and September 2020, which may be paid to parties who made protective advances on the Company's behalf.

3. Maritime lienholder payments reflect discussions with management regarding outstanding amounts owed, inclusive of ongoing negotiations related to settlement payments and installment plans estimated to be due during the Interim Period.

4. Other Expenses include, but are not limited to, general operational restart costs such as rent, utilities and office expenses, as well as adequate protection for Wells Fargo and Fortress, insurance brokerage fees, repayment of custodian bills, and additional expenses which may be necessary in categories listed herein.

5. Estimated bankruptcy costs include professional fees & expenses incurred within the bankruptcy period for Debtor professionals, including Kirkland, Jackson Walker, Jefferies, Portage Point, Stretto, Chalos & Co, P.C. as Special Maritime Counsel and other related bankruptcy costs.

6.  Estimated Bankruptcy Costs for Initial Draw include 45 days of accrued fees, beginning from Petition Date, for the above listed professional services firms. A portion of the bankruptcy costs may be paid out of exit financings or sale proceeds, including accrued & unpaid professional fees.

7.  Initial DIP Draw calculated to include Structuring Fee of 1% of total DIP Commitment of $60 million and Original Issue Discount ("OID") of 5% of Initial DIP Draw.

**Schedule 1**

FIRST PREFERRED SHIP MORTGAGES COVERING BOUCHARD VESSELS FILED BY
WELLS FARGO WITH THE NATIONAL VESSEL DOCUMENTATION CENTER

| DOCUMENT TITLE | DATE | MORTGAGOR | VESSEL |
| --- | --- | --- | --- |
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 210 Corp. | B. NO. 210, Official Number 1037844 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 210 Corp. | B. NO. 210, Official Number 1037844 |
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 215 Corp. | B. NO. 215, Official Number 1064767 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 215 Corp. | B. NO. 215, Official Number 1064767 |
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 225 Corp. | B. NO. 225, Official Number 1139764 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 225 Corp. | B. NO. 225, Official Number 1139764 |
| First Preferred Ship Mortgage | February 4, 2015 | B. No. 242 Corp. | B. NO. 242, Official Number 1154327 |
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 245 Corp. | B. NO. 245, Official Number 1050073 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 245 Corp. | B. NO. 245, Official Number 1050073 |
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 250 Corp. | B. NO. 250, Official Number 1235496 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 250 Corp. | B. NO. 250, Official Number 1235496 |

| | | | |
|---|---|---|---|
| First Preferred Ship Mortgage | November 5, 2019 | B. No. 252 Corp. | B. NO. 252, Official Number 1292046 |
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 260 Corp. | B. NO. 260, Official Number 1210060 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 260 Corp. | B. NO. 260, Official Number 1210060 |
| First Preferred Ship Mortgage | February 4, 2015 | B. No. 262 Corp. | B. NO. 262, Official Number 1216336 |
| First Preferred Ship Mortgage | November 27, 2017 | B. No. 270 Corp. | B. NO. 270, Official Number 1257373 |
| First Preferred Ship Mortgage | February 4, 2015 | B. No. 295 Corp. | B. NO. 295, Official Number 955449 |
| First Preferred Ship Mortgage | November 27, 2017 | Tug Kim M. Bouchard Corp. | KIM M. BOUCHARD, Official Number 1257372 |
| First Preferred Ship Mortgage | November 5, 2019 | Tug Evening Breeze Corp. | EVENING BREEZE, Official Number 1282121 |
| First Preferred Ship Mortgage | October 30, 2013 | Tug Evening Star Corp. | EVENING STAR, Official Number 1234828 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | Tug Evening Star Corp. | EVENING STAR, Official Number 1234828 |
| First Preferred Ship Mortgage | February 4, 2015 | Tug Morton S. Bouchard, IV Corp. | MORTON S. BOUCHARD IV, Official Number 1154328 |
| First Preferred Ship Mortgage | October 30, 2013 | Tug Jane A. Bouchard Corp. | JANE A. BOUCHARD, Official Number 1139762 |

| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | Tug Jane A. Bouchard Corp. | JANE A. BOUCHARD, Official Number 1139762 |
|---|---|---|---|
| First Preferred Ship Mortgage | October 30, 2013 | Tug Brendan J. Bouchard Corp. | BRENDAN J. BOUCHARD, Official Number 1086926 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | Tug Brendan J. Bouchard Corp. | BRENDAN J. BOUCHARD, Official Number 1086926 |
| First Preferred Ship Mortgage | October 30, 2013 | Tug Danielle M. Bouchard Corp. | DANIELLE M. BOUCHARD, Official Number 1053010 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | Tug Danielle M. Bouchard Corp. | DANIELLE M. BOUCHARD, Official Number 1053010 |
| First Preferred Ship Mortgage | February 4, 2015 | Tug Bouchard Girls Corp. | BOUCHARD GIRLS, Official Number 955450 |

## EARNINGS ASSIGNMENTS AND ASSIGNMENTS OF INSURANCES FILED BY WELLS FARGO WITH THE NATIONAL VESSEL DOCUMENTATION CENTER

| DOCUMENT TITLE | DATE |
|---|---|
| First Earnings Assignment | October 30, 2013 |
| First Amendment to First Earnings Assignment | February 4, 2015 |
| Second Amendment to First Earnings Assignment | March 12, 2020 |
| Assignment of Insurances | October 30, 2013 |
| First Amendment to Assignment of Insurances | February 4, 2015 |

Second Amendment to Assignment of Insurances

March 12, 2020

## **Schedule 2**

A. Each of the Debtors (with respect to itself and each of its Subsidiaries) agrees that they shall and shall cause each of its respective subsidiaries to:

    i.    comply with the milestones set forth in the DIP Term Sheet;

    ii.    comply with the Sources and Uses (subject to Permitted Deviations);

    iii.    deliver to the DIP Agent as soon as practicable in advance of filing with the Bankruptcy Court, the Interim Order and the Final Order (each of which must be in form and substance acceptable to the DIP Lenders and the DIP Agent), any material motion or proposed order, any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

    iv.    deliver notice of any material litigation, contingent liabilities, termination of material contracts and ERISA and environmental events that could lead to a material adverse effect;

    v.    grant the DIP Lenders with access to information (including historical information) and personnel, including, without limitation, participating on telephonic meetings as reasonably requested and upon reasonable advance notice by the DIP Lenders with access to all information reasonably requested;

    vi.    within five business days following the Closing Date (or as soon as reasonably practicable thereafter), pay in full all obligations giving rise to any liens or encumbrances existing on the Specified Vessel Collateral as necessary to fully extinguish any such liens or encumbrances; and

    vii.    cause the professional restructuring advisors to the Debtors as of the Petition Date (including each of Kirkland & Ellis LLP, Jackson Walker L.L.P., Jefferies LLC, and Portage Point Partners, LLC) to continue to be employed as the Debtors' restructuring advisors.

The affirmative covenants in the DIP Documents will include the foregoing and be consistent with the DIP Documentation Principles.

B.  Each of the Debtors (with respect to itself and each of its Subsidiaries) agrees that they will not, and will not permit any of its subsidiaries to (the following shall be collectively referred to herein as the "**Negative Covenants**"):

   i.   create or permit to exist any liens or encumbrances on any assets, other than liens securing the DIP Facility and any permitted liens and other liens described in "DIP Collateral" in the DIP Order;

   ii.   incur any indebtedness, other than the DIP Facility and any permitted indebtedness described therein;

   iii.   create or permit to exist any other superpriority claim which is *pari passu* with or senior to the claims of the DIP Lenders and other "secured parties" under the DIP Facility, except for the Carve-Out, the Wells Fargo Superpriority Claim and Fortress Superpriority Claim;

   iv.   sell any assets (including, without limitation, any sale and leaseback transaction and any disposition under section 363(b) of the Bankruptcy Code) without the prior written consent of the DIP Lenders (other than any disposition of the Aircraft Collateral or Permitted Dispositions);

   v.   modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted (except as otherwise contemplated as part of the operational restructuring initiatives described in the First Day Declaration) or (ii) its organizational documents, except as required by the Bankruptcy Code or with the prior written consent of the DIP Lenders;

   vi.   pay pre-petition indebtedness, except as expressly provided for in the Interim Order or pursuant to "first day" or other orders entered upon pleadings in form and substance reasonably satisfactory to the DIP Lenders;

   vii.   assert any right of subrogation or contribution against any other Debtors until all borrowings under the DIP Facility are paid in full and the DIP Commitments are terminated;

   viii.   make any investment or distribution (other than distributions amongst Debtors) or any debt prepayment except as required hereunder;

   ix.   except with respect to transactions between a DIP Obligor and another DIP Obligor or as expressly permitted by the DIP Lenders, this Interim Order or the Final Order, directly or indirectly: (a) make any investment in an affiliate (other than investments evidenced by the BTC Loan or any investments by BTC into a DIP Obligor); (b) transfer, sell, lease, assign or otherwise dispose (collectively for this sub-section, "dispositions") of any assets to an affiliate (other than any disposition evidenced by the BTC Loan or any disposition by BTC to a DIP Obligor for non-cash consideration); (c) merge into or consolidate with or purchase or acquire

78

assets from an affiliate; or (d) enter into any other transaction directly or indirectly with or for the benefit of any affiliate (including, without limitation, guarantees and assumptions of obligations of an affiliate) provided, however, that: (i) any affiliate who is a natural person may serve as an employee or director of the Debtors and receive reasonable compensation for his services in such capacity and (ii) the Debtors may enter into any transaction with an affiliate providing for the leasing of property, the rendering or receipt of services or the purchase or sale of product, inventory and other assets in the ordinary course of business if the monetary or business consideration arising therefrom would be substantially advantageous to the Debtors as the monetary or business consideration that they would obtain in a comparable arm's length transaction with a person not an affiliate; and

x.    fail to pay any undisputed DIP Fees and Expenses, Adequate Protection Fees and Expenses, or other administrative expenses within fourteen (14) of the receipt of an invoice therefor.

The negative covenants in the DIP Documents will include the foregoing and will be consistent with the DIP Documentation Principles.

C. Each of the Debtors (with respect to itself and each of its Subsidiaries) agrees that they shall and shall cause each of its respective subsidiaries to comply with the following conditions precedent to the Closing Date (the following shall be collectively referred to herein as the "**Interim Conditions**"):

    i.   <u>Interim Order/Bankruptcy Matters</u>

      (a)  The Chapter 11 Cases for each of the Debtors shall have been commenced in the Bankruptcy Court for the Southern District of Texas, Houston Division, and all of the "first day orders" and all related pleadings to be entered prior to or shortly following the "first day hearing" shall have been reviewed in advance by the DIP Lenders and the DIP Agent and shall be reasonably acceptable in form and substance to the DIP Lenders and the DIP Agent.

      (b)  The Bankruptcy Court shall have entered, upon motion in form and substance acceptable to the DIP Lenders and the DIP Agent, the Interim Order no later than twenty-five (25) calendar days after the Petition Date, approving and authorizing the DIP Facility, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, in form and substance acceptable to the DIP Lenders and the DIP Agent.

      (c)  The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, that is adverse to the interests of the DIP Lenders or the DIP Agent, without the prior written consent of the DIP Lenders and the DIP Agent, as applicable.

      (d)  The Debtors shall be in compliance in all respects with the Interim Order.

      (e)  Each other milestone that is required to be complied with prior to or concurrently with entry of the Interim Order shall have been complied with.

      (f)  No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Debtors or their respective properties.

      (g)  A cash management order encompassing the cash management arrangements currently in place under the Prepetition Revolving Credit Agreement and otherwise reasonably acceptable to the DIP Lenders shall be in full force and effect.

      (h)  The Closing Date shall have occurred on or before the date that is three business days after the date of entry of the Interim Order.

      (i)  The DIP Agent shall have a fully perfected lien on the DIP Collateral (it being understood and agreed that the liens granted under the proposed form of Interim Order are sufficient to satisfy this condition).

(j) The BTC Loan shall be in form and substance satisfactory to the DIP Agent and DIP Lenders.

ii.  <u>Financial Statements, Budgets and Reports</u>

(a) The DIP Lenders and the DIP Agent shall have received and the DIP Lenders shall have approved the Sources and Uses and such other information (financial or otherwise) as may be reasonably requested by the DIP Lenders, in each case, shall be acceptable in form and substance to the DIP Lenders (it being understand and agreed that proposed Sources and Uses and such other information already provided as of the date of the filing of this proposed form of Interim Order are sufficient to satisfy this condition).

iii.  <u>Performance of Obligations</u>

(a) All costs, fees, expenses (including, without limitation, reasonable and documented legal fees) and other compensation contemplated by the DIP Term Sheet and the DIP Documents to be payable to the DIP Lenders and DIP Agent.

(b) No default or Event of Default under the DIP Facility shall have occurred or be occurring.

(c) Representations and warranties under the DIP Facility shall be true and correct in all material respects.

(d) Since the Petition Date, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency (other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code by any of the Debtors or their subsidiaries and the commencement of the Chapter 11 Cases) that, individually or in the aggregate, has had or could reasonably be expected to have, a material adverse effect on (a) the business, condition (financial or otherwise), operations or assets of the Debtors taken as a whole, or (b) the ability of the Debtors, taken as a whole, to perform their obligations under the DIP Documents or (c) the validity or enforceability of the DIP Documents or the rights and remedies of the DIP Agent, or the DIP Lenders under any DIP Document (including, but not limited to, the enforceability or priority of any liens granted to the DIP Agent under the DIP Documents) (any of the foregoing being a "**Material Adverse Effect**").

(e) Upon entry of the Interim Order, the entry into this DIP Term Sheet shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.

iv.  <u>Customary Closing Documents</u>

(a) Receipt of good standing certificates; corporate formation documents; obtaining of any material third party and governmental consents necessary; to

the extent requested at least three (3) business days prior to the Initial DIP Draw, "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and beneficial ownership regulations.

(b) Execution and delivery by the Debtors of promissory notes evidencing the loans to be made under the DIP Term Sheet, acceptable in all respects to the DIP Lenders (the parties hereto acknowledging that funding prior to the Full Availability shall be made, as to loan documentation, solely on the basis of the DIP Term Sheet and such promissory notes, and that funding of the DIP Loans during the Full Availability is subject to the parties entering into the DIP Documents).

v.   <u>Other</u>

(a) The DIP Lenders and DIP Agent shall have received evidence that the DIP Collateral is not subject to liens (other than liens disclosed by the Debtors to the DIP Lenders in writing prior to October 21, 2020) that were existing, valid, enforceable, properly perfected and non-avoidable as of the Petition Date, which evidence shall be satisfactory to the DIP Lenders and the DIP Agent in their sole discretion.

D. Each of the Debtors (with respect to itself and each of its Subsidiaries) agrees that they shall and shall cause each of its respective subsidiaries to comply with the following conditions precedent to Full Availability (as defined in the DIP Term Sheet) (the following shall be collectively referred to herein as the "**Full Availability Conditions**"):

    i.   <u>Final Order; Bankruptcy Matters</u>

        (a) Not later than forty five (45) calendar days following the entry of the Interim Order, the Final Order shall have been entered by the Bankruptcy Court on a motion by the Debtors that is in form and substance acceptable to the DIP Lenders and the DIP Agent, approving and authorizing on a final basis the matters and containing the provisions described in paragraph A.1(a) above, in each case, in form and substance acceptable to the DIP Lenders and the DIP Agent.

        (b) The Final Order shall not have been reversed, modified, amended, stayed or vacated.

        (c) The Debtors shall be in compliance with the Final Order.

    ii.   <u>Other</u>

        (a) The Interim Conditions shall continue to be satisfied.

        (b) The conditions to Full Availability set forth in the DIP Term Sheet and/or DIP Credit Agreement shall have been satisfied.

        (c) The Conditions Precedent (as defined below) shall have been satisfied.

        (d) The DIP Documents shall have been entered into, and the DIP Lenders shall be satisfied in their discretion with the perfection of liens and pledges on the UCC collateral securing the DIP Facility.

        (e) The delivery of customary legal opinions as to authority, authorization, execution and delivery, as to the Debtors with respect to the DIP Documents; corporate records and documents from public officials.

        (f) The DIP Lenders shall have received the required updates of the Budget, in form and substance acceptable to the DIP Lenders.

        (g) No default or Event of Default shall have occurred under the DIP Facility.

        (h) Representations and warranties shall be true and correct in all material respects at the date of each extension of credit except to the extent such representations and warranties relate to an earlier date.

(i)   The Debtors shall have paid the balance of all fees and expenses then payable as referenced herein.

(j)   The DIP Lenders and DIP Agent shall have completed their due diligence investigation of BTC and the results shall be satisfactory to the DIP Lenders and the DIP Agent in their sole discretion.

E.  Each of the Debtors (with respect to itself and each of its Subsidiaries) agrees that they shall and shall cause each of its respective subsidiaries to comply with the following conditions precedent to all borrowings (the "**Conditions Precedent**"):

    i.  Receipt of customary signed borrowing request, accuracy in all material respects of representations and warranties, absence of any default or Event of Default and the following:

        (a)  as a result of such extension of credit, usage of the DIP Commitments shall not exceed (i) the applicable DIP Commitments then in effect and (ii) the aggregate amount authorized by the Interim Order or the Final Order, as the case may be;

        (b)  the Interim Order or Final Order, as the case may be, and the cash management order, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is adverse to the interests of the DIP Lenders;

        (c)  satisfaction by the Debtors of all milestones set forth in the DIP Term Sheet that have occurred as of each draw date;

        (d)  compliance with the Budget or Sources and Uses (as applicable), in each case subject to Permitted Deviations;

        (e)  the DIP Agent, on behalf of itself, the DIP Lenders and the other secured parties with respect to the DIP Facility, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected liens on, and security interests in, the DIP Collateral, in each case, having the priorities set forth in the DIP Orders and subject only to the payment in full in cash of any amounts due under the Carve-Out;

        (f)  the Debtors shall have paid the balance of all fees and expenses then due and payable as referenced herein; and

        (g)  the making of such extension of credit will not violate any requirement of material law and shall not be enjoined, temporarily, preliminarily or permanently.

F.  The term "**Specified Event of Default**" shall mean:

    i.    the bringing of a motion or application by any Debtors in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all DIP Obligations in full in cash immediately upon the consummation of such financing; (ii) to grant any Lien (other than Liens expressly permitted under the DIP Credit Agreement and the DIP Term Sheet, as applicable) upon or affecting any DIP Collateral; (iii) except as provided in this DIP Term Sheet, the DIP Credit Agreement, the Interim Order or the Final Order, as the case may be, to use cash collateral of the DIP Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Agent and the DIP Lenders; or (iv) that (in the case of any Debtor) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court) approves or provides authority to take any other action or actions adverse to the rights and remedies of the DIP Agent, or the DIP Lenders under this DIP Term Sheet or the DIP Credit Agreement, as applicable, or their interest in the DIP Collateral;

    ii.    the filing of any plan of reorganization or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement, by any Debtor other than a chapter 11 plan that is acceptable to the DIP Lenders (an "**Approved Plan**");

    iii.    the termination or modification of any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization;

    iv.    the entry of an order in any of the Chapter 11 Cases approving a disclosure statement in respect of a plan other than an Approved Plan, or the entry of an order confirming a plan or plans of reorganization other than an Approved Plan;

    v.    the entry of an order in the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying any DIP Document or the Interim Order or the Final Order in any case without the prior written consent of the DIP Lenders;

    vi.    the Final Order is not entered within forty-five (45) calendar days (or such other period as the DIP Lenders may agree to in writing) following the date the Court enters the Interim Order;

    vii.    the payment of, or application by any Debtor for authority to pay, any prepetition claim without the DIP Lenders' prior written consent other than (i) as provided in any "first day order" or other Court order in form and substance reasonably acceptable to the DIP Lenders, or (ii) as set forth in the Sources and Uses or the Budget, as applicable, in each case subject to Permitted Deviations;

    viii.    the entry of an order by the Bankruptcy Court appointing, or the filing of a motion or application by any Debtor, for an order seeking the appointment of, in either case

without the consent of the DIP Lenders, an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of BTC or with the power to conduct an investigation of (or compel discovery);

ix.     the sale without the DIP Agent's and the DIP Lenders' written consent, of any of the Debtors' assets (other than any disposition of the Aircraft Collateral or Permitted Dispositions) either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise;

x.      the dismissal of the Chapter 11 Cases which does not contain a provision for payment in full in cash of all noncontingent and liquidated monetary DIP Obligations of the Borrower ("**Payment in Full**") under the DIP Credit Agreement or the DIP Term Sheet, as applicable, or if any Debtor shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases that does not contain a provision for Payment in Full, in each case, without the prior written consent of the DIP Lenders;

xi.     the conversion of the Chapter 11 Cases from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or a bankruptcy under Debtor Relief Laws, as applicable, or any Debtor shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

xii.    any Debtor files a motion or application seeking, or the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any DIP Collateral not in accordance with the terms hereof, in an amount in excess of $4,500,000, or (y) with respect to any lien of or the granting of any lien on any DIP Collateral to any state or local environmental or regulatory agency or authority having priority over the liens in favor of the DIP Agent and the Prepetition Revolving Agent in an amount in excess of $4,500,000;

xiii.   any Debtor files a motion or application seeking, or the entry of an order in the Chapter 11 Cases challenging, subordinating, disgorging, avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under the DIP Credit Agreement, the DIP Term Sheet, the Prepetition Revolving Credit Agreement or the other DIP Documents;

xiv.    the failure of any Debtor to perform in any material respect, any of its obligations under the Interim Order or the Final Order or any violation of any of the terms of the Interim Order or the Final Order, subject to any applicable grace or cure periods set forth therein;

xv.    the challenge by any Debtor to the validity, extent, perfection or priority of any liens granted under or obligations arising under, the DIP Documents, the Prepetition Revolving Credit Agreement, the Interim Order or the Final Order;

xvi.    the remittance, use or application of proceeds of the DIP Loans, cash collateral, or other cash or funds of the Debtors other than in accordance with the DIP Orders;

xvii.    any Debtor files a motion or application seeking, or the entry of an order in any of the Chapter 11 Cases granting any other super-priority administrative claim or lien equal or superior to that granted to the DIP Agent, on behalf of itself and the DIP Lenders, without the consent in writing of the DIP Lenders (other than any such superpriority administrative claim or lien that is expressly permitted to have such priority under this DIP Term Sheet);

xviii.    the filing of a motion or application by any Debtor requesting, or the entry of any order granting, any super-priority claim which is senior or *pari passu* with the DIP Lenders' claims or with the claims of the Prepetition Revolving Agent under the Prepetition Revolving Credit Agreement or the DIP Lenders under the DIP Documents not in accordance with the terms hereof;

xix.    any Debtor files a motion or application seeking, or the entry of an order precluding the DIP Agent or the Prepetition Revolving Agent or its respective designee from having the right to or being permitted to "credit bid" with respect to the assets of the Debtors;

xx.    any attempt by any Debtor to reduce (other than a reduction in accordance with the terms of the DIP Credit Agreement or the DIP Term Sheet, as applicable), avoid, set off or subordinate the DIP Obligations or the liens securing such DIP Obligations to any other debt, including, without limitation, the obligations under the Prepetition Revolving Credit Agreement, other than in accordance with the DIP Orders, the DIP Credit Agreement, or the DIP Term Sheet, as applicable;

xxi.    the reversal, vacation or stay of the effectiveness of either the Interim Order or the Final Order or any provision thereof without the prior written consent of the DIP Lenders;

xxii.    the payment of or granting adequate protection with respect to any obligations under the Prepetition Revolving Credit Agreement (other than with respect to payment permitted under the Interim Order or the Final Order) without the prior written consent of the DIP Lenders;

xxiii.    an application for any of the orders described under the Specified Event of Defaults including, without limitation, clauses (i), (iv), (vi), (vii), (ix), (xiii), (xiv), (xviii), (xix) or (xx) shall be made by a person other than the DIP Agent or the DIP Lenders

and such application is not, to the extent requested by DIP Agent or the DIP Lenders, contested by any Borrower in good faith;

xxiv.    the breach of any Negative Covenant as set forth in this <u>Schedule 2</u>;

xxv.    any representation or warranty set forth on <u>Annex A</u> attached hereto was incorrect in any material respect on the Closing Date;

xxvi.    the cessation of liens or super-priority claims granted with respect to this DIP Term Sheet or the DIP Credit Agreement, as applicable, to be valid, perfected and enforceable in all respects; or the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the DIP Documents, the DIP Orders, the liens granted under this DIP Term Sheet, the DIP Credit Agreement, the DIP Documents, or the DIP Orders, as applicable, and the DIP Collateral;

xxvii.    the breach by the Debtors of any provision of the DIP Term Sheet; or

xxviii.    the occurrence of the Wells Fargo Termination Date.

The events of default in the DIP Documents will include the foregoing and be consistent with the DIP Documentation Principles.

Subject to approval by the Bankruptcy Court, the DIP Agent and the DIP Lenders shall have customary remedies determined appropriate by the DIP Lenders.

Annex A

Each of the following representations and warranties set forth in the Prepetition Revolving Credit Facility are hereby incorporated by reference with respect to each of the Debtors and their respective Subsidiaries, on a *mutatis mutandis* basis: (a) Sections 3.1, 3.2, 3.3, 3.10, 3.12, 3.14, 3.18, 3.19 (other than the second sentence and the penultimate sentence thereto, and it being understood that for the purposes hereunder any reference to Financial Statements only includes the Financial Statements for such periods ending on or prior to December 31, 2018), 3.20, 3.21, 3.22 and 3.23 and (b) Sections 3.5, 3.6, 3.7 (other than in a manner that would reasonably be expected to result in a Material Adverse Effect), 3.15, 3.17 and 3.24 (such provisions, collectively, the "Specified Representations") other than, in each case, such matters that have been disclosed to the DIP Lenders on or prior to the date on which the DIP Loans are funded (including, without limitation, as part of any lien search results, sources and uses and/or information materials and communications received by the DIP Lenders), and, in addition, the Debtors and their respective Subsidiaries shall be deemed to have represented and warranted that:

(a) the orders of the Bankruptcy Court with respect to the Debtors remain in effect and not been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is adverse to the interests of the DIP Lenders;

(b) the Debtors have not failed to disclose any material assumptions with respect to the Sources of Uses or Budget (if applicable); *provided* that any use of the term "material adverse effect" or similar term will be deemed to have the meaning of "Material Adverse Effect" as defined in the DIP Orders; and

(c) as of the Petition Date, there are no charter contracts, express or implied, made or issued for or in connection with the service, use or operation of any Specified Vessel for the carriage of goods or passengers or for any other purpose whatsoever relating to the service, use or operation of any Specified Vessel for or as charter hire, freight, demurrage or otherwise thereunder, or as compensation for the modification, termination or breach thereof;

*provided*, that, notwithstanding the foregoing or any provision in any DIP Document to the contrary, the Specified Representations shall only be made as a condition precedent to Full Availability.

90