**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
12/21/2020

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BOUCHARD TRANSPORTATION CO., INC., *et al.*,[1] | ) Case No. 20-34682 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Re: Docket No. 141 |

**FINAL ORDER (A) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS
AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,
(F) SCHEDULING A FURTHER HEARING, AND (G) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of Bouchard Transportation Co., Inc. ("**BTC**"), B. No.

272 Corp., B. No. 205 Corp., B. No. 284 Corp., B. No. 282 Corp., Tug Donna J. Bouchard Corp.,

Tug Morton S. Bouchard Corp., Tug Frederick E. Bouchard Corp., Tug Linda Lee Bouchard Corp.

and Tug Denise A. Bouchard Corp. (collectively, the "**Borrower**"), and each of their affiliated

debtors other than BTC (collectively with the Borrower, the "**DIP Guarantors**") (the Borrower

and the DIP Guarantors, collectively, the "**DIP Obligors**"), each as a debtor and debtor-in-

possession (collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**")

and pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(e), 364(c)(1), 364(c)(2), 364(c)(3),

364(e), 503, 506(c), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtor entities and the last
      four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on
      the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/bouchard.  The
      location of the Debtors' service address is:  58 South Service Road, Suite 150, Melville, NY 11747.

[2]   Capitalized terms used but not immediately defined have the meanings given to them in the Motion or the DIP
      Credit Agreement, as applicable.

"**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 1075-1, 2002-1, 4001-1(b), 4002-1(i) and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "**Local Bankruptcy Rules**") and the Procedures for Complex Chapter 11 Chapter 11 Cases promulgated by the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"), seeking, among other things:

(i)    authorization for the Debtors to obtain a senior secured superpriority debtor-in-possession term loan credit facility (the "**DIP Facility**"), consisting of a new money multiple draw term loan in the aggregate principal amount of up to $60 million (the loans made thereunder, the "**DIP Loans**"), with an initial draw of up to $28.8 million drawn following entry of the Interim Order (as defined herein) and, thereafter, one or more draws of up to an additional $31.2 million to be drawn subject to entry of this Final DIP Order (as defined herein) and satisfaction of the terms and conditions set forth in this Final DIP Order and that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement, dated as of December 21, 2020, attached hereto as **Exhibit A** (such credit agreement, as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**") and the other DIP Documents (as defined herein), by and among the Borrower, as co-borrowers, the DIP Guarantors, as guarantors, Hartree Partners, LP, as administrative agent and collateral agent (in such capacities, the "**DIP Agent**") and the financial institutions party thereto from time to time as lenders (the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**");

(ii)   authorization for the Debtors to negotiate, execute, and deliver the DIP Credit Agreement and any other agreements, instruments, collateral agreements, pledge agreements, guarantees, security agreements, ship mortgages, control agreements, notes and other documents related thereto (as amended, restated, supplemented, waived or modified from time to time) (all of the foregoing, together with the DIP Credit Agreement, the Interim Order, and this Final DIP Order collectively, the "**DIP Documents**"), and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate or desirable in connection with the DIP Documents;

(iii)  authorization for the DIP Obligors to guarantee on a joint and several basis the Borrower's obligations in respect of the DIP Facility;

(iv)   authorization for (a) BTC to incur, and the Borrower to use the proceeds of the DIP Facility to fund, an intercompany loan to BTC (the "**BTC Loan**"),

2

pursuant to an intercompany note attached hereto as **Exhibit B**, which is an allowed superpriority claim of the Borrower against BTC pursuant to section 364(c)(1) of the Bankruptcy Code and administrative expense of BTC and its estate pursuant to section 503(b)(1) of the Bankruptcy Code, and (b) the Borrower to direct the proceeds of the DIP Facility to be funded directly to a deposit account of BTC for purposes of funding such BTC Loan;

(v)　　authorization for the Debtors to use the proceeds of the DIP Facility solely in accordance with the Sources and Uses (as defined below) and/or Approved Budget (as defined in the DIP Credit Agreement), as applicable, in each case subject to Permitted Deviations (as defined in the DIP Credit Agreement) and the terms and conditions set forth in this Final DIP Order and the DIP Documents;

(vi)　　subject to the restrictions set forth in the DIP Documents and this final order (this "**Final DIP Order**"), authorization for the Debtors to use the Prepetition Collateral (as defined herein), including "cash collateral", if any, as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), subject to the Sources and Uses and/or Approved Budget, as applicable and in each case subject to Permitted Deviations, and provide adequate protection to the Prepetition Secured Parties (as defined herein) on the terms set forth herein;

(vii)　　authorization for the Debtors to incur and pay all DIP Obligations (as defined herein) including the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(viii)　　authorization for the Debtors to make certain Stipulations with respect to the Prepetition Debt Documents (as defined herein) and the liens and security interests arising therefrom;

(ix)　　the granting to the DIP Secured Parties of allowed superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code, payable from and having recourse to all assets of the Borrower and the DIP Guarantors, subject and subordinate to the Carve Out and the Adequate Protection Obligations;

(x)　　the granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, and authorizing the Borrower and the DIP Guarantors to incur, valid, enforceable, non-avoidable, automatically and fully perfected liens on and security interests in all DIP Collateral (as defined below) on a final basis to secure the DIP Obligations, which liens and security interests shall be subject to the rankings and priorities set forth herein (it being understood that prior to entry by the Court of this Final DIP Order, such DIP Collateral secures the DIP Obligations pursuant to the Interim Order);

(xi)    modification of the automatic stay to the extent set forth herein;

(xii)   a waiver of any applicable stay with respect to the effectiveness and enforceability of this Final DIP Order (including under Bankruptcy Rule 6004); and

(xiii)  the scheduling of a hearing with respect to the amount of Adequate Protection Obligations asserted by Wells Fargo or Fortress (each as defined herein), as applicable, to have been incurred by the Debtors under the Interim Order prior to entry of this Final DIP Order that remain outstanding and owing to Wells Fargo or Fortress, as applicable (the "**Outstanding Adequate Protection Obligations**"), to be held by this Court on or before February 11, 2021 (the "**Adequate Protection Obligations Hearing**").

The Court having considered the relief requested in the Motion, the exhibits attached thereto, the *Declaration of Richard W. Morgner in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "**DIP Declaration**"), the *Declaration of Matthew Ray of Portage Point Partners, LLC in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 79] (the "**First Day Declaration**"), the DIP Documents, and the evidence submitted and arguments made by the Debtors at the Interim Hearing held on October 22, 2020 (the "**Interim Hearing**") and the hearing held before this Court on December 10, 2020 (the "**Final DIP Hearing**"); and notice of the Interim Hearing and the Final DIP Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Interim Hearing and Final DIP Hearing having been held and concluded; the Court having entered the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured*

4

*Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 141] (the "**Interim Order**"); and all objections, if any, to the interim and final relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the final relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into and/or performance under the DIP Credit Agreement and other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE FINAL DIP HEARING BY THE DEBTORS, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:** [3]

A.    *Petition Date*.  On September 28, 2020 and September 29, 2020 (as applicable to each Debtor, the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.  On September 30, 2020, this Court entered orders approving the joint administration of the Chapter 11 Cases [Docket Nos. 30, 31].

B.    *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    *Jurisdiction and Venue*.  This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), 503, 506, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rules 2002-1, 4001-1(b), 4002-1(i) and 9013-1.

D.     *Committee Formation*.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

E.     *Notice*.  The Final DIP Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this Final DIP Order shall be required.

F.     *Debtors' Stipulations*.  Without prejudice to the rights of the Debtors' estates or any other party in interest (but subject to the limitations thereon contained in paragraph 24 below), and after consultation with their attorneys and financial advisors, the Debtors acknowledge, admit, stipulate and agree that:

(i)     *Prepetition Revolving Credit Facility*.  Wells Fargo Bank, National Association ("**Wells Fargo**") and BTC are parties to that certain Loan Agreement, dated as of October 30, 2013, as amended by:  (i) that certain First Amendment to Loan Agreement, Note and Guaranty, dated as of February 4, 2015; (ii) that certain Second Amendment and Waiver, dated as

6

of May 15, 2015; (iii) that certain Second Amendment to Loan Agreement, Note and Guaranty, dated as of October 30, 2018; (iv) that certain Third Amendment to Loan Agreement, dated as of April 29, 2019; and (v) that certain Fourth Amendment, Forbearance, Waiver and Joinder to Loan Agreement, dated as of November 5, 2019 (collectively, the "**Wells Fargo Loan Agreement**"), pursuant to which Wells Fargo made a revolving credit facility in the maximum principal amount of $163,450,000 available to BTC (the "**Prepetition Revolving Credit Facility**").    Wells Fargo:  (x) and BTC are parties to that certain Business Direct Credit Application – Agreement dated on or about November 12, 2013 (the "**Wells Fargo BTC P-Card Agreement**") pursuant to which Wells Fargo provided certain purchase cards to BTC; and (y) and B. No. 200 Corp. are parties to that certain Business Direct Credit Application – Agreement dated on or about November 12, 2013 (the "**Wells Fargo B. No. 200 P-Card Agreement**" and, together with the Wells Fargo BTC P-Card Agreement, the "**Wells Fargo P-Card Facilities**") pursuant to which Wells Fargo provided certain purchase cards to B. No. 200 Corp.

(ii)     B. No. 210 Corp., B. No. 215 Corp., B. No. 225 Corp., B. No. 245 Corporation, B. No. 250 Corp., B. No. 260 Corporation, Tug Brendan J. Bouchard Corp., Tug Danielle M. Bouchard Corp., Tug Jane A. Bouchard Corp., Tug Evening Star Corp., B. No. 242 Corp., B. No. 262 Corp., B. No. 295 Corp., Tug Bouchard Girls Corp., Tug Morton S. Bouchard, IV Corp., B. No. 270 Corp., Tug Kim M. Bouchard Corp., B. No. 252 Corp., and Tug Evening Breeze Corp. (collectively, the "**Prepetition Guarantors**") are parties to that certain Guaranty, dated as of October 30, 2013, in favor of Wells Fargo (the "**Prepetition Guaranty**"), pursuant to which the Prepetition Guarantors, among other things, guaranteed the punctual payment of all indebtedness, liabilities, and obligations of BTC to Wells Fargo under the Wells Fargo Loan Agreement.

(iii)     In connection with the Prepetition Revolving Credit Facility and the Prepetition Guaranty (and, with respect to the B. No. 252 Collateral and the Evening Breeze Collateral (each as defined herein), the Wells Fargo P-Card Facilities), BTC and the Prepetition Guarantors delivered, or caused to be delivered, to Wells Fargo, among other things (collectively and as amended, the "**Wells Fargo Security Documents**"):

(a)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 210 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 210 (Official Number 1037844), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 210 Vessel-Related Property (collectively, the "**B. No. 210 Collateral**"). "**Vessel-Related Property**" shall mean, with respect to any Wells Fargo Vessel: all engines, boilers, machinery, derricks, cranes, masts, boats, anchors, cables, chains, rigging, tackle, apparel, furniture, winches, capstans, outfit, tools, pumps, gears, furnishings, appliances, fittings, navigation and communications equipment, computers, stores, spare and replacement parts, and all other appurtenances thereto appertaining or belonging; and all equipment related thereto; and any and all additions improvements and replacements thereof or any part thereof; and all products and proceeds of all of the foregoing;

(b)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 215 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 215 (Official Number 1064767), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 215 Vessel-Related Property (collectively, the "**B. No 215 Collateral**");

(c)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 225 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 225 (Official Number 1139764), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 225 Vessel-Related Property (collectively, the "**B. No 225 Collateral**");

(d)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 242 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest

8

in and lien upon the whole (100%) of B. No. 242 (Official Number 1154327), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 242 Vessel-Related Property (collectively, the "**<u>B. No 242 Collateral</u>**");

(e)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 245 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 245 (Official Number 1050073), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 245 Vessel-Related Property (collectively, the "**<u>B. No 245 Collateral</u>**");

(f)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 250 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 250 (Official Number 1235496), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 250 Vessel-Related Property (collectively, the "**<u>B. No 250 Collateral</u>**");

(g)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 252 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 252 (Official Number 1292046), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 252 Vessel-Related Property (collectively, the "**<u>B. No 252 Collateral</u>**");

(h)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 260 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 260 (Official Number 1210060), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 260 Vessel-Related Property (collectively, the "**<u>B. No 260 Collateral</u>**");

(i)     that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 262 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 262 (Official Number 1216336), a documented vessel of the United States, whose records are maintained at the

National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 262 Vessel-Related Property (collectively, the "**B. No 262 Collateral**");

(j)    that certain First Preferred Ship Mortgage, dated as of November 27, 2017, pursuant to which B. No. 270 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 270 (Official Number 1257373), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 270 Vessel-Related Property (collectively, the "**B. No 270 Collateral**");

(k)    that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which B. No. 295 Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of B. No. 295 (Official Number 955449), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all B. No. 295 Vessel-Related Property (collectively, the "**B. No 295 Collateral**");

(l)    that certain First Preferred Ship Mortgage, dated as of November 27, 2017, pursuant to which Tug Kim M. Bouchard Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Kim M. Bouchard (Official Number 1257372), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Kim M. Bouchard Vessel-Related Property (collectively, the "**Kim M. Bouchard Collateral**");

(m)    that certain First Preferred Ship Mortgage, dated as of November 5, 2019, pursuant to which Tug Evening Breeze Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Evening Breeze (Official Number 1282121), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Evening Breeze Vessel-Related Property (collectively, the "**Evening Breeze Collateral**");

(n)    that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Evening Star Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Evening Star (Official Number 1234828), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together

with all Evening Star Vessel-Related Property (collectively, the "**Evening Star Collateral**");

(o)    that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Morton S. Bouchard, IV Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Morton S. Bouchard IV (Official Number 1154328), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Morton S. Bouchard IV Vessel-Related Property (collectively, the "**Morton S. Bouchard IV Collateral**");

(p)    that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Jane A. Bouchard Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Jane A. Bouchard (Official Number 1139762), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Jane A. Bouchard Vessel-Related Property (collectively, the "**Jane A. Bouchard Collateral**");

(q)    that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Brendan J. Bouchard Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Brendan J. Bouchard (Official Number 1086926), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Brendan J. Bouchard Vessel-Related Property (collectively, the "**Brendan J. Bouchard Collateral**");

(r)    that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Danielle M. Bouchard Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Danielle M. Bouchard (Official Number 1053010), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Danielle M. Bouchard Vessel-Related Property (collectively, the "**Danielle M. Bouchard Collateral**");

(s)    that certain First Preferred Ship Mortgage, dated as of February 4, 2015, pursuant to which Tug Bouchard Girls Corp. granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon the whole (100%) of Bouchard Girls (Official Number 955450), a documented vessel of the United States, whose records are maintained at the National Vessel Documentation Center, Falling Waters, West Virginia, together with all Bouchard Girls Vessel-Related Property (collectively, the "**Bouchard Girls Collateral**");

(t)      that certain First Earnings Assignment, dated as of October 30, 2013, as amended by that certain First Amendment to First Earnings Assignment, dated as of February 4, 2015, and that certain Second Amendment to First Earnings Assignment, dated as of March 12, 2020, pursuant to which B. No. 210 Corp., B. No. 215 Corp., B. No. 225 Corp., B. No. 245 Corp., B. No. 250 Corp., B. No. 260 Corp., Tug Brendan J. Bouchard Corp., Tug Danielle M. Bouchard Corp., Tug Jane A. Bouchard Corp., Tug Evening Star Corp., B. No. 242 Corp., B. No. 262 Corp., B. No. 295 Corp., Tug Bouchard Girls Corp., Tug Morton S. Bouchard, IV Corp., B. No. 270 Corp., Tug Kim M. Bouchard Corp., B. No. 252 Corp., and Tug Evening Breeze Corp. sold, assigned, transferred, and set over unto Wells Fargo, and conferred upon Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon, all accounts and contract rights consisting of, and all monies or claims for monies, due or to become due to such Debtors and all liens therefor under or arising out of any bill of lading, contract of affreightment or other contract or arrangement whatsoever (excluding charter contracts and the revenue therefrom), whether expressed or implied, made or issued for or in connection with the service, use or operation of the United States flag vessels (as described above) (collectively, the "**Wells Fargo Vessels**") owned by, and chartered to, such Debtors for the carriage of goods or passengers or for any other purpose whatsoever relating to the service, use or operation of any Wells Fargo Vessel for or as charter hire, freight, demurrage or otherwise thereunder, or as compensation for the modification, termination or breach thereof, and any proceeds of the foregoing; and any and all monies and claims for monies, due or to become due to such Debtors with respect to the requisition for use or requisition of title, by seizure, condemnation, confiscation, sequestration or compulsory acquisition or otherwise, by act of any country or any governmental authority or otherwise, of any Wells Fargo Vessel, and all claims for damages or compensation with respect, and any proceeds of the foregoing (collectively, the "**Earnings Collateral**"); and

(u)      that certain Assignment of Insurances, dated as of October 30, 2013, as amended by that certain First Amendment to Assignment of Insurances, dated as of February 4, 2015, and that certain Second Amendment to Assignment of Insurances, dated as of March 12, 2020, pursuant to which B. No. 210 Corp., B. No. 215 Corp., B. No. 225 Corp., B. No. 245 Corp., B. No. 250 Corp., B. No. 260 Corp., Tug Brendan J. Bouchard Corp., Tug Danielle M. Bouchard Corp., Tug Jane A. Bouchard Corp., Tug Evening Star Corp., B. No. 242 Corp., B. No. 262 Corp., B. No. 295 Corp., Tug Bouchard Girls Corp., Tug Morton S. Bouchard, IV Corp., B. No. 270 Corp., Tug Kim M. Bouchard Corp., B. No. 252 Corp., and Tug Evening Breeze Corp. granted, bargained, assigned, transferred, conveyed, mortgaged, pledged and confirmed to Wells Fargo, and granted Wells Fargo a first-priority (subject only to Permitted Liens, as defined in the Wells Fargo Loan Agreement) security interest in and lien upon, all moneys and claims for moneys due and to become due to such Debtors with respect to any loss of a Wells Fargo Vessel, including, without limitation, requisition for title, seizure, condemnation, confiscation, sequestration or compulsory acquisition or otherwise of a Wells Fargo Vessel, and all claims for damages or compensation with respect thereto; and all policies and contracts of

insurance of whatsoever nature and all entries with protection and indemnity clubs or societies (to the fullest extent that the rules of the relevant insurance company club or society allow such assignment) taken out in respect of such Debtors' interests in the Wells Fargo Vessels, including, without limitation, all machinery, materials, equipment, appurtenances, and outfits thereon, including, without being limited to, hull and machinery, war risks, protection and indemnity, and title requisition or otherwise howsoever and all the benefits thereof, including all claims of whatsoever nature and return of premiums, together with the income payments and proceeds of any and all of the foregoing (collectively, the "**Insurance Collateral**").

(iv)    In connection with the Wells Fargo Security Documents, Wells Fargo, among other things, filed the items described on **Schedule 1** attached hereto.

(v)    The prepetition loan documents described in this paragraph F, as amended, supplemented, or otherwise modified prior to the Petition Date, together with all collateral and ancillary documents executed in connection therewith are collectively referred to herein as the "**Wells Fargo Loan Documents**," and the principal, interest, costs, expenses, fees, and other amounts owing under the Wells Fargo Loan Documents are collectively referred to herein as the "**Wells Fargo Indebtedness**."

(vi)    *Prepetition Aircraft Loan*.  Fortress Credit Co, LLC ("**Fortress**"), as agent and initial lender, the lenders party thereto from time to time (collectively, the "**Aircraft Lenders**" and collectively with Fortress, the "**Aircraft Secured Parties**" (the Aircraft Secured Parties together with Fortress and Wells Fargo, the "**Prepetition Secured Parties**"), and BTC are parties to that certain Loan and Aircraft Security Agreement, dated as of March 10, 2020 (the "**Loan and Aircraft Security Agreement**" and collectively with the Wells Fargo Loan Documents, the "**Prepetition Loan Documents**"), pursuant to which the Aircraft Lenders made a loan in the principal amount of $25 million (the "**Aircraft Loan**" and together with the Prepetition Revolving Credit Facility and the Wells Fargo P-Card Facilities, the "**Prepetition Facilities**") available to BTC.  As of the Petition Date, not less than $25,258,333.33 was due and owing under the Aircraft

13

Loan (inclusive of principal and accrued interest), plus certain fees and expenses, and reimbursement of that certain $140,767.00 protective advance made by Fortress on or about October 9, 2020 with respect to insurance of the Aircraft Collateral (the "**Aircraft Insurance Advance**").

(vii)   *WF Stipulated Amount.*   Subject to the Challenge Period set forth in paragraph 24, the Debtors admit, stipulate, and agree that they are liable to Wells Fargo for Wells Fargo Indebtedness as of the Petition Date in an aggregate amount of at least $163,469,952.06 (the "**WF Stipulated Amount**").

(viii)   Subject to the Challenge Period set forth in paragraph 24, the Debtors admit, stipulate, and agree that, as security for repayment of the Wells Fargo Indebtedness, Wells Fargo holds valid, binding, enforceable, perfected, and non-avoidable first-priority (subject only to Permitted Liens, as defined in the Prepetition Credit Agreement) liens upon and security interests in (collectively, the "**Wells Fargo Liens**"):  (a) the B. No. 210 Collateral; (b) the B. No. 215 Collateral; (c) the B. No. 225 Collateral; (d) the B. No. 242 Collateral; (e) the B. No. 245 Collateral; (f) the B. No. 250 Collateral; (g) the B. No. 252 Collateral; (h) the B. No. 260 Collateral; (i) the B. No. 262 Collateral; (j) the B. No. 270 Collateral; (k) the B. No. 295 Collateral; (l) the Kim M. Bouchard Collateral; (m) the Evening Breeze Collateral; (n) the Evening Star Collateral; (o) the Morton S. Bouchard IV Collateral; (p) the Jane A. Bouchard Collateral; (q) the Brendan J. Bouchard Collateral; (r) the Danielle M. Bouchard Collateral; (s) the Bouchard Girls Collateral; (t) the Earnings Collateral, and (u) the Insurance Collateral (collectively, the "**Wells Fargo Collateral**").

(ix)   [RESERVED]

14

(x)      Subject to the Challenge Period set forth in paragraph 24, the Debtors admit, stipulate, and agree that the Wells Fargo Collateral does not presently but may in the future include "cash collateral" as defined in section 363(a) of the Bankruptcy Code with respect to certain of the Debtors' cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents that are proceeds, products, offspring, rents, or profits of the Wells Fargo Collateral constitute "cash collateral" as defined in section 363(a) of the Bankruptcy Code (collectively, the "**Wells Fargo Cash Collateral**").  As of the Petition Date, there was no Wells Fargo Cash Collateral.

(xi)      *Aircraft Secured Claim*.   Subject to the Challenge Period set forth in paragraph 24 the Debtors admit, stipulate, and agree that they are liable to the Aircraft Secured Parties for (the "**Aircraft Secured Claim**" and together with the Wells Fargo Indebtedness, the "**Prepetition Secured Claims**") principal (in an amount not less than $25,000,000.00), interest (in an amount not less than $258,333.33), costs, expenses, fees, and other amounts owing under the Loan and Aircraft Security Agreement (including the Aircraft Insurance Advance).

(xii)      Subject to the Challenge Period set forth in paragraph 24, the Debtors admit, stipulate, and agree that, as security for repayment of the Aircraft Secured Claim, the Aircraft Secured Parties hold valid, binding, enforceable, perfected, and non-avoidable first-priority liens upon and security interests in (collectively, the "**Aircraft Liens**" and collectively with the Wells Fargo Liens, the "**Prepetition Liens**") the Collateral (as defined in the Loan and Aircraft Security Agreement) (the "**Aircraft Collateral**" and collectively with the Wells Fargo Collateral, the "**Prepetition Collateral**").

(xiii)      Subject to the Challenge Period set forth in paragraph 24, the Debtors admit, stipulate, and agree that the Aircraft Collateral does not presently but may in the future include

"cash collateral" as defined in section 363(a) of the Bankruptcy Code with respect to certain of the Debtors' cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents that are proceeds, products, offspring, rents, or profits of the Aircraft Collateral (including, for the avoidance of doubt, the proceeds of any sale of the Aircraft Collateral) constitute "cash collateral" of the Aircraft Secured Parties as defined in section 363(a) of the Bankruptcy Code.  As of the Petition Date, there was no Aircraft Collateral that constitutes "cash collateral".

      (xiv)  *Value of Prepetition Liens and Prepetition Claims*.  The aggregate value of the Prepetition Collateral exceeds the aggregate amount of the Prepetition Secured Claims.

      G.  *Findings Regarding the DIP Facility and Use of Cash Collateral*.

      (i)  Good and sufficient cause has been shown for the entry of this Final DIP Order.

      (ii)  The Debtors have a critical need to obtain the DIP Facility on a final basis and to use Prepetition Collateral (other than Wells Fargo Cash Collateral, if any) to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, employees and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs and to fund expenses of these Chapter 11 Cases.  The Debtors' access to sufficient working capital and liquidity through the incurrence of new indebtedness under the DIP Facility is necessary and vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

      (iii)  The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative

16

expense.  The Debtors are also unable to obtain unsecured and/or secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors (x) granting to the DIP Secured Parties, subject to the Carve Out, the DIP Liens (as defined herein) and, subject to the Carve Out, the Prepetition Liens, and the Adequate Protection Liens, the DIP Superpriority Claims (as defined herein) and (y) subject to the Carve Out, incurring the Adequate Protection Obligations, in each case, under the terms and conditions set forth in this Final DIP Order and the DIP Documents.

(iv)    Based on the Motion, the DIP Declaration, the First Day Declaration and the record presented to the Court at the Interim Hearing and the Final DIP Hearing, the terms of the DIP Facility, the terms of the Adequate Protection Obligations, and the terms on which the Debtors may continue to use the Prepetition Collateral (other than Wells Fargo Cash Collateral, if any) pursuant to this Final DIP Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(v)    Except as provided in paragraph 4(b), Wells Fargo has not consented to the use of Wells Fargo Cash Collateral.  Notwithstanding anything contained in this Final DIP Order, the Debtors shall have no authority to use any Wells Fargo Cash Collateral under this Final DIP Order, except as provided in paragraph 4(b).

(vi)    To the extent such consent is required, the Prepetition Secured Parties have either (a) consented or are deemed to have consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral or (b) are determined to be adequately protected under this Final DIP Order, as the case may be.

(vii)    The DIP Facility, the Adequate Protection Obligations, and the use of Prepetition Collateral (other than Wells Fargo Cash Collateral, if any) have been negotiated in good faith and at arm's length among the Debtors, the Prepetition Secured Parties, and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Documents, including, without limitation, all DIP Loans made to the Debtors pursuant to the DIP Documents and any DIP Obligations shall be deemed to have been extended by the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or this Final DIP Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)    The Prepetition Secured Parties are entitled to the adequate protection provided in this Final DIP Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of Prepetition Collateral (other than Wells Fargo Cash Collateral, if any) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration.

(ix)    Consummation of the DIP Facility and the use of Prepetition Collateral (other than Wells Fargo Cash Collateral, if any), in accordance with this Final DIP Order and the DIP Documents are in the best interests of the Debtors' estates, consistent with the Debtors' exercise of their fiduciary duties and are necessary, essential and appropriate for the continued

18

operation of the Debtors' businesses and the management and preservation of their assets and properties.

       H.    *Good Faith of the DIP Agent and the DIP Lenders*.

       (i)    *Willingness to Provide Financing*.   The DIP Lenders have indicated a willingness to provide postpetition financing to the Debtors subject to, among other things: (a) the entry by the Court of the Interim Order and this Final DIP Order; (b) approval by the Court of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by the Court that such financing is essential to the Debtors' estates, that the DIP Agent and the DIP Lenders are extending postpetition credit to the Debtors pursuant to the DIP Documents, the Interim Order and this Final DIP Order in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to the Interim Order and this Final DIP Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of the Interim Order, this Final DIP Order or any other order.

       (ii)    *Business Judgment and Good Faith Pursuant to Section 364(e)*.   The terms and conditions of the DIP Facility, including the extension of credit, the fees and other amounts paid to be paid thereunder: (a) are fair and reasonable; (b) are the best available to the Debtors under the circumstances; (c) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; and (d) are supported by reasonably equivalent value and fair consideration.   The DIP Facility was negotiated in good faith and at arms' length among the Debtors, the DIP Agent, and the DIP Lenders.   The credit to be extended under the DIP Facility shall be deemed to have been so advanced, made, used and/or extended in good faith, and for valid

business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Final DIP Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      *Final Access to Financing Approved*.  The Motion is hereby granted on a final basis with respect to the DIP Facility on the terms and conditions set forth in this Final DIP Order and the DIP Documents.  All objections to this Final DIP Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.      *Authorization of the DIP Facility and the DIP Documents*.

(a)      The Debtors were, by the Interim Order, and hereby are, on a final basis, authorized to execute, deliver, enter into and perform all of their obligations in accordance with, and subject to, the terms of the Interim Order, this Final DIP Order and the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith. The Debtors were, by the Interim Order, and hereby are, on a final basis, authorized to borrow the DIP Loans from the DIP Lenders under the DIP Facility (and the DIP Guarantors were, by the Interim Order, and hereby are, on a final basis, authorized to unconditionally guarantee, on a joint and several basis, the repayment of the DIP Facility), subject to the terms and conditions set forth in this Final DIP Order and the DIP Documents.  All DIP Loans shall be borrowed with the Original Issue Discount (as defined in the DIP Credit Agreement) as provided for in the DIP Documents, which was, by the Interim Order, and hereby is, on a final basis, approved. The

Structuring Fee (as defined in the DIP Credit Agreement) and the Exit Fee (as defined in the DIP Credit Agreement) and payment of the Structuring Fee from the proceeds of any DIP Loans, were, by the Interim Order, and hereby are, on a final basis, approved.  The DIP Lenders shall have no obligation to make any loan or advance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Final DIP Order have been satisfied in full or waived in accordance with the DIP Documents.

(b)      Prior to entry of this Final DIP Order, the provisions of the Interim Order, any other DIP Documents executed prior to entry of this Final DIP Order and, prior to entry into the DIP Credit Agreement, the DIP Term Sheet (as defined in the Interim Order) governed the parties' rights with respect to the DIP Loans.  From and after entry of this Final DIP Order, the provisions of the DIP Credit Agreement, this Final DIP Order and any other DIP Documents executed in connection therewith shall govern the parties' rights with respect to the DIP Loans. Upon execution of the DIP Credit Agreement, (i) the DIP Term Sheet was no longer in force and effect and (ii) the DIP Credit Agreement became binding and enforceable against the Debtors as of the date of the effectiveness of the DIP Credit Agreement.  Any actions taken in accordance with the DIP Term Sheet will be deemed to have been taken in accordance with the DIP Credit Agreement or other applicable DIP Documents.  Any DIP Document entered into, and any and all actions taken by the Debtors, the DIP Agent or the DIP Lenders as contemplated by, in accordance with and/or in furtherance of the Interim Order and the DIP Documents are hereby ratified in full as if taken in accordance with this Final DIP Order.

(c)      The DIP Facility is hereby approved on a final basis.  In furtherance of the foregoing and without further approval of this Court, each Debtor was, by the Interim Order, and hereby are, on a final basis, authorized to perform all acts, to make, execute and deliver all

instruments, certificates, agreements and documents (including, without limitation, the execution

or recordation of security agreements, mortgages and financing statements), and to pay all fees

and expenses in connection with or that may be reasonably required, necessary, or desirable for

the Debtors' performance of their obligations under or related to the DIP Facility, including,

without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents, supplements or other modifications to and under the DIP Documents, in each case, in such form as the Debtors and the DIP Agent may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents that do not shorten the scheduled maturity of the extensions of credit thereunder or increase the aggregate DIP Commitments (as defined in the DIP Credit Agreement) under the DIP Facility or the rate of interest or fees payable thereunder or add additional collateral;

(iii)     the non-refundable payment to the DIP Secured Parties of all fees, including the Original Issue Discount, the Structuring Fee and the Exit Fee (which fees shall be, and shall be deemed to have been, approved on a final basis upon entry of this Final DIP Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other

claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification obligations and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders, in each case in their respective capacities as such, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party, except as expressly set forth herein; and

(iv)     the making and the incurrence of the BTC Loan and the execution and delivery of, and performance under, such documents as may be necessary or desirable in connection therewith, including the execution and delivery of, and performance under, one or more amendments, waivers, consents, supplements, or other modifications to and under the BTC Loan, in each case, in such form as the Debtors and the DIP Agent may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents, or other modifications to and under the BTC Loan that do not shorten the scheduled maturity of the extensions of credit thereunder or increase the aggregate commitments under the BTC Loan or the rate of interest or fees payable thereunder or add additional collateral; and

(v)     the performance of all other acts necessary, appropriate and/or desirable under or in connection with the DIP Documents.

23

3.     *DIP Obligations*.   For purposes hereof, the term "DIP Obligations" means all "Obligations" as defined in the DIP Credit Agreement, and, for the avoidance of doubt, shall include, without limitation, any and all principal, interest, fees (including the Original Issue Discount, the Structuring Fee and the Exit Fee), fees of the DIP Agent, payments, costs, expenses, charges, any obligations in respect of indemnity claims, whether contingent or absolute, due under the DIP Documents and any other amounts that are or may become due under the DIP Documents, in each case, whether or not such fees arose before or after the Petition Date, as such amounts become earned, due and payable under the DIP Documents, without the need to obtain further Court approval.   The DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable against each Debtor and their estates in accordance with the terms of the DIP Documents, the Interim Order and this Final DIP Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). The DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Secured Parties, in each case, under, or secured by, the DIP Documents, the Interim Order or this Final DIP Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the DIP Documents.   The DIP Obligors shall be jointly and severally liable for the DIP Obligations.   No obligation, payment, transfer or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens) shall be stayed, restrained, voidable, avoidable or recoverable, under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or

24

under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.      *Carve Out.*

(a)      Carve Out.  As used in this Final DIP Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below) in an aggregate amount not to exceeds $100,000; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Creditors' Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent or the Required DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,500,000 incurred after the first business day following delivery by the DIP Agent or the Required DIP Lenders of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order,

or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Prepetition Secured Parties, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked. Upon the receipt of the Carve Out Trigger Notice, the Debtors shall provide immediate notice to all Estate Professionals informing them that such notice was delivered and further advising them that the Debtors' ability to pay such Estate Professionals is subject to and limited by the Carve Out.

(b)    Carve Out Reserves. On the day on which a Carve Out Trigger Notice is given by the DIP Agent or the Required DIP Lenders to the Debtors with a copy to counsel to the Prepetition Secured Parties and counsel to the Creditors' Committee (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be

deemed a request by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter (excluding the proceeds referred to in paragraph 17 hereof) held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims. On the third business day after the DIP Agent gives such notice to the DIP Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding DIP Commitment (on a pro rata basis based on the then outstanding DIP Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders. All funds

in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay, as applicable, Wells Fargo, Fortress, or the DIP Agent for the benefit of the DIP Lenders on a *pro rata* basis based on their respective funding of the Post-Carve Out Trigger Notice Reserve. Notwithstanding anything to the contrary in the DIP Documents, the Interim Order, or this Final DIP Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 4, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 4, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable. For the avoidance of doubt, notwithstanding anything to the contrary contained herein, nothing herein shall require the DIP Secured Parties to advance or fund DIP Loans in an aggregate amount greater than $60,000,000, after taking into account any DIP Loans previously advanced, the Structuring Fee, the Original Issue Discount and any netted fees or other amounts payable to the DIP Secured Parties. Notwithstanding anything to the contrary in the DIP Documents, the Interim Order or this Final DIP Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, Wells Fargo, and Fortress shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets but excluding cash proceeds described in paragraph 17 hereof) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a fully perfected, non-avoidable security interest in any residual interest in any residual cash after any excess of the Carve Out Reserves is paid to the DIP Agent, Wells Fargo, or Fortress, as applicable, for application in accordance with the DIP Documents. Further, notwithstanding

28

anything to the contrary in this Final DIP Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Sources and Uses, Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Final DIP Order, the DIP Facility, or in any Prepetition Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens (as defined below), the Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Claims (except liens on the proceeds referred to in paragraph 17 hereof).

(c)　Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)　No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Final DIP Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out by DIP Loans shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under the Interim Order, this Final DIP Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(f)     *Objection Rights*.  Nothing contained herein is intended to constitute, nor shall be construed as consent to, the allowance of any Professional Person's fees, costs or expenses by any party and shall not affect the rights of the DIP Secured Parties or the Prepetition Secured Parties to object to the allowance of any such amounts incurred or requested.

5.     *DIP Superpriority Claims*.  Subject only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims (the "**DIP Superpriority Claims**") against each of the DIP Obligors (without the need to file any proof of claim) (a) with priority over any and all any and all administrative expense claims, unsecured claims and all other claims against the DIP Obligors or their estates in any of the Chapter 11 Cases or any Successor Cases (other than the Carve Out), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses, unsecured claims, or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment and (b) which shall at all times be senior to the

30

rights of the DIP Obligors or their estates, and any trustee appointed in the Chapter 11 Cases or any Successor Cases to the extent permitted by law; _provided_ that the DIP Superpriority Claim shall be _pari passu_ with the Wells Fargo Superpriority Claim and the Fortress Superpriority Claim. The DIP Superpriority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each DIP Obligor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral and all other prepetition and postpetition assets and property of the DIP Obligors and all proceeds thereof, including Avoidance Action Proceeds (as defined herein). The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order, this Final DIP Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

6.      _BTC Loan Superpriority Claim._  Subject only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, the BTC Loan shall constitute an allowed superpriority administrative expense claim (the "**BTC Superpriority Claim**") of the Borrower against BTC (without the need to file any proof of claim) with priority over any and all any and all administrative expense claims, unsecured claims and all other claims against BTC or its estate in the BTC Chapter 11 Case or any Successor Cases (other than the Carve Out), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses, unsecured claims, or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, _provided_ that the BTC Superpriority Claim shall be _pari_

*passu* with the Wells Fargo Superpriority Claim and the Fortress Superpriority Claim. The BTC Superpriority Claim shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code.

7.     *DIP Liens*.  As security for the DIP Obligations, immediately upon, and effective as of, the date of the Interim Order, the DIP Agent, for the benefit of itself and each of the other DIP Secured Parties, was granted (and such grant is hereby ratified and approved on a final basis) continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on (collectively, the "**DIP Liens**") all DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all of the DIP Obligations, without the necessity of the execution, recordation or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent.

The term "**DIP Collateral**" means all of the DIP Obligors' rights, title and interests in, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the DIP Obligors, or leased from or to, the DIP Obligors, and regardless of wherever located:  (a) the barges and tugs identified on Annex A to this Final DIP Order (the "**Specified Vessels**", and together with the items set forth clause (d) below the "**Specified Vessel Collateral**") and any and all proceeds thereof or received in connection therewith, (b) all proceeds of claims and causes of action arising under chapter 5 of the Bankruptcy Code ("**Avoidance Action Proceeds**"), (c) the BTC Loan and the related loan, collateral and ancillary documents executed in connection therewith, and (d) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing, including any and all

proceeds of any insurance, indemnity, warrant or guaranty payable to such DIP Obligor from time to title with respect to any of the foregoing.

(a)     To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the DIP Obligors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any DIP Obligor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Documents and this Final DIP Order or in favor of the Prepetition Secured Parties in accordance with this Final DIP Order.

8.     *Priority of DIP Liens.*  The DIP Liens shall have the following priorities:

(a)     *Liens on Unencumbered Property.*  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, fully perfected first priority security interest in and lien upon all DIP Collateral that is not subject to liens that were existing, valid, enforceable, properly perfected and non-avoidable as of the Petition Date (the "**Unencumbered DIP Collateral**"), which Unencumbered DIP Collateral shall, for the avoidance of doubt, include the Specified Vessel Collateral, the BTC Loan and Avoidance Action Proceeds, subject and subordinate only to the Carve Out; provided, however, that to the extent any of the Specified Vessel Collateral is subject to a valid, enforceable, properly perfected and non-avoidable lien as of the Petition Date, the DIP Liens on such Specified Vessel Collateral

33

shall, pursuant to section 364(c)(3) of the Bankruptcy Code, be junior liens, subject only to such existing valid, enforceable, properly perfected and non-avoidable liens and the Carve Out;

(b)    Except as expressly set forth herein, the DIP Liens and the DIP Superpriority Claims:  (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

9.    Sources and Uses; Use of DIP Facility Proceeds.

(a)    The Debtors have prepared and delivered to the DIP Agent and the DIP Lenders a sources and uses, in form and substance acceptable to the Required Lenders (the "Sources and Uses"), attached as Annex B to this Final DIP Order, setting forth all line-item disbursements (including all necessary and required expenses which the Loan Parties expect to incur and uses of proceeds of the Interim Availability Amount under the Facility).

(b)    From and after the Closing Date, the Debtors shall be permitted to draw upon the DIP Facility only pursuant to the terms and conditions set forth in Article IV of the DIP Credit Agreement and use the proceeds of the DIP Facility only for the purposes set forth in section 3.27 of the DIP Credit Agreement, in each case, solely in accordance with and subject to this Final DIP Order, the DIP Documents, the Sources and Uses and/or Approved Budget, as applicable and in each case subject to Permitted Deviations.

10.     *DIP Events of Default*.

(a)     Without requiring further order from the Court and without the need for filing any motion for relief from the automatic stay or any other pleading, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent or the Required DIP Lenders (as defined in the DIP Credit Agreement, the "**Required DIP Lenders**"), immediately upon the occurrence and during the continuance of any Event of Default (as defined in the DIP Documents or as otherwise provided herein, in either case, an "**Event of Default**"), to send written notice of the occurrence of an Event of Default (such notice, the "**Event of Default Notice**") to the Debtors, the U.S. Trustee, counsel for the Prepetition Secured Parties, and any statutory committee appointed in these cases.  Upon the delivery of the Event of Default Notice, the DIP Agent (acting at the direction of the Required DIP Lenders, if applicable) may (a) after giving effect to paragraph 4 hereof with respect to the Carve Out, immediately terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (b) declare all DIP Obligations to be immediately due and payable; (c) invoke the right to charge interest at the default rate under the DIP Documents; and (d) one (1) business day after delivery of the Event of Default Notice, foreclose on the BTC Loan (subject to any appropriate remedy the Court may fashion at the Stay Relief Hearing (as defined herein)).  Five (5) business days after delivery of an Event of Default Notice, which period shall run concurrently with any notice required to be provided under the DIP Documents (the "**Remedies Notice Period**"), the DIP Agent (acting at the direction of the Required DIP Lenders, if applicable) may file a motion on shortened notice seeking relief from the automatic stay (the "**Stay Relief Motion**").  Pending the hearing on the Stay Relief Motion

(the "**Stay Relief Hearing**"), the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of an Event of Default) or Cash Collateral to (a) fund expenses necessary to preserve the business in accordance with the DIP Documents and the Sources and Uses and/or Approved Budget, as applicable and in each case subject to Permitted Deviations, or as otherwise agreed to in writing by the DIP Agent (acting at the direction of the Required DIP Lenders) and (b) to fund the Carve Out Reserves.  Upon the Court's ruling at the Stay Relief Hearing, the Court may fashion any appropriate remedy, including, without limitation, permitting the DIP Secured Parties to (a) enforce any and all rights against the DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral, collection of accounts receivable, occupying the Debtors' premises, sale or disposition of the DIP Collateral; and (b) take any other actions or exercise any other rights or remedies permitted under the Interim Order, this Final DIP Order, the DIP Documents or applicable law.  If the DIP Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral following the Stay Relief Hearing, the Debtors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security interests in the DIP Collateral.  Notwithstanding the occurrence of an Event of Default, the Maturity Date, and/or termination of the DIP Commitments under the DIP Facility, all of the rights, remedies, benefits, and protections provided to the DIP Secured Parties under the DIP Documents and this Final DIP Order, as applicable, shall survive.

(b)      For purposes of this Final DIP Order, each of the following, unless waived or consented to by the DIP Agent or the Required DIP Lenders, shall constitute an "Event of Default":  (i) the twelve (12) month anniversary of the date of entry of this Final DIP Order,

subject to a six (6) month extension agreed to in writing at the sole discretion of the DIP Lenders; (ii) the consummation of a sale of substantially all of the DIP Obligors' assets pursuant to section 363 of the Bankruptcy Code; (iii) the substantial consummation or effective date of any chapter 11 plan; (iv) a failure of the Debtors to (x) observe or perform in any material respect any of the terms or provisions contained in this Final DIP Order or (y) comply with any covenant or agreement in this Final DIP Order, in each case, in any material respect; (v) any modification, amendment or extension of this Final DIP Order that is adverse to the DIP Lenders; (vi) an order converting to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases; (vii) an order appointing a chapter 11 trustee in the Chapter 11 Cases; (viii) an order appointing an examiner with enlarged powers in the Chapter 11 Cases (beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code); or (ix) the occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement.

(c)     Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or that otherwise is at any time entered:  (x) the DIP Superpriority Claims, the DIP Liens, the Adequate Protection Liens, and the Carve Out shall continue in full force and effect and shall maintain their priorities as provided in this Final DIP Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash, and such DIP Superpriority Claims, DIP Liens, and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest; (y) the other rights granted by this Final DIP Order shall not be affected; and (z) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Final DIP Order.

(d)     Upon entry of this Final DIP Order, in no event shall the DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

(e)     No rights, protections or remedies of the DIP Secured Parties or the Prepetition Secured Parties granted by the provisions of this Final DIP Order or any DIP Documents, as applicable, shall be limited, modified or impaired in any way by (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

11.     *Limitation on Charging Expenses against Collateral*.  Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders), and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties and nothing contained in this Final DIP Order shall be deemed to be a consent by the DIP Secured Parties to any charge, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

12.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Agent (on its own behalf or on behalf of the DIP Lenders) pursuant to the provisions of the Interim Order, this Final DIP Order, or any subsequent order of the Court shall be irrevocably received

free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors.  Any and all payments or proceeds remitted to the Prepetition Secured Parties shall be subject to paragraph 16(p) hereof.

13.     *Use of Cash Collateral*.  Pursuant to section 363(c) of the Bankruptcy Code, the Debtors were, by the Interim Order, and hereby are, on a second interim basis, authorized to use Cash Collateral, if any, upon (and only upon) the terms and conditions set forth in this Final DIP Order.  Notwithstanding anything contained in this Final DIP Order, the Debtors shall have no authority to use any Wells Fargo Cash Collateral under this Final DIP Order, except as provided in paragraph 4(b).  For the avoidance of doubt, that the Debtors may seek relief from the Court to use Wells Fargo Cash Collateral, and Wells Fargo may oppose such relief.

14.     [RESERVED]

15.     *Disposition of DIP Collateral/Mandatory Prepayments*.

(a)     Unless the DIP Obligations are indefeasibly paid in full, in cash, upon the closing of a sale or other disposition of the DIP Collateral, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral (other than any such transactions permitted under the terms of DIP Credit Agreement, including dispositions of equipment that is obsolete or worn out or that is no longer useful in the ordinary course of business and consistent with past practices or that is replaced or to be replaced in the ordinary course of business and consistent with past practices (it being agreed and understood that any such equipment which replaces equipment that constitutes DIP Collateral shall also constitute DIP Collateral) (collectively, "**Permitted Dispositions**")) without the prior written consent of the

Required DIP Lenders (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Secured Parties, or from any order of this Court), except as otherwise permitted under the DIP Documents or otherwise ordered by the Court.

(b)     The following mandatory prepayments shall be required:  (1) prepayments of the DIP Facility in an amount equal to 100% of the net cash proceeds of sales or other dispositions of the DIP Collateral without the prior written consent of the Required DIP Lenders; (2) prepayments of the DIP Facility in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any part of the DIP Collateral (other than any such proceeds received prior to the Closing Date); (3) prepayments of the DIP Facility in an amount equal to 100% of the net cash proceeds received from the incurrence of indebtedness by any of the DIP Obligors (other than such other indebtedness otherwise permitted under the DIP Documents, otherwise consented to by the DIP Lenders, or secured by the Wells Fargo Collateral); and (4) any other prepayments required under the DIP Credit Agreement (the foregoing clauses (1)–(4), collectively, "**Mandatory Prepayments**").  Mandatory Prepayments will result in a dollar-for-dollar permanent reduction of the then-outstanding DIP Loans in accordance with an application waterfall in a manner consistent with the DIP Credit Agreement.

16.     *Adequate Protection of Prepetition Secured Parties*.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral from and after the Petition Date, for any diminution in the value of their interests in the Prepetition Collateral occurring as a result of the entry of this Final DIP Order, the use of Cash Collateral (if any) authorized hereby, and the imposition of the automatic stay in the Chapter 11 Cases.  In consideration of the foregoing, as adequate protection, the Prepetition Secured Parties are hereby

granted the following, in each case, subject and subordinate to the Carve Out, solely to the extent of such diminution in value (collectively, the "**Adequate Protection Obligations**"):

(a)      Wells Fargo Replacement Liens.  Notwithstanding anything in section 552 of the Bankruptcy Code to the contrary, pursuant to the Interim Order, Wells Fargo shall have, and is hereby granted, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, and non-avoidable replacement liens on and security interests in and on all property and assets of each Prepetition Guarantor and their respective estates, including property and assets acquired by such Debtors and their estates after the Petition Date, except for Avoidance Actions and proceeds thereof (the "**Wells Fargo Replacement Liens**"), solely as and to the extent necessary to adequately protect Wells Fargo from any diminution in the value of its interests in the Wells Fargo Collateral occurring as a result of the entry of this Final DIP Order, the use of Wells Fargo Cash Collateral authorized hereby, and the imposition of the automatic stay in the Chapter 11 Cases.  Notwithstanding anything to the contrary contained herein, the Wells Fargo Replacement Liens shall not attach to the Specified Vessel Collateral or the Avoidance Action Proceeds.  The Wells Fargo Replacement Liens shall be subject only to (i) valid, binding, enforceable, perfected, and non-avoidable liens on and security interests in such property or assets existing as of the Petition Date or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, and (ii) the Carve Out.

(b)      No Impairment of Priority of Wells Fargo Replacement Liens.  The Wells Fargo Replacement Liens shall not be made subject to or *pari passu* with any lien or security interest by any other order entered by the Court in any of the Chapter 11 Cases.  Furthermore, unless and until the Wells Fargo Indebtedness has been indefeasibly satisfied and paid in full, the

Wells Fargo Replacement Liens shall remain enforceable and maintain their priority as provided by this Final DIP Order in any successor Chapter 7 case(s) or any subsequently filed bankruptcy case under any Chapter of the Bankruptcy Code regardless of whether such successor/subsequent cases are filed in this Court or any other bankruptcy court of competent jurisdiction.

(c)     Wells Fargo Replacement Lien Perfection.  This Final DIP Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Wells Fargo Replacements Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, notice of lien, or other similar instrument or document that may otherwise be required under the law of any jurisdiction, or the taking of any other action, to validate or perfect the Wells Fargo Replacement Liens in order to entitle the Wells Fargo Replacement Liens to the priorities granted under this Final DIP Order.  Notwithstanding the foregoing, Wells Fargo may, in its sole and absolute discretion, file such financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents and is hereby granted relief from the automatic stay imposed by section 362 of the Bankruptcy Code for the limited purpose of making such filings.  All financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents filed in accordance with this provision shall be deemed to have been filed or recorded at the time and on the date of this Final DIP Order.  The Debtors shall execute and deliver to Wells Fargo all such financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents as Wells Fargo may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the Wells Fargo Replacement Liens.  Wells Fargo, in its sole discretion, may file a photocopy of this Final DIP Order as a financing statement with any recording officer designated to file financing statements or with any registry or recorder of deeds or similar office in any jurisdiction in which

42

any Prepetition Guarantor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final DIP Order.

(d)   <u>Wells Fargo Superpriority Claim</u>.   To the extent the Wells Fargo Replacement Liens granted to Wells Fargo in this Final DIP Order do not provide Wells Fargo with adequate protection of its interests in the Wells Fargo Collateral, Wells Fargo shall have a super-priority administrative expense claim under section 507(b) of the Bankruptcy Code as necessary to fully compensate Wells Fargo for any diminution in the value of the Wells Fargo Collateral occurring as a result of the entry of this Final DIP Order, the use of Cash Collateral (if any) authorized hereby, and the imposition of the automatic stay in the Chapter 11 Cases (the "**<u>Wells Fargo Superpriority Claim</u>**").   The Wells Fargo Superpriority Claim shall have priority over all administrative expenses of any kind incurred in any of the Chapter 11 Cases, any successor Chapter 7 cases, or any subsequently filed bankruptcy case under any Chapter of the Bankruptcy Code regardless of whether such successor/subsequent cases are filed in this Court or any other bankruptcy court of competent jurisdiction, including such administrative expenses of the kinds specified in, or allowable under, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code; *provided* that the Wells Fargo Superpriority Claim shall be *pari passu* with the DIP Superpriority Claim and shall be subject and subordinate to the Carve Out.

(e)   [RESERVED]

(f)   <u>Fortress Replacement Liens</u>.   Notwithstanding anything in section 552 of the Bankruptcy Code to the contrary, Fortress shall have, and is hereby granted, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, and non-avoidable replacement liens on and security interests in and on all

43

Aircraft Collateral (the "**Fortress Replacement Liens**" and together with the Wells Fargo Replacement Liens, the "**Adequate Protection Liens**"), solely as and to the extent necessary to adequately protect Fortress from any diminution in the value of its interests in the Aircraft Collateral as a result of the entry of this Final DIP Order, the use of Cash Collateral (if any) authorized hereby, and the imposition of the automatic stay in the Chapter 11 Cases. Notwithstanding anything to the contrary contained herein, the Fortress Replacement Liens shall not attach to the Specified Vessel Collateral or the Avoidance Action Proceeds.  The Fortress Replacement Liens shall be subject only to (i) valid, binding, enforceable, perfected, and non-avoidable liens on and security interests in such property or assets existing as of the Petition Date or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, and (ii) the Carve Out.

(g)    No Impairment of Priority of Fortress Replacement Liens.  The Fortress Replacement Liens shall not be made subject to or *pari passu* with any lien or security interest by any other order entered by the Court in any of the Chapter 11 Cases.  Furthermore, unless and until the Aircraft Loan has been indefeasibly satisfied and paid in full, the Fortress Replacement Liens shall remain enforceable and maintain their priority as provided by this Final DIP Order in any successor Chapter 7 case(s) or any subsequently filed bankruptcy case under any Chapter of the Bankruptcy Code regardless of whether such successor/subsequent cases are filed in this Court or any other bankruptcy court of competent jurisdiction.

(h)    Fortress Replacement Lien Perfection.  This Final DIP Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Fortress Replacements Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, notice of lien, or other similar instrument or document that may otherwise be

44

required under the law of any jurisdiction, or the taking of any other action, to validate or perfect the Fortress Replacement Liens in order to entitle the Fortress Replacement Liens to the priorities granted under this Final DIP Order.  Notwithstanding the foregoing, Fortress may, in its sole and absolute discretion, file such financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents and is hereby granted relief from the automatic stay imposed by section 362 of the Bankruptcy Code for the limited purpose of making such filings. All financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents filed in accordance with this provision shall be deemed to have been filed or recorded at the time and on the date of this Final DIP Order.  The Debtors shall execute and deliver to Fortress all such financing statements, deeds of trust, mortgages, notices of liens, and other similar instruments and documents as Fortress may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the Fortress Replacement Liens.

(i)     Fortress Superpriority Claim.  To the extent the Fortress Replacement Liens granted to Fortress in this Final DIP Order do not provide Fortress with adequate protection of its interests in the Aircraft Collateral, Fortress shall have a super-priority administrative expense claim under section 507(b) of the Bankruptcy Code solely as and to the extent necessary to fully compensate Fortress for any diminution in the value of the Aircraft Collateral occurring as a result of the entry of this Final DIP Order, the use of Cash Collateral (if any) authorized hereby, and the imposition of the automatic stay in the Chapter 11 Cases (the "**Fortress Superpriority Claim**"). The Fortress Superpriority Claim shall have priority over all administrative expenses of any kind incurred in any of the Chapter 11 Cases, any successor Chapter 7 cases, or any subsequently filed bankruptcy case under any Chapter of the Bankruptcy Code regardless of whether such successor/subsequent cases are filed in this Court or any other bankruptcy court of competent

jurisdiction, including such administrative expenses of the kinds specified in, or allowable under, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code; *provided* that the Fortress Superpriority Claim shall be shall be *pari passu* with the DIP Superpriority Claim and subject and subordinate to the Carve Out.

(j)     [RESERVED]

(k)     [RESERVED]

(l)     <u>Information Rights</u>.  The Debtors shall comply with all reasonable diligence requests from Fortress or its representatives with respect to the Aircraft Collateral and from Wells Fargo or its representatives with respect to the Wells Fargo Collateral.  On reasonable advance notice to the Debtors, Wells Fargo shall be entitled to inspect, under the supervision of the Debtors or their designees, the Wells Fargo Collateral during normal business hours not more than twice per calendar year.  The cost of any such inspection shall be allocated in accordance with the terms of the Wells Fargo Loan Documents.

(m)     <u>Maintenance of Aircraft Collateral</u>.  The Debtors shall maintain, secure, and insure the Aircraft Collateral in a commercially reasonable manner consistent with historical practice.

(n)     [RESERVED]

(o)     <u>Modification of the Automatic Stay</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to:  (i) permit the Debtors to grant the Adequate Protection Liens and to incur all liabilities and obligations to the Prepetition Secured Parties under this Final DIP Order; and (ii) authorize the Prepetition Secured Parties to retain and apply payments, if any, made to it pursuant to the terms of this Final DIP Order.

(p)      Notwithstanding anything to the contrary herein, the Debtors reserve and preserve the right to seek any appropriate relief from this Court for entry of an order (a) determining the secured, and, if any, unsecured portion of a Prepetition Secured Party's claim pursuant to section 506(b) of the Bankruptcy Code and (b) if there is an unsecured portion, ordering that any payment made to a Prepetition Secured Party under the Interim Order or this Final DIP Order, including, in each case, paragraph 16 thereof and hereof, should be recharacterized and/or applied as payments of principal owed under the applicable Prepetition Loan Documents.   This Court shall have authority to fashion any appropriate remedy in connection with such relief requested, including, but not limited to, reducing the amount any allowed secured claim on a dollar-for-dollar basis for any payments made to a Prepetition Secured Party under the Interim Order or this Final DIP Order, including, in each case, paragraph 16 thereof and hereof.   For the avoidance of doubt, the rights of each Prepetition Secured Party to oppose any such relief are fully reserved and preserved.

17.     *Sales and Insurance Proceeds*.  Upon the closing of any sale outside of the ordinary course of business of any of the Prepetition Collateral pursuant to section 363 of the Bankruptcy Code or under a plan of reorganization, the proceeds of such sale shall be paid to the applicable Prepetition Secured Party for immediate application to its allowed Prepetition Secured Claim, without the need to obtain any further approval from the Court.   Upon the occurrence of any insurable event with respect any of the Prepetition Collateral, the insurance proceeds thereof shall be segregated, pending further order of the Court.

18.     [RESERVED].

19.     *No Admissions / Waiver by Prepetition Secured Parties*.  Notwithstanding any other provision in this Final DIP Order to the contrary, this Final DIP Order is without prejudice to, and

does not constitute a waiver, expressly or implicitly, or relinquishment, of the Prepetition Secured Parties' rights with respect to any person or entity or any other collateral owned or held by any person or entity.  The rights of each of the Prepetition Secured Parties are expressly reserved and entry of this Final DIP Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, or relinquishment, of:

(a)    the Prepetition Secured Parties' rights to bring or be heard on any matter brought before this Court;

(b)    the Prepetition Secured Parties' rights under the Prepetition Credit Agreement, the Loan & Aircraft Security Agreement, the Bankruptcy Code or applicable non-bankruptcy law;

(c)    the Prepetition Secured Parties' rights to seek any other or supplemental relief in respect of the Debtors;

(d)    the Prepetition Secured Parties' rights to seek modification of the grant of adequate protection provided under this Final DIP Order so as to provide different or additional adequate protection or, in the alternative, seek termination of the authorization granted to the Debtors to use Wells Fargo Cash Collateral (if any) or other Prepetition Collateral under this Final DIP Order; or

(e)    any other respective rights, claims, or privileges (whether legal, equitable, or otherwise) of the Prepetition Secured Parties.

20.    [RESERVED]

21.    *Payment of Fees and Expenses*.  The Debtors were, by the Interim Order, and hereby are, on a final basis, authorized and directed to pay the reasonable and documented fees, costs, disbursements and expenses of the DIP Secured Parties in accordance with the DIP

Documents (the "**DIP Fees and Expenses**") incurred at any time, to the extent provided by the DIP Documents and this Final DIP Order, whether or not the transactions contemplated hereby are consummated, including, without limitation, legal, accounting, collateral examination, monitoring and appraisal fees and expenses, financial advisory fees and expenses, fees and expenses of other consultants and indemnification and reimbursement of fees and expenses (including, without limitation, the reasonable and documented prepetition and postpetition fees, costs and expenses of Stroock & Stroock & Lavan LLP, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard LLP and any other necessary or appropriate counsel, advisors, professionals or consultants in connection with advising the DIP Secured Parties (collectively the "**DIP Secured Party Advisors**").  Subject to the review procedures set forth in this paragraph 21, payment of all DIP Fees and Expenses and Adequate Protection Fees and Expenses shall not be subject to allowance by the Court. Professionals to be paid in respect of the DIP Fees and Expenses and the Adequate Protection Fees and Expenses shall not be required to comply with the U.S. Trustee fee guidelines; *provided*, *however*, that any time that any professional seeks payment of fees and expenses from the Debtors, such professional shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the Debtors, the Creditors' Committee (if appointed) and the U.S. Trustee. Any objections raised by the Debtors, the U.S. Trustee or a Creditors' Committee (if appointed) with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) days of the receipt of such

invoice (the "**Review Period**").  If, after the Review Period, an objection remains unresolved, it will be subject to resolution by the Court.  Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors.  No professional to be paid in respect of the DIP Fees and Expenses and the Adequate Protection Fees and Expenses shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Notwithstanding the foregoing, the Debtors were authorized and directed by the Interim Order (and such authorization is hereby ratified and approved on a final basis) to pay on the Closing Date the fees and expenses of the DIP Secured Party Advisors incurred on or prior to such date (including the funding of retainers) without the need to provide notice to any other party or otherwise comply with the procedures set forth in this paragraph 21.  Notwithstanding anything to the contrary herein, the Debtors shall not be required to pay any portion of any invoice for DIP Fees and Expenses for the DIP Secured Party Advisors prior to the earlier of (a) any draw on the DIP Facility after the entry of this Final DIP Order and (b) any Mandatory Prepayment or other prepayment of any DIP Obligations; *provided* that, subject to the review procedures set forth in this paragraph 21, any such DIP Fees and Expenses shall constitute DIP Obligations.

22.     *Perfection of DIP Liens*.

(a)     Without in any way limiting the automatically effective perfection of the DIP Liens granted hereunder, the DIP Secured Parties were, by the Interim Order, and hereby are, on a final basis, authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests

granted to them hereunder.  Whether or not the DIP Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Final DIP Order.  Upon the reasonable request of the DIP Agent (acting at the direction of the Required DIP Lenders), each of the Debtors, without any further consent of any party, is authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens, in accordance with the DIP Documents.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Final DIP Order may, in the discretion of the DIP Agent (acting at the direction of Required DIP Lenders), be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices were, by the Interim Order, and hereby are, on a final basis, authorized and directed to accept such certified copy of this Final DIP Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

(c)     If any or all of the provisions of the Interim Order or this Final DIP Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect:  (i) the validity, priority or enforceability of any DIP Obligations or Adequate

Protection Obligations incurred prior to the actual receipt by each of the DIP Agent, Wells Fargo, or Fortress, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacatur or stay or any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Secured Parties, Wells Fargo, or Fortress, as the case may be, prior to the actual receipt by the DIP Agent, Wells Fargo, or Fortress, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of the Interim Order or this Final DIP Order (as the case may be), the DIP Secured Parties, Wells Fargo, and Fortress shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, the Interim Order, this Final DIP Order and the DIP Documents.

(d)     Except as provided in this Final DIP Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Final DIP Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission.  The terms and provisions of this Final DIP Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection

Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties granted by the provisions of this Final DIP Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Prepetition Secured Claims are indefeasibly paid in full in cash (other than, with respect to the Prepetition Secured Claims, contingent obligations in respect of unasserted claims), as set forth herein and in the DIP Documents and the Prepetition Loan Documents, as applicable, and the DIP Commitments under the DIP Facility have been terminated.

23.    <u>Proceeds of Subsequent Financing</u>.    Without limiting the provisions of the immediately preceding paragraph, if the Debtors, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Final DIP Order or the DIP Documents at any time prior to the indefeasible payment in full in cash of all of the DIP Obligations, the satisfaction of the DIP Superpriority Claims, and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility and this Final DIP Order, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, then unless otherwise agreed by the Required DIP Lenders, all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied to any liquidated and non-contingent DIP Obligations then outstanding pursuant to the DIP Documents; *provided*, *however*, that, with respect to credit obtained or debt incurred pursuant to section 364(d) of the Bankruptcy Code and secured by the Prepetition Collateral, the foregoing sentence shall not apply.

24.    *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, and releases contained in this Final DIP Order shall be binding upon the Debtors and their respective

Debtor Representatives in all circumstances and, only subject to any Challenge Action (as defined herein) timely commenced by an Investigating Party (as defined herein) before the expiration of the Challenge Period (as defined herein), upon each of the Debtors' estates, all creditors thereof, any Committees appointed or formed in these Chapter 11 Cases, and all other parties in interest, including, without limitation, any trustee or other representative appointed by the Court, whether such trustee or representative is appointed in cases under Chapter 11 or Chapter 7 of the Bankruptcy Code.  With regard to all other:  (a) creditors, including, but not limited to, any Creditors Committee appointed or formed in these Chapter 11 Cases, (b) parties-in-interest, or (c) other non-Debtor parties, in each case, who have requisite standing and wish to object to, challenge, or seek to avoid or subordinate the amount, validity, enforceability, perfection, extent or priority of any of the Prepetition Secured Claims or the Prepetition Liens (collectively, the "**Investigating Parties**"), such Investigating Parties must, by way of adversary proceeding, commence such objection to, challenge to, or action to avoid or subordinate the applicable Prepetition Secured Claims or Prepetition Liens (a "**Challenge Action**") no later than the later of (i) the date that is seventy-five (75) days after the date of entry of the Interim Order, provided that if a Creditors' Committee is appointed prior to the expiration of such seventy-five (75) day period, such Creditors' Committee shall have sixty (60) days from the date of its appointment to file such a Challenge Action, (ii) any such later date agreed to in writing by the applicable Prepetition Secured Party, in its sole and absolute discretion, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served prior to the expiration of the deadline to commence a Challenge Action (the time period established by the later of the foregoing clauses (i), (ii), and (iii), the "**Challenge Period**").  If no Challenge Action to a Prepetition Secured Claim or Prepetition Lien is timely filed prior to the expiration of the Challenge Period by an Investigating

Party, without further order of this Court, the stipulations and admissions of the Debtors contained in this Final DIP Order shall be binding upon each of the Debtors' estates, all creditors thereof, any Creditors Committee or other statutory committee appointed or formed in these Chapter 11 Cases, and all other parties in interest, including, without limitation, any trustee or other representative appointed by the Court, whether such trustee or representative is appointed in cases under Chapter 11 or Chapter 7 of the Bankruptcy Code.  If a Challenge Action is timely filed prior to the expiration of the Challenge Period by an Investigating Party, the stipulations and admissions of the Debtors contained in this Final DIP Order shall nevertheless be binding upon each of the Debtors' estates, all creditors thereof, any Creditors Committee or other statutory committee appointed or formed in these Chapter 11 Cases, and all other parties in interest, including, without limitation, any trustee or other representative appointed by the Court, whether such trustee or representative is appointed in cases under Chapter 11 or Chapter 7 of the Bankruptcy Code, except as to any such stipulations and admissions that were expressly and successfully challenged in such Challenge Action.  Nothing in this Final DIP Order vests or confers on any person or entity standing or authority to pursue any Challenge Action belonging to the Debtors or their estates. The filing by any person or entity of any motion seeking to obtain authority and/or standing to commence a Challenge Action shall not toll or extend the Challenge Period.  Notwithstanding anything to the contrary in this Final DIP Order, in the event there is a successful Challenge Action by any party in interest in accordance with the terms of this Final DIP Order, this Court may fashion an appropriate remedy as applicable.

25. *Indemnification*.  Each of the Debtors (with respect to itself and each of its Subsidiaries) were, by the Interim Order, and hereby are, on a final basis, authorized to jointly and severally hold harmless the DIP Agent, each DIP Lender and each other Indemnified Party (as

defined in the DIP Credit Agreement) in accordance and subject to the terms and conditions set forth in the DIP Credit Agreement.

26.     *Limitation on Use of DIP Facility Proceeds and Collateral.*  Notwithstanding anything herein or in any other order by this Court to the contrary, none of the DIP Loans, the DIP Collateral, the Cash Collateral, the Prepetition Collateral, the proceeds of any of the foregoing, or the Carve Out may be used, directly or indirectly, by any of the Debtors, any Official Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):  (a) to use or seek to use Cash Collateral other than as provided pursuant to the Interim Order or this Final DIP Order or, except to the extent expressly permitted by the terms of the DIP Documents, selling or otherwise disposing of DIP Collateral without the consent of the Required DIP Lenders; (b) solely with respect to the DIP Collateral (including Cash Collateral that constitutes DIP Collateral) and proceeds thereof, to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the DIP Superpriority Claims; (c) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the DIP Secured Parties with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the amount, validity, enforceability, priority and extent of,

or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, or the DIP Documents, (D) any action seeking to challenge, invalidate, modify, set aside, avoid, marshal, recharacterize or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, or the DIP Collateral, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either the DIP Agent or the DIP Lenders hereunder or under any of the DIP Documents, (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Documents and the Interim Order and/or this Final DIP Order (as applicable)), or (F) objecting to, contesting, or interfering with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Credit Agreement) and so long as the Court has entered an appropriate order in connection therewith.

27.    *Loss or Damage to Collateral*.  Nothing in the Interim Order, this Final DIP Order, the DIP Documents or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business or in connection with their restructuring efforts.  Except to the extent of the DIP Secured Parties' gross negligence or willful misconduct, none of the DIP Secured Parties shall, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer,

bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtors.

28.     *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Final DIP Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Creditors' Committee, any other statutory or non-statutory committee appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns; *provided* that the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

29.     *Limitation of Liability.*  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Final DIP Order or the DIP Documents, none of the DIP Secured Parties shall (a) be deemed to be in "control" of the operations or participating in the management of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms

or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute). Nothing in the Interim Order, this Final DIP Order or in any of the DIP Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties of any liability for any claims arising from any and all activities by the Debtors in the operation of their businesses in connection with the Debtors' postpetition restructuring efforts.

30.   *Proofs of Claim*.  The DIP Secured Parties and the Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim of the DIP Secured Parties and the Prepetition Secured Parties, and the stipulations and findings set forth in this Final DIP Order shall constitute an informal proof of claim in respect thereof.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, each of Wells Fargo and Fortress were, by the Interim Order, and hereby are, on a final basis, authorized and entitled, in its sole discretion, but not required, (x) to file (and amend and/or supplement, as it sees fit) proofs of claim and/or an aggregate proof of claim in each of the Chapter 11 Cases or Successor Cases for any claim allowed herein and (y) to file a single master proof of claim in Case No. 20-34682 (DRJ), and such master proof of claim shall be deemed filed as a claim against each of the Debtors.  No such proof of claim filed by Wells Fargo or Fortress shall be required to attach any of the Prepetition Loan Documents.  Any proof of claim filed by Wells Fargo or Fortress shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases shall not apply to any claim of any of

the DIP Secured Parties or the Prepetition Secured Parties.  Notwithstanding anything to the contrary herein, the Debtors reserve the right to estimate or object to the quantum of any contingent, unliquidated, or disputed portion of the Prepetition Secured Claims.

31.     *Insurance*.  The DIP Agent is deemed to be the loss payee under the DIP Obligors' insurance policies with respect to the DIP Collateral.

32.     *Effectiveness*.   This Final DIP Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rule 4001(a)(3), 6004(h), 6006(d), 7062 or 9014, any Local Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final DIP Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final DIP Order.

33.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final DIP Order.

34.     *Credit Bidding*.  In connection with any sale or other disposition of all or any portion of the DIP Collateral or the Prepetition Collateral, the DIP Secured Parties and, subject to the Challenge Period set forth in paragraph 24, the Prepetition Secured Parties, respectively, shall have the unqualified right to credit bid up to the full amount of the applicable outstanding DIP Obligations or Prepetition Secured Claims (as applicable), in each case including any accrued interest and expenses (each a "**Credit Bid**"), including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under

section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of

the Debtors under section 725 of the Bankruptcy Code, subject in each case to the rights and duties

of the parties under the DIP Documents and the Prepetition Loan Documents.

35.     *Discharge Waiver/Release.*  The DIP Obligations shall not be discharged by the

entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases,

notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP

Obligations have been indefeasibly paid in full in cash, on or before the effective date of such

confirmed plan of reorganization or the DIP Agent otherwise consents.

36.     *Final DIP Order Controls*.  In the event of any inconsistency between the terms

and conditions of the DIP Documents, the Interim Order and/or this Final DIP Order, the

provisions of this Final DIP Order shall govern and control.

37.     *No Modification to Final DIP Order*.  Until and unless the DIP Obligations have

been or are proposed to be indefeasibly paid in full in cash (or the Required DIP Lenders otherwise

agree in writing), the Debtors irrevocably waive the right to seek and shall not seek or consent to,

directly or indirectly:  without the prior written consent of the DIP Agent (at the direction of the

Required DIP Lenders), (a) a priority claim for any administrative expense or unsecured claim

against the Debtor (now existing or hereafter arising of any kind or nature whatsoever, including,

without limitation any administrative expense of the kind specified in sections 503(b), 506(c),

507(a) or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases, equal or superior to the DIP

Superpriority Claims, other than the Carve Out, the Wells Fargo Superiority Claim or the Fortress

Superpriority Claim (each on the terms set forth in this Final DIP Order); (b) any order authorizing

the use of Cash Collateral resulting from the DIP Collateral that is inconsistent with this Final DIP

Order; or (c) any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens,

except as specifically provided in the DIP Documents or this Final DIP Order.  The Debtors irrevocably waive any right to seek any amendment, vacatur, stay, modification or extension of this Final DIP Order without the prior written consent, as provided in the foregoing, of the Required DIP Lenders with respect to subparts (a) - (c) of the foregoing sentence.

38.    *Survival.*  The provisions of this Final DIP Order and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of the Chapter 11 Cases, (b) converting any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of the Chapter 11 Cases, or (d) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases.  The terms and provisions of this Final DIP Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Secured Parties pursuant to this Final DIP Order, notwithstanding the entry of any such order, shall continue in any of the Chapter 11 Cases, following dismissal of any of the Chapter 11 Cases, or any Successor Cases, and shall maintain their priority as provided by this Final DIP Order.  The rights, privileges, benefits and protections afforded herein and in the DIP Documents, including the DIP Liens, the DIP Superpriority Claims, as well as the terms and provisions concerning the indemnification of the DIP Secured Parties shall continue in any of the Chapter 11 Cases following dismissal of any of the Chapter 11 Cases, termination of the provisions of this Final DIP Order, and/or the indefeasible payment in full of the DIP Obligations.

39.    *Harris County.*  Notwithstanding any provisions of the Interim Order or this Final DIP Order or any agreements validated by such orders, any valid, senior, perfected, and unavoidable statutory tax liens (collectively, the "Tax Liens") held by Harris County as of the Petition Date shall neither be primed nor subordinated to any liens granted thereby or pursuant to

this Final DIP Order, and all parties' (including the Debtors') rights to object to the priority, validity, amount, and extent of the Tax Liens or any other claims and liens asserted by Harris County are fully preserved.  In the event of a sale of the Debtors' assets subject to such Tax Liens, the rights of Harris County to request adequate protection of its interests are preserved.

40.    *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

41.    *Necessary Action*.  The Debtors were, by the Interim Order, and hereby, on a final basis, authorized to take all such actions as are necessary or appropriate to implement the terms of this Final DIP Order.

42.    *Retention of Jurisdiction*.  The Court shall retain jurisdiction to implement, interpret and enforce the provisions of this Final DIP Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

43.    *Hearing on Outstanding Adequate Protection Obligations*.    The Adequate Protection Obligations Hearing to resolve the remaining amount of Outstanding Adequate Protection Obligations is hereby scheduled for February 11, 2021, at 10:00 a.m. (Central time) before this Court.  The Debtors shall file and serve a brief in support of their objection to the remaining amount of the Outstanding Adequate Protection Obligations at least 7 days before such hearing.  Wells Fargo and Fortress may each file and serve reply a brief thereto at least 2 days before such hearing.  Any and all rights, claims, counterclaims, and defenses of the parties are fully preserved and may be adjudicated by this Court.

   **Signed:  December 21, 2020.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**Annex A**

**Specified Vessels**

|     | Vessel Description | Legal Owner |
| --- | --- | --- |
| 1. | B. NO. 272, OFFICIAL NO. 1257375 | B. NO. 272 CORP. |
| 2. | B NO 205, OFFICIAL NO. 1191747 | B. NO. 205 CORP. |
| 3. | B NO 284, OFFICIAL NO. 1216341 | B. NO. 284 CORP. |
| 4. | B NO 282, OFFICIAL NO. 1204610 | B. NO. 282 CORP. |
| 5. | DONNA J. BOUCHARD, OFFICIAL NO. 1257374 | TUG DONNA J. BOUCHARD CORP. |
| 6. | MORTON S. BOUCHARD JR., OFFICIAL NO. 1265315 | TUG MORTON S. BOUCHARD JR. CORP. |
| 7. | FREDERICK E. BOUCHARD, OFFICIAL NO. 1265316 | TUG FREDERICK E. BOUCHARD CORP. |
| 8. | LINDA LEE BOUCHARD, OFFICIAL NO. 1189191 | TUG LINDA LEE BOUCHARD CORP. |
| 9. | DENISE A. BOUCHARD, OFFICIAL NO. 1251312 | TUG DENISE A. BOUCHARD CORP. |

65

## **Annex B**

### **Sources & Uses**

Interim Availability Sources & Uses

| Interim Availability Disbursements Summary ($USD) | Revised Sources & Uses Estimate |
|---|---|
| Employees [1] | $ 5,908,377 |
| Insurance [2] | 3,043,641 |
| Maritime Liens [3] | 6,699,616 |
| Other Expenses [4] | 6,661,381 |
| Bankruptcy Cost Reserve [5] | 4,600,000 |
| **Total Estimated Disbursements** | **$ 26,913,014** |
| DIP Facility OID and Structuring Fee [6] | 2,040,000 |
| **Total Interim DIP Uses (Net Beginning Cash) [7]** | **$ 28,776,446** |

1. Includes employee backpay from July 2020 through September 2020, and post-petition payroll through year-end 2020. Office employees paid bi-weekly; vessel employees paid twice per month. Assumes final payroll cycle in December inclusive of holiday pay for vessel employees.

2. Represents Hull, MGL, War, Bumbershoot, Healthcare and other insurance premiums. Includes premium payments for the aforementioned insurance due through December 2020.

3. Maritime lienholder payments reflect ~$6.7 million of payments made through November 2020 on account of maritime liens or to parties who may be able to assert maritime liens. Future payments to be reviewed and discussed with management regarding outstanding amounts owed. Ongoing negotiations related to settlement payments and installment plans estimated to be due outside of the Interim Availability Period.

4. Other Expenses include, but are not limited to, general operational restart costs such as rent, utilities, ordinary course professional fee payments and office expenses, outstanding post-petition invoices due prior to year-end 2020 and key pre-petition obligations; as well as adequate protection, post-petition interest expenses through November for Wells Fargo and Fortress, and additional expenses which may be necessary in categories listed herein.

5. Estimated bankruptcy costs include professional fees & expenses incurred, less applicable holdback amounts, through November 2020 for Debtor professionals, including Kirkland & Ellis, Jackson Walker, Jefferies, Portage Point, Stretto, U.S. Trustee fees and other related bankruptcy costs. A portion of the bankruptcy costs may be paid out of exit financings or sale proceeds, including accrued & unpaid professional fees.

6. Initial DIP Draw calculated to include Structuring Fee of 1% of total DIP Commitment of $60 million and Original Issue Discount ("OID") of 5% on Initial DIP Draw ($28.8 million).

7. Initial Sources & Uses in Interim DIP Order excluded existing cash balance of ~$0.2 million, which has been reallocated to the above Revised Sources & Uses disbursement summary.

## Exhibit A

**DIP Credit Agreement**

*EXECUTION VERSION*

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AGREEMENT

BY AND AMONG

B. NO. 272 CORP.,
B. NO. 205 CORP.,
B. NO. 284 CORP.,
B. NO. 282 CORP.,
TUG DONNA J. BOUCHARD CORP.,
TUG MORTON S. BOUCHARD JR. CORP.,
TUG FREDERICK E. BOUCHARD CORP.,
TUG LINDA LEE BOUCHARD CORP., and
TUG DENISE A. BOUCHARD CORP.,

Collectively, as the Borrower,

BOUCHARD TRANSPORTATION CO., INC.,

as Parent,

HARTREE PARTNERS, LP,

as Agent,

and

THE LENDERS PARTY HERETO FROM TIME TO TIME

dated as of December 21, 2020, and
effective as of October 23, 2020

## TABLE OF CONTENTS

**Page**

**ARTICLE 1. Definitions** ........................................................................................2
    Section 1.1    Certain Definitions ................................................2
    Section 1.2    Accounting Terms ..............................................15
    Section 1.3    Certain Interpretations ......................................15

**ARTICLE 2. Loans; Collateral** ..........................................................................15
    Section 2.1    Loans ..................................................................15
    Section 2.2    Notices Relating to Loans .................................16
    Section 2.3    Disbursement of Loan Proceeds........................16
    Section 2.4    Note ...................................................................16
    Section 2.5    Repayment of Principal of Loans......................16
    Section 2.6    Mandatory and Voluntary Prepayments ...........17
    Section 2.7    Interest ..............................................................18
    Section 2.8    Structuring Fee; Original Issue Discount; Exit Fee................19
    Section 2.9    Computations ....................................................20
    Section 2.10   [Reserved] ........................................................20
    Section 2.11   [Reserved] ........................................................20
    Section 2.12   Time and Method of Payments .........................20
    Section 2.13   [Reserved] ........................................................20
    Section 2.14   Guaranties .........................................................20
    Section 2.15   Security .............................................................20
    Section 2.16   [Reserved] ........................................................21
    Section 2.17   [Reserved] ........................................................21
    Section 2.18   [Reserved.] .......................................................21
    Section 2.19   Illegality ...........................................................21
    Section 2.20   Advisors ...........................................................21
    Section 2.21   [Reserved] ........................................**Error! Bookmark not defined.**

**ARTICLE 3. Representations and Warranties**..................................................22
    Section 3.1    Organization......................................................22
    Section 3.2    Power, Authority, Consents ..............................22
    Section 3.3    No Violation of Law or Agreements ..................23
    Section 3.4    Due Execution, Validity, Enforceability ...........23
    Section 3.5    Properties; Priority of Liens; Vessel Classification;
                      Documentation, Insurance, etc. .........................24
    Section 3.6    Judgments, Actions, Proceedings......................25
    Section 3.7    No Defaults, Compliance with Laws..................25
    Section 3.8    Burdensome Documents ....................................26
    Section 3.9    Orders ...............................................................26
    Section 3.10   Tax Returns .......................................................26
    Section 3.11   Intangible Assets ..............................................26
    Section 3.12   Regulation U .....................................................27
    Section 3.13   Name Changes, Mergers, Acquisitions; Location of Collateral ..............27

**TABLE OF CONTENTS (CONT'D)**

Section 3.14   Full Disclosure ..................................................................27
Section 3.15   Licenses and Approvals............................**Error! Bookmark not defined.**
Section 3.16   Labor Disputes: Collective Bargaining Agreements: Employee
                 Grievances..............................................**Error! Bookmark not defined.**
Section 3.17   Condition of Assets ...............................................28
Section 3.18   ERISA ....................................................................28
Section 3.19   Financial Statements.............................................28
Section 3.20   Compliance with OFAC Rules and Regulations.....................................29
Section 3.21   Anti-Terrorism Laws ............................................29
Section 3.22   Compliance with FCPA .........................................29
Section 3.23   Investment Company Act Etc. ..............................30
Section 3.24   Vessel Qualification .............................................30
Section 3.25   Sources and Uses...................................................30
Section 3.26   Bankruptcy Matters...............................................30
Section 3.27   Use of Proceeds.....................................................30

**ARTICLE 4. The Closing: Conditions to the Loan.** ..........................................**31**
Section 4.1    Conditions to Effectiveness of this Agreement.........................31
Section 4.2    Conditions Precedent to the Full Availability Period..............................34
Section 4.3    Conditions Precedent to each Borrowing ............................36

**ARTICLE 5. Delivery of Financial Reports. Documents and Other Information**................**37**
Section 5.1    Reporting Requirements .......................................37
Section 5.2    Other Reports .......................................................38
Section 5.3    Insurance Advice...................................**Error! Bookmark not defined.**
Section 5.4    [Reserved] .............................................................38
Section 5.5    [Reserved] .............................................................39
Section 5.6    Notices of Defaults................................................39
Section 5.7    ERISA Notices and Requests................................39
Section 5.8    Additional Information..........................................39

**ARTICLE 6. Affirmative Covenants.**..............................................................**39**
Section 6.1    Books and Records................................................39
Section 6.2    Inspections and Audits..........................................39
Section 6.3    Compliance with Laws: Maintenance and Repairs .................................40
Section 6.4    Continuance of Business........................................40
Section 6.5    Copies of Corporate Documents ...........................40
Section 6.6    Perform Obligations ..............................................40
Section 6.7    Notice of Litigation ..............................................41
Section 6.8    Insurance ...............................................................41
Section 6.9    Final Order ............................................................42
Section 6.10   Notice of Certain Events ......................................43
Section 6.11   ERISA Compliance ...............................................43
Section 6.12   Environmental Compliance ...................................43
Section 6.13   Certain Affirmative Covenants Relating to the Vessels.........................43
Section 6.14   Sanctions and Anti-Corruption Laws ....................44

**TABLE OF CONTENTS (CONT'D)**

**Page**

Section 6.15    [Reserved]. ..................................................................44
Section 6.16    Milestones ..................................................................44
Section 6.17    Cash Management and Cash Management Order ......................44
Section 6.18    Other Bankruptcy Matters ................................................44

**ARTICLE 7. Negative Covenants.** ........................................................**45**
Section 7.1     Indebtedness ...............................................................45
Section 7.2     Liens ........................................................................45
Section 7.3     Guaranties ..................................................................46
Section 7.4     Mergers, Acquisitions ....................................................46
Section 7.5     Key Employee Incentive Program ......................................46
Section 7.6     Stock Issuance .............................................................46
Section 7.7     Change in Business; Dispositions ......................................46
Section 7.8     Prepayments ................................................................47
Section 7.9     Investments .................................................................47
Section 7.10    Fiscal Year .................................................................47
Section 7.11    ERISA Obligations ........................................................48
Section 7.12    Amendments of Documents ..............................................48
Section 7.13    Budget Covenant ..........................................................48
Section 7.14    Use of Proceeds ...........................................................48
Section 7.15    Use of Cash ................................................................48
Section 7.16    [Reserved] ..................................................................48
Section 7.17    Transactions with Affiliates ............................................49
Section 7.18    Hazardous Material .......................................................49
Section 7.19    Certain Negative Covenants Relating to the Vessels ...............50
Section 7.20    Other Negative Covenants. .............................................50

**ARTICLE 8. Events of Default** ..........................................................**51**
Section 8.1     Payments ....................................................................51
Section 8.2     Certain Covenants .........................................................51
Section 8.3     Other Covenants ...........................................................51
Section 8.4     [Reserved] ..................................................................52
Section 8.5     Representations and Warranties .........................................52
Section 8.6     Collateral Documents .....................................................52
Section 8.7     Judgments. ..................................................................52
Section 8.8     ERISA ........................................................................52
Section 8.9     Ownership of Stock .......................................................52
Section 8.10    Management .................................................................53
Section 8.11    Liens .........................................................................53
Section 8.12    The Vessels .................................................................53
Section 8.13    Chapter 11 Cases ..........................................................54
Section 8.14    Remedies Upon Event of Default .......................................56

**ARTICLE 9. Miscellaneous Provisions** .................................................**59**
Section 9.1     Fees and Expenses: Indemnity ..........................................59
Section 9.2     Taxes .........................................................................60

**TABLE OF CONTENTS (CONT'D)**

**Page**

Section 9.3    Payments ......................................................................................... 60
Section 9.4    Survival of Agreements and Representations: Construction ......... 61
Section 9.5    Lien on and Set-off of Deposits ................................................... 61
Section 9.6    Modifications, Consents and Waivers: Entire Agreement ........... 61
Section 9.7    Remedies Cumulative; Counterclaims ......................................... 61
Section 9.8    Further Assurances ...................................................................... 62
Section 9.9    Notices ......................................................................................... 62
Section 9.10   Counterparts ................................................................................. 63
Section 9.11   Severability .................................................................................. 63
Section 9.12   Binding Effect: No Assignment or Delegation by Borrower ....... 64
Section 9.13   GOVERNING LAW: CONSENT TO JURISDICTION: WAIVER
               OF TRIAL BY JURY ................................................................... 64
Section 9.14   Assignments and Participations by the Agent ............................. 65
Section 9.15   Confidentiality ............................................................................. 66

## TABLE OF CONTENTS (CONT'D)

**Page**

SCHEDULES

| | |
|---|---|
| 3.1 | Organization |
| 3.2 | Consents, Approvals, Waivers |
| 3.5 | Vessels |
| 3.6 | Judgments, Actions, Proceedings |
| 3.7 | Civil Liabilities |
| 3.8 | Burdensome Documents |
| 3.10 | Taxes |
| 3.13 | Name Changes, Mergers, Acquisitions; Location of Collateral |
| 3.15 | Licenses and Approvals |
| 3.17 | Condition of Assets |
| 3.18 | Employee Benefit Plans |
| 3.24 | Vessel Qualification |
| 7.1 | Indebtedness Existing on the Closing Date |
| 7.2 | Liens Existing on the Closing Date |

EXHIBITS

| | |
|---|---|
| A | Form of Note |
| B | [Reserved] |
| C | Form of Guaranty |

### SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT

This **SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT** (this "Agreement") made as of the 21st day of December, 2020 (the "Specified Date") and effective as of the Closing Date (as defined herein), by and among B. No. 272 Corp., B. No. 205 Corp., B. No. 284 Corp., B. No. 282 Corp., Tug Donna J. Bouchard Corp., Tug Morton S. Bouchard Jr. Corp., Tug Frederick E. Bouchard Corp., Tug Linda Lee Bouchard Corp., and Tug Denise A. Bouchard Corp., as co-borrowers (collectively, the "Borrower"), Bouchard Transportation Co., Inc., as parent (the "Parent"), the Guarantors (as defined herein) from time to time guaranteeing the obligations of the Borrower, Hartree Partners, LP, as administrative agent and collateral agent hereunder (the "Agent") and the Lenders (as defined herein) from time to time party hereto.

### WITNESSETH:

**WHEREAS**, each Loan Party (as defined below) filed voluntary petitions for relief under chapter 11 (such proceedings, the "Chapter 11 Cases") of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), bearing Case No. 20-34682, on September 28 and 29, 2020 (as applicable to each Loan Party, the "Petition Date");

**WHEREAS**, each of the Loan Parties is continuing in the possession of its assets and in the management of its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, on October 22, 2020 (the "Interim Order Date"), the Bankruptcy Court entered the Interim Order (as defined below);

**WHEREAS**, on the Interim Order Date, pursuant to the DIP Term Sheet attached as Exhibit A to the Interim Order (the "DIP Term Sheet") and the Interim Order, the Lenders provided a multi-draw super-priority senior secured debtor-in-possession term loan facility (the "Facility") to the Borrower, under which the Lenders agreed to make available to the Borrower, term loans in an aggregate principal amount (excluding, for the avoidance of doubt, any accrued and unpaid interest) of $60,000,000.00, subject to the Orders (as defined herein) and the terms and conditions in the DIP Term Sheet (which conditions included, in part, entry into this Agreement);

**WHEREAS**, on or about the Interim Order Date, the Lenders provided to the Borrower new money term loans in an aggregate principal amount equal to $28,800,000.00 (the amounts advanced, the "Interim Availability Amount"), which for the avoidance of doubt shall constitute and be deemed to be Loans hereunder for all intents and purposes;

**WHEREAS**, as security for the repayment of the loans made available pursuant hereto and payment of the other obligations of the Borrower hereunder, the Loan Parties have agreed to provide to the Agent and the other Secured Parties (as defined below), in each case, subject to the Carve-Out (as defined below), Liens (as defined below) on the Collateral (as defined below);

**WHEREAS**, (i) the Lenders are willing, subject to the terms and conditions set forth herein, to make Term Loans to the Borrower and (ii) the Agent is willing to serve as Agent and collateral agent for the Lenders and the other Secured Parties.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

ARTICLE 1.
Definitions

Section 1.1    Certain Definitions.

As used in this Agreement, the following terms shall have the following meanings:

"Adequate Protection Provisions" means the provisions in paragraph 16 of the Interim Order (or as superseded by the Final Order or further order of the Bankruptcy Court with respect to adequate protection, as applicable), providing for adequate protection to the Prepetition Secured Parties (as defined in the Interim Order).

"Affiliate" means, as to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise), provided that, in any event: (a) any Person that owns directly or indirectly 5% or more of the securities having ordinary voting power for the election of directors or other governing body of a corporation or 10% or more of the partnership or other ownership interests of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person; and (b) each shareholder, director and officer of any Loan Party shall be deemed to be an Affiliate of the Borrower.

"Agent" has the meaning ascribed thereto in the preamble.

"Agreement" has the meaning ascribed thereto in the preamble.

"Anti-Corruption Laws" shall mean all laws, rules and regulations of any jurisdiction applicable to the Loan Parties and their Subsidiaries concerning or relating to bribery or corruption.

"Applicable Margin" means seven percent (7.00%).

"Approved Budget" has the meaning specified in subsection 4.2(a).

"Assignments" has the meaning ascribed thereto in subsection 2.15(a)(ii)(C).

"<u>Attributable Indebtedness</u>" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"<u>Avoidance Actions</u>" means any and all claims and causes of action of any Loan Party's estate arising under Sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, or any other avoidance action under the Bankruptcy Code, together with any proceeds, settlements or judgments recovered therefrom.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code (11 U.S.C. §§101-1532), as applicable to the Chapter 11 Cases.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Barges and Tugs</u>" means, individually and collectively, the barges and tugs that are not Vessels, together with all engines, machinery, masts, boats, anchors, cables, chains, rigging, tackle, apparel, winches, capstans, outfit, tools, pumps, gears, furnishings, appliances, fittings, navigation and communications equipment, computers, spare and replacement parts, and all other appurtenances thereto appertaining or belonging.

"<u>Borrower</u>" has the meaning ascribed thereto in the preamble.

"<u>Borrowing Notice</u>" has the meaning ascribed thereto in subsection 2.1(b).

"<u>Business Day</u>" means any day other than a Saturday, Sunday or any other day on which commercial banks are authorized or required to close under the laws of, or are in fact closed in, the State of New York.

"<u>Capitalized Lease</u>" means any lease the obligations to pay rent or other amounts under which constitute Capitalized Lease Obligations.

"<u>Capitalized Lease Obligations</u>" Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) real and/or personal property which obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP and, for purposes of this Agreement the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"<u>Carve-Out</u>" has the meaning specified in the Interim Order (with respect to the period prior to the entry of the Final Order), or the Final Order (from and after the date the Final Order is entered).

"<u>Cash</u>" means, as to any Person, such Person's cash and cash equivalents, as defined in accordance with GAAP.

"<u>Cash Management Order</u>" means that certain Interim Order (A) Authorizing the Debtors to (I) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (II) Maintain Existing Business Forms and Books and Records, and (III) Continue to Perform Intercompany Transactions and (B) Granting Related Relief filed at Docket No. 93, in the

Chapter 11 Cases, as may be amended and superseded by a final order, which Cash Management Order shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to the possibility of appeal, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Agent and the Required Lenders.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980,42 U.S.C. 9601, et seq., as amended from time to time.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Closing Date" means October 23, 2020.

"Code" means the Internal Revenue Code of 1986, as it may be amended from time to time.

"Collateral" means all of the assets and properties covered by each of the respective Security Documents.

"Commitment" means the obligation and commitment of the Lenders to make a Loan hereunder, but subject to the terms and conditions set forth herein, which such obligation and commitment (x) as of the Closing Date immediately prior to giving effect the extension of the Interim Availability Amount was equal to $60,000,000 and (y) as of the date hereof, is equal to the Full Availability Amount.

"Consolidated" shall mean, when used with reference to financial statements or financial statement items of the Loan Parties and their Subsidiaries or any other Person, such statements or items on a consolidated basis in accordance with the consolidation principles of GAAP.

"Debt Instrument" has the meaning ascribed thereto in subsection 8.4(a).

"Default" means an event which with notice or lapse of time, or both, would constitute an Event of Default.

"DIP Superpriority Claims" shall have the meaning assigned to such term in the Orders.

"DIP Term Sheet" has the meaning specified in the recitals hereto.

"Discharge" has the meaning set forth in section 1001(7) of OPA.

"Disposal" means the discharge, deposit, injection, dumping, spilling, leaking or placing of any hazardous materials into or on any land or water so that such hazardous materials or constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

"DOC" means a document of compliance issued to an Operator in accordance with rule 13 of the ISM Code;

4

"Dollars" and "$" means lawful money of the United States of America.

"Draw Date" means the date Terms Loans are extended pursuant to the Interim Order or this Agreement from time to time.

"Earnings Assignment(s)" has the meaning ascribed thereto in subsection 2.15(a)(ii)(B).

"Employee Benefit Plan" means any employee benefit plan within the meaning of section 3(3) of ERISA which (a) is maintained for employees of the Loan Parties or any of their ERISA Affiliates or (b) has at any time within the preceding six (6) years been maintained for employees of any Loan Party or any current or former ERISA Affiliate.

"Environmental Laws and Regulations" means all federal, state, local and foreign environmental, health and safety laws, regulations, ordinances, orders, judgments, permits, concessions, grants, franchises, licenses, agreements, decrees or governmental restrictions applicable to the Borrower or any other Loan Party, or any of their respective assets or properties.

"Environmental Liability" means any OPA Liability or any liability under any applicable Environmental Laws and Regulations for any disposal» Release or threatened release of a Hazardous Substance pollutant or contaminant as those terms are defined under CERCLA, and any liability which would require a removal, remedial or response action, as those terms are defined under CERCLA, by any Person or any environmental regulatory body having jurisdiction over the Borrower or any other Loan Party and/or any liability arising under any Environmental Laws and Regulations for the Borrower' or any other Loan Party's failure to comply with such laws and regulations, including without limitation, the failure to comply with or obtain any applicable environmental permit

"Environmental Proceeding" means any judgment, action, proceeding or investigation pending before any court or governmental authority, with respect to a Borrower or any other Loan Party and arising under or relating to any Environmental Laws and Regulations.

"ERISA" means the Employee Retirement Income Security Act of 1974, as it may be amended from time to time, and the regulations promulgated thereunder.

"ERISA Affiliate" means, with respect to any Loan Party, any corporation, person or trade or business which is a member of a group which is under common control with any Loan Party, who together with any Loan Party, is treated as a single employer within the meaning of sections 414(b) - (o) of the Code and, if applicable, sections 4001(a)(14) and (b) of ERISA.

"Eurodollar Rate" means for any Loan for any Interest Period therefor, the greater of (a) 1.00% and (b) the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1 %) determined by the Agent to be equal to (a) the LIBOR for such Loan for such Interest Period; divided by (b) 1 minus the Reserve Requirement for such Loan for such Interest Period. The Agent shall use its commercially reasonable best efforts to advise the Borrower of the Eurodollar Rate as soon as practicable after each change in the Eurodollar Rate; provided, however, that the failure of the Agent to so advise the Borrower on any one or more occasions shall not affect the rights of the Agent or the obligations of the Borrower hereunder.

"Event of Default" has the meaning ascribed thereto in Article 8.

"Event of Default Notice" has the meaning ascribed thereto in subsection 8.14(a).

"Exit Fee" has the meaning ascribed thereto in subsection 2.8(c).

"Facility" has the meaning specified in the recitals hereto.

"FDIC" means the Federal Deposit Insurance Corporation or any successor organization.

"Final Order" means a final order of the Bankruptcy Court approving the Loans, the Facility and the Loan Documents on a final basis (but which may approve Adequate Protection Provisions on an interim basis), in form and substance acceptable to the Lenders and the Agent in their sole discretion, which Final Order shall be in full force and effect and (other than in respect of Adequate Protection Provisions) shall not have been reversed, vacated, stayed or subject to the possibility of appeal, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Agent and the Lenders (it being agreed and understood that the Adequate Protection Provisions shall be in form and substance acceptable to the Lenders and the Agent in their sole discretion).

"Fortress Superpriority Claim" has the meaning assigned to such term in the Orders.

"Full Availability Amount" means $31,200,000.

"Full Availability Period" means the period commencing on the date all the conditions set forth in Section 4.2 have been satisfied.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantor" means each direct and indirect Subsidiary of Parent other than the Borrower.

"Guaranty(ies)" has the meaning ascribed thereto in Section 2.14.

"Hazardous Material" means any toxic chemical, Hazardous Substances, contaminants or pollutants, medical wastes, infectious wastes, or hazardous wastes.

"Hazardous Substance" has the meaning set forth in section 101(14) of CERCLA or comparable provisions of state or local law.

"Hazardous Waste" has the meaning set forth in the Resource Conservation and Recovery Act, 42 U.S.C. 9603(5), and the Environmental Protection Agency's implementing regulations, or state or local law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money;

(b)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(c)     all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(d)     indebtedness (including prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(e)     Capitalized Leases;

(f)     all obligations, contingent or otherwise, of such Person as an account party or applicant in respect of letters of credit (and bankers' acceptances, bank guaranties, surety bonds and similar instruments) created for the account or upon the application of such Person;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation, plus accrued and unpaid dividends;

(h)     all guarantees (direct or indirect) of such Person in respect of any of the foregoing; and

(i)     all liabilities which would be reflected on a balance sheet of such Person, prepared in accordance with GAAP.

For purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness

is expressly made non-recourse to such Person. The amount of any capital lease as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

"Initial Budget" has the meaning specified in subsection 4.2(g).

"Insurance Assignments" has the meaning ascribed thereto in subsection 2.15(a)(ii)(C).

"Interest Payment Date" means the last Business Day of each calendar month (with the first Interest Payment Date occurring on October 30, 2020).

"Interest Period" means, as to each Loan (a) initially, the period commencing on the date of borrowing and ending on the last day of such calendar month and (b) thereafter, each period commencing on the last day of the preceding Interest Period and ending on the last day of the calendar month next occurring; provided that, in all cases:

(i)   if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)   no Interest Period may extend beyond the Maturity Date; and

(iii)   any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"Interim Availability Amount" has the meaning set forth in the recitals.

"Interim Availability Period" means the period commencing on the Interim Order Date (when all of the conditions precedent set forth on the DIP Term Sheet, as applicable, are satisfied or waived by the Required Lenders) through and including the date that is immediately prior to the Bankruptcy Court's entry of the Final Order.

"Interim Order" means the interim order entered by the Bankruptcy Court on the Interim Order Date in the Chapter 11 Cases approving the Facility, the Loans and the Loan Documents on an interim basis, in form and substance acceptable to the Lenders and the Agent.

"Interim Order Date" has the meaning set forth in the recitals.

"Interim Term Loan Amount" means $28,800,000.

"Investment" means, in respect of any Person:

(j)   the amount paid or committed to be paid, or the value of property or services contributed or committed to be contributed, by such Person for or in connection with the acquisition by such Person of any stock, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person; and

8

(k)     the amount of any advance, loan or extension of credit by such Person, to any other Person, or guaranty or other similar obligation of such Person with respect to any Indebtedness of such other Person, and (without duplication) any amount committed to be advanced, loaned, or extended by such Person to any other Person, or any amount the payment of which is committed to be assured by a guaranty or similar obligation by such Person for the benefit of, such other Person.

"IRS" means the Internal Revenue Service.

"ISM Code" shall mean International Safety Management Code for the Safe Operating of Ships and for Pollution Prevention constituted pursuant to Resolution A.741(18) of the International Maritime Organization and incorporated into the Safety of Life at Sea Convention and includes any amendments or extensions thereto and any regulation issued pursuant thereto.

"ISPS Code" shall mean the International Ship and Port Facility Code adopted by the International Maritime Organization at a conference in December 2002 and amending Chapter XI of the Safety of Life at Sea Convention and includes any amendments or extensions thereto and any regulation issued pursuant thereto.

"ISSC" shall mean the International Ship Security Certificate issued pursuant to the ISPS Code.

"Latest Balance Sheet" has the meaning specified in Section 3.19.

"Leases" means leases and subleases (other than Capitalized Leases), licenses for the use of real property, easements, grants, and other attachment rights and similar instruments under which a Loan Party has the right to use real or personal property or rights of way.

"Lenders" means each of the Persons identified as a "Lender" on the signature pages hereto and their successors and permitted assigns.

"LIBOR" means, with respect to any Loan for any Interest Period therefor, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1.00%) appearing on Reuters Screen L1BOR01 Page (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 A.M. (London time) two (2) Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period. If for any reason such rate is not available, then "LIBOR" shall mean the rate per annum at which, as determined by the Agent in accordance with its customary practices, Dollars in an amount comparable to the Loans then requested are being offered to leading banks at approximately 11:00 A.M. London time, two (2) Business Days prior to the commencement of the applicable Interest Period for settlement in immediately available funds by leading banks in the London interbank market for a period equal to the Interest Period selected.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, lien (statutory or otherwise), charge, preference, priority or other preferential arrangement in the nature of a security interest of any kind (including any agreement to give any of the foregoing), any conditional sale or other title retention

agreement, any lease in the nature of any of the foregoing, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction.

"Loans" means the Term Loans.

"Loan Documents" means this Agreement, the Note, the Guaranties, the Security Documents and all other documents executed and delivered in connection herewith or therewith, including all amendments, modifications and supplements of or to all such documents.

"Loan Party" means the Borrower, any Guarantor, any other Person which now or hereafter becomes a Borrower or Guarantor pursuant to the terms of this Agreement, and Parent.

"Loss" has the meaning ascribed thereto in subsection 2.6(a)(i).

"Material Adverse Effect" means any event, condition, circumstance or contingency (other than (x) as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code and (y) as has occurred as a result of, in connection with, or leading up to the commencement of the Chapter 11 Cases) that, individually or in the aggregate, has had or would reasonably be expected to have, a material adverse effect on (a) the business, condition (financial or otherwise), operations or assets of the Loan Parties taken as a whole, or (b) the ability of the Loan Parties, taken as a whole, to perform their obligations under the Loan Documents or (c) the validity or enforceability of the Loan Documents or the rights and remedies of the Agent, or the Lenders under any Loan Document (including, but not limited to, the enforceability or priority of any liens granted to the Agent under the Loan Documents).

"Maturity Date" means the earliest of (a) the Stated Maturity Date, (b) the date that is sixty-one (61) calendar days after the Interim Order Date if the Final Order has not been entered by the Bankruptcy Court on or before that date, (c) the closing date of any Section 363 Sale not consented to in writing by the Required Lenders, (d) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code), or the effective date, of a plan of reorganization or liquidation filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court and (e) the date of acceleration of the Obligations upon an Event of Default in accordance with the terms set forth herein and the other Loan Documents.

"Milestones" has the meaning specified in Section 4.2(m).

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate is making, or is accruing an obligation to make, contributions or has made, or been obligated to make, contributions within the preceding six (6) years.

"Net Cash Proceeds" means with respect to any Disposition, all cash and liquid investments received from such Disposition after (a) payment of, or provision for, all brokerage commissions and other reasonable out of pocket fees and expenses actually incurred in connection with such Disposition (including, without limitation, legal fees and expenses); (b) payment of any outstanding obligations relating to the property that is being disposed of pursuant to such Disposition; (c) all taxes paid or payable by such Person in connection with such Disposition; and

(d) the amount of actual escrowed funds for indemnity or similar obligations of the Person making such Disposition and its Affiliates directly related to such Disposition (less any amounts subsequently distributed or released from escrow to such Person).

"Note" shall mean the promissory note described in Section 2.4 hereof.

"Obligations" means, collectively, all of the Indebtedness, liabilities and obligations of the Borrower to the Agent, whether now existing or hereafter arising, whether or not currently contemplated, including those arising under the Loan Documents and any indemnification payable hereunder and any attorneys' fees or other fees and disbursements payable hereunder or under the Orders.

"OFAC" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Oil" has the meaning assigned in OPA.

"OPA" means the Oil Pollution Act of 1990, 33 U.S.C. 2701 et, seq., as amended from time to time.

"OPA Liability" means any liability for any Discharge or any substantial threat of a Discharge, as those terms are defined under OPA, and any liability for removal, removal costs and damages, as those terms are defined under OPA, by any Person or any environmental regulatory body having jurisdiction over the Borrower or any other Loan Party.

"Orders" means, collectively, the Interim Order and the Final Order and separately, the Interim Order and the Final Order, as the context requires.

"Original Issue Discount" has the meaning ascribed thereto in subsection 2.8(b).

"Parent" has the meaning ascribed thereto in the preamble.

"Parent Loan" has the meaning ascribed thereto in subsection 7.1(c).

"Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (Title HI of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from, time to time.

"Payment Date" means the last Business Day of each calendar month and on the applicable Maturity Date.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permitted Deviation" means (a) when used in respect of any one line item of the Sources and Uses, any positive or negative difference of 25% and (b) when used in respect of any Approved Budget, a percentage to be agreed in good faith by the Borrower, the Agent and the Required Lenders in connection with the approval of the Initial Budget.

"Permitted Dispositions" means any dispositions of equipment that is obsolete or worn out or that is no longer useful in the ordinary course of business and consistent with past practices or that is replaced or to be replaced in the ordinary course of business and consistent with past practices.

"Permitted Liens" means, as to any Person: (a) pledges or deposits by such Person under workers compensation laws, unemployment insurance laws, social security laws, or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness of such Person), or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of Cash or United States Government Bonds to secure surety, appeal, performance, customs or other similar bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent; (b) Liens imposed by law, such as carriers', warehousemen's, materialmen's and mechanics' liens, or Liens arising out of judgments or awards against such Person with respect to which such Person at the time shall currently be prosecuting an appeal or proceedings for review; (c) Liens for taxes not yet subject to penalties for non-payment and Liens for taxes the payment of which is being contested as permitted by Section 6.6; (d) minor survey exceptions, minor encumbrances, easements or reservations of, or rights of, others for rights of way, highways and railroad crossings, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties; (e) Liens incidental to the conduct of the business of such Person or to the ownership of such Persons property that were not incurred in connection with Indebtedness of such Person, all of which Liens referred to in the preceding clause (e) do not in the aggregate materially detract from the value of the properties to which they relate or materially impair their use in the operation of the business taken as a whole of such Person, and as to all the foregoing only to the extent arising and continuing in the ordinary course of business; (f) Liens in favor of the Secured Parties; (g) Liens existing on the Closing Date as set forth in Schedule 7.2; and (h) Liens otherwise expressly permitted by this Agreement; provided, however, that with respect to the Vessels, no Lien shall be a Permitted Lien other than Permitted Maritime Liens as defined in the Ship Mortgages.

"Person" means an individual, a corporation, a limited liability company, a partnership, a joint venture, a trust or unincorporated organization, a joint stock company or other similar organization, a Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Petition Date" has the meaning specified in the recitals hereto.

"Post-Default Rate" means a rate per annum equal to 2% above the interest rate applicable to Loans as in effect at the time of the Event of Default that resulted in the Post-Default Rate being instituted and as in effect thereafter from time to time until such Event of Default has been cured or waived by the Agent.

"Recent Financial Statements" means the consolidated statements of income and retained earnings and statements of cash flow and combining balance sheets for the Loan Parties as at December 31, 2017 and 2018.

"Regulation D" means Regulation D of the Board of Governors of the Federal Reserve System, as the same may be amended or supplemented from time to time.

"Regulatory Change" means any change after foe date of this Agreement in United States federal, state or foreign laws or regulations or the adoption or making after such date of any interpretations, directives or requests applying to a class of banks, including the Agent, of or under any United States federal, state or foreign laws or regulations (whether or not having the force of law) by any court or governmental or monetary authority charged with the interpretation or administration thereof; provided, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by for the Agent for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Regulatory Change", regardless of the date enacted, adopted or issued.

"Release" has the meaning set forth in section 10 1(22) of CERCLA or state or local law.

"Remedies Notice Period" has the meaning ascribed to such term in the Interim Order.

"Reorganization Plan" means a plan of reorganization filed by the Loan Parties in the Chapter 11 Cases, in form and substance acceptable to the Required Lenders.

"Reporting Period" has the meaning ascribed to such term in Section 5.1(b).

"Required Lenders" means, at any time, Lenders holding an outstanding principal amount of Loans representing more than 50% of the aggregate outstanding principal Loans held by all Lenders.

"Sanctioned Country" shall mean, at any time, a country, region or territory that is, or whose government is, the subject or target of any Sanctions.

"Sanctioned Entity" shall mean (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a person or entity resident in or determined to be resident in a country, that is subject to a country sanctions program administered and enforced by OFAC.

"Sanctioned Person" shall mean, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any Person located, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"Sanctions" shall mean economic or financial sanctions or trade embargoes administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Secured Parties" means the Lenders and Agent.

"Security Documents" has the meaning ascribed thereto in subsection 2.15(c).

"Ship Mortgage and Ship Mortgages" have the meanings ascribed thereto in subsection 2.15(a)(ii)(A).

"Shipping Act" means the Shipping Act of 1916, as amended and consolidated at 46 U.S.C. §55101.

"SMC" means the safety management certificate issued in respect of a Vessel or any of the Barges and Tugs in accordance with Rule 13 of the ISM Code.

"Sources and Uses" has the meaning ascribed thereto in subsection 3.25(a).

"Specified Date" has the meaning ascribed thereto in the preamble.

"Stated Maturity Date" means October 22, 2021 (provided that the Stated Maturity Date may be extended to April 22, 2022 at the Required Lenders' sole discretion.

"Structuring Fee" has the meaning ascribed thereto in subsection 2.8(a).

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, joint venture or other business entity whether now existing or hereafter organized or acquired: (a) in the case of a corporation or limited liability company, of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned by such Person and/or one or more Subsidiaries of such Person, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, by such Person, or (b) in the case of a partnership or joint venture in which such Person is a general partner or joint venturer or of which a majority of the partnership or other ownership interests are at the time beneficially owned by such Person and/or one or more of its Subsidiaries, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, by such Person. Unless the context otherwise requires, references in this Agreement to "Subsidiary" or "Subsidiaries" shall be deemed to be references to a Subsidiary or Subsidiaries of any Loan Party.

"Term Loans" means the term loans extended pursuant to the Interim Order and such terms loans as may be further extended pursuant to this Agreement, in each case, as more fully described in Section 2.1.

"Trading with the Enemy Act" has the meaning ascribed thereto in subsection 3.21.

"Unused Commitment" means the aggregate principal amount of Loans which, at any time, remain available to Borrower pursuant to Section 2.1 hereof to be borrowed subject to the terms and conditions hereof.

"Updated Budget" has the meaning specified in Section 5.1(a).

14

"Variance Report" has the meaning specified in Section 5.1(b).

"Variance Test" has the meaning ascribed thereto in subsection 4.2(j).

"Variance Report Date" has the meaning specified in Section 5.1.

"Vessels" means, collectively, the barges and tugs set forth on Schedule 3.5 and any other tug or barge which shall be or become subject to a Lien pursuant hereto, together with all engines, machinery, masts, boats, anchors, cables, chains, rigging, tackle, apparel, winches, capstans, outfit, tools, pumps, gears, furnishings, appliances, fittings, navigation and communications equipment, computers, spare and replacement parts, and all other appurtenances thereto appertaining or belonging, and, individually, "Vessel" means any of them.

"Wells Fargo Superpriority Claim" has the meaning assigned to such term in the Orders.

Section 1.2     Accounting Terms.

Any accounting terms used in this Agreement that are not specifically defined herein shall have the meanings customarily given to them in accordance with GAAP as in effect on the date of this Agreement, except that references in Article 5 to such principles shall be deemed to refer to GAAP as in effect on the date of the financial statements delivered pursuant thereto.

Section 1.3     Certain Interpretations.

The definitions set forth in Section 1.1 shall be equally applicable to both the singular and plural forms of the defined terms. The words "herein," "hereof" and words of similar import as used in this Agreement shall refer to this Agreement as a whole and not to any particular provision in this Agreement. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation".   Unless specifically stated to the contrary, all references to "Sections," "subsections," "paragraphs," "Exhibits" and "Schedules" in this Agreement shall refer to Sections, subsections, paragraphs, Exhibits and Schedules of this Agreement unless otherwise expressly provided; references to Persons include their respective permitted successors and assigns or, in the case of Governmental Authorities, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.

ARTICLE 2.
Loans; Collateral

Section 2.1     Loans. On the terms and subject to the conditions contained in this Agreement and the Orders, each Lender having a Commitment, severally and not jointly, (i) agrees to make one or more term loans denominated in Dollars to the Borrower from time to time in an aggregate principal amount not to exceed such Lender's ratable share of the undrawn Commitment during the Full Availability Period and (ii) is deemed to have made term loans denominated in Dollars to the Borrower during the Interim Availability Period equal to the Interim Term Loan Amount; provided, however, the Lenders (a) shall not be required to make any additional Loans to the Borrower during the Interim Availability Period and (b) shall not be required to make any

Loans to the Borrower during the Full Availability Period in excess of the Full Availability Amount.  Amounts borrowed under this Section 2.1 and repaid or prepaid may not be reborrowed. Each Lender's Commitment shall be (A) permanently reduced on a dollar-for-dollar basis by the aggregate principal amount of any Loans made by such Lender in accordance with this Section 2.1, (B) terminated in full upon the Maturity Date and (C) terminated in full to the extent done so pursuant to Article VIII.

Section 2.2      Notices Relating to Loans. The Borrower shall give the Agent written notice of each borrowing of each Loan (in each case, a "Borrowing Notice"). Each Borrowing Notice shall be irrevocable and shall be effective only if received by the Agent not later than 4:00 p.m., New York City time, on the date of the related borrowing. Each Borrowing Notice shall (i) specify the amount (subject to the limitations set forth in subsection 2.1(a)) and the type of Loan to be borrowed, the date of borrowing (which shall be a Business Day) and the duration of the initial Interest Period and (2) be accompanied by the certificates and documents set forth in Section 4.3, if any.

Section 2.3      Disbursement of Loan Proceeds.

The Borrower shall give the Agent notice of each borrowing hereunder as provided in subsection 2.1 not later than 4:00 p.m., New York City time, on the date specified for each borrowing hereunder, the Lenders shall disburse the amount of such Loan to Borrower by depositing the amount thereof in an account of the Borrower as designated by the Borrower, provided that on the Closing Date the proceeds of loans shall be deemed disbursed so as to comply with subsection 4.2(i) hereof.

Section 2.4      Note.

The Loans shall be evidenced by a single promissory note (the "Note") of the Borrower payable to the Lenders and dated the Closing Date.  The Note shall be in the principal amount of Twenty Eight Million Eight Hundred Thousand Dollars and No/100 Dollars ($28,800,000.00) (as may be increased up to an aggregate principal amount of Sixty Million and No/100 Dollars ($60,000,000.00) subject to the conditions set forth herein and shall be in the form of Exhibit A annexed hereto.

Section 2.5     Repayment of Principal of Loans.

(a)      All unpaid Obligations shall be payable in one installment on the Maturity Date in the full amount of the balance thereof outstanding on such date, including the Exit Fee.

(b)      Any prepayment of less than the entire outstanding Obligations shall be applied (i) first to the payment of all accrued interest on the amount so prepaid to and including the date of prepayment, (ii) second to the payment of any Obligations then due other than principal and interest, and (iii) third to the payment of principal under the Loans.

(c)      If an Event of Default exists, notwithstanding the preceding sentence or any other provisions of this Agreement to the contrary, all amounts collected or received by the Agent on account of the Obligations or any other amounts outstanding under any of the

16

Loan Documents or in respect of the Collateral shall be paid over or delivered as follows (irrespective of whether the following costs, expenses, fees, interest, premiums, scheduled periodic payments or Obligations are allowed, permitted or recognized as a claim in any proceeding resulting from the occurrence of a bankruptcy, insolvency or similar proceeding):

FIRST, to the payment of all out of pocket costs and expenses (including, without limitation, reasonable attorneys' fees) of the Agent in connection with enforcing its rights under the Loan Documents and any protective advances made by the Agent with respect to the Collateral under or pursuant to the terms of the Security Documents;

SECOND, to the payment of any fees owed to the Agent;

THIRD, to the payment of all of the Obligations consisting of accrued fees and interest, including the Exit Fee;

FOURTH, to the payment of the outstanding principal amount of the Obligations;

FIFTH, to all other Obligations and other obligations which shall have become due and payable under the Loan Documents or otherwise and not repaid pursuant to clauses "FIRST" through "FOURTH" above; and

SIXTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

Section 2.6    <u>Mandatory and Voluntary Prepayments</u>.

(a)    (i) In the event of an actual, constructive, agreed or compromised total loss of, or requisition of title to, or seizure or forfeiture of, one or more Vessels (a "<u>Loss</u>"), the Borrower may, at its option: (A) prepay the Loans in an amount equal to the agreed value of each Vessel subject to a Loss as set forth on Schedule 3.5 on the date on which payment is received of the amount payable as a result of such Loss or (B) no later than thirty (30) days after such Loss shall have occurred, assign and pledge to the Lenders additional collateral to secure the due payment of the Obligations by granting, or causing to be granted, to the Lenders, with respect to an additional Lien free barge, tug or other vessel or vessels having an aggregate value (as determined by the Lenders in its sole discretion) at least equal to the agreed value (as set forth on Schedule 3.5) of the Vessel or Vessels subject to such Loss: (x) a first preferred ship mortgage substantially in the form of the Ship Mortgages; (y) a first assignment covering the earnings and requisition compensation, if any, of each such barge, tug or other vessel, in substantially the form of the Earnings Assignment; and (z) a first assignment covering the insurances of each such barge, tug or other vessel in substantially the form of the insurance Assignment, and in each case otherwise in form and substance satisfactory to the Required Lenders in its their sole discretion; <u>provided</u>, <u>however</u>, that the Borrower only shall be permitted to elect to deliver such additional collateral in lieu of the repayment otherwise required by the preceding clause (A) hereof if, upon the delivery thereof, the Borrower shall then be in compliance with the requirements of Section 6.16 and no Event of Default shall have occurred and be continuing.

(ii)     An actual total loss, of a Vessel shall be deemed to have occurred on the date that such Vessel is lost or, if the date of loss is unknown, the date on which such Vessel is last reported. A constructive total loss shall be deemed to have occurred on the date that notice of abandonment of a Vessel is given to the insurers of such Vessel, provided that a claim for total loss is admitted by such insurers or, if such insurers do not admit such claim, on the date that a total loss is subsequently adjudged to have occurred. An agreed or compromised total loss shall be deemed to have occurred on the date of such agreement or compromise.

(iii)    Any such prepayment shall be made together with payment of accrued interest on the amount prepaid to and including the date of prepayment, without premium or penalty, but shall include any related breakage and termination costs and fees that are provided for in this Agreement (if any).

(b)     The Borrower may, at its option, upon not less than two (2) Business Days' prior written notice to the Agent (which notice shall be irrevocable), prepay all or part of the aggregate outstanding Obligations in full at any time, or in part from time to time; provided, however, that each such prepayment shall (x) be in an amount at least equal to One Hundred Thousand Dollars ($100,000) or an integral multiple thereof, (y) include all accrued and unpaid interest with respect to such Obligations being so prepaid and (z) be accompanied by a ratable amount of the Exit Fee, based on the amount of Obligations being so prepaid.

(c)     [Reserved].

(d)     [Reserved].

(e)     [Reserved].

(f)     Any prepayment of less than the aggregate outstanding Obligations shall be applied in accordance with Section 2.5

Section 2.7     Interest.

(a)     The Borrower shall pay to the Agent on each Interest Payment Date interest on the unpaid principal amount of each Loan for the period, commencing on the date of such Loan until such Loan shall be paid in full, at the Eurodollar Rate for such Loan for such Interest Period plus the Applicable Margin; provided that such interest shall be payable in kind by having such interest capitalized and added to the outstanding principal balance of the Loans on such Interest Payment Date in lieu of cash payment.

(b)     Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans shall thereafter bear interest at the Post-Default Rate.

(c)     Except as provided in the next sentence, accrued interest on each Loan shall be payable: (i) on the applicable Interest Payment Date (which such payment shall be payable in kind as provided in clause (a) above), and (ii) in the case of any payment of principal of any Loan, upon the payment or prepayment thereof (but only on the principal so paid or prepaid) (which such payment shall be in cash). Interest that is payable at the Post-Default Rate shall be payable from time to time on demand of the Agent. Promptly after the establishment of any interest rate provided for herein or any change therein, the Agent will notify the Borrower thereof, provided that the failure of the Agent to so notify the Borrower shall not affect the obligations of the Borrower hereunder or under the Note in any respect.

(d)     Anything in this Agreement or the Note to the contrary notwithstanding, the obligation of the Borrower to make payments of interest shall be subject to the limitation that payments of interest shall not be required to be made to the Agent to the extent that the Agent's receipt thereof would not be permissible under the law or laws applicable to the Agent limiting rates of interest which may be charged or collected by the Agent. Any such payments of interest which are not made as a result of the limitation referred to in the preceding sentence shall be made by the Borrower to the Agent on the earliest interest payment date or dates on which the receipt thereof would be permissible under the laws applicable to the Agent limiting rates of interest which may be charged or collected by the Agent. Such deferred interest shall not bear interest.

Section 2.8     <u>Structuring Fee; Original Issue Discount; Exit Fee.</u>

(a)     The Borrower hereby shall be deemed to have paid to the Agent for the account of each Lender, an upfront option payment in an amount equal to 1.00% of the aggregate principal amount of each such Lender's Commitment, as of the Interim Order Date, payable in kind on the Interim Order Date (the "<u>Structuring Fee</u>"). The Structuring Fee shall be treated for U.S. federal income tax purposes as a premium for the right of the Borrower to put the Term Loans to the applicable Lenders and thus as an increase to the yield of the Term Loans made pursuant to Section 2.01(a), taxable as original issue discount in accordance with the applicable rules under the Code and the United States Department of the Treasury regulations thereunder, and no U.S. federal, state or local withholding tax will be withheld or deducted on account of the Structuring Fee.

(b)     Upon each borrowing hereunder, the Borrower shall be deemed to have paid to the Agent for the account of each Lender, a payment in an amount equal to 5.00% of the aggregate principal amount of Loans made by such Lender, payable in kind on the date of such borrowing (the "<u>Original Issue Discount</u>"). The Original Issue Discount shall be treated for U.S. federal income tax purposes as an increase to the yield of the Loans made pursuant to Section 2.01(a), taxable as original issue discount in accordance with the applicable rules under the Code and the United States Department of the Treasury regulations thereunder, and no U.S. federal, state or local withholding tax will be withheld or deducted on account of the Original Issue Discount.

(c)     Upon the earlier of (i) the Maturity Date and (ii) any date on which the Borrower prepays all of the aggregate outstanding Obligations in full, the Borrower hereby

agrees to pay an exit fee equal to $3,000,000 (as such amount shall be reduced by any prior partial payments thereof pursuant to Section 2.6(b), if any) to the Agent for the account of each Lender (such payment, the "Exit Fee"). If the Lenders provide exit financing to the Loan Parties pursuant to a plan of reorganization that is confirmed by the Bankruptcy Court, then the Lenders and the Loan Parties agree to negotiate a full or partial rebate of the Exit Fee.

Section 2.9        Computations.

Interest payable hereunder and all other fees, interest and all other amounts payable hereunder shall be computed on the basis of a year of 360 days and actual days elapsed (including the first day but excluding the last) occurring in the period for which payable.

Section 2.10      [Reserved].

Section 2.11      [Reserved].

Section 2.12      Time and Method of Payments.

All payments of principal, interest, fees and other amounts (including indemnities) payable by the Borrower hereunder shall be made in Dollars, in immediately available funds, to the Agent not later than 4:00 p.m., New York City time, on the date on which such payment shall become due (and the Agent may, but shall not be obligated to, debit the amount of any such payment that is not made by such time to any ordinary deposit account of the Borrower with the Agent). Additional provisions relating to payments are set forth in Section 9.3 hereof.

Section 2.13      [Reserved].

Section 2.14      Guaranties.

The due payment and performance of the Obligations shall be unconditionally guaranteed to the Agent by each of the Guarantors by the execution and delivery to the Agent of a Guaranty in the form of Exhibit C hereto (hereinafter referred to individually, together with any guaranty executed and delivered before or after the date hereof as a "Guaranty" and collectively as the "Guaranties").

Section 2.15      Security.

(a)        In order to secure the due payment and performance by the Borrower of the Obligations, each Borrower shall on or before the Specified Date:

(a)        execute and deliver to the Lenders a preferred ship mortgage covering each Vessel and all stores, fuel and other inventory and equipment related thereto, and all proceeds thereof, in form and substance satisfactory to the Required Lenders (each as amended, restated, supplemented or otherwise modified from time to time, a "Ship Mortgage" and collectively the "Ship Mortgages"); and

20

(b)     execute and deliver, or cause to be executed and delivered, and cause each Guarantor to execute and deliver, such other agreements, instruments and documents as the Agent may reasonably require in order to effect the purposes of this subsection 2.15(a) and this Agreement, including a confirmation that any documents herein referred to that have already been executed and delivered remain in effect for the benefit of the Obligations hereunder.

(b)     The Ship Mortgages and other agreements, instruments and documents referred to in Subsection 2.15(a) above shall constitute a first lien, subject to Liens permitted by Section 7.2 and subject in all respects to the Carve-Out, on the property covered thereby and all proceeds thereof.

(c)     All of the agreements, documents and instruments provided for or referred to in this Section 2.15 together with any and all agreements, instruments and documents executed and delivered to the Agent by any Person in order to secure the due payment and performance by the Borrower of the Obligations, including all amendments, modifications and restatements thereof and all replacements and substitutions therefor, are hereinafter sometimes referred to collectively as the "Security Documents".

Section 2.16   [Reserved].

Section 2.17   [Reserved].

Section 2.18   [Reserved.]

Section 2.19   Illegality.

Notwithstanding any other provision in this Agreement, in the event that it becomes unlawful for the Lenders to honor their obligation to make Loans hereunder, then, upon written notice given by the Lenders to the Borrower, describing such illegality in reasonable detail, the Lenders' obligation to make Loans hereunder shall be suspended until such time as the Lenders may again make and maintain Loans. Promptly thereafter, the Lenders shall notify the Borrower of such cessation of illegality.

Section 2.20   Advisors.

Subject to paragraph 21 of the Interim Order and/or any applicable provision in the Final Order, the Borrower shall pay all reasonable fees, costs and expenses of the Agents' and the Lenders' advisors, including Stroock & Stroock & Lavan LLP, counsel to the Agent and the Lenders, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard LLP, special local and maritime counsel to the Agent and the Lenders, and any financial advisor and/or shipping consultant retained by the Agent and the Lenders, within fourteen (14) days of the delivery of any invoice therefor (which such delivery may be via electronic mail).

ARTICLE 3.
Representations and Warranties

Each Loan Party hereby represents and warrants to the Agent and the Lenders that:

Section 3.1    Organization.

(a)    Each of the Loan Parties is a debtor in the Chapter 11 Cases and is duly organized and validly existing business corporation under the laws of the State of New York and has the power to own its assets and to transact the business in which it is presently engaged and in which it proposes to be engaged. The Loan Parties have full power and authority to own, operate and charter to others, vessels documented under the laws of the United States of America, including the Vessels and the Barges and Tugs. Schedule 3.1 accurately and completely lists, as to each of the Loan Parties (i) the classes and number of authorized and outstanding shares of capital stock of each such corporation, and the owners of such outstanding shares of capital stock, and (ii) the business in which each of such entities is engaged. All of the foregoing shares or other equity interests that are issued and outstanding have been duly and validly issued and are fully paid and non-assessable, and are owned by the Persons referred to on Schedule 3.1, free and clear of any Lien except as otherwise provided for herein. Except as set forth on Schedule 3.1, there are no outstanding warrants, options, contracts or commitments of any kind entitling any Person to purchase or otherwise acquire any shares of capital stock or other equity interests of any Loan Party nor are there outstanding any securities that are convertible into or exchangeable for any shares of capital stock or other equity interests of any Loan Party. Except as set forth on Schedule 3.1, no Loan Party has any Subsidiary.

(b)    Each Loan Party is in good standing in the State of New York and in each state in which it is qualified to do business except as set forth on Schedule 3.1. Except as set forth on Schedule 3.1, there are no jurisdictions in which the character of the properties owned or proposed to be owned by the Loan Parties or in which the transaction of the business of the Loan Parties as now conducted or as proposed to be conducted requires or will require any Loan Party to qualify to do business and as to which failure so to qualify could have a Material Adverse Effect on the Loan Parties.

(c)    Each of the Loan Parties is and will remain a "citizen of the United States" within the meaning of section 2 of the Shipping Act and is eligible to own and operate vessels in the coastwise trade. Each Vessel and each of the Barges and Tugs was or will be built in the United States within the meaning of 46 C.F.R. § 67.97, has never been rebuilt outside the United States and has never been owned by any Person other than a "citizen of the United States" within the meaning of the Shipping Act.

Section 3.2    Power, Authority, Consents.

Each Loan Party has the power to execute, deliver and perform the Loan Documents to be executed by it. The Borrower has the power to borrow hereunder and has taken all necessary corporate action to authorize the borrowing hereunder on the terms and conditions of this Agreement. Each Loan Party has taken all necessary action, corporate or otherwise, to authorize

the execution, delivery and performance of the Loan Documents to be executed by it. No consent or approval of any Person (including, without limitation, any stockholder of any Loan Party), no consent or approval of any landlord or mortgagee, no waiver of any Lien or right of distraint or other similar right and no consent, license, approval, authorization or declaration of any Governmental Authority, bureau or agency, is or will be required in connection with the execution, delivery or performance by the Borrower or any other Loan Party, or the validity, enforcement or priority, of the Loan Documents or any Lien created and granted thereunder, except as set forth on Schedule 3.2, each of which either has been duly and validly obtained on or prior to the date hereof and is now in full force and effect, or is designated on Schedule 3.2 as waived by the Agent. None of the Loan Parties or any of their Subsidiaries or, to the knowledge of the Borrower or such Loan Party, any of their respective directors, officers, employees or agents acting or benefitting in any capacity in connection with this Agreement, (i) is a Person that is owned or controlled by a Sanctioned Person, (ii) is a Sanctioned Person, or (iii) is located, organized or resident in a Sanctioned Country. The Loan Parties and their Subsidiaries have conducted their businesses in compliance in all material respects with Anti-Corruption Laws and applicable Sanctions and have instituted and maintained policies and procedures designed to promote and achieve compliance with Anti-Corruption Laws and applicable Sanctions.

Section 3.3    No Violation of Law or Agreements.

The execution and delivery by the Loan Parties of each Loan Document to which it is a party and performance by it hereunder and thereunder, will not violate any provision of law, including, without limitation: (a) Executive Order No. 8389, as amended and supplemented of the President of the United States or any rules or regulations thereunder, (b) any Foreign, Cuban or Iranian Assets Control Regulations of the United States contained in Title 31, Code of Federal Regulations, Subchapter B, Chapter V, as amended, or (c) Executive Order No, 12722 dated August 2, 1990, and Executive Order No, 12724 dated August 9, 1990, prohibiting certain transactions with respect to Iraq, and will not, except as set forth on Schedule 3.2, conflict with or result in a breach of any order, writ, injunction, ordinance, resolution, decree, or other similar document or instrument of any court or Governmental Authority, bureau or agency, domestic or foreign, or any certificate of incorporation or by-laws of either Borrower or any other corporate Loan Party, or create (with or without the giving of notice or lapse of time, or both) a default under or breach of any agreement, bond, note or indenture to which either Borrower or any other Loan Party is a party, or by which any of them is bound or any of their respective properties or assets is affected, or result in the imposition of any Lien of any nature whatsoever upon any of the properties or assets owned by or used in connection with the business of the Borrower or any other Loan Party, except for the Liens created and granted pursuant to the Security Documents.

Section 3.4    Due Execution, Validity, Enforceability.

This Agreement and each other Loan Document to which any Loan Party is a party has been duly executed and delivered by the Loan Party that is a party thereto and each constitutes the valid and legally binding obligation of the Borrower or such other Loan Party that is a party thereto, enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws, now or hereafter in effect, relating to or affecting the enforcement of creditors' rights generally and except that the remedy of specific performance and other equitable remedies are subject to judicial discretion.

Section 3.5    Properties; Priority of Liens; Vessel Classification; Documentation, Insurance, etc..

(a)     The Borrower and each Guarantor is the sole owner of the whole of the Vessel set forth opposite its name on Schedule 3.5. All of the properties and assets owned by the Loan Parties (including the Vessels and the Barges and Tugs) are owned by each of them, respectively, free and clear of any Lien of any nature whatsoever, except as provided for in the Security Documents, and as permitted by Section 7.2 and subject in all respects to the Carve-Out.

(b)     The Liens that, simultaneously with the Closing, have been created and granted by the Security Documents constitute valid perfected first Liens on the properties and assets covered by the Security Documents, subject to no prior or equal Lien except as permitted by Section 7.2 and subject in all respects to the Carve-Out. Each Ship Mortgage, when duly executed and delivered by the relevant Loan Party, will be effective to create in favor of the Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien on all of such Secured Party's right, title and interest in and to the Vessel under such Ship Mortgage, all stores, fuel and other inventory and equipment related thereto and the proceeds thereof, and when the Ship Mortgages are filed with the United States Coast Guard, National Vessel Documentation Center, the Ship Mortgages shall constitute a Lien on, and security interest in, all right, title and interest of the Secured Parties in such Vessels that are subject of the Ship Mortgage and the proceeds thereof, in each case prior and superior in right to any other Person, other than "preferred maritime liens" as defined in 46 U.S.C. §31301 and subject in all respects to the Carve-Out.

(c)     The Interim Order is (and the Final Order when entered will be) effective to create in favor of the Agent, for the benefit of the Secured Parties, a legal, valid and enforceable, non-avoidable and automatically and fully and properly perfected priority security interest in all right, title and interest of the Loan Parties in each item of Collateral and the proceeds thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents with the priorities set forth in the Orders. Each Loan Party is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, other than the Permitted Liens and subject in all respects to the Carve-Out. Pursuant to the terms of the Orders, the Obligations of the Loan Parties under this Agreement will constitute DIP Superpriority Claims and be allowed as superpriority administrative expense claims in the Chapter 11 Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including avoidance actions and the proceeds thereof), subject only to the terms of the Orders and the Carve-Out.

(d)     Except as set forth on Schedule 3.5, each Vessel and each of the Barges and Tugs: (i) if classed on the Petition Date, is in class with the classification noted on Schedule 3.5 without recommendation or extension affecting such classification; (ii) is documented

24

with the United States Coast Guard, National Vessel Documentation Center, in the name of the respective Borrower with its certificate of documentation endorsed for the coastwise trade, (iii) is duly qualified to operate in the coastwise trade of the United States, (iv) is eligible to transport cargo or to perform towage between ports in the United States under the Merchant Marine Act of 1920, (v) was built in the United States within the meaning of 46 C.F.R. §67.97 and has been continuously owned and operated by a citizen of the United States, within the meaning of Section 2 of the Shipping Act, (vi) is covered by hull, war and protection and indemnity and mortgagee's interest insurance in accordance with the requirements of this Agreement and, with respect to each of the Vessels, the Ship Mortgage covering such Vessel, and otherwise satisfactory to the Agent; (vii) [reserved], (viii) if subject to inspection, is covered by a valid certificate of inspection issued by the United States Coast Guard, and such certificate of inspection is in full force and effect without recommendation, (ix) [reserved], (x) if subject to load line regulations, is covered by a valid load line certificate issued by the American Bureau of Shipping or other authorized classification society, and such certificate of inspection is in full force and effect, if subject to the ISM or ISPS Codes, has in effect all required documentation thereunder; and (xi) if any of the Vessels or the Barges and Tugs is a tank barge or other vessel transporting oil or hazardous materials on the navigable water or exclusive economic zone of the United States, is covered by a current and valid Certificate of Financial Responsibility ("COFR").

(e)     As of the Petition Date, except as set forth on Schedule 3.5 or as otherwise disclosed to the Agent by the Borrower in writing, there are no charter contracts, express or implied, made or issued for or in connection with the service, use or operation of any Vessel or the Barges and Tugs for the carriage of goods or passengers or for any other purpose whatsoever relating to the service, use or operation of any Vessel or any of the Barges and Tugs for or as charter hire, freight, demurrage or otherwise thereunder, or as compensation for the modification, termination or breach thereof.

Section 3.6     Judgments, Actions, Proceedings.

Except as otherwise disclosed to the Agent in writing or as set forth on Schedule 3.6, there are no outstanding judgments, actions or proceedings at law, in equity or in admiralty, including, without limitation, any Environmental Proceeding, pending before any court or Governmental Authority, bureau, agency, commission, board or instrumentality, with respect to or, to the best of the knowledge of the Loan Parties, threatened against or affecting the Loan Parties or any Affiliate, involving a claim in excess of $1,000,000 (which is not fully covered by insurance, subject to deductibles), nor, to the best of the knowledge of the Loan Parties, is there any reasonable basis for the institution of any such action or proceeding that is probable of assertion, nor are there any such actions or proceedings in which any Loan Party is a plaintiff or complainant.

Section 3.7     No Defaults, Compliance with Laws.

Except as set forth on Schedule 3.7, neither any Loan Party nor any Affiliate is in default under any agreement, ordinance, resolution, decree, order or judgment to which it is a party or by which it is bound, or any other agreement or other instrument by which any of the properties or assets owned by it or used in the conduct of its business is affected, nor is it in material breach of any Environmental Laws and Regulations or subject to any Environmental Liability, in each case,

which default, breach or liability (x) is final, non-appealable and enforceable against any Loan Party and (y) could (after considering any insurance proceeds available in respect thereof) have a Material Adverse Effect on the Loan Parties and their businesses (taken as a whole). Each Loan Party has complied and is in compliance in all material respects with all applicable laws, ordinances and regulations, resolutions, ordinances, decrees and other similar documents and instruments of all courts and Governmental Authorities, bureaus and agencies, domestic and foreign, including, without limitation, all applicable provisions of the Americans with Disabilities Act (42 U.S.C. 12101-12213) and the regulations issued thereunder and all applicable Environmental Laws and Regulations, non-compliance with which could have a Material Adverse Effect on the Loan Parties.

Section 3.8    Burdensome Documents.

Except as set forth on Schedule 3.8 or as otherwise disclosed to the Agent in writing, no Loan Party is a party to or bound by, nor are any of the properties or assets owned by any Loan Party used in the conduct of their respective businesses affected by, any agreement, ordinance, resolution, decree, bond, note, indenture, order or judgment (including, without limitation, any of the foregoing relating to any Environmental Liability) that, in each case, is (x) currently enforceable against any Loan Party and (y) materially and adversely affects their respective businesses, assets or conditions, financial or otherwise.

Section 3.9    Orders.

Each of the Interim Order and the Final Order (from and after the date the Final Order is entered) are in full force and effect and have not been vacated or subject to a stay pending appeal, reversed, modified, amended, stayed or rescinded, in a manner, or relating to a matter, that is adverse to the interests of the Lenders without the prior written consent of the Agent and Required Lenders.

Section 3.10    Tax Returns.

Except as set forth on Schedule 3.10, each of the Loan Parties has filed all material federal, state and local tax returns required to be filed by it and since the Closing Date has not failed to pay any material taxes, or interest and penalties relating thereto, on or before the due dates thereof. Except to the extent reserved therefor and for which proper reserves are reflected on the Recent Financial Statements, there are no (a) material federal, state or local tax liabilities of any Loan Party due or to become due for any tax year ended on or prior to the date of the Latest Balance Sheet, whether incurred in respect of or measured by the income of such entity, that are not properly reflected in the Latest Balance Sheet, and (b) material claims pending or, to the knowledge of the Loan Parties, proposed or threatened against any Loan Party for past federal, state or local taxes, except those as to which proper reserves are reflected in the Recent Financial Statements.

Section 3.11    Intangible Assets.

The Loan Parties possess all patents, trademarks, service marks, trade names, and copyrights, and rights with respect to the foregoing, necessary to conduct their business as now conducted and as proposed to be conducted, without any conflict with the patents, trademarks,

service marks, trade names, and copyrights and rights with respect to the foregoing, of any other Person.

Section 3.12   Regulation U.

No part of the proceeds received by the Borrower or any Guarantor from the Loans will be used directly or indirectly for: (a) any purpose other than as set forth in the Sources and Uses and Approved Budget, as applicable, subject to Permitted Deviation or (b) the purpose of purchasing or carrying, or for payment in foil or in part of Indebtedness that was incurred for the purposes of purchasing or carrying, any "margin stock", as such term is defined in Section 221.3 of Regulation U of the Board of Governors of the Federal Reserve System, 12 C.F.R, Chapter II, Part 221.

Section 3.13   Name Changes, Mergers, Acquisitions; Location of Collateral.

(a)      Except as set forth on Schedule 3.13, no Loan Party has within the five-year period immediately preceding the date of this Agreement changed its name, been the surviving entity of a merger or consolidation, or acquired all or substantially all of the assets of any Person.

(b)      No Collateral (other than the Vessels) constituting personal property (which property, for the avoidance of doubt, shall exclude the Barges and Tugs) having an aggregate fair market value in excess of $50,000 covered by the Security Documents has at any time during the four-month period immediately preceding the date hereof, been located anywhere other than: (i) at its location on the date hereof, or (ii) the location referred to in the Security Document covering such Collateral.

Section 3.14   Full Disclosure.

No financial statement, certificate, opinion, or any other statement made or furnished in writing to the Agent or any Lender by or on behalf of the Loan Parties in connection with this Agreement or the transactions contemplated herein, contains any untrue statement of a material fact, or omits to state a material fact necessary in order to make the statements contained therein or herein not misleading, as of the date such statement was made. There is no fact known to the Loan Parties that has, or would in the now foreseeable future have, a Material Adverse Effect on the Loan Parties, which fact has not been set forth herein, in any financial statements or any certificate, opinion or other written statement so made or famished to the Agent.  Notwithstanding the forgoing, the Loan Parties have not failed to disclose any and all material assumptions made in connection with the Sources and Uses, the Initial Budget and then-Approved Budget, as applicable.

Section 3.15   Licenses and Approvals.

Except as set forth on Schedule 3.15, the Loan Parties have all requisite power and authority and necessary licenses and permits (including, without limitation, all licenses, authorizations and permits arising under or relating to any Environmental Liability) to own and operate its properties, and to carry on its businesses as now conducted, except in each case such licenses, permits and authorizations the failure of which would not likely result in a Material Adverse Effect.

27

Section 3.16    Labor Disputes: Collective Bargaining Agreements: Employee Grievances.

Except as set forth on Schedule 3.16: (a) there are no collective bargaining agreements or other labor contracts covering the Loan Parties; (b) no such collective bargaining agreement or other labor contract will expire during the term of this Agreement; (c) to the best of the Loan Parties' knowledge, no union or other labor organization is seeking to organize, or to be recognized as bargaining representative for, a bargaining unit of employees of the Loan Parties, (d) there is no pending or, to the best of the Loan Parties' knowledge, threatened strike, work stoppage, material unfair labor practice claim or charge, arbitration or other material labor dispute against or affecting the Loan Parties or their respective employees; and (e) there are no actions, suits, charges, demands, claims, counterclaims or proceedings pending or, to the best of the Loan Parties' knowledge, threatened against any Loan Party, by or on behalf of, or with, its employees, other than employee grievances arising in the ordinary course of business that are not, in the aggregate material.

Section 3.17    Condition of Assets.

Except as set forth on Schedule 3.17 or as otherwise disclosed to the Agent as part of or in connection with any inspection of the Vessels and Barges and Tugs performed pursuant to Section 6.2 hereto, all of the Vessels and the Barges and Tugs are in good working condition, ordinary wear and tear excepted, and are able to serve the function for which they are currently being used. Without limiting the foregoing and except as set forth on Schedule 3.17 or as otherwise disclosed to the Agent as part of or in connection with any inspection of the Vessels and Barges and Tugs performed pursuant to Section 6.2 hereto, each of the Vessels and the Barges and Tugs is seaworthy, in good running condition, order and repair, and in such condition that she complies with all United States laws, treaties, conventions, rules, regulations and class certifications to which she is currently or may become subject.

Section 3.18    ERISA.

(a)    Except as set forth on Schedule 3.18, no Employee Benefit Plan is maintained or has ever been maintained by any Loan Party or any ERISA Affiliate, nor has any Loan Party or any ERISA Affiliate ever contributed to a Multiemployer Plan.

(b)    There are no agreements which will provide payments to any officer, employee, shareholder or highly compensated individual which will be "parachute payments" under 280G of the Code that are nondeductible to any Loan Party and which will be subject to tax under Section 4999 of the Code for which any Loan Party will have a material withholding liability.

Section 3.19    Financial Statements.

Each of the Recent Financial Statements is correct and complete and presents fairly the financial position of the Loan Parties and each other entity to which the Loan Parties relate, as at its date, and has been prepared in accordance with generally accepted accounting principles. Neither any Loan Party nor any other entity to which any of the Recent Financial Statements relates, has any material obligation, liability or commitment, direct or contingent (including, without limitation, any Environmental Liability), as at its date, that is not reflected in the Recent

Financial Statements. Except such matters leading to, in connection with or arising out of the Chapter 11 Cases, there has been no material adverse change in the financial position or operations of any Loan Party or any other entity to which any of the Recent Financial Statements relates since the date of the latest balance sheet included in the Recent Financial Statements (the "Latest Balance Sheet"). The fiscal year of the Loan Parties is the twelve-month period ending on December 31 in each year.

Section 3.20    Compliance with OFAC Rules and Regulations.

(a)    None of the Loan Parties or their Subsidiaries or their respective Affiliates is in violation of and shall not violate any of the country or list based economic and trade sanctions administered and enforced by OFAC that are described or referenced at http://www.ustreas.gov/offices/enforcement/ofac/ or as otherwise published from time to time.

(b)    None of the Loan Parties or their Subsidiaries or their respective Affiliates (i) is a Sanctioned Person or a Sanctioned Entity, (ii) has a more than 10% of its assets located in Sanctioned Entities, or (iii) derives more than 10% of its operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. No proceeds of any Loan will be used nor have any been used to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Entity.

Section 3.21    Anti-Terrorism Laws.

Neither any Credit Party nor any of its Subsidiaries is an "enemy" or an "ally of the enemy" within the meaning of Section 2 of the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 *et seq.)* (the "Trading with the Enemy Act") as amended. Neither any Credit Party nor any of its Subsidiaries is in violation of (a) the Trading with the Enemy Act, as amended, (b) any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto or (c) the Patriot Act. None of the Credit Parties (i) is a blocked person described in Section 1 of the Anti-Terrorism Order or (ii) to the best of its knowledge, engages in any dealings or transactions, or is otherwise associated, with any such blocked person.

Section 3.22    Compliance with FCPA.

Each of the Loan Parties and their Subsidiaries is in compliance with the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-l, *et seq.,* and any foreign counterpart thereto. None of the Loan Parties or their Subsidiaries has made a payment, offering, or promise to pay, or authorized the payment of, money or anything of value (a) in order to assist in obtaining or retaining business for or with, or directing business to, any foreign official, foreign political party, party official or candidate for foreign political office, (b) to a foreign official, foreign political party or party official or any candidate for foreign political office, and (c) with the intent to induce the recipient to misuse his or her official position to direct business wrongfully to such Loan Party or its Subsidiary or to any other Person, in violation of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-l, *et. seq*.

29

Section 3.23    Investment Company Act Etc..

Neither the Borrower nor any of its Subsidiaries is (a) an "investment company" or is "controlled" by an "investment company", as such terms are defined in, or subject to registration under, the Investment Company Act of 1940, as amended, or (b) otherwise subject to registration under any other regulatory scheme limiting its ability to incur debt or requiring any approval or consent from or registration or filing with, any Governmental Authority in connection therewith.

Section 3.24    Vessel Qualification.

Except as set forth on Schedule 3.24, the Loan Parties maintains in their possession a current SMC for each of the Vessels and the Barges and Tugs, a DOC for the operator of each of the Vessels and the Barges and Tugs and a United States Coast Guard Certificate of Financial Responsibility (Water Pollution) with respect to each of the Vessels and the Barges and Tugs. Upon reasonable request of the Agent or any Lender at any time and from time to time, the Borrower shall deliver confirmation to the Agent and/or Lenders that each of the foregoing certificates is in force and effect. No Loan Party requires an ISSC to operate any of the Vessels and the Barges and Tugs for domestic coastwise trade.

Section 3.25    Sources and Uses.

The Borrower has prepared and delivered a sources and uses (the "Sources and Uses"), setting forth all line-item disbursements (including all necessary and required expenses which the Loan Parties expect to incur and uses of proceeds of the Interim Availability Amount under the Facility), as the same may be amended, supplemented or modified from time to time only with the prior written consent of the Required Lenders (which consent may be given via email).

Section 3.26    Bankruptcy Matters.

(a)      The Chapter 11 Cases were commenced on the Petition Date, in accordance with applicable Requirements of Law and proper notice thereof under the circumstances, and proper notice under the circumstances of (x) the motion seeking approval of the Loan Documents and (y) entry of the Orders, as applicable and the hearings for the approval of the Interim Order have been held by the Bankruptcy Court.

(b)      Upon the entry of the Orders, each such Order and the Loan Documents are sufficient to provide that the Obligations will constitute a DIP Superpriority Claim and the Liens and security interests securing the Obligations shall be senior secured, valid, enforceable and automatically and properly perfected priming liens, having the priorities set forth in the Orders, subject to the Carve-Out and Permitted Liens in all respects.

Section 3.27    Use of Proceeds.

The proceeds of the Loans are being and shall at all times be used by the Borrower (and, to the extent provided to them by the Borrower, each other Loan Party) solely (a) for disbursements expressly permitted in the Sources and Uses (with respect to the Interim Availability Amount) and the then-Approved Budget (with respect to the Final Availability Amount), subject in each case to the Orders and the Loan Documents and Permitted Deviation and (b) for such other purposes as

are consented to in advance in writing by the Required Lenders (which consent may be given via email).

ARTICLE 4.

The Closing: Conditions to the Loan.

Section 4.1     Conditions to Effectiveness of this Agreement. This Agreement shall become effective on the date on which each of the following conditions and the conditions set forth in Section 4.2 are satisfied or waived in writing by the Required Lenders:

(a)     Credit Agreement.   Receipt by the Agent and the Lenders of executed counterparts of this Agreement, in form and substance satisfactory to the Agent and the Required Lenders, properly executed by a Responsible Officer of each Loan Party, the Agent and each Lender.

(b)     Loan Documents.   Receipt by the Agent and the Lenders of executed counterparts of the Loan Documents (other than this Agreement), in form and substance satisfactory to the Agent and the Required Lenders, each properly executed by a Responsible Officer of the signing Loan Party.

(c)     Organization Documents, Resolutions.   Receipt by the Agent and the Lenders of the following, in form and substance reasonably satisfactory to the Required Lenders and their legal counsel:

(i)     All of the consents, approvals and waivers referred to on Schedule 3.2 (except only those which, as stated on Schedule 3.2, shall not be delivered);

(ii)     Good standing certificates with respect to the Loan Parties, from the Secretary of State of their respective states of incorporation;

(iii)     certified charters with respect to each of the Loan Parties from the Secretary of State of their respective states of incorporation; and

(iv)     Incumbency certificates (with specimen signatures) with respect to the Loan Parties.

(d)     Sources and Uses.   The Lenders and the Agent shall have received and the Required Lenders shall have approved the Sources and Uses and such other information (financial or otherwise) as may be reasonably requested by the Required Lenders, in each case, shall be acceptable in form and substance to the Required Lenders (it being understand and agreed that proposed Sources and Uses and such other information already provided as of the date of the filing of this proposed form of Interim Order are sufficient to satisfy this condition).

(e)     Opinions of Counsel.   Receipt by the Agent and the Lenders of an opinion of Kirkland & Ellis LLP, counsel to the Loan Parties.

(f)     <u>Attorney Costs</u>.   The Borrower shall have paid all previously invoiced reasonable fees, costs and expenses of the Agents' and the Lenders' advisors, including Stroock & Stroock & Lavan LLP, counsel to the Agent and the Lenders, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard LLP, special local and maritime counsel to the Agent and the Lenders, and any financial advisor and/or shipping consultant retained by the Agent and the Lenders.

(g)     <u>Expenses</u>.   Receipt by the Agent, in each case for the account of the applicable Persons (without duplication for clause (f) above) of all fees and expenses and other amounts due and payable by any Loan Party to any of the Agent or the Lenders on or prior to the Closing Date.

(h)     <u>KYC/Patriot Act</u>.   The Lenders and the Agent shall have received all documentation and other information that may be required by such Lenders and the Agent in order to enable compliance with applicable "know your customer" and Anti-Money Laundering Laws and Anti-Terrorism Laws, including the Patriot Act, and any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall have delivered to each Lender and the Agent that so requests a Beneficial Ownership Certification in relation to such Loan Party, in each case to the extent requested not less than three (3) Business Days prior to the Closing Date.

(i)     <u>Chapter 11 Cases</u>.   In connection with the Chapter 11 Cases, each of the following conditions shall have been met:

(i)     The Chapter 11 Cases for each of the Loan Parties shall have been commenced in the Bankruptcy Court for the Southern District of Texas, Houston Division, and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Lenders and the Agent and shall be in form and substance acceptable to the Lenders and the Agent. Each of the Lenders hereby confirms that such condition has been satisfied as of the date hereof.

(ii)     The Bankruptcy Court shall have entered, upon motion in form and substance acceptable to the Required Lenders and the Agent, the Interim Order no later than twenty-five (25) calendar days after the Petition Date, approving and authorizing the Facility, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, in form and substance acceptable to the Lenders and the Agent. Each of the Lenders hereby confirms that such condition has been satisfied as of the date hereof.

(iii)     The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, that is materially adverse to the

32

interests of the Lenders or the Agent, without the prior written consent of the Lenders and the Agent, as applicable.

(iv)     The Loan Parties shall be in compliance in all respects with the Interim Order.

(v)      No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Loan Parties or their respective properties.

(vi)     The Cash Management Order shall be in full force and effect.

(vii)    Upon entry of the Interim Order, the entry into this Agreement shall not violate any Requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently.

(viii)   The Closing Date shall have occurred on or before the date that is three Business Days after the date of entry of the Interim Order. Each of the Lenders hereby confirms that such condition has been satisfied as of the date hereof.

(ix)     The Agent, for the benefit of the Secured Parties, shall have a valid and fully perfected lien on the Collateral, having the priorities set forth in the Orders.

(x)      The Parent Loan shall be in form and substance satisfactory to the Agent and Lenders. Each of the Lenders hereby confirms that such condition has been satisfied as of the date hereof.

(j)      <u>No Default</u>.  No Default or Event of Default shall exist, or would result from the making of such Loans or from the application of the proceeds thereof.

(k)      <u>Material Adverse Effect</u>.  Since the Petition Date, there shall not have occurred any event, condition, circumstance or contingency that could reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect (other than as customarily occurs as a result of the events leading up to and following the commencement or the continuation of the Chapter 11 Cases).

(l)      <u>Interim Availability Period Notes</u>.  The Borrower shall have delivered the Interim Availability Period Notes.[1]

(m)      <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of the Borrower and each other Loan Party contained in Article III or any other

---

[1]      <u>Note to Kirkland</u>:  No replacement of the existing promissory note is contemplated in connection with the signing of the Credit Agreement.

Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date.

Section 4.2    <u>Conditions Precedent to the Full Availability Period</u>.  The obligation of each Lender to make any Loans in an aggregate amount up to the Full Availability Amount, is subject to the satisfaction or waiver in writing by the Required Lenders of the following conditions:

(a)    <u>Delivery of Budget/Variance Reports</u>. The Borrower shall have prepared and delivered a thirteen week cash flow forecast, providing for, with respect to each barge and tug owned by a Loan Party, the licensing and operation of such vessel during such 13-week period, in form and substance acceptable to the Required Lenders in all respects (the "<u>Initial Budget</u>"), setting forth all line-item and cumulative receipts and operating disbursements (including all necessary and required expenses which the Loan Parties expect to incur and anticipated uses of proceeds of the Final Availability Amount under the Facility) on a weekly basis for the period beginning as of the commencement of the Full Availability Period through and including the thirteenth (13th) week after such week, as the same may be amended, supplemented or modified from time to time only with the prior written consent of the Required Lenders (which consent may be given via email). The Initial Budget shall be deemed the "<u>Approved Budget</u>" for all purposes of this Agreement and the other Loan Documents until superseded by any Updated Budget that subsequently is approved by the Required Lenders.  The Borrower shall have delivered any required updates of the Approved Budget and Variance Reports, in each case in form and substance acceptable to the Required Lenders.

(b)    <u>Final Order</u>.  In connection with the Chapter 11 Cases, each of the following conditions shall have been met:

(i)    Not later than sixty-one (61) calendar days following the entry of the Interim Order, the Bankruptcy Court shall enter a Final Order that is in form and substance acceptable to the Lenders and the Agent by the Bankruptcy Court on a motion by the Loan Parties, approving and authorizing on a final basis (except as provided for in the definition of Final Order) the matters and containing the provisions described in the Interim Order.

(ii)    The Final Order shall not have been revised, modified, amended, stayed or vacated (other than in respect of the Adequate Protection Provisions which must be satisfactory to the Lenders and the Agent in their sole discretion).

(iii)    The Loan Parties shall be in compliance with the Final Order.

(c) <u>Conditions to Interim Availability Period</u>.  The Interim Order Date shall have occurred (it being agreed that this condition has been satisfied).

(d) <u>Officer's Certificates</u>.  The Agent and the Lenders shall have received a certificate from a Responsible Officer of the Loan Parties, dated the Closing Date certifying that (i) the conditions set forth in Sections 4.1, 4.2 and 4.3 have been satisfied and (ii) the representations and warranties set forth in Article III are true and correct in all material respects as of the date thereof (except to the extent that such representation and warranty is qualified by materiality or material adverse effect, in which instance such representation and warranty shall be true and correct in all respects and except for representations and warranties that expressly relate to an earlier date, which shall be true and correct as of such earlier date).

(e) <u>Advisor Costs</u>.  The Borrower shall have paid the reasonable fees, costs and expenses of the Agents' and the Lenders' advisors, including Stroock & Stroock & Lavan LLP, counsel to the Agent and the Lenders, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard LLP, special local and maritime counsel to the Agent and the Lenders, and any financial advisor and/or shipping consultant retained by the Agent and the Lenders, in full provided such fees are evidenced by an invoice presented to the Borrower eleven (11) days prior to the commencement of the Full Availability Period.

(f) <u>Expenses</u>.  Receipt by the Agent, in each case for the account of the applicable Persons all fees and expenses and other amounts due and payable by any Loan Party to the Agent or the Lenders on or prior to the Closing Date.

(g) <u>Funding Notice</u>. The Funding Notice submitted by the Borrower with respect to all or any part of the Full Availability Amount shall include a certification and representation and warranty by Borrower that the conditions specified in this Section 4.02 and 4.03 have been satisfied on and as of the date thereof.

(h) <u>Opinions of Counsel</u>.  Receipt by the Agent and the Lenders of a favorable customary opinion of Kirkland & Ellis LLP, counsel to the Loan Parties, in connection with the Full Availability Period, in form and substance reasonably satisfactory to the Required Lenders, the Agent and their respective legal counsel and covering such matters incident to the transactions contemplated by this Agreement and the other Loan Documents as the Agent and the Required Lenders may reasonably require.

(i) <u>Due Diligence</u>.  The Agent and the Lenders shall have completed their due diligence investigation of the Loan Parties and the results shall be satisfactory to the Lenders and the Agent in their sole discretion.

(j) <u>Variance Test</u>.  The Borrower and the Required Lenders shall have agreed in good faith on the form and substance on the testing of the then-Approved Budget for purposes of <u>Section 7.13</u> hereof (such testing, the "<u>Variance Test</u>").

(k) <u>Full Availability Period Notes</u>. The Borrower shall have delivered the Full Availability Period Notes.

(l)     No Default.  No Default or Event of Default shall have occurred or be continuing under this Agreement.

(m)     Milestones.  The Loan Parties shall have proposed, and the Required Lenders in their reasonable discretion, shall have agreed to milestones for the confirmation and substantial consummation of plan of reorganization in the Chapter 11 Cases (such agreed milestones, the "Milestones").

Section 4.3     Conditions Precedent to Each Borrowing  The agreement of each Lender to make any Loan hereunder (including any Loans made on the Closing Date and any Loans made during the Full Availability Period) is subject to the satisfaction (or waiver (which, subject to the parenthetical below, shall be in writing) by the Required Lenders) of the following conditions precedent (the making of such Loan by a Lender being conclusively deemed to be its satisfaction or waiver of such conditions precedent):

(a)     Full Availability Amount.  During the Full Availability Period, the principal amount of any such Loans (together with the aggregate principal amount of all Loans made) shall not be in excess of the Full Availability Amount.

(b)     Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect), in each case on and as of such date as if made on and as of such date except to the extent that such representations and warranties relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect) as of such earlier date.

(c)     Orders.  The Interim Order or the Final Order, as the case may be, and the Cash Management Order, shall be (other than as provided in the definition of Final Order) in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in any manner, or relating to any matter, that is adverse to the interests of the Lenders without the prior written consent of the Lenders.

(d)     Validity and Priority of Liens.  The Agent, for the benefit of the Secured Parties, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected Liens on, and security interests in, the Collateral, in each case, having the priorities set forth in the Orders and subject only to the payment in full in cash of any amounts due under the Carve-Out.

(e)     Milestones.  The Loan Parties shall have satisfied all Milestones, if any, which are required to be satisfied on or prior to the applicable Draw Date.

(f)     No Default.  No Default or Event of Default shall exist, or would result from the making of such Loans or from the application of the proceeds thereof.

36

(g)     Advisor Costs.  The Borrower shall have paid the reasonable fees, costs and expenses of the Agents' and the Lenders' advisors, including Stroock & Stroock & Lavan LLP, counsel to the Agent and the Lenders, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard LLP, special maritime counsel to the Agent and the Lenders, and any financial advisor and/or shipping consultant retained by the Agent and the Lenders, in full provided such fees are evidenced by an invoice presented to the Borrower eleven (11) days prior to the applicable draw date.

(h)     Approved Budget.  The Sources and Uses, the Initial Budget or the Approved Budget, as applicable, shall be in full force and effect on and as of the proposed Draw Date, and the making of any Loan on any such Draw Date and the use of proceeds therefrom shall be in accordance with the Sources and Uses, the Initial Budget or the Approved Budget, as applicable, subject to Permitted Deviation.

(i)     Compliance with Order.  As a result of making the Loans on such Draw Date, the usage of the Commitments shall not exceed (i) the Full Availability Amount and (ii) the aggregate amount authorized by the Final Order.

(j)     Funding Notice.  The Agent shall have received a fully executed and delivered Funding Notice pursuant to and in accordance with Section 2.02, executed by a Responsible Officer no later than five (5) Business Days prior to the date of the relevant Draw or such shorter period of time acceptable to the Required Lenders.

(k)     Borrowings.  The making of any Loan will not violate any requirement of material Law and shall not be enjoined, temporarily, preliminarily or permanently.

ARTICLE 5.
Delivery of Financial Reports. Documents and Other Information.

While the Loans remain outstanding, so long as the Borrower is indebted to the Agent and until payment in full of the Obligations and full and complete performance of all of their other obligations arising hereunder, the Loan Parties shall deliver to the Agent and the Lenders (and their advisors):

Section 5.1     Reporting Requirements. Commencing upon the delivery of the Initial Budget, in form and detail reasonably satisfactory to the Required Lenders:

(a)     On or before 12:00 p.m. New York City time on the Thursday of each fourth (4th) calendar week following the delivery of the Initial Budget, a supplement to the Initial Budget (or the previously supplemented Approved Budget, as the case may be), covering the subsequent 13-week period that commences with the week immediately following the date of delivery of the supplemental budget, consistent with the form and level of detail set forth in the Initial Budget and otherwise in form and substance acceptable to the Required Lenders in all respects (each such supplemental budget, an "Updated Budget").  Upon (and subject to) the approval of any such Updated Budget by the Required Lenders in all respects, such Updated Budget shall constitute the then-approved Approved Budget; provided that unless and until the Required Lenders approve such supplemental budget, the then-current Approved Budget shall remain in effect.

(b)     By no later than 12:00 p.m. New York City time on the Thursday of each calendar week following the Closing Date (each such Thursday, a "Variance Report Date"), a variance report (each, a "Variance Report") setting forth, in reasonable detail, any differences between disbursements and receipts for (i) each Reporting Period versus projected corresponding disbursements and receipts set forth in the Initial Budget or Approved Budget, as applicable, for such Reporting Period and (ii) on a cumulative basis for the period from the Closing Date to the latest week prior to the Variance Report Date together with a statement from Parent's chief executive officer or the chief restructuring officer certifying the information contained in the report and compliance with Section 7.13 hereof. The Variance Report shall also provide a reasonably detailed explanation for any variance.

Section 5.2     Other Reports. As soon as reasonably practicable after the Closing Date (but in no event later than three (3) Business Days after becoming available to the Loan Parties, or such later date as the Agent may agree), the Agent and the Lenders shall have received the following:

(a)     (i) a true and complete copy of the Certificate of Documentation of each Vessel and (ii) a Certificate of Ownership (on form CG-1330) or a certified copy of the Abstract of Title (on form CG-1332) for such Vessel issued by the United States Coast Guard, National Documentation Center showing the Borrower described on Schedule 3.5 as the owner of such Vessel to be the sole owner of each Vessel free and clear of all Liens of record except the Ship Mortgage or Mortgages covering each such Vessel in favor of the Agent for the benefit of the Secured Parties;

(b)     with respect to each Vessel if the Agent or any Lender shall have requested the same in writing, a current confirmation of class certificate or classification survey status report from the American Bureau of Shipping; and

(c)     with respect to each Vessel that is subject to inspection under applicable law, a copy of the current certificate of inspection issued by the United States Coast Guard covering such Vessel reflecting no outstanding recommendations.

Section 5.3     Insurance Advice. As soon as reasonably practicable after the Closing Date (but in no event later than fifteen (15) Business Days (other than excess risk insurance which shall be obtained within 30 days of the Closing Date) after the Specified Date or such later date as the Agent may agree), the Agent and the Lenders shall have received written advice from Willis Towers Watson (or such other insurance broker acting for the Loan Parties reasonably acceptable to the Agent), (i) confirming the placement of the insurances covering each Vessel, (ii) providing written confirmation that they have received no notice of the assignment of the insurances or any claim covering any Vessel in favor of any party other than the Agent for the benefit of the Secured Parties, (iii) providing written confirmation that such insurance complies with the applicable provisions of the Ship Mortgages, and (iv) providing written confirmation that the insurances of each Vessel, and claims thereunder, will not be affected by nonpayment of premiums on any other insurances.

Section 5.4     [Reserved].

Section 5.5    [Reserved].

Section 5.6    Notices of Defaults.

Promptly, notice of the occurrence of any Default or Event of Default, or any event that would constitute or cause a material adverse change in the condition, financial or otherwise, or the operations of the Loan Parties.

Section 5.7    ERISA Notices and Requests.

Notice, within ten (10) days after the occurrence of any of the following: (a) the establishment or maintenance by any Loan Party or any ERISA Affiliate, or any Loan Party or ERISA Affiliate becoming liable in respect of, any Employee Benefit Plan or any Multiemployer Plan other than the Plans set forth on Schedule 3.18; (b) the failure by any Loan Party or any ERISA Affiliate to make any required contribution or payment in respect of any Employee Benefit Plan or Multiemployer Plan; and (c) receipt by any Loan Party or ERISA Affiliate of any correspondence with the PBGC, the Secretary of Labor of the United States of America or any representative of the IRS with respect to any Employee Benefit Plan or Multiemployer Plan, relating to an actual or threatened change or development which could have a Materially Adverse Effect on the Borrower, any other Loan Party or any ERISA Affiliate.

Section 5.8    Additional Information.

Such other information regarding the business, affairs and condition of the Loan Parties as the Agent or any Lender may from time to time reasonably request.

ARTICLE 6.
Affirmative Covenants.

While the Loans or the commitment of Lenders to make Loans hereunder remain outstanding, so long as the Borrower is indebted to the Lenders, and until payment in full of the Obligations and full and complete performance of all of their other obligations arising hereunder and the termination of all commitments of Lenders to lend funds hereunder, the Borrower shall and shall cause each Subsidiary and Loan Party to:

Section 6.1    Books and Records.

Keep proper books of record and account in a manner in which full, true and correct entries shall be made of all dealings or transactions in relation to its business and activities, except in a manner that would not likely result and does not result in a Material Adverse Effect.

Section 6.2    Inspections and Audits.

Upon reasonable prior written notice and at a mutually agreeable time, permit representatives, advisors and independent contractors on behalf of the Agent and the Lenders to visit and inspect the Vessels and any of the properties of the Loan Parties, to examine their current corporate, financial and operating records, and to make copies thereof or abstracts therefrom, and to discuss their current affairs, finances and accounts with their directors, officers and independent

public accountants or other advisors to any Loan Party and to otherwise make available promptly to such representatives and independent contractors such other information and virtual access to such personnel (including, but not limited to, the corporate controller and treasurer of Parent) requested thereby, all at the expense of the Borrower and as requested by the Agent or any Lender or any representative, advisor or independent contractor on behalf of the Agent or any Lender.

Section 6.3   <u>Compliance with Laws: Maintenance and Repairs</u>.

(a)   Except as set forth in Schedule 3.5, comply, in connection with the Loan Parties' ownership and operation of their business, with all applicable laws, ordinances, regulations and orders, noncompliance with which could have a Material Adverse Effect.

(b)   Maintain in good repair, working order and condition, subject to normal wear and tear, all of the Vessels, and use commercially reasonable efforts to maintain in good repair, working order and condition, subject to normal wear and tear, all of the Barges and Tugs, and make all reasonable repairs, replacements, additions and improvements to the Vessels and the Barges and Tugs (it being agreed and understood that the Loan Parties shall have a period of thirty (30) days after receiving notice thereof to (x) in the case of minor repairs which can be performed by such Loan Party's employees, complete any necessary repair of any of the Vessels or the Barges and Tugs or (y) in the case of repairs that require servicing by a third party maintenance service provider, commence necessary repairs by scheduling such Vessel and/or Barge and Tug for a service appointment and providing weekly status updates to the Agent (which updates may be communicated telephonically, by email or such other method reasonably acceptable to the Agent) in reasonable detail regarding the status of such repairs) and (c) hire necessary personnel to manage the Vessels and the Barges and Tugs and their respective operations.

Section 6.4   <u>Continuance of Business</u>.

Do, or cause to be done, all things reasonably necessary to preserve and keep in full force and effect their corporate existence as of the date hereof and all permits, rights and privileges necessary and currently maintained for the proper conduct of their business and continue to engage in the same line of business, except such actions the failure to take would not reasonably be expected to result in a Material Adverse Effect and such deficiencies disclosed on Schedule 3.5, Schedule 3.15 and Schedule 3.24.

Section 6.5   <u>Copies of Corporate Documents</u>   Subject to the prohibitions set forth in Section 7.12, (x) promptly deliver to the Agent copies of their certificate of incorporation (and any amendments or modifications thereto) certified by the Secretary of State of such corporation's state of incorporation and (y) shall not amend, restate, supplement or otherwise modify its bylaws.

Section 6.6   <u>Perform Obligations</u>.   Pay and discharge all of their respective obligations and liabilities in respect of taxes, assessments and governmental charges upon their income and properties when due, unless and to the extent only that such obligations, Liabilities, taxes, assessments and governmental charges shall be contested in good faith and by appropriate proceedings and that, to the extent required by generally accepted accounting principles then in effect, proper and adequate book reserves relating thereto are established by the Loan Parties and

then only to the extent that a bond is filed in cases where the filing of a bond is necessary to avoid the creation of a Lien against any of its properties except such obligations and liabilities the failure to discharge would not reasonably be expected to result in a Material Adverse Effect.

Section 6.7    Notice of Litigation.  Promptly notify the Agent in writing of any litigation, legal proceeding, investigation or dispute, at law, in equity or in admiralty, other than disputes in the ordinary course of business or, whether or not in the ordinary course of business, (a) involving amounts, either, individually or in the aggregate, (i) in excess of One Million Five Hundred Thousand Dollars ($1,500,000), or (ii) that could reasonably be expected to have a Material Adverse Effect, (b) that involves material injunctions or material requests for injunctive relief by or against any Loan Party or any Subsidiary of any Loan Party, (c) affecting or with respect to this Agreement, any other Loan Document or any security interest or Lien created thereunder or (d) by any Governmental Authority relating to any Loan Party or any Subsidiary thereof and alleging fraud, criminal deception or willful misconduct by such Person that involves potential liability to any Loan Party or any Subsidiary thereof, either individually or in the aggregate, that could reasonably be expected to (i) exceed One Million Five Hundred Thousand Dollars ($1,500,000), or (ii) have a Material Adverse Effect, in each case of subsections (a) through (d) hereof, affecting any Loan insurance, subject to deductibles).

Section 6.8    Insurance.

(a)    Maintain with financially sound and reputable insurance companies such insurance on such of its properties and business, and the properties and business of its Subsidiaries, in such amounts and against such risks as is customarily maintained by similar businesses operating in the same or similar locations and all insurance required to be maintained pursuant to the Security Documents, with policy deductibles that shall not exceed that which is customary for companies similarly situated and reasonably acceptable to the Agent, including, without limitation (x)(1) full form hull and machinery and war risks hull and machinery insurance, with a stipulated agreed value in an amount not less than the fair market value of such Vessel and the Barges and Tugs (but in no event and at no time shall such aggregate hull insurance be in an amount less than the outstanding balance of the Obligations), (2) protection and indemnity insurance, on form SP-23 or equivalent, including, without limitation, coverage for the crew of each of the Vessels and the Barges and Tugs, liability to cargo legal liability and wreck removal, in amounts per occurrence reasonably acceptable to the Agent, and (3) pollution liability and clean-up insurance, with limits per occurrence of no less than the limits of liability under the Oil Pollution Act of 1990, 33 U.S.C. §2701, et seq. and the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601, et seq., as each is amended from time to time, and (y) within 30 days of the Closing Date, (1) excess risks, including excess protection and indemnity, excess cargo liability, excess collision, and excess pollution insurance, in one or more layers, with aggregate limits in excess of primary in amounts reasonably acceptable to the Agent, and (2) such additional insurance or limits as may be reasonably required by the Agent.

(b)    File with the Agent upon Agent's request a detailed list, certified by the chief executive officer, chief financial officer or chief restructuring officer of Parent, of the insurance then in effect, stating the names of the insurance companies, the amounts and

rates of the insurance, the dates of the expiration thereof and the properties and risks covered thereby.

(c)     At all times shall name the Agent as additional insured on all liability insurance policies of the Loan Parties and as loss payee (pursuant to the loss payee endorsement approved by the Agent) on all casualty and property insurance policies of the Loan Parties (including on all hull and machinery, increased value and other physical loss or damage coverages).

(d)     Ensure that insurance policies pertaining to Vessels and Barges and Tugs provide that (1) there shall be no recourse against the Agent or any Lender for the payment of premiums, commissions or deductibles, (2) if such policies provide for the payment of club calls, assessments or advances, there shall be no recourse against the Agent or any Lender for the payment thereof and (3) to the extent obtainable from underwriters or brokers, the Agent and the Lenders will receive at least fourteen (14) days (other than for War Risks insurance, where seven (7) Business Days shall apply) written notice from the insurance company or broker prior to cancellation or any material alteration in the insurance policy or reduction in coverage which could materially affect the interest of the Agent or any Lender.

(e)     Should any Vessel or any of the Barges and Tugs be navigated outside her customary navigation limits, the Loan Parties shall, prior to any such navigation, procure an endorsement to the policies obtained hereunder authorizing such navigation, and procure increased value, war risk and related coverages as may be reasonably required by the Required Lenders.

(f)     Provide to the Agent and the Lenders, as soon as reasonably practicable, a separate mortgagee's single interest or breach of warranty coverage in an amount at all times equal to or greater than the Obligations, such that no act or omission of the Loan Parties, or any charterer, or breach of any warranty, including breach of any warranty of seaworthiness, whether express or implied, shall operate to forfeit the Secured Parties' coverage under the above policies or result in a cancellation of insurance as to the Secured Parties.

(g)     Should the Loan Parties fail to obtain any insurance referred to herein, give the Agent and the Lenders written notice of such fact, endeavor to obtain such insurance and detain such vessel in port until such insurance has been obtained.

Section 6.9     Final Order.

Not later than sixty-one (61) calendar days (or such later date as the Agent may agree) following the entry of the Interim Order, cause the entry of a Final Order that is in form and substance acceptable to the Lenders and the Agent by the Bankruptcy Court on a motion by the Loan Parties, approving and authorizing on a final basis (other than as provided in the definition of Final Order) the matters and containing the provisions described in the Interim Order.

Section 6.10    Notice of Certain Events.

(a)    Promptly notify the Agent in writing of any event in respect of any Employee Benefit Plan or any Multiemployer Plan which could have a Material Adverse Effect on any Borrower, any other Loan Party or any ERISA Affiliate.

(b)    Promptly notify the Agent in writing if either Borrower or any other Loan Party or Affiliate receives: (i) any notice of any violation or administrative or judicial complaint or order having been filed or about to be filed against such Borrower or such other Loan Party alleging violations of any Environmental Law and Regulation that could reasonably be expected to (x) result in liability, either individually or in the aggregate, in excess of $500,000 or (y) have a Material Adverse Effect, or (ii) any notice from any Governmental Authority or any other Person alleging that such Borrower or such other Loan Party is or may be subject to any Environmental Liability that could reasonably be expected to (x) result in liability, either individually or in the aggregate, in excess of $500,000 or (y) have a Material Adverse Effect; and promptly upon receipt thereof, provide the Agent with a copy of such notice together with a statement of the action the Borrower or such other Loan Party intends to take with respect thereto.

Section 6.11    ERISA Compliance.

Materially comply with all applicable provisions of ERISA and the Code now or hereafter in effect.

Section 6.12    Environmental Compliance.

Operate all property owned, operated or leased by it in compliance with all Environmental Laws and Regulations, such that no material Environmental Liability arises under any Environmental Laws and Regulations, which could (a) reasonably be expected to have a Material Adverse Effect on any Borrower or any other Loan Party or (b) materially adversely affect the value of any Vessel or the validity, priority or enforceability of the Agent's Lien thereon.

Section 6.13    Certain Affirmative Covenants Relating to the Vessels.

(a)    Promptly after the date hereof, cause a certified copy of each Ship Mortgage, together with a notice thereof, to be kept with the certificate of documentation of the Vessel to which it relates, and with respect to each Vessel, shall furnish the Agent with copies of the masters' signed receipts therefor.

(b)    Cause the Vessels to be maintained in their current classification with the American Bureau of Shipping or any other classification society satisfactory to the Required Lenders without exceptions, unfulfilled recommendations or extensions affecting class.

(c)    Permit the Lenders to have desktop appraisals performed with respect to each of the Vessels by a qualified appraiser selected by the Required Lenders, in their sole discretion, at such times as the Required Lenders may reasonably request.

Section 6.14    Sanctions and Anti-Corruption Laws.  (a) None of the Loan Parties or any of their Subsidiaries or, to the knowledge of the Loan Parties or such Subsidiaries, any of their respective directors, officers, employees or agents acting or benefitting in any capacity in connection with this Agreement, (i) is a Person that is owned or controlled by a Sanctioned Person, (ii) is a Sanctioned Person or (iii) is located, organized or resident in a Sanctioned Country; and (b) the Loan Parties and their Subsidiaries have conducted their businesses in compliance in all material respects with Anti-Corruption Laws and applicable Sanctions and have instituted and maintained policies and procedures designed to promote and achieve compliance with Anti-Corruption Laws and applicable Sanctions and have instituted and maintained policies and procedures designed to promoted and achieve compliance with Anti-Corruption laws and applicable Sanctions.

Section 6.15    [Reserved].

Section 6.16    Milestones.  After commencement of the Full Availability Period, comply with all Milestones.

Section 6.17    Cash Management and Cash Management Order.  Keep the Cash Management Order in effect at all times on and after the Interim Order Date.  Maintain a cash management system that is reasonably satisfactory to the Required Lenders (it being agreed and understood that the Loan Parties' cash management system as it exists on the Closing Date is and shall remain satisfactory to the Required Lenders).

Section 6.18    Other Bankruptcy Matters.

(a)    Comply in all material respects with the Bankruptcy Code, all applicable federal and local bankruptcy rules, and all orders entered in the Chapter 11 Cases;

(b)    deliver to the Agent as soon as practicable in advance of filing with the Bankruptcy Court, the Interim Order and the Final Order (each of which must be in form and substance acceptable to the Required Lenders and the Agent), any material motion or proposed order, any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

(c)    deliver notice of any material litigation, contingent liabilities, termination of material contracts and ERISA and environmental events that could lead to a Material Adverse Effect;

(d)    grant the Required Lenders with access to information (including historical information) and personnel, including, without limitation, participating on telephonic meetings as reasonably requested and upon reasonable advance notice by the Required Lenders with access to all information reasonably requested;

(e)    within five (5) Business Days following the Closing Date (or as soon as reasonably practicable thereafter), pay in full all obligations giving rise to any liens or encumbrances existing on the Specified Vessel Collateral as necessary to fully extinguish any such liens or encumbrances; and

(f)      cause the professional restructuring advisors to the Loan Parties as of the Petition Date (including each of Kirkland & Ellis LLP, Jefferies LLC, and Portage Point Partners, LLC) to continue to be employed as the Loan Parties' restructuring advisors.

ARTICLE 7.

Negative Covenants.

While the Loans or the commitment of Lenders to make Loans hereunder remain outstanding, so long as the Borrower is indebted to the Lenders, and until payment in full of the Obligations, the Loan Parties shall not and shall not permit any of their Subsidiaries or any Loan Party to do, agree to do, or permit to be done, any of the following:

Section 7.1     Indebtedness.

Create, incur, permit to exist or have outstanding any Indebtedness, except:

(a)      Indebtedness of the Borrower to the Lenders under this Agreement and the Note;

(b)      (i) Taxes, assessments and governmental charges (A) not more than 90 days past due from the original due date thereof or (B) more than 90 days past due but not more than 365 days past due from the original due date thereof, so long as such amounts described in this clause (B) shall be contested in good faith by appropriate proceedings and reserves, if applicable, in conformity with GAAP with respect thereto have been provided on the books of the Loan Parties, (ii) non-interest bearing accounts payable (A) not more than 90 days past due from the original due date thereof or (B) more than 90 days past due but not more than 365 days past due from the original due date thereof, so long as such amounts described in this clause (B) shall be contested in good faith by appropriate proceedings and reserves, if applicable, in conformity with GAAP with respect thereto have been provided on the books of the Loan Parties, (iii) accrued liabilities not more than 365 days past due from the original due date thereof and (iv) non-interest bearing deferred liabilities other than for borrowed money (e.g., deferred compensation and deferred taxes), in each case incurred and continuing in the ordinary course of business;

(c)      Indebtedness pursuant to that certain Unsecured Intercompany Note, dated as of October 23, 2020 (the "Unsecured Intercompany Note"), by Parent, as borrower thereunder, in favor of the Borrower, as lenders thereunder (the "Parent Loan"); and

(d)      Indebtedness outstanding on the Closing Date as set forth on Schedule 7.1.

(e)      Indebtedness consisting of accrued expenses, deferred income and taxes.

Section 7.2     Liens.

(a)      Other than Liens existing on the Closing Date and set forth on Schedule 7.2, create, incur, assume or suffer to exist upon any Vessel, or the earnings or insurances thereof, any Liens whatsoever, except:

45

(i)        Liens provided for herein or otherwise securing the Obligations; and

(ii)       Permitted Maritime Liens as defined in the Ship Mortgages.

(b)     Other than Liens existing on the Closing Date and set forth on Schedule 7.2, create, or assume or permit to exist, any Lien on any of the properties or assets of the Loan Parties other than the Vessels, whether now owned or hereafter acquired, except:

(i)        those created and granted by the Security Documents; and

(ii)       Permitted Liens.

Section 7.3    <u>Guaranties</u>.

Except as set forth on Schedule 7.1 or as required hereunder, assume, endorse, be or become liable for, or guarantee, the obligations of any Person, except by the endorsement of negotiable instruments for deposit or collection in the ordinary course of business. For the purposes hereof, the term "guarantee" shall include any agreement, whether such agreement is on a contingency or otherwise, to purchase, repurchase or otherwise acquire Indebtedness of any other Person, or to purchase, sell or lease, as lessee or lessor, property or services, in any such case primarily for the purpose of enabling another person to make payment of Indebtedness, or to make any payment (whether as an advance, capital contribution, purchase of an equity interest or otherwise) to assure a minimum equity, asset base, working capital or other balance sheet or financial condition, in connection with the Indebtedness of another Person, or to supply funds to or in any manner invest in another Person in connection with such Person's Indebtedness.

Section 7.4    <u>Mergers, Acquisitions</u>.

Merge or consolidate with any Person (whether or not a Borrower is the surviving entity), or, except as consented to in writing by the Agent, acquire any vessel or acquire all or substantially all of the assets or any of the capital stock of any Person.

Section 7.5    <u>Key Employee Incentive Program</u>.  Without the prior written consent of the Lenders, enter into, adopt or establish any key employee retention or incentive plan or similar agreement or arrangement.

Section 7.6    <u>Stock Issuance</u>.

Issue any additional shares or any right or option to acquire any shares, or any security convertible into any shares, of the capital stock of any Loan Party.

Section 7.7    <u>Change in Business; Dispositions</u>.

Make any material change in its business, or in the nature of its operation, or liquidate or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise dispose of any of its property, assets or business (other than any disposition of the Aircraft Collateral (as defined in the Interim Order) or any Permitted Dispositions), or dispose of any shares of stock or any Indebtedness, whether now owned or hereafter acquired, or discount,

sell, pledge, hypothecate or otherwise dispose of accounts receivable, or permit the conveyance, sale, lease, assignment, transfer or disposal of any Vessel or any of the Barges and Tugs or any change in the flag of any Vessel or any of the Barges and Tugs.

Section 7.8    Prepayments.

Make any voluntary or optional prepayment of any Indebtedness for borrowed money (other than any payment of Indebtedness due and owing to Fortress, as lienholder, in connection with the sale of the Aircraft Collateral) incurred or permitted to exist under the terms of this Agreement, other than the Obligations and obligations arising under the Parent Loan (as long as the proceeds thereof are used to make a substantially concurrent prepayment of the Obligations) or as otherwise directed by the Bankruptcy Court or other Governmental Authority.

Section 7.9    Investments.

Make, or suffer to exist, any Investment in any Person, including, without limitation, any Affiliate, shareholder, director, officer or employee of any Loan Party, except:

(a)    Investments in:

(i)    obligations issued or guaranteed by the United States of America;

(ii)    certificates of deposit, bankers acceptances and other "money market instruments" issued by any bank or trust company organized under the laws of the United States of America or any State thereof and having capital and surplus in an aggregate amount of not less than $500,000,000;

(iii)    open market commercial paper bearing the highest credit rating issued by Standard & Poor's Corporation or by another nationally recognized credit rating agency;

(iv)    repurchase agreements entered into with any bank or trust company organized under the laws of the United States of America or any State thereof and having capital and surplus in an aggregate amount of not less than $500,000,000 relating to United States of America government obligations;

(v)    shares of "money market funds", each having net assets of not less than $500,000,000; in each case maturing or being due or payable in full not more than 180 days after a Loan Party's acquisition thereof; and

(b)    to the extent constituting an Investment, the extension of the Parent Loan in accordance with the Unsecured Intercompany Note.

Section 7.10    Fiscal Year.

Change its fiscal year.

Section 7.11   ERISA Obligations.

(a)   Establish, or permit any Loan Party or ERISA Affiliate to establish, maintain, operate or participate in any Employee Benefit Plan or Multiemployer Plan other than as set forth on Schedule 3.18; or

(b)   Fail, or permit any Loan Party or ERISA Affiliate to fail, to make any contribution or payment to any Employee Benefit Plan or Multiemployer Plan, required to be made by it the result of which could result in a Material Adverse Effect on the Borrower or any other Loan Party or any ERISA Affiliate; or

(c)   Fail, or permit any Loan Party or ERISA Affiliate to fail, to establish, maintain and operate each Employee Benefit Plan in compliance in all material respects with the provisions of ERISA, the Code and all other applicable laws and the regulations and interpretations thereof.

Section 7.12   Amendments of Documents.

Modify, amend, supplement or terminate, or agree to modify, amend, supplement or terminate, its certificate of incorporation or by-laws or the certificate of incorporation or by-laws of the Borrower or any Guarantor.

Section 7.13   Budget Covenant.  With respect to the each Variance Report required to be delivered, at no time shall the Loan Parties fail to comply with the Variance Test then required.

Section 7.14   Use of Proceeds.  Use the proceeds of the Loans in any manner inconsistent with the Sources and Uses, the Initial Budget or then-Approved Budget, as applicable, in each case subject to Permitted Deviation.

Section 7.15   Use of Cash.

Use, or permit to be used, in any manner or to any extent, any of the Loan Parties' Cash for the benefit of any Person, except: in each case, in accordance with the Approved Budget and the Sources and Uses (a) in connection with the payment or prepayment of expenses (other than capital expenditures, but to include professional fees and expenses, adequate protection payments and other costs and expenses incurred in connection with the Chapter 11 Cases) directly incurred for the benefit of the Loan Parties in the maintenance and operation of their business, in each case, only in the ordinary course of its business; (b) subject to Section 7.8, for the payment (but not prepayment, except to the extent permitted by this Agreement) of scheduled required payments of principal and interest on Indebtedness of the Loan Parties permitted to exist hereunder; and (c) for uses that are otherwise specifically permitted by this Agreement.

Section 7.16   [Reserved].

Section 7.17    <u>Transactions with Affiliates</u>.

Except as expressly permitted by this Agreement, directly or indirectly:

(a)    make any Investment in an Affiliate:

(b)    transfer, sell, lease, assign or otherwise dispose of any assets to an Affiliate (other than investments evidenced by the Unsecured Intercompany Note or any investments by Parent into a Loan Party);

(c)    merge into or consolidate with or purchase or acquire assets from an Affiliate; or

(d)    enter into any other transaction directly or indirectly with or for the benefit of any Affiliate (including, without limitation, guarantees and assumptions of obligations of an Affiliate); provided, however, that: (i) payments on Investments expressly permitted by Section 7.9 hereof may be made, (ii) any Affiliate who is a natural person may serve as an employee or director of any Loan Party and receive reasonable compensation for his services in such capacity consistent with past practice, and (iii) the Loan Parties may enter into any transaction with an Affiliate providing for the leasing of property, the rendering or receipt of services or the purchase or sale of product, inventory and other assets in the ordinary course of business if the monetary or business consideration arising therefrom would be substantially as advantageous to the applicable Loan Party as the monetary or business consideration that would obtain in a comparable arm's length transaction with a Person not an Affiliate as approved by such Loan Party's board of directors and upon an opinion of its legal counsel.

Section 7.18    <u>Hazardous Material</u>

(a)    Cause or permit any Hazardous Material or Oil to be used, stored, treated, transported, Discharged or disposed of in violation of any applicable Environmental Laws and Regulations such that an Environmental Liability could arise under any Environmental Laws and Regulations which could (i) have a Material Adverse Effect on the Borrower or any other Loan Party or (ii) materially adversely affect the value of any Vessel or the validity, priority or enforceability of the Agent's Lien thereon.

(b)    Each Loan Party acknowledges and agrees that the Agent shall have no liability or responsibility for either:

(i)    damage, loss or injury to human health, the environment or natural resources caused by the presence, disposal, Release, threatened Release, Discharge or threat of Discharge of Hazardous Material or Oil; or

(ii)    abatement, removal and/or clean-up required under any applicable Environmental Laws and Regulations for a Release, threatened Release, Discharge, threat of Discharge or disposal of any

49

Hazardous Material or Oil transported by or used by or in connection with the Loan Parties' business.

Section 7.19    Certain Negative Covenants Relating to the Vessels.

Do any act or voluntarily suffer or permit any act to be done: (a) whereby any insurance required hereunder or under any of the Ship Mortgages shall or may be suspended, impaired or defeated; (b) suffer or permit any Vessel or any of the Barges and Tugs to engage in any voyage or carry any cargo not permitted under the policies of insurance then in effect covering such Vessel, except in such a manner that would not reasonably be expected to result in a Material Adverse Effect; (c) other than such actions taken prior to, the subject of, in or in connection with the Chapter 11 Cases, do any act or voluntarily suffer or permit any act to be done which would subject any Vessel or any of the Barges and Tugs to a risk of forfeiture or which would cause such vessel to cease to be eligible to engage in the coastwise trade of the United States; or (d) permit the transfer of all or any portion of its capital stock if as the result of such transfer such Person would cease to be a "citizen of the United States" within the meaning of section 2 of the Shipping Act eligible to own and operate vessels in the coastwise trade.

Section 7.20    Other Negative Covenants.

(a)    Incur, create, assume, suffer to exist or permit, or file any motion seeking any other superpriority claim which is *pari passu* with or senior to the DIP Superpriority Claims of the Lenders and other "secured parties" under the Facility, except for the Carve-Out, the Wells Fargo Superpriority Claim and the Fortress Superpriority Claim;

(b)    sell any assets (including any sale and leaseback transaction and any disposition under section 363 of the Bankruptcy Code) without the prior written consent of the Required Lenders (other than any disposition of the Aircraft Collateral or Permitted Dispositions);

(c)    modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted (except as otherwise contemplated as part of the operational restructuring initiatives described in the First Day Declaration) or (ii) its organizational documents, except as required by the Bankruptcy Code or with the prior written consent of the Required Lenders;

(d)    pay pre-petition indebtedness, except as expressly provided for in the Interim Order or pursuant to "first day" or other orders entered upon pleadings in form and substance reasonably satisfactory to the Required Lenders;

(e)    assert any right of subrogation or contribution against any other Loan Party until all borrowings under the Facility are paid in full and the Commitments are terminated;

(f)    fail to pay any undisputed fees and expenses, undisputed Adequate Protection Fees and Expenses (as defined in the Interim Order), or other undisputed administrative expenses within fourteen (14) of the receipt of an invoice therefor (or as otherwise agreed by the Agent);

(g)      make or permit to be made any amendment, modification, supplement or change to the Orders, as applicable, without the prior written consent of the Agent and the Required Lenders; or

(h)      file any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Loan Parties without consulting with the Required Lenders and providing the Lenders prior (in any case, not less than two (2) Business Days' (or such lesser time as may be acceptable to Required Lenders in their sole discretion)) notice and the opportunity to review and comment on each such motion.

<u>ARTICLE 8.</u>
<u>Events of Default</u>

If any one or more of the following events ("<u>Events of Default</u>") shall occur and be continuing, subject to the Orders, the entire unpaid balance of the principal of and interest on the Note outstanding and all other obligations and Indebtedness of the Borrower to the Agent arising hereunder and under the other Loan Documents shall immediately become due and payable upon written notice to that effect given to the Borrower by the Agent (except that in the case of the occurrence of any Event of Default described in <u>Section 8.6</u> no such notice shall be required and all such amounts shall thereupon automatically become immediately due and payable), without presentment or demand for payment, notice of non-payment, protest or further notice or demand of any kind, all of which are expressly waived by the Borrower:

Section 8.1      <u>Payments</u>.

Failure to make any (i) payments or mandatory prepayments of principal when due hereunder or (ii) payment of interest or other amounts due hereunder within three (3) days after the date when due; or

Section 8.2      <u>Certain Covenants</u>.

(a)      Failure to perform or observe any of the covenants or other agreements contained in Sections 6.9 or Article 7 hereof; or

(b)      The occurrence of an Event of Default under and as defined in any of the Ship Mortgages; or

Section 8.3      <u>Other Covenants</u>.

(a)      Failure by any Loan Party to perform or observe any of the covenants or other agreements contained in Sections 5.1, 5.2 or 5.6 hereof, which shall remain unremedied for a period (after notice thereof shall have been given to the Borrower by the Agent) of seven (7) days; or

(b)      Failure by any Loan Party to perform or observe any other term, condition or covenant of this Agreement or of any of the other Loan Documents to which it is a party, which shall remain unremedied for a period (after notice thereof shall have been given to the Borrower by the Agent) of twenty five (25) days; <u>provided</u>, <u>however</u>, that in the event

such Loan Party shall have made a diligent effort to cure such default and such default shall not be susceptible of a cure within such 25-day period, then no Event of Default shall be deemed to have occurred hereunder until the expiration of fifty (50) days from the date of notice from the Agent to the Borrower with respect thereto so long as the applicable Loan Party continues diligently and in good faith (as determined by the Agent in its sole discretion) to attempt to cure such default; or

Section 8.4      [Reserved].

Section 8.5      Representations and Warranties.

Any representation or warranty made in writing to the Agent in any of the Loan Documents or in connection with the making of the Loan, or any certificate, statement or report made or delivered in compliance with this Agreement, shall have been false or misleading in any material respect when made or delivered; or

Section 8.6      Collateral Documents.  Any Collateral Document shall for any reason cease (x) to be in full force and effect in any respect or (y) create a valid and perfected Lien, with the priority required by the Collateral Documents on and security interest in any portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.2; or

Section 8.7      Judgments.

After the date hereof, any judgment against any Loan Party or any attachment, levy or execution against any of their respective properties for any amount in excess of $1,000,000 shall remain unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of thirty (30) days or more unless such judgment is fully covered by insurance as to which the insurance company has acknowledged its obligation to pay such judgment in full; or

Section 8.8      ERISA.

(a)      The termination of any Employee Benefit Plan or Multiemployer Plan or the institution by the PBGC of proceedings for the involuntary termination of any Employee Benefit Plan or Multiemployer Plan, in either case, by reason of, or that results or could result in, a "material accumulated funding deficiency" under Section 412 of the Code; or

(b)      Failure by any Loan Party to make required contributions, in accordance with the applicable provisions of ERISA, to each of the Employee Benefit Plans or Multiemployer Plans hereafter established or assumed by it; or

Section 8.9      Ownership of Stock.

Morton S. Bouchard, III, members of his immediate family and trusts established for the benefit of his immediate family shall at any time own, beneficially and of record, directly or indirectly, less than 80% in the aggregate of all of the issued and outstanding shares of capital stock of the Loan Parties, having ordinary voting rights for the election of directors; or

Section 8.10    <u>Management</u>.

(a)    Morton S. Bouchard, III, shall cease for any reason whatsoever, including, without limitation, death or disability (as such disability shall be determined in the sole and absolute judgment of the Agent) to be and continuously perform the duties of chief executive officer and chief operating officer, respectively, of Parent or, if such cessation shall occur as a result of the death or such disability, no successor satisfactory to the Agent and the Required Lenders, in their sole discretion, shall have become and shall have commenced to perform the duties of chief executive officer and chief operating officer, as the case may be, of Parent within thirty (30) days after such cessation; <u>provided</u>, <u>however</u>, that if any satisfactory successor shall have been so elected and shall have commenced performance of such duties within such period, the name of such successor or successors shall be deemed to have been inserted in place of Morton S. Bouchard, III, as applicable, in this subsection 8.10(a) and <u>provided</u>, <u>further</u>, that the Agent hereby acknowledges and agrees that the following is and shall remain satisfactory to the Agent: in the event of the death or incapacity of Morton S. Bouchard, III, the Trustees of the Morton S. Bouchard Revocable Trust u/a/d July 10, 1999 (who are currently intended to be his wife, Ms. Linda Lee Bouchard and Mr. Michael Gawyrch) will have complete authority to exercise the voting rights over the shares of stock in Parent; or

(b)    Matthew Ray, of Portage Point Partners, shall cease for any reason whatsoever, including, without limitation, death or disability (as such disability shall be determined in the sole and absolute judgment of the Agent) to be and continuously perform the duties of proposed chief restructuring officer of Parent, with customary duties and responsibilities, or, if such cessation shall occur as a result of the death or such disability, no successor satisfactory to the Agent and the Required Lenders, in their sole discretion, shall have become and shall have commenced to perform the duties of proposed chief restructuring officer, as the case may be, of Parent within thirty (30) days after such cessation; <u>provided</u>, <u>however</u>, that if any satisfactory successor shall have been so elected and shall have commenced performance of such duties within such period, the name of such successor or successors shall be deemed to have been inserted in place of Matthew Ray, as applicable, in this subsection 8.10(b); or

Section 8.11    <u>Liens</u>.

Any of the Liens created and granted to the Agent under the Security Documents shall fail to be valid, first priority, perfected Liens, subject to no prior or equal Lien, except as permitted by Section 7.2; or

Section 8.12    <u>The Vessels</u>.

(a)    A proceeding shall have been commenced on behalf of the United States of America to effect the forfeiture of any of the Vessels or any notice shall have been issued on behalf of the United States of America of the seizure of any of the Vessels or to the effect that the Certificate of Documentation of any of the Vessels is subject to cancellation or revocation, for any reason whatsoever and the Loan Parties shall have failed within twenty (20) days of the occurrence thereof to have assigned and pledged to the Agent, or

cause to have assigned and pledged to the Agent, additional collateral having an aggregate value (as determined by the Agent in its sole discretion) at least equal to the agreed value (as set forth on Schedule 3.5) of such Vessel or Vessels in accordance with Section 2.5; or

(b)      Any Loan Party shall lose its status as a citizen of the United States of America for the purpose of operating vessels in the coastwise trade in accordance with Section 2 of the Shipping Act; or

Section 8.13   Chapter 11 Cases.  There shall have occurred any of the following in the Chapter 11 Cases:

(i)      the bringing of a motion or application by any Loan Party in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (a) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under this Agreement in full in cash immediately upon the consummation of such financing; (b) to grant any Lien other than Liens expressly permitted under this Agreement upon or affecting any Collateral; (c) except as provided herein or the Orders, to use any cash that is Collateral under section 363(c) of the Bankruptcy Code without the prior written consent of the Agent and the Lenders; or (d) that (in the case of any Loan Party) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Agent and the Lenders hereunder or their interest in the Collateral; or

(ii)      the filing of any plan of reorganization or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement, by any Loan Party other than a chapter 11 plan that is acceptable to the Required Lenders (and, with respect to any terms that would reasonably be expected to have a materially adverse economic impact on the Lenders that are not Required Lenders, such Lenders (an "Approved Plan")); or

(iii)      the termination or modification of any Loan Party's exclusive right to file and solicit acceptances of a plan of reorganization; or

(iv)      the entry of an order in any of the Chapter 11 Cases approving a disclosure statement in respect of a plan other than an Approved Plan, or the entry of an order confirming a plan or plans of reorganization other than an Approved Plan; or

(v)      the entry of an order in the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document or the Interim Order or the Final Order in any case without the prior written consent of the Lenders; or

(vi)      the Final Order is not entered within sixty-one (61) calendar days (or such other period as the Lenders may agree to in writing) following the Interim Order Date; or

(vii)      the payment of, or application by any Loan Party for authority to pay, any prepetition claim without the Required Lenders' prior written consent other than (i) as provided in any "first day order" in form and substance acceptable to the Required Lenders, or (ii) as set forth in the Sources and Uses or the then-Approved Budget, as applicable; or

(viii)   the entry of an order by the Bankruptcy Court appointing, or the filing of a motion or application by any Loan Party, for an order seeking the appointment of, in either case without the prior written consent of the Required Lenders, an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Loan Parties or with the power to conduct an investigation of (or compel discovery); or

(ix)   the sale without the Agent's and the Required Lenders' written consent, of any of the Loan Parties' assets (other than any disposition of the Aircraft Collateral or Permitted Dispositions) either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise; or

(x)   the dismissal of the Chapter 11 Cases which does not contain a provision for payment in full in cash of all noncontingent and liquidated monetary DIP Obligations of the Borrower hereunder, or if any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases that does not contain a provision for payment in full in cash of all Obligations of the Borrower hereunder, in each case, without the prior written consent of the Required Lenders; or

(xi)   the conversion of the Chapter 11 Cases from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or a bankruptcy under Debtor Relief Laws, as applicable, or any Loan Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise; or

(xii)   any Loan Party files a motion or application seeking, or the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral not in accordance with the terms hereof, in an amount in excess of $4,500,000 or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Agent in an amount in excess of $4,500,000; or

(xiii)   any Loan Party files a motion or application seeking, or the entry of an order in the Chapter 11 Cases challenging, subordinating, disgorging, avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents; or

(xiv)   the failure of any Loan Party to perform in any material respect any of its obligations under the Interim Order or the Final Order or any violation of any of the terms of the Interim Order or the Final Order, subject to any applicable grace or cure periods set forth therein; or

(xv)   the challenge by any Loan Party to the validity, extent, perfection or priority of any liens granted under or obligations arising under the Loan Documents, the Interim Order or the Final Order; or

(xvi)   the remittance, use or application of proceeds of the Loans, cash collateral or other cash or funds of the Loan Parties other than in accordance with the Orders; or

(xvii)   any Loan Party files a motion or application seeking, or the entry of an order in any of the Chapter 11 Cases granting any other superpriority administrative claim or Lien equal or superior to that granted to the Agent, on behalf of itself and the Lenders, without the consent in writing of the Required Lenders (other than the Carve-Out, the Wells Fargo Superpriority Claim and the Fortress Superpriority Claim); or

(xviii)   the filing of a motion or application by any Loan Party requesting, or the entry of any order granting, any super-priority claim which is senior or *pari passu* with the Lenders' claims under the Loan Documents, not in accordance with the terms hereof; or

(xix)   any Loan Party files a motion or application seeking, or the entry of an order precluding the Agent or the Lenders (or their respective designee(s)) from having the right to or being permitted to "credit bid" with respect to the assets of the Loan Parties; or

(xx)   any attempt by any Loan Party to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing such Obligations to any other debt, including the loans under the Wells Fargo Loan Agreement (as defined in the Interim Order) and the Prepetition Revolving Credit Facility (as defined in the Interim Order); or

(xxi)   the reversal, vacation or stay of the effectiveness of either the Interim Order or the Final Order or any provision thereof without the prior written consent of the Required Lenders; or

(xxii)   the payment of or granting of adequate protection to any person other than the Lenders, except pursuant to the Adequate Protection Provisions, without the prior written consent of the Required Lenders; or

(xxiii)   an application for any of the relief described in this Section 8.12 shall be made by a Person other than the Loan Parties, the Agent or the Lenders and such application is not, to the extent requested by Agent or the Required Lenders, contested by the Loan Parties in good faith; or

(xxiv)   the cessation of Liens or super-priority claims granted with respect to this Agreement to be valid, perfected and enforceable in all respects; or the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the Orders, the Liens granted under the Collateral Documents and the Collateral; or

(xxv)   the occurrence of the Wells Fargo Termination Date (as defined in the Orders).

Section 8.14   Remedies Upon Event of Default.

(a)      If any Event of Default occurs and is continuing, and subject in all respects to the Orders, the Agent (subject to the terms hereof and the Orders) may and, at the written request of the Required Lenders, shall deliver written notice to the Borrower (the "<u>Event of Default Notice</u>") that, pursuant to the Orders, the automatic stay provisions of section 362 of the Bankruptcy Code shall be deemed vacated and modified to the extent necessary to permit the Agent and the Lenders to exercise the following rights and remedies provided for in the Loan Documents or the Orders, without further order of or application to the Bankruptcy Court (as applicable):

(i)      after giving effect to the Carve-Out, terminate this Agreement and the other Loan Documents as to any future liability or obligation of the Loan Parties, but without affecting any of the Agent's Liens in the Collateral and without affecting the Obligations; and

(ii)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, premiums, fees and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower and the other Loan Parties.

(b)      One Business Day after the delivery of such written notice, subject to any appropriate remedy the Bankruptcy Court may fashion, the Agent may foreclose on the Parent Loan.

(c)      Subject to the Remedies Notice Period, the Agent may exercise any other appropriate right or remedy the Bankruptcy Court may fashion, including:

(i)      foreclosure, sale or disposition of the Collateral;

(ii)      collection of accounts receivable;

(iii)      seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Agent's remedies (for the benefit of the Secured Parties); and

(iv)      taking any other actions or exercise any other rights or remedies permitted under the Orders, the Loan Documents or applicable Law or equity.

(d)      Each Loan Party further agrees, that, during the continuance of any Event of Default, subject to the Remedies Notice Period, (i) at the Agent's request, it shall assemble the Collateral and make it available to the Agent at places that the Agent shall reasonably select, whether at such Secured Party's premises or elsewhere, (ii) without limiting the foregoing, the Agent also has the right to require that each Loan Party store and keep any Collateral pending further action by the Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, and (iii) until the Agent is able to sell any Collateral, the Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value. The Agent shall not have any obligation to any

Loan Party to maintain or preserve the rights of any Loan Party as against third parties with respect to any Collateral while such Collateral is in the possession of the Agent.

(e)      All of the rights and remedies of the Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any applicable Law. To the extent it may lawfully do so, each Loan Party absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Agent or any Lender, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(f)      To the extent that applicable Law imposes duties on the Agent to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for the Agent to do any of the following:

(i)      fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)      fail to obtain Permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by applicable Law, fail to obtain Permits or other consents for the collection or disposition of any Collateral;

(iii)      fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)      advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Loan Party, for expressions of interest in acquiring any such Collateral;

(v)      exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Agent in the collection or disposition of any Collateral, or utilize internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi)      dispose of assets in wholesale rather than retail markets;

(vii)    disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii)   purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of any Collateral or to provide to the Agent a guaranteed return from the collection or disposition of any Collateral.

Notwithstanding anything contained herein or in any other Loan Document to the contrary, the Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Agent and the Lenders set forth in the Orders and in the Loan Documents.

ARTICLE 9.
Miscellaneous Provisions

Section 9.1    Fees and Expenses: Indemnity.

Subject to the terms of the Orders, the Borrower will promptly pay all reasonable costs of the Agent and the Lenders in preparing the Loan Documents and any amendments, modifications or waivers of the provisions thereof and all costs and expenses of the issue of the Note (including, without limitation, reasonable fees of counsel to the Agent and the Lenders and the disbursements of counsel in respect of the Closing) and of the Borrower's and the other Loan Parties' performance of and compliance with all agreements and conditions contained herein on its part to be performed or complied with (including, without limitation, all costs of filing or recording any assignments, mortgages, financing statements and other documents and all appraisal and environmental review fees and expenses (except as otherwise expressly provided for herein)), and the reasonable fees and expenses and disbursements of counsel to the Agent and the Lenders in connection with the Chapter 11 Cases and the administration, interpretation and enforcement of this Agreement, the other Loan Documents and all other agreements, instruments and documents relating to this transaction, the consummation of the transactions contemplated by all such documents, the preservation of all rights of the Agent and the Lenders, the negotiation, preparation, execution and delivery of any amendment, modification or supplement of or to, or any consent or waiver under, any such document (or any such instrument that is proposed but not executed and delivered) and with any claim or action threatened, made or brought against the Agent or the Lenders arising out of or relating to any extent to this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby. In addition, the Borrower will promptly pay all costs and expenses (including, without limitation, reasonable fees and disbursements of counsel) suffered or incurred by the Agent or the Lenders in connection with its enforcement of the payment of the Note or any other sum due to it under this Agreement or any of the other Loan Documents or any of its other rights hereunder or thereunder. In addition to the foregoing, the Borrower shall indemnify the Agent, the Lenders and each of its directors, officers, employees, attorneys, agents and Affiliates against, and hold each of them harmless from, any loss, liabilities, damages, claims, costs and expenses (including reasonable attorneys' fees and disbursements) suffered or incurred by any of them arising out of, resulting from or in any manner connected with, the execution, delivery and performance of each of the Loan Documents, the Loans and any and all transactions related to or consummated in connection with the Loans, including, without limitation, losses, liabilities, damages, claims, costs and expenses suffered or incurred by the Agent, the Lenders or any of their

59

respective directors, officers, employees, attorneys, agents or Affiliates arising out of or related to any Environmental Liability or Environmental Proceeding, or in investigating, preparing for, defending against, or providing evidence, producing documents or taking any other action in respect of any commenced or threatened litigation, administrative proceeding or investigation under any federal securities law or any other statute of any jurisdiction, or any regulation, or at common law or otherwise against the Agent, the Lenders or any of their respective officers, directors, affiliates, agents or Affiliates, except for such liabilities as may result from fraud or willful misconduct of the Agent or the Lenders. The indemnity set forth herein shall be in addition to any other obligations or liabilities of the Borrower to the Agent and Lenders hereunder or at common law or otherwise. The provisions of this Section 9.1 shall survive the payment of the Note and the termination of this Agreement.

Section 9.2     Taxes.

If, under any law in effect on the Closing Date, or under any retroactive provision of any law subsequently enacted, it shall be determined that any federal, state or local tax is payable in respect of the issuance of the Note, or in connection with the filing or recording of any assignments, mortgages, financing statements, or other documents (whether measured by the amount of Indebtedness secured or otherwise) as contemplated by this Agreement, then the Borrower will pay any such tax and all interest and penalties, if any, and will indemnify the Agent against and save it harmless from any loss or damage resulting from or arising out of the nonpayment or delay in payment of any such tax. If any such tax or taxes shall be assessed or levied against the Agent or any other holder of any Note, the Agent, or such other holder, as the case may be, may notify the Borrower and make immediate payment thereof, together with interest or penalties in connection therewith, and shall thereupon be entitled to and shall receive immediate reimbursement therefor from the Borrower. Notwithstanding any other provision contained in this Agreement, the covenants and agreements of the Borrower in this Section 9.2 shall survive payment of any Note and the termination of this Agreement.

Section 9.3     Payments.

As set forth in Article 2 hereof, all payments by the Borrower on account of principal, interest, fees and other charges (including any indemnities) shall be made to the Agent in lawful money of the United States of America in immediately available funds, by wire transfer or otherwise, not later than 4:00 p.m. New York City time on the date such payment is due. Any such payment made on such date but after such time shall, if the amount paid bears interest, be deemed to have been made on, and interest shall continue to accrue and be payable thereon until, the next succeeding Business Day. If any payment of principal or interest becomes due on a day other than a Business Day, such payment may be made on the next succeeding Business Day and such extension shall be included in computing interest in connection with such payment. All payments hereunder and under any Note shall be made without set-off or counterclaim and in such amounts as may be necessary in order that all such payments shall not be less than the amounts otherwise specified to be paid under this Agreement and such Note (after withholding for or on account of: (i) any present or future taxes, levies, imposts, duties or other similar charges of whatever nature imposed by any government or any political subdivision or taxing authority thereof, other than any tax (except those referred to in clause (ii) below) on or measured by the net income of the Agent to which any such payment is due pursuant to applicable federal, state and local income tax laws,

60

and (ii) deduction of amounts equal to the taxes on or measured by the net income of the Agent payable by the Agent with respect to the amount by which the payments required to be made under this sentence exceed the amounts otherwise specified to be paid in this Agreement and the Note), Upon payment in full of any Note, the Agent shall mark the Note "Paid" and return it to the Borrower.

Section 9.4    Survival of Agreements and Representations: Construction.

All agreements, representations and warranties made herein shall survive the delivery of this Agreement and the Notes. The headings used in this Agreement and the table of contents are for convenience only and shall not be deemed to constitute a part hereof. All uses herein of the masculine gender or of singular or plural terms shall be deemed to include uses of the feminine or neuter gender, or plural or singular terms, as the context may require.

Section 9.5    Lien on and Set-off of Deposits.

As security for the due payment and performance of all the Obligations, the Borrower hereby grants to the Agent a Lien on any and all deposits or other sums at any time credited by or due from the Agent to the Borrower, whether in regular or special depository accounts or otherwise, and any and all monies, securities and other property of the Borrower, and the proceeds thereof, now or hereafter held or received by or in transit to the Agent from or for the Borrower, whether for safekeeping, custody, pledge, transmission, collection or otherwise, and any such deposits, sums, monies, securities and other property, may at any time after the occurrence and during the continuance of any Event of Default be set-off, appropriated and applied by the Agent against any of the Obligations, whether or not any of such Obligations is then due or is secured by any collateral, or, if it is so secured, whether or not the collateral held by the Agent is considered to be adequate.

Section 9.6    Modifications, Consents and Waivers: Entire Agreement.

No modification, amendment or waiver of or with respect to any provision of this Agreement, any Note, the Security Documents, or any of the other Loan Documents and all other agreements, instruments and documents delivered pursuant hereto or thereto, nor consent to any departure by the Borrower from any of the terms or conditions thereof, shall in any event be effective unless it shall be in writing and signed by the Agent. Any such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No consent to or demand on the Borrower in any case shall, of itself, entitle them to any other or further notice or demand in similar or other circumstances. This Agreement and the other Loan Documents embody the entire agreement and understanding between the Agent and the Borrower and supersede all prior agreements and understandings, whether written or oral, relating to the subject matter hereof and no party hereto is relying on any promise, agreement or undertaking not set forth in this Agreement.

Section 9.7    Remedies Cumulative; Counterclaims.

Each and every right granted to the Agent hereunder or under any other document delivered hereunder or in connection herewith, or allowed it by law, equity or admiralty, shall be cumulative and may be exercised from time to time. No failure on the part of the Agent or the holder of any

Note to exercise, and no delay in exercising, any right shall operate as a waiver thereof, nor shall any single or partial exercise of any right preclude any other or future exercise thereof or the exercise of any other right. The due payment and performance of the Obligations shall be without regard to any counterclaim, right of offset or any other claim whatsoever that the Borrower may have against any Agent and without regard to any other obligation of any nature whatsoever that the Agent may have to the Borrower, and no such counterclaim or offset shall be asserted by the Borrower (unless such counterclaim or offset would, under applicable law, be permanently and irrevocably lost if not brought in such action) in any action, suit or proceeding instituted by the Agent for payment or performance of the Obligations.

Section 9.8    Further Assurances.

At any time and from time to time, upon the request of the Agent, the Borrower shall execute, deliver and acknowledge or cause to be executed, delivered and acknowledged, such further documents, instruments and assurances and do such other acts and things as the Agent may reasonably request in order to fully effect the purposes of this Agreement, the other Loan Documents and any other agreements, instruments and documents delivered pursuant hereto or in connection with the Loans, including, without limitation, the execution and delivery to the Agent of mortgages in form and substance satisfactory to the Agent covering all property or interests therein acquired by the Borrower, and all leases of property entered into by the Borrower as tenant or lessee, after the date of this Agreement, promptly after such acquisition or the entering into of any such lease. Upon receipt of an affidavit of an officer of Agent as to the loss, theft, destruction or mutilation of any Note or any other security document which is not of public record, and, in the case of any such loss, theft, destruction or mutilation, upon cancellation of such Note or other security document, Borrower will issue, in lieu thereof, a replacement note or other security document in the same principal amount thereof and otherwise of like tenor.

Section 9.9    Notices.

All notices, requests, reports and other communications pursuant to this Agreement shall be in writing, either by letter (delivered by hand or commercial messenger service or sent by certified mail, return receipt requested, except for routine reports delivered in compliance with Article S which may be sent by ordinary first-class mail) or email, addressed as follows:

(a)    If to any Loan Party, including the Borrower:

c/o Bouchard Transportation Co., Inc.
58 S. Service Drive
Suite 150
Melville, New York 11747
Attention: Mr. Morton S. Bouchard, III
Email: MSBIII@bouchardtransport.com

with a copy to:

Kirkland & Ellis LLP
300 North LaSalle Drive

Chicago, Illinois 60654
Attention: Ryan Blaine Bennett, Esq.
        Mary Kogut Brawley, Esq.
Email: ryan.bennett@kirkland.com
       mkogut@kirkland.com

(b)     If to the Agent:

Hartree Partners, LP
1185 Avenue of the Americas
New York, New York 10036
Attention: Scott Levy
         Ali Taqi
         Jacob Thride
Email: slevy@hartreecapital.com
       ataqi@hartreecapital.com
       jthride@hartreecapital.com

with a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attention:  Alex Cota, Esq.
          Christopher Guhin, Esq.
E-mail: acota@stroock.com
        cguhin@gmail.com

Any notice, request, demand or other communication hereunder shall be deemed to have been given on: (x) the day on which it is telecopied to such party at its telecopier number specified above (provided such notice shall be effective only if followed by one of the other methods of delivery set forth herein) or delivered by receipted hand or such commercial messenger service to such party at its address specified above, or (y) on the third Business Day after the day deposited in the mail, postage prepaid, if sent by mail, or (z) on the day it is delivered to the telegraph company, addressed as aforesaid, if sent by telegraph. Any party hereto may change the Person, address or telecopier number to whom or which notices are to be given hereunder, by notice duly given hereunder; provided, however, that any such notice shall be deemed to have been given hereunder only when actually received by the party to which it is addressed.

Section 9.10    Counterparts.

This Agreement may be signed in any number of counterparts with the same effect as if the signatures thereto and hereto were upon the same instrument.

Section 9.11    Severability.

The provisions of this Agreement are severable, and if any clause or provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or

unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision in this Agreement in any jurisdiction. Each of the covenants, agreements and conditions contained in this Agreement is independent and compliance by any Loan Party with any of them shall not excuse non-compliance by the Borrower with any other. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

Section 9.12    Binding Effect: No Assignment or Delegation by Borrower.

This Agreement shall be binding upon and inure to the benefit of the Borrower and its successors and to the benefit of the Lenders and its successors and assigns. The rights and obligations of the Borrower under this Agreement shall not be assigned or delegated without the prior written consent of the Agent and the Lenders, and any purported assignment or delegation without such consent shall be void.

Section 9.13    GOVERNING LAW: CONSENT TO JURISDICTION: WAIVER OF TRIAL BY JURY.

(a)    THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL OTHER DOCUMENTS AND INSTRUMENTS EXECUTED AND DELIVERED IN CONNECTION HEREWITH AND THEREWITH, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE UNITED STATES OF AMERICA, TO THE EXTENT APPLICABLE, AND OTHERWISE BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS RULES PERTAINING TO CONFLICTS OF LAWS.

(b)    EACH LOAN PARTY IRREVOCABLY CONSENTS THAT ANY LEGAL ACTION OR PROCEEDING AGAINST IT UNDER, ARISING OUT OF OR IN ANY MANNER RELATING TO THIS AGREEMENT, AND EACH OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE BANKRUPTCY COURT. EACH LOAN PARTY, BY THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXPRESSLY AND IRREVOCABLY ASSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF ANY OF SUCH COURT IN ANY SUCH ACTION OR PROCEEDING. EACH LOAN PARTY FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF ANY COMPLAINT, SUMMONS, NOTICE OR OTHER PROCESS RELATING TO ANY SUCH ACTION OR PROCEEDING BY DELIVERY THEREOF TO IT BY HAND OR BY MAIL IN THE MANNER PROVIDED FOR IN SECTION 9.9. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES ANY CLAIM OR DEFENSE IN ANY SUCH ACTION OR PROCEEDING BASED ON ANY ALLEGED LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS OR ANY SIMILAR BASIS. NOTHING IN THIS SECTION 9.13 SHALL AFFECT OR IMPAIR IN ANY MANNER OR TO ANY EXTENT THE RIGHT OF THE AGENT TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE

PROCEED AGAINST SUCH LOAN PARTY IN ANY JURISDICTION OR TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW.

(c)     EACH LOAN PARTY AND THE AGENT WAIVES TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF, THIS AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS, OR ANY INSTRUMENT OR DOCUMENT DELIVERED PURSUANT TO THIS AGREEMENT, OR THE VALIDITY, PERFECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF AGENT RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, EACH LOAN PARTY HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. EACH LOAN PARTY CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF AGENT HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT AGENT WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER THIS WATER CONSTITUTES A MATERIAL INDUCEMENT FOR AGENT TO ACCEPT ANY NOTE AND MAKE ANY LOAN PROVIDED FOR HEREIN.

Section 9.14    <u>Assignments and Participations by the Agent</u>.

(a)     The Agent shall, at no expense to Borrower, have the unrestricted right at any time or from time to time, and without the consent of any Loan Party, to assign all or any portion of its rights and obligations hereunder to one or more banks or other financial institutions (each, an "<u>Assignee</u>"), and each Loan Party agrees that it shall execute, or cause to be executed, such documents, including without limitation, amendments to this Agreement and to any other documents, instruments and agreements executed in connection herewith as Agent shall deem necessary to effect the foregoing. In addition, at the request of Agent and any such Assignee, Borrower shall issue one or more new promissory notes, as applicable, to any such Assignee and, if Agent has retained any of its rights and obligations hereunder following such assignment, to Agent, which new promissory notes shall be issued in replacement of, but not in discharge of, the liability evidenced by the promissory note held by Agent prior to such assignment and shall reflect the amount of the respective commitments and loans held by such Assignee and Agent after giving effect to such assignment. Upon the execution and delivery of appropriate assignment documentation, amendments and any other documentation required by Agent in connection with such assignment, and the payment by Assignee of the purchase price agreed to by Agent, and such Assignee, such Assignee shall be a party to this Agreement and shall have all of the rights and obligations of Agent hereunder (and under any and all other guaranties, documents, instruments and agreements executed in connection herewith)

to the extent that such rights and obligations have been assigned by Agent pursuant to the assignment documentation between Agent and such Assignee, and Agent shall be released from its obligations hereunder and thereunder to a corresponding extent. The Loan Parties may furnish any information concerning the Loan Parties in its possession from time to time to prospective Assignees, provided that Agent shall require any such prospective Assignees to agree to maintain the confidentiality of such information in accordance with Section 9.15 hereof.

(b)     The Agent may sell participations to one or more banks or other entities (each a "Participant") in all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of the Commitment, the Loans and the Notes). In the event of any such grant by Agent of a participating interest to a Participant, whether or not upon notice to Borrower, Agent shall remain responsible for the performance of its obligations hereunder and Borrower shall continue to deal solely and directly with Agent in connection with Agent's rights and obligations hereunder.

(c)     The Agent may, in connection with any actual or potential assignment or participation or proposed assignment or participation pursuant to this Section 9.14, disclose to the assignee or participant or proposed assignee or participant, any information relating to the Borrower furnished to the Agent by or on behalf of the Borrower, provided that Agent shall require any such Participant to maintain the confidentiality of such information in accordance with Section 9.15 hereof.

Section 9.15    Confidentiality.

The Agent and the Lenders agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder, under any other Loan Document or under any other agreement or transaction between the Agent and the Loan Parties or any action or proceeding relating to this Agreement, any other Loan Document or any other agreement or transaction between the Agent and the Loan Parties or the enforcement of rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (f) with the consent of the Loan Parties or (g) to the extent such Information (1) becomes publicly available other than as a result of a breach of this Section or (2) becomes available to the Agent or any of their respective Affiliates on a nonconfidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" shall mean all information received from any Loan Party or any of its Subsidiaries relating to any Loan Party or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Agent on a

nonconfidential basis from anyone other than a Loan Party prior to disclosure by any Loan Party or any of its Subsidiaries; provided that, in the case of information received from any Loan Party or any of its Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

**Exhibit B**

**BTC Loan**

*Execution Version*

## UNSECURED INTERCOMPANY NOTE

New York, New York
October 23, 2020

FOR VALUE RECEIVED, Bouchard Transportation Co., Inc., a New York corporation (the "**Borrower**"), hereby promises to pay to each of B. No. 272 Corp., B. No. 205 Corp., B. No. 284 Corp., B. No. 282 Corp., Tug Donna J. Bouchard Corp., Tug Morton S. Bouchard Corp., Tug Frederick E. Bouchard Corp., Tug Linda Lee Bouchard Corp. and Tug Denise A. Bouchard Corp. and any successors or assigns of the foregoing (collectively, the "**Lenders**" and each a "**Lender**") on the terms and subject to the conditions set forth herein their respective equal pro rata portion of the aggregate principal sum of (a) twenty eight million eight hundred thousand DOLLARS ($28,800,000) *plus* (b) an additional thirty one million two hundred thousand DOLLARS ($31,200,000) (clauses (a) and (b), the "**Commitments**") *plus* (c) such additional principal amounts as contemplated under Section 3 below (in addition to all other Obligations accruing or arising hereunder) in lawful money of the United States of America in immediately available or same day funds, as applicable, at such location as the Lenders shall from time to time designate.

1.      BTC Loan. The loans evidenced by this Intercompany Note (collectively, the "**Loan**") is the BTC Loan referred to in that certain Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief, entered into as of October 22, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Interim Order**"), which among other things authorized the Debtors (as defined therein) to obtain postpetition financing, authorized the Borrower to enter into this BTC Loan and incur the Obligations hereunder, granted the liens and provided for the claims as set forth therein and granted certain other relief as further detailed therein.  Capitalized terms used (but not defined) herein shall have the meanings assigned thereto in the applicable DIP Order (as defined in the Interim Order).

2.      Commitments.

(a)      Interim Order. Subject solely to entry of the Interim Order and the occurrence and funding of the Initial DIP Draw under the Interim Order (the amount funded under the DIP Facility at such time, the "**Initial DIP Funding**"), the Lenders shall make a loan (the "**Initial Intercompany Funding**") to the Borrower in an amount equal to the principal amount of the Initial DIP Funding. Such Initial Intercompany Funding shall be deemed to occur immediately and automatically upon the funding of the Initial DIP Funding.

(b)      Final Order. Subject solely to entry of the Final Order and the occurrence and funding of Full Availability under the Final Order (the amount funded under the DIP Facility at such time, the "**Final DIP Funding**"), the Lenders shall make an additional loan (the "**Final Intercompany Funding**") to the Borrower in an amount equal to the principal amount of the Final DIP Funding. Such Final Intercompany Funding shall be deemed to occur immediately and automatically upon the funding of the Final DIP Funding.

(c)     Equal Pro Rata Share. Each Lender's obligations under this Section 2 shall be several and not joint, with each Lender committed to fund its equal pro rata share of the principal amount of the Initial Intercompany Funding and the Final Intercompany Funding.

3.     Interest and Fees.

(a)     Interest. The Borrower promises to pay interest on the principal amount of this Intercompany Note from time to time outstanding at a rate per annum equal to LIBOR (as determined by the DIP Lenders) plus 7.00% (subject to a LIBOR floor of 1.00%) (calculated in the same manner specified under the DIP Credit Agreement in respect of the DIP Facility).

(b)     Fees. The following fees shall be due and payable by the Borrower to the Lenders:

    i.     Structuring Fee:  The Borrower shall pay each Lender its equal pro rata portion of a structuring fee equal to 1.00% of the aggregate principal amount of the Commitments, which such fee shall be due and payable on the date of the Initial Intercompany Funding and which shall be funded from the proceeds of the Initial Intercompany Funding; and

    ii.     Exit Fee:  The Borrower shall pay each Lender its equal pro rata portion of  an exit fee equal to $3,000,000, which such fee shall be due and payable upon repayment in full of the Loan, interest, fees and all other obligations arising hereunder (collectively, the "Obligations").

(c)     Original Issue Discount. The Loan borrowed at each of the Initial Intercompany Funding and Final Intercompany Funding shall be subject to an original issue discount equal to 5.00% of the aggregate principal face amount borrowed at such time.

4.     Interest Payment Dates.   Accrued interest on this Intercompany Note shall be compounded monthly and be payable monthly in kind on the last business day of each calendar month.

5.     Amortization; Mandatory Prepayments. The Loan shall not be subject to amortization. Upon the Lenders entry into the DIP Credit Agreement, the "Mandatory Prepayments" section (or substantively equivalent section) of the DIP Credit Agreement shall be incorporated herein by reference mutatis mutandis.

6.     Principal Payment Dates. The entire principal amount of this Intercompany Note shall be paid on the same date that the DIP Obligations under the DIP Facility are required to be paid (whether at the stated maturity, by acceleration or otherwise). The principal amount of and accrued interest on this Intercompany Note and any other obligations arising hereunder may be prepaid by, and in the sole discretion of, the Borrower on any business day without premium or penalty.

7.     Expense Reimbursement. In addition to and not in limitation of the foregoing, the Borrower agrees to pay all professional fees and expenses, including reasonable and documented attorneys' fees and legal expenses and advisor expenses (including of restructuring, local and maritime counsel, finance advisors and shipping consultants), incurred by the Lenders (or incurred by the Lenders' creditors and to be reimbursed by the Lenders, including funding of retainers for such persons as contemplated by the DIP Orders) in connection with this Intercompany Loan or the DIP Facility,

including on account of any indemnity or expense reimbursement obligations arising under the DIP Facility or in seeking to collect any amounts payable hereunder which are not paid when due.

8. <u>Maximum Interest</u>. Notwithstanding anything in this Intercompany Note to the contrary, the Borrower shall never be required to pay unearned interest on any amount outstanding hereunder and shall never be required to pay interest on the principal amount outstanding hereunder at a rate in excess of the maximum nonusurious interest rate that may be contracted for, charged or received under applicable federal or state law (such maximum rate being herein called the "**Highest Lawful Rate**"). If the effective rate of interest which would otherwise be payable under this Intercompany Note would exceed the Highest Lawful Rate, or if the holder of this Intercompany Note shall receive any unearned interest or shall receive monies that are deemed to constitute interest which would increase the effective rate of interest payable by the Borrower under this Intercompany Note to a rate in excess of the Highest Lawful Rate, then (i) the amount of interest which would otherwise be payable by the Borrower under this Intercompany Note shall be reduced to the amount allowed by applicable law, and (ii) any unearned interest paid by the Borrower or any interest paid by the Borrower in excess of the Highest Lawful Rate shall be refunded to the Borrower. Upon the Lenders entry into the DIP Credit Agreement, the substantively equivalent section of the DIP Credit Agreement shall be incorporated herein by reference *mutatis mutandis* and this Section 7 shall be deemed immediately and automatically replaced in all respects.

9. <u>Claim Priority Status</u>. As more thoroughly described in the DIP Orders, subject to the Carve-Out, this Intercompany Note, the Loan and the other obligations hereunder shall be an allowed superpriority claim of each Lender against the Borrower pursuant to section 364(c)(1) of the Bankruptcy Code and administrative expense of the Borrower and its estate pursuant to section 503(b)(1) of the Bankruptcy Code.

10. <u>Records</u>. Each Lender is hereby authorized to record the Loan made by it to the Borrower (which is evidenced by this Intercompany Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting prima facie evidence of the accuracy of the information contained therein.

11. <u>Events of Default; Remedies</u>. An Event of Default under the DIP Facility shall constitute an immediate Event of Default under this Intercompany Note. Upon an acceleration under the DIP Facility, (a) all unpaid principal of, and premium, if any, and accrued and unpaid interest on the Loan shall *ipso facto* become and be immediately due and payable without any declaration or other act on the part of any Lender and (b) interest shall *ipso facto* begin to accrue at the default rate (which such default rate shall be the default rate specified (and shall be calculated in the same manner specified) under the DIP Credit Agreement in respect of the DIP Facility). After any foreclosure on this Intercompany Note by the DIP Agent approved by the Court pursuant to paragraph 10(a) of the Interim Order (or substantively equivalent paragraph in the Final Order), following the Remedies Notice Period, the DIP Agent shall be entitled to file a Stay Relief Motion seeking, on behalf of the DIP Secured Parties, to enforce any and all rights against the Borrower, including, without limitation, collection of accounts receivable and any other rights or remedies permitted under the Interim Order, the Final Order or applicable law.

12. <u>Waiver</u>. To the fullest extent permitted by law, the Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Intercompany Note. Except to the extent of any taxes required by law to be withheld, all payments under this Intercompany Note shall be made without offset, counterclaim or deduction of any kind.

13.    <u>Successors and Assigns</u>. This Intercompany Note shall be binding upon the Borrower and its successors and assigns, and the terms and provisions of this Intercompany Note shall inure to the benefit of each Lender and its successors and assigns, including subsequent holders hereof. No party hereto shall assign its rights or delegate its obligations hereunder without the prior written consent of the Majority DIP Lenders and any such assignment or delegation without such prior written consent shall be null and void *ab initio; provided, however,* the Borrower and each Lender hereby acknowledges and consents to each Lender's grant of a first priority security interest in this Intercompany Note, and any proceeds hereof, to the DIP Agent (for the benefit of the DIP Secured Parties) in satisfaction of the DIP Obligations, subject and pursuant to the terms of the DIP Order, and acknowledges the DIP Agent's rights and remedies as contemplated under and exercised pursuant to the DIP Order and consents to any assignment of this Intercompany Note in accordance with such rights and remedies (or to any subsequent successor or assignee of the DIP Agent).

14.    **<u>Governing Law</u>. THIS INTERCOMPANY NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAWS OF THE STATE OF NEW YORK) AND, AS MAY BE APPLICABLE, THE BANKRUPTCY CODE.**

15.    **<u>Jurisdiction</u>. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS INTERCOMPANY NOTE TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AND TO THE EXTENT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION, THE SUPREME COURT OF THE STATE OF NEW YORK FOR THE COUNTY OF NEW YORK AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT COURT OF NEW YORK.**

16.    **<u>Waiver of Jury Trial</u>. EACH OF THE PARTIES TO THIS INTERCOMPANY NOTE HEREBY IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS INTERCOMPANY NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY**.

17.    <u>Captions</u>. Paragraph captions used in this Intercompany Note are for convenience only and shall not affect the meaning or interpretation of any provision of this Intercompany Note.

18.    <u>Amendments</u>. No alteration of or amendment to this Intercompany Note shall be effective unless (a) given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment and (b) without written consent from DIP Lenders holding at least fifty percent (50%) of the outstanding principal amount of loans and undrawn commitments under the DIP Facility (the "**Majority DIP Lenders**").

19.    <u>Third Party Beneficiary</u>. The Borrowers agree that the DIP Agent and the DIP Lenders are third party beneficiaries of this Intercompany Note.

20.    <u>Conflicts</u>. In the case of any conflict between the provisions of this Intercompany Note and the DIP Orders, the provisions of the DIP Orders shall prevail to the extent permitted by law.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## <u>Schedule 1</u>

FIRST PREFERRED SHIP MORTGAGES COVERING BOUCHARD VESSELS FILED BY
WELLS FARGO WITH THE NATIONAL VESSEL DOCUMENTATION CENTER

| DOCUMENT TITLE | DATE | MORTGAGOR | VESSEL |
|---|---|---|---|
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 210 Corp. | B. NO. 210, Official Number 1037844 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 210 Corp. | B. NO. 210, Official Number 1037844 |
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 215 Corp. | B. NO. 215, Official Number 1064767 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 215 Corp. | B. NO. 215, Official Number 1064767 |
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 225 Corp. | B. NO. 225, Official Number 1139764 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 225 Corp. | B. NO. 225, Official Number 1139764 |
| First Preferred Ship Mortgage | February 4, 2015 | B. No. 242 Corp. | B. NO. 242, Official Number 1154327 |
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 245 Corp. | B. NO. 245, Official Number 1050073 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 245 Corp. | B. NO. 245, Official Number 1050073 |
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 250 Corp. | B. NO. 250, Official Number 1235496 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 250 Corp. | B. NO. 250, Official Number 1235496 |

| First Preferred Ship Mortgage | November 5, 2019 | B. No. 252 Corp. | B. NO. 252, Official Number 1292046 |
| First Preferred Ship Mortgage | October 30, 2013 | B. No. 260 Corp. | B. NO. 260, Official Number 1210060 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | B. No. 260 Corp. | B. NO. 260, Official Number 1210060 |
| First Preferred Ship Mortgage | February 4, 2015 | B. No. 262 Corp. | B. NO. 262, Official Number 1216336 |
| First Preferred Ship Mortgage | November 27, 2017 | B. No. 270 Corp. | B. NO. 270, Official Number 1257373 |
| First Preferred Ship Mortgage | February 4, 2015 | B. No. 295 Corp. | B. NO. 295, Official Number 955449 |
| First Preferred Ship Mortgage | November 27, 2017 | Tug Kim M. Bouchard Corp. | KIM M. BOUCHARD, Official Number 1257372 |
| First Preferred Ship Mortgage | November 5, 2019 | Tug Evening Breeze Corp. | EVENING BREEZE, Official Number 1282121 |
| First Preferred Ship Mortgage | October 30, 2013 | Tug Evening Star Corp. | EVENING STAR, Official Number 1234828 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | Tug Evening Star Corp. | EVENING STAR, Official Number 1234828 |
| First Preferred Ship Mortgage | February 4, 2015 | Tug Morton S. Bouchard, IV Corp. | MORTON S. BOUCHARD IV, Official Number 1154328 |
| First Preferred Ship Mortgage | October 30, 2013 | Tug Jane A. Bouchard Corp. | JANE A. BOUCHARD, Official Number 1139762 |

| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | Tug Jane A. Bouchard Corp. | JANE A. BOUCHARD, Official Number 1139762 |
| First Preferred Ship Mortgage | October 30, 2013 | Tug Brendan J. Bouchard Corp. | BRENDAN J. BOUCHARD, Official Number 1086926 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | Tug Brendan J. Bouchard Corp. | BRENDAN J. BOUCHARD, Official Number 1086926 |
| First Preferred Ship Mortgage | October 30, 2013 | Tug Danielle M. Bouchard Corp. | DANIELLE M. BOUCHARD, Official Number 1053010 |
| First Amendment to First Preferred Ship Mortgage | February 4, 2015 | Tug Danielle M. Bouchard Corp. | DANIELLE M. BOUCHARD, Official Number 1053010 |
| First Preferred Ship Mortgage | February 4, 2015 | Tug Bouchard Girls Corp. | BOUCHARD GIRLS, Official Number 955450 |

EARNINGS ASSIGNMENTS AND ASSIGNMENTS OF INSURANCES FILED BY
WELLS FARGO WITH THE NATIONAL VESSEL DOCUMENTATION CENTER

| DOCUMENT TITLE | DATE |
| --- | --- |
| First Earnings Assignment | October 30, 2013 |
| First Amendment to First Earnings Assignment | February 4, 2015 |
| Second Amendment to First Earnings Assignment | March 12, 2020 |
| Assignment of Insurances | October 30, 2013 |
| First Amendment to Assignment of Insurances | February 4, 2015 |

Second Amendment to Assignment of                    March 12, 2020
            Insurances