**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| BOUCHARD TRANSPORTATION CO., INC., *et al.*,[1] | Case No. 20-34682 (DRJ) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF EXECUTED**
**AIRCRAFT PURCHASE AGREEMENT**
**AND ORDER (I) AUTHORIZING THE SALE OF**
**THE AIRCRAFT FREE AND CLEAR OF ALL LIENS,**
**CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) AUTHORIZING**
**THE PAYMENT OF THE TRANSACTION EXPENSES IN CONNECTION**
**THEREWITH, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT**
**OF CERTAIN EXECUTORY CONTRACTS, AND (IV) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that on November 29, 2020, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Emergency Motion for Entry of an Order (I) Establishing Certain Procedures for the Sale of the Aircraft Free and Clear of all Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Payment of Certain Transaction Expenses in Accordance With the Sale Procedures, and (III) Granting Related Relief* [Docket No. 263] (the "Motion").[2]

**PLEASE TAKE FURTHER NOTICE** that on December 3, 2020, the Court entered an *Order (I) Approving the Procedures for the Sale of the Aircraft Free and Clear of all Liens, Claims, Interests, and Encumbrances, (II) Approving the Payment of Certain Transaction Expenses in*

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/bouchard.  The location of the Debtors' service address is:  58 South Service Road, Suite 150, Melville, New York 11747.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, Order, Sale Order, or Purchase Agreement, as applicable.

*Accordance With the Sale Procedures, and (III) Granting Related Relief* [Docket No. 282] (the "Order").

 **PLEASE TAKE FURTHER NOTICE** that pursuant to the Order the Debtors intend to file a proposed *Order (I) Authorizing the Sale of the Aircraft Free and Clear of all Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Payment of Certain Transaction Expenses in Accordance With the Sale Procedures, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and (IV) Granting Related Relief* (the "Sale Order"), which shall be attached as **Exhibit A** to a supplemental notice.

 **PLEASE TAKE FURTHER NOTICE** that pursuant to the Order, the Debtors hereby file the Aircraft Purchase Agreement for the sale of the Aircraft, attached hereto as **Exhibit B** (the "Purchase Agreement").

 **PLEASE TAKE FURTHER NOTICE** that a summary of certain material terms of the Purchase Agreement are summarized below[3]:

| | |
|---|---|
| **Seller** | Bouchard Transportation Co., Inc. |
| **Purchaser** | Surebliss LLC |
| **Purchased Property / Excluded Assets** | The Aircraft, together with all "Ancillary Items" will be sold with the Aircraft (all tool kits, spare parts, rotables (including life rafts) support equipment, engine covers, loose equipment and other equipment of whatever nature that is associated with the Airframe and the Engines identified in Exhibit A-1 to the Purchase Agreement.<br><br>There are no excluded assets. |
| **Purchase Price** | $44,000,000.00 |
| **Deposit** | $1,000,000.00, deposited with the Escrow Agent prior to the execution of the Purchase Agreement. |

---

[3] The following summary chart is included for the convenience of the Court and parties.  To the extent this summary conflicts with the Purchase Agreement, the Purchase Agreement shall govern.

| Closing Deadline | On or around March 15, 2021, in accordance with the Purchase Agreement. |
|---|---|
| Assumption and Assignment of Contracts | Seller will assign to Purchaser the (1) Rolls Royce CorporateCare – Engines and (2) APU on Honeywell MSP maintenance service plans, as listed on Exhibit F to the Purchase Agreement, in accordance with the Sale Order. |
| Transaction Expenses | $250,000 payable to Avpro, Inc., aircraft broker, from the proceeds of and upon consummation of the sale transaction. $12,500 payable to Insured Aircraft Title Service, LLC, the Escrow Agent, prior to the consummation of the sale transaction in accordance with the Purchase Agreement. |

**PLEASE TAKE FURTHER NOTICE** that parties in interest seeking to object to the sale or to entry of the Sale Order shall have until five days following the Debtors' filing on the docket and service of the proposed Sale Order (the "Objection Deadline") to file and serve a written objection filed with the Court on the docket of the Debtors' chapter 11 cases (each an "Objection").

**PLEASE TAKE FURTHER NOTICE** that if an Objection is timely filed and not withdrawn or resolved, the Debtors shall request that the Court set a hearing within 24 hours of the Objection Deadline to consider any such Objections.

**PLEASE TAKE FURTHER NOTICE** that, absent an Objection being timely filed, or following resolution of any Objections, the Court may enter the Sale Order without a hearing and, in that case, the sale shall be consummated in accordance with the Sale Order and the Purchase Agreement.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion, the Order, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.case.stretto.com/bouchard. You may also obtain copies of any pleadings by visiting the Court's website at http://www.txs.uscourts.gov in accordance with the procedures and fees set forth therein.

Houston, Texas
February 24, 2021

/s/ *Matthew Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                ggraham@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (admitted *pro hac* vice)
W. Benjamin Winger (admitted *pro hac* vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          ryan.bennett@kirkland.com
                benjamin.winger@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**Certificate of Service**

I certify that on February 24, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew Cavenaugh*
Matthew D. Cavenaugh

## <u>Exhibit A</u>

**Proposed Sale Order**

[*To be filed*]

## Exhibit B

**Purchase Agreement**

## AIRCRAFT PURCHASE AGREEMENT

Dated as of February 24, 2021,

between

Bouchard Transportation Co. Inc.
as Seller,

and

Surebliss LLC
as Purchaser,

2018 Gulfstream Aerospace Corp. GVI (G650) Aircraft, bearing

Manufacturer's serial number 6302,

and

Federal Aviation Administration registration number N440MB

## AIRCRAFT PURCHASE AGREEMENT

This **AIRCRAFT PURCHASE AGREEMENT** (the "Agreement") is entered into and given effect this 24th day of February, 2021, by and between Bouchard Transportation Co. Inc., a Delaware corporation ("Seller"), and Surebliss LLC, a Delaware limited liability company ("Purchaser").

### W I T N E S S E T H:

**WHEREAS**, Seller owns the Aircraft described and referred to herein and desires to sell the Aircraft;

**WHEREAS**, Purchaser desires to purchase the Aircraft from Seller; and

**WHEREAS,** Purchaser and Seller now desire to enter into this Agreement for the purpose of setting forth all of the terms and conditions pursuant to which Purchaser shall buy and accept and Seller shall cause the sale and delivery of the Aircraft.

**NOW, THEREFORE**, in consideration of these premises and the mutual covenants and agreements herein contained, the Parties agree as follows:

### ARTICLE I.  DEFINITIONS

1.1    The following terms shall have the following meanings for all purposes of this Agreement:

**"Aircraft"** means the Airframe, the Engines, the APU, the Parts, the Ancillary Items, and the Aircraft Documents.

**"Aircraft Documents"** means a current and validly issued United States Standard Airworthiness Certificate with no exceptions, and all logbooks, manuals, maintenance and inspection records, parts catalogs, yellow tags, wiring diagrams, completion/refurbishment records, 8130-3s or equivalent for all life limited components, burn certifications, or required STC's and other technical documentation pertaining to the Airframe or any Engine that are in Seller's possession or control.

**"Aircraft Specification"** means the Aircraft Specification set forth in Exhibit A attached hereto.

**"Airframe"** means that certain 2018 Gulfstream Aerospace Corp. GVI (G650) aircraft, bearing manufacturer's serial number 6302, and Federal Aviation Administration registration number N440MB (described on the International Registry as Gulfstream model Gulfstream GVI), together with any and all Parts incorporated or installed in or attached thereto or otherwise in Seller's possession or control.

"**Airworthiness of the Aircraft**" or "**Airworthy**" means that (i) the Aircraft conforms to the type certification issued by the FAA with respect to the type of aircraft which includes the Aircraft; (ii) the Aircraft is in a condition for safe operation and may be returned to service without any conditions or limitations; and (iii) the Aircraft meets the requirements for operation under United States Federal Aviation Regulations 91**.**

"**Ancillary Items**" means all tool kits, spare parts, rotables (including life rafts) support equipment, engine covers, loose equipment and other equipment of whatever nature in Seller's possession that is associated with the Airframe and the Engines identified in Exhibit A-1 (such list of Ancillary Items to be revised jointly by Purchaser and Seller during the Inspection in order to add any other items agreed upon).

"**APU**" means the Honeywell RE220 serial number P-416 auxiliary power unit auxiliary power unit described in greater detail on Exhibit A, hereto, together with all Parts currently incorporated or installed on, attached to, or furnished with, the APU, or which have been removed from the APU but belonging thereto.

"**Balance of the Purchase Price**" means the amount of forty three million United States dollars (US$43,000,000.00).

"**Business Day(s)**" means any day of the year other than a Saturday or Sunday or any other day on which commercial banks are authorized to close, or are in fact closed, in the State of Delaware or the State of Oklahoma and, for the purpose of the Closing Date, means a day on which the FAA is open for the filing of title documents.

"**Cape Town Treaty**" means, collectively, the official English language texts of (i) the Convention on International Interests in Mobile Equipment, signed at Rome on May 9, 2003; (ii) the Protocol to the Convention; (iii) the procedures for the International Registry issued by the supervisory authority thereof pursuant to the Convention and the Protocol to the Convention; and (iv) the regulations for the International Registry issued by the supervisory authority thereof pursuant to the Convention and the Protocol, as the same may be amended or modified from time to time.

"**Closing**" means the consummation of the purchase and sale transaction contemplated by this Agreement.

"**Closing Date**" has the meaning ascribed to the term in Section 4.1.

"**Damage History**" shall mean (a) damage, the repair of which would constitute a "major repair" as such term is defined in 14 C.F.R. Part 43, Appendix A, Paragraph (b); (b) damage, the repair of which would require the issuance of an FAA Form 337 if completed by a repair station other than the manufacturer (whether or not an FAA Form 337 has actually been issued); or (c) the existence of any nonstandard inspection

or inspection interval, which requires any deviation from the original approved manufacturer's aircraft build specification or standard production configuration.

**"Delivery Conditions"** has the meaning ascribed to the term in Section 3.1.

**"Delivery Location"** means the Inspection Location.

**"Delivery Receipt"** means an Aircraft Delivery Receipt in the form of Exhibit D attached hereto.

**"Deposit"** means a cash deposit in the amount of one million United States dollars (US$1,000,000.00).

**"Engines"** means two (2) Rolls Royce model BR725A1-12 series engines bearing manufacturer's serial numbers 25713 and 25712 (described on the International Registry as ROLLS ROYCE model BR725 bearing manufacturer's serial numbers 25713 and 25712) together with any and all Parts incorporated or installed in or attached thereto or otherwise in Seller's possession and control.

**"Escrow Agent"** means Insured Aircraft Title Service, LLC, located at 21 E. Main St. Oklahoma City, Oklahoma 73104, Attn: Joan Roberts.

**"Escrow Fee"** means the amount of twenty five thousand United States dollars (US$25,000.00), inclusive of International Registry search and registration charges other than fees and charges for a Party to register as a Transacting User Entity which shall be borne by such Party.

**"Event of Default"** has the meaning ascribed to the term in Section 8.4.1.

**"FAA"** means the Federal Aviation Administration of the United States Department of Transportation.

**"FAA Bill of Sale"** means an FAA Aeronautical Center Form 8050-2 Aircraft Bill of Sale.

**"FAA Civil Aviation Registry"** means the FAA Civil Aviation Registry, Aircraft Registration Branch, Mike Monroney Aeronautical Center, 6500 South MacArthur Boulevard, Oklahoma City, Oklahoma 73169.

**"FAR"** means the Aeronautics Regulations of Title 14, Parts 1 to 399 of the United States Code of Federal Regulations, as amended.

**"Inspection"** has the meaning ascribed to the term in Section 3.1.

**"Inspection Discrepancies"** means all Airworthy discrepancies and deficiencies

discovered during the Inspection and any test flight that must be corrected or repaired in order for Seller to deliver the Aircraft to Purchaser in the Delivery Condition on the Closing Date, excluding, in all cases, any discrepancy or deficiency of a cosmetic nature.

**"Inspection Location"** shall mean Seller's hangar in Farmingdale, New York or another mutually acceptable location.

**"Inspection Work Scope"** means the Inspection Work Scope attached hereto as Exhibit B and any additional inspection items requested by Purchaser.

**"International Interest"** shall have the meaning ascribed thereto in the Cape Town Convention.

**"International Registry"** means the International Registry of Mobile Assets located in Dublin, Ireland and established pursuant to the Cape Town Convention, along with any successor registry thereto.

**"International Registry Regulations"** means the official English language text of the regulations for the International Registry issued by the supervisory authority thereof pursuant to the Convention and the Aircraft Protocol, as the same may be amended or modified from time to time.

**"Lien"** means any lien, pledge, mortgage, security interest, lease or other charge or encumbrance or claim or right of others, including, without limitation, rights of others under any engine or parts interchange, loan, lease, or pooling agreement.

**"Material Corrosion"** means corrosion discovered on the Aircraft during the Inspection which exceeds the Manufacturer's allowable limits that cannot be repaired, rectified or terminated on a non-recurring basis such that the Aircraft can be returned to service without (i) a requirement of repetitive or recurring inspections which deviate from the manufacturer's original recommended inspection program, or (ii) required modifications to the component life limitations.

**"Parties"** means Purchaser and Seller collectively.

**"Parts"** means all appliances, components, parts, avionics, instruments, appurtenances, accessories, furnishings or other equipment of whatever nature (other than complete Engines or engines) incorporated or installed in or attached to the Airframe or any Engine identified on Exhibit A.

**"Party"** means a party to this Agreement.

**"Professional User"** and **"Professional User Entity"** have the meanings ascribed to those terms in Section 2.1.12 of the Registry Regulations.

**"Purchase Price"** means the amount of forty four million United States dollars ($44,000,000.00).

**"Registration Application"** means an FAA Aeronautical Center Form 8050-1 Aircraft Registration Application.

**"Registry Regulations"** means the Regulations for the International Registry, which may be obtained online through the International Registry's website at https://www.internationalregistry.aero.

**"Service Contracts"** has the meaning ascribed to term in Section 3.2.1.

**"Technical Acceptance"** has the meaning ascribed to the term in Section 3.3.2.

**"Technical Acceptance Letter"** means a Technical Acceptance Letter in the form of Exhibit C attached hereto.

**"Transacting User"** and **"Transacting User Entity"** have the meanings ascribed to those terms in Section 2.1.11 of the Registry Regulations.

**"Warranty Bill of Sale"** means a Warranty Bill of Sale in the form of Exhibit E attached hereto.

## ARTICLE II.  AGREEMENT TO BUY AND SELL

2.1  **Agreement to Sell and Buy**.  For and in consideration of the Purchase Price, and subject to the terms and conditions set forth herein, Seller hereby agrees to sell and deliver the Aircraft to Purchaser, and Purchaser hereby agrees to purchase and accept delivery of the Aircraft from Seller.

2.2  **Escrow Agent**.  The Parties hereby agree to appoint Escrow Agent as document holder and stakeholder for the sale and purchase of the Aircraft.  Purchaser and Seller shall each pay one-half (½) of the Escrow Fees.

2.3  **Deposit**.  Prior to the execution of this Agreement, Purchaser paid the Deposit to Escrow Agent by wire transfer in immediately available funds.  The Deposit shall be held by Escrow Agent and shall be applied towards the Purchase Price at the Closing or otherwise disbursed in accordance with the provisions of this Agreement.

2.4  **Deposit Refundable**.  The Deposit shall be refundable to Purchaser until such time as Purchaser accepts the Aircraft pursuant to Section 3.3, and thereafter the Deposit shall be non-refundable to Purchaser, subject to Seller's repair and correction of any Inspection Discrepancies, and except as otherwise provided herein.

2.5    **Flight Operations**.   Unless otherwise mutually agreed upon between Seller and Purchaser, following the Parties' execution of this Agreement and until Closing, the Aircraft shall not be flown, except for delivery of the Aircraft by Seller for the Inspection, the test and acceptance flights described herein and for delivery of the Aircraft to the Delivery Location.

### ARTICLE III.  AIRCRAFT CONDITION AND INSPECTION

3.1    **Inspection Authority**.   The Parties acknowledge that prior to the execution of this Agreement, Purchaser performed a visual inspection of the Aircraft at the Inspection Location.   As soon as practical following the execution of this Agreement, Purchaser shall be entitled to perform the Inspection Work Scope and a test flight of the Aircraft in order to determine that the Aircraft is in the condition described in this Section 3.1 (the "Inspection") at the Inspection Location.   The test flight shall not to exceed three (3) hours and will be used to determine that all systems are functioning normally. The test flight will have up to four (4) designated Purchaser representatives of Purchaser on board and shall at all times be under the operational control of Seller and will start and end at the Inspection Location.   The Inspection shall be used to determine that the Aircraft is in the following condition (the "Delivery Conditions"):

3.1.1        In an Airworthy condition.

3.1.2        Free and clear of all Liens.

3.1.3        With all complete and continuous original Aircraft Documents in the English language.

3.1.4        With no loaner or rental equipment installed thereon or thereto.

3.1.5        With no Damage History.

3.1.6        With all FAA Airworthiness Directives and Manufacturers' Mandatory Service Bulletins and mandatory inspections (or equivalents)  with respect to the Aircraft complied with, by terminating action, without deferment or extension that have compliance due dates on or before the Closing Date.

3.1.7        With all Aircraft systems, components and equipment functioning normally and operating in accordance with the guidelines, limits and tolerances established by the manufacturer thereof.

3.1.8        With no Material Corrosion beyond manufacturer's specifications and tolerances.

3.1.9        Current and enrolled on the Gulfstream's Computerized Maintenance Tracking Program (G-CMP).

3.1.10        Current on a standard maintenance program with no nonstandard inspection intervals, waivers or dispositions, with proper functioning of all systems in accordance with the respective manufacturers' maintenance specifications under Part 91 of the FARs.

3.1.11        With all calendar, cycle and hourly inspections completed which are due through Closing Date, by terminating action, without deferment or extension.

3.1.12        In conformity with the Aircraft Specification (as adjusted to reflect current times, landings and cycles).

3.1.13        With certifications for all life-limited and time-controlled components; and in compliance with its type certificate, with no missing placards and in compliance with its type certificate, with no missing placards and with Seller's company name and logos removed or deleted, from the interior and exterior of the Aircraft (including Airshow presentations).

3.1.14        With all Service Contracts in good standing, paid in full through the Closing Date, without any deficiencies, and fully transferrable to Purchaser.

3.2     **Additional Seller Covenants**.  Seller covenants and agrees as follows:

3.2.1     Effective as of the Closing, Seller shall cooperate with Purchaser to cause to be transferred and assigned to Purchaser any of its rights, but not obligations, with respect to any repair or maintenance agreements or programs relating to the Aircraft that are in effect and transferrable or assignable, including without limitation, any subscriptions maintained by Seller to any computerized maintenance programs and any maintenance service programs for the Engines, avionics, APU or other similar agreements, including, without limitation, the contracts described on Exhibit F  (collectively, the "Service Contracts").  Seller shall be responsible for and shall have paid any and all sums owing to providers of Service Contracts with respect to all periods prior to the Closing.  Purchaser shall be responsible for and shall pay any fees associated with the transfer or assignment of such Service Contracts.  Purchaser, at its election, may terminate any Service Contracts after the Closing or choose not to have any Service Contract transferred or assigned.  Prior to Closing, Seller shall provide Purchaser with written confirmation from the service provider of each Service Contract that the Service Contract is in good standing, paid in full through the Closing Date, without any deficiencies, and fully transferrable to Purchaser, at Purchaser's option and cost ("Service Contract Confirmation").  Seller shall cooperate with Purchaser to obtain acceptance and acknowledgement by the

provider of any Service Contract of the transfer or assignment of each such Service Contract.  Seller's obligations in this Section 3.2.1 shall survive Closing.

3.2.2   To the extent that any warranties from manufacturers, prior owners of the Aircraft, service providers or suppliers with respect to the Aircraft are still in effect and are assignable, all rights under such warranties are hereby assigned and transferred to Purchaser effective upon completion of the Closing; provided that Purchaser shall pay any transfer fees.

3.3 **Aircraft Acceptance**.  Within two (2) Business Days after completion of the Inspection, Purchaser shall execute and deliver to Seller the Technical Acceptance Letter and shall therein indicate:

3.3.1   Purchaser's acceptance of the Aircraft "as is, where is and with all faults" basis, subject to the performance by Seller of all of its obligations under this Agreement; or

3.3.2 Purchaser's acceptance of the Aircraft with Inspection Discrepancies. If Purchaser chooses to accept the Aircraft with Inspection Discrepancies, Purchaser shall provide written confirmation in the form of the Technical Acceptance Letter that it will accept delivery of the Aircraft on the Closing Date ("Technical Acceptance"), provided, however, that Purchaser's Technical Acceptance will include a list of Inspection Discrepancies which Seller must correct, at Seller's expense, in order for the Aircraft to comply with the Delivery Conditions. In the event the Parties do not agree as to whether an Inspection Discrepancy violates the Delivery Conditions, final determination of that issue shall be made by a mutually agreed upon third party.

3.3.3.   Purchaser's rejection of the Aircraft. Upon rejection under this subsection 3.3.3, the Parties shall proceed pursuant to Section 3.5 below.

3.4   **Correction of Inspection Discrepancies.**   As soon as reasonably practicable after Purchaser's conditional acceptance of the Aircraft pursuant to Section 3.3.2, Seller, at Seller's sole cost and expense, will remedy all Inspection Discrepancies.

3.5   **Rejection**. In the event that Purchaser rejects the Aircraft pursuant to Section 3.3.3, the Deposit shall immediately be refunded to Purchaser (less any unpaid costs of the Inspection, less any unpaid Flight Costs (defined below) and less Purchaser's share of Escrow Fees, if any, which shall be retained by Escrow Agent), and this Agreement shall terminate and be of no further force or effect, and the Parties shall have no further obligations hereunder.

3.7   **Flight Costs**.  Purchaser shall pay all costs and expenses associated with the Inspection. Purchaser shall pay or reimburse Seller the costs incurred in connection with the test flight at a rate of $5,200 per hour, which shall include the cost of fuel ("Flight Costs").

**ARTICLE IV.  CLOSING AND CLOSING PROCEDURES**

4.1 **Date and Time of Closing**.  The Closing shall occur on a mutually acceptable day on or around March 15, 2021; provided however, that if the Inspection Discrepancies are still being repair on March 15, 2021 and then Closing shall occur two (2) days after the remediation of the Inspection Discrepancies (such date being the "Closing Date") and shall take place at the Delivery Location.

4.2 **Pre-Closing Deliveries**.

4.2.1 Immediately upon execution of this Agreement and immediately prior to Closing, Escrow Agent shall prepare and deliver to Purchaser and Seller title reports for the Airframe and each Engine, which reports shall include relevant information from both the FAA Civil Aviation Registry and the International Registry.

4.2.2 Prior to the Closing, Seller shall deliver each of the following to the Escrow Agent:

4.2.2.1 An undated, but otherwise fully executed, FAA Bill of Sale.

4.2.2.2 An undated, but otherwise fully executed, Warranty Bill of Sale.

4.2.2.3 An **original** court order from the United States Bankruptcy Court on case No. 20-34682 ordering the sale of the Aircraft free and clear of all Liens (the "Order").

4.2.3 Prior to the Closing, Purchaser shall deliver each of the following to the Escrow Agent:

4.2.3.1 An undated, but otherwise fully executed, Registration Application.

4.2.3.2 Funds in an amount equal to the sum of the Balance of the Purchase Price, plus one-half of the Escrow Fee, plus any Flight Costs described in Section 3.7 which haven't already been paid.

4.2.4 Prior to the Closing, Seller shall position the Aircraft at the Delivery Location.

4.2.5 Prior to the Closing, Seller shall deliver to Purchaser the Service Contract Confirmation(s).

4.2.6 Prior to the Closing, Seller and Purchaser shall each register as a Transacting User Entity with the International Registry and shall each appoint an Administrator; and the Administrator for each of Seller and Purchaser shall appoint Escrow

Agent as their Professional User Entity with the International Registry for purposes of registering and consenting to the registration of the purchase of the Airframe and each Engine by Purchaser, and any other related actions.

THE PRE-POSITIONING OF ANY DOCUMENT OR THE BALANCE OF THE PURCHASE PRICE WITH THE ESCROW AGENT IS FOR THE CONVENIENCE OF THE PARTIES ONLY SO THAT THEY MAY BE RELEASED AT THE ORAL OR WRITTEN DIRECTION OF THE DEPOSITING PARTIES FOLLOWING SATISFACTION OF ANY CONDITIONS CONTAINED HEREIN, AND SHALL NOT BE CONSTRUED AS OR IMPLY ACCEPTANCE OF THE AIRCRAFT OR CONVEYANCE OF TITLE THERETO, WHICH MAY ONLY OCCUR AS SPECIFICALLY PROVIDED IN THIS AGREEMENT.

4.3     **Conditions Precedent to Seller's Obligations**.  Seller's obligation to sell and deliver the Aircraft to Purchaser on the Closing Date shall be subject to the following conditions precedent:

4.3.1   At the time of Closing, Purchaser shall not be in breach or default of any of Purchaser's obligations arising under this Agreement.

4.3.2   Prior to the Closing, Purchaser shall have delivered to the Escrow Agent the Balance of the Purchase Price plus one-half of the Escrow Fee, plus any Flight Costs described in Section 3.7 which haven't already been paid.

4.3.3   Prior to the Closing, Purchaser shall have delivered to the Escrow Agent an undated, but otherwise fully executed, Registration Application.

4.3.4   Prior to the Closing, Purchaser shall have registered as a Transacting User Entity with the International Registry and shall have appointed an Administrator; and Purchaser's Administrator shall have appointed the Escrow Agent as Purchaser's Professional User Entity with the International Registry.

4.3.5   At the time of Closing, all of Purchaser's representations set forth in Section 5.2 shall be true and accurate.

4.4     **Conditions Precedent to Purchaser's Obligations**.  Purchaser's obligation to purchase and accept delivery of the Aircraft from Seller on the Closing Date shall be subject to the following conditions precedent:

4.4.1   At the time of Closing, Seller shall not be in breach or default of any of Seller's obligations arising under this Agreement.

4.4.2   At the time of Closing, all of Seller's representations set forth in Section 5.1 shall be true and accurate.

4.4.3   Prior to the Closing, Seller shall have delivered to Purchaser the Service Contract Confirmation(s) and to the Escrow Agent an undated, but otherwise fully executed, FAA Bill of Sale, and an undated, but otherwise fully executed, Warranty Bill of Sale.

4.4.4   Prior to the Closing, Seller shall have registered as a Transacting User Entity with the International Registry and shall have appointed an Administrator; and Seller's Administrator shall have appointed the Escrow Agent as Seller's Professional User Entity with the International Registry.

4.4.5   Prior to Closing, Seller shall have positioned the Aircraft to the Delivery Location in the Delivery Condition.

4.5   **Closing**.  Subject to the condition that all the Conditions Precedent set forth in Section 4.3 and Section 4.4 have been satisfied or waived, at the date and time of the Closing determined in accordance with Section 4.1, the Parties shall perform the following actions, all of which collectively shall constitute the Closing:

4.5.1   Seller shall deliver the Aircraft to Purchaser at the Delivery Location and the Aircraft shall meet the Delivery Conditions.

4.5.2   Purchaser shall accept delivery of the Aircraft from Seller at the Delivery Location and Purchaser's representative at the Delivery Location shall execute the Delivery Receipt (except that the time of delivery shall be left blank until Escrow Agent advises the time of recording of the FAA Bill of Sale in the FAA Civil Aviation Registry), and fax or scan the executed Delivery Receipt to the Escrow Agent.

4.5.3   Seller and Purchaser shall commence a conference call with Escrow Agent, during which Seller and Purchaser shall instruct the Escrow Agent to perform the following tasks:

4.5.3.1 Purchaser shall instruct the Escrow Agent to register the sale of the Airframe and Engines to Purchaser following filing of the FAA Bill of Sale and the Aircraft Registration Application with the FAA Civil Aviation Registry; to file the Order; to release to Seller, or as designated in the Order, the Purchase Price, less one-half of the Escrow Fee which shall be retained by Escrow Agent.

4.5.3.2 Seller shall instruct the Escrow Agent to date and file the Order, the FAA Bill of Sale in the FAA Civil Aviation Registry; to discharge any registration with the International Registry by Seller of any international interest in the Aircraft; to consent on behalf of Seller to Purchaser's registration with the International Registry of the sale of the Airframe and Engines to

Purchaser; and to date and to deliver the Warranty Bill of Sale to Purchaser.

The Parties intend that each of the foregoing actions shall be deemed to have occurred simultaneously and that each is interdependent with all of the others.  Once the Closing process described in this Section 4.5 has begun, it shall be irrevocable, and no one shall have any right to demand or comply with any demand that the process be stopped prior to completion of each of the foregoing steps.

4.6   **International Registry Matters**.   Prior to Closing, Seller shall apply to the International Registry for approval as a Transacting User Entity, and at or after the Closing Seller shall either provide its consent, or shall designate Escrow Agent as Seller's Professional User Entity for the purpose of providing consent, to the registration by Purchaser of a contract of sale evidencing the transfer of title to the Airframe and Engine(s) to Purchaser.

## ARTICLE V. REPRESENTATIONS AND WARRANTIES

5.1   **Seller's Representations and Warranties.**   Seller hereby represents and warrants as follows:

5.1.1   Seller owns legal title to the Aircraft. At the time of the Closing, Seller shall convey to Purchaser legal, good, and marketable title to the Aircraft, free and clear of all Liens whatsoever, and Seller will warrant and defend such title forever against all claims and demands whatsoever.

5.1.2   At the time of the Closing, Seller's covenants in Section 3.2 shall be true and correct.

5.1.3   Seller is a corporation duly formed, validly existing, and in good standing under the laws of the State of Delaware, having the capacity to sue and be sued in its own name, having full power, legal right and authority to execute, deliver and perform this Agreement.

5.1.4   This Agreement has been duly authorized by all necessary corporate action, executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

5.1.5   The execution and delivery of this Agreement and the performance by Seller of its obligations hereunder do not violate or conflict with any provision of Seller's constitutional documents, or any law, regulation, order, writ or injunction of any court or governmental authority; or any obligation, restriction or agreement entered into or binding on Seller or by which any of Seller's assets may be bound or affected, whether relating to the Aircraft or otherwise, and do not constitute a breach or grounds for the occurrence of declaration of a default thereof.

5.2   **Purchaser's Representations and Warranties.**   Purchaser hereby represents and warrants as follows:

5.2.1   Purchaser is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of Delaware, having the capacity to sue and be sued in its own name, having full power, legal right and authority to execute, deliver and perform this Agreement.

5.2.2   This Agreement has been duly authorized by all necessary legal action, executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

5.2.3   The execution and delivery of this Agreement and the performance by Purchaser of its obligations hereunder do not violate or conflict with any provision of Purchaser's constitutional documents, or any law, regulation, order, writ or injunction of any court or governmental authority; or any obligation, restriction or agreement entered into or binding on Purchaser or by which any of Purchaser's assets may be bound or affected, whether relating to the Aircraft or otherwise, and do not constitute a breach or grounds for the occurrence of declaration of a default thereof.

### ARTICLE VI. DISCLAIMER AND LIMITATION OF LIABILITY

6.1   PURCHASER ACKNOWLEDGES THAT THE AIRCRAFT IS BEING SOLD SUBJECT TO INSPECTION AND DELIVERED TO PURCHASER IN "AS IS, WHERE IS, AND WITH ALL FAULTS" CONDITION, AND THAT ALL DELIVERY CONDITIONS SPECIFIED IN THIS AGREEMENT SHALL EXPIRE AND BE OF NO FURTHER FORCE OR EFFECT AS OF THE CLOSING.  NEITHER SELLER, NOR ITS REPRESENTATIVES MAKE, GIVE, OR EXTEND, AND PURCHASER HEREBY DISCLAIMS AND RENOUNCES, ANY AND ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER, EXPRESS OR IMPLIED, WHETHER ARISING IN LAW, IN EQUITY, IN CONTRACT, OR IN TORT, AND INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, AIRWORTHINESS, DESIGN, CONDITION, OR FITNESS FOR A PARTICULAR USE.  IN NO EVENT MAY SELLER OR ITS REPRESENTATIVES BE HELD LIABLE TO PURCHASER FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY

KIND. NOTHING IN THIS SECTION 6.1 IS INTENDED TO LIMIT IN ANY WAY SELLER'S REPRESENTATIONS AND WARRANTIES IN SECTION 5.1, WHICH SHALL SURVIVE THE CLOSING.

## ARTICLE VII.  TAXES

7.1     **Taxes for Seller's Account.**  Seller warrants and represents that it has paid all sales, use, property, excise and other similar taxes, and any and all taxes, duties, fees, interest, penalties, assessments, charges, claims, invoices or statements imposed or imposable by any federal, state, county, local, foreign or other governmental authority, entity or party with respect to the Aircraft and Seller's ownership and usage of the Aircraft, incurred, arising or attaching with respect to any period prior to the Closing, including all taxes incurred as of the lien date prior to the Closing or, to the extent that it has not, Seller agrees to pay any and all of the foregoing as and when due and to indemnify, defend and hold harmless Purchaser in connection thereto.  Seller's obligations under this Section 7.1 shall survive Closing.

7.2     **Taxes for Purchaser's Account.**  The Purchase Price does not include any taxes, duties, fees or assessments, including, without limitation, any sales, use, transfer, recording, personal property, excise, consumption, goods and services, luxury, value added or other similar taxes, duties or assessments ("Taxes"), which may be levied, assessed or imposed by any foreign, federal, state or local governmental authority or agency on or as a result of the sale transaction contemplated herein or other matters or things covered hereunder, or on the Aircraft or the use thereof by Purchaser arising after the Closing, or on the sale, delivery, ownership, registration or transfer from Seller to Purchaser.  Purchaser shall indemnify, defend and hold Seller harmless from and against, any and all such Taxes (including any interest and penalties).  Notwithstanding the foregoing, Purchaser shall not be liable or obligated under any circumstances to pay any taxes imposed on the income or gains of Seller, all of which shall be the sole responsibility of Seller.  Upon Seller's request, and, if appropriate and applicable, Purchaser shall provide Seller a certificate or affidavit asserting and representing that Purchaser is entitled to an exemption, exception, or exclusion from, any and all sales taxes, use taxes, retail taxes, excise taxes, or other taxes, duties, and fees of any and every kind or nature whatsoever that may be imposed on Purchaser, Seller, or both, by any federal, national, state, county, local, or other governmental authority, as a result of the sale or delivery of the Aircraft or the purchase, use, storage or other consumption of the Aircraft.  Purchaser's obligations under this Section 7.2 shall survive delivery and acceptance of the Aircraft.

**ARTICLE VIII.  MISCELLANEOUS**

8.1     **Termination Without Cause.**  This Agreement may be terminated without cause at any time before the Closing by the mutual written agreement of Seller and Purchaser.  The rights of the Parties upon such termination shall be set forth in the mutual written agreement of Seller and Purchaser.

8.2     **Continuing Obligations**.  Each Party shall take, or cause to be taken, such actions, and will execute and deliver, or cause to be executed and delivered, such additional documents and instruments, and will do, or cause to be done, all such actions as are necessary, convenient, proper, or advisable, prior to, in conjunction with, and after the Closing, to effectuate the transactions contemplated in this Agreement.

8.3     **Risk of Loss.**  Seller shall bear all risk of loss, damage, or destruction of the Aircraft occurring prior to the time of filing of the FAA Bill of Sale with the FAA Civil Aviation Registry.  Purchaser shall bear all risk of loss, damage, or destruction of the Aircraft occurring subsequent to the Closing.  Notwithstanding any contrary provision of this Agreement, if at any time prior to the Closing the Aircraft is destroyed or damaged beyond economic repair, as determined by Seller and Seller's insurance carrier in their reasonable discretion, this Agreement shall terminate, and Escrow Agent shall refund the Deposit to Purchaser and neither Party shall have any further obligation to the other.

8.4     **Defaults and Remedies**.

    8.4.1   **Events of Default**.  If any one or more of the following events of default (each an "Event of Default") shall occur, then this Agreement may, at the option of the Party not in default, be terminated:

        8.4.1.1 If Purchaser shall default in the due and punctual payment of any sum due to Seller, which default shall continue for five (5) days after receipt of written notice of default by Purchaser.

        8.4.1.2 If either Party shall default in the performance of any of the provisions contained in this Agreement, which default shall continue for five (5) Business Days after receipt of written notice of default by the defaulting Party.

    8.4.2   **Purchaser's Remedies**.  Upon the occurrence of an Event of Default by Seller, and provided Purchaser is not then in breach or default of this Agreement, Purchaser shall have the option to terminate this Agreement by written notice to Seller, and upon such notice the Escrow Agent  shall refund the Deposit to Purchaser and Seller shall reimburse Purchaser within three (3) Business Days of

such termination for Purchaser's Inspection costs and any Flight Costs to the extent previously paid by Purchaser.  Purchaser's right to receive a refund of the Deposit and reimbursement of Inspection costs and Flight Costs to the extent previously paid shall be the sole remedy available to Purchaser in the event Seller defaults on Seller's obligations under this Agreement and Purchaser waives any other remedies that may be available to Purchaser at law or in equity.

8.4.3   **Seller's Remedies**.  Upon the occurrence of an Event of Default by Purchaser, and provided Seller is not then in breach or default of this Agreement, Seller shall have the option to terminate this Agreement by written notice to Purchaser and Escrow Agent.  If Seller elects to terminate this Agreement under this Section, Seller shall retain the Deposit as liquidated damages, and this Agreement shall be of no further force or effect.  Seller acknowledges and represents that the liquidated damages amount provided for in this Section is a reasonable estimate of the damages that would be incurred by Seller in the event Purchaser defaults on Purchaser's obligations under this Agreement. Seller's right to retain the Deposit shall be the sole remedy available to Seller in the event Purchaser defaults on Purchaser's obligations under this Agreement, and Seller waives any other remedies that may be available to Seller at law or in equity.

8.5   **Amendments.**  The provisions of this Agreement may not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by the Parties.

8.6   **Severability.**  Any provision of this Agreement that may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.7   **Assignment**.  Neither Party may assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other Party. Notwithstanding the prior sentence, Purchaser may, without the prior written consent of Seller: (i) assign this Agreement to a party controlled by or under the common ownership and control with Purchaser; (ii) assign this Agreement to an owner trust or (iii) assign its right under this Agreement to a financial or other institution that will provide financing.  Any purported or attempted assignment in violation of this Section shall be null and void and of no effect.

8.8   **Successor and Assigns**.  This Agreement shall inure to the benefit of and be binding upon each of the Parties hereto and their respective successors and assigns.

8.9    **Headings and References**.  The division of this Agreement into sections, and the insertion of headings, are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

8.10   **Counterparts**.  This Agreement may be executed in any number of counterparts, and by each of the Parties on separate counterparts, each of which, when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile, .pdf file, or other electronic means shall be equally as effective as delivery of a manually executed original counterpart of this Agreement.

8.11   **Notices**.  All communications, declarations, demands, consents, directions, approvals, instructions, requests and notices required or permitted by this Agreement shall be in writing and shall be deemed to have been duly given or made when delivered personally, or transmitted by facsimile (provided confirmation of successful transmission is received by the sending facsimile machine at the time of transmission) or electronic mail (provided that a transmission error message is not received by sender), or in the case of documented overnight delivery service or registered or certified mail, return receipt requested, delivery charge or postage prepaid, on the date shown on the receipt therefor, in each case at the address set forth below.

If to Purchaser:        Surebliss LLC
                        c/o DDK & Company
                        1 Penn Plaza, 4th Floor
                        New York, NY 10119
                        Attention: Jeffrey Feinman
                        E-Mail: jfeinman@ddkcpas.com

with a copy (which shall not constitute notice) to:

                        Aerlex Law Group
                        11900 West Olympic Boulevard, Suite 450
                        Los Angeles, California 90064
                        Attention: Amanda M. Applegate, Esq.
                        E-Mail: aapplegate@aerlex.com

If to Seller:           Bouchard Transportation Co. Inc.
                        58 S. Service Road, Suite 150
                        Melville, New York 11747
                        Attention: Morton S. Bouchard III
                        E-Mail: MSBIII@bouchardtransport.com

If to Escrow Agent:    Insured Aircraft Title Service, Inc.
                       21 E. Main St.
                       Oklahoma City, OK. 73104
                       Attention: Joan Roberts
                       Email: jroberts@insuredaircraft.com

Seller shall provide to Purchaser a copy of all communications, declarations, demands, consents, directions, approvals, instructions, requests and notices sent by Seller to Escrow Agent, and Purchaser shall provide to Seller a copy of all communications, declarations, demands, consents, directions, approvals, instructions, requests and notices sent by Purchaser to Escrow Agent.

8.12   **Attorney Fees**.   In the event it becomes necessary to enforce the terms of this Agreement by litigation or otherwise, each Party shall be responsible for its own attorney fees and court costs, including any such fees or costs arising from subsequent appeals and efforts to execute on any judgment.

8.13   **Non-Waiver**.   Any failure at any time of either Party to enforce any provision of this Agreement shall not constitute a waiver of such provision or prejudice the right of such Party to enforce such provision at any subsequent time.

8.14   **Entire Agreement**.   The Parties agree that the terms and conditions of this Agreement constitute the entire agreement between the Parties.   This Agreement supersedes all prior agreements between the Parties, express or implied.

8.15   **Transaction Costs and Expenses**.   Each Party to this Agreement shall bear its own transaction costs and expenses, including, without limitation, any brokers' commissions and/or attorneys' fees.

8.16   **Brokerage Fees and Expenses**.   Each Party shall pay, and shall defend, indemnify, and hold the other party harmless from and against, all brokerage fees and commissions due and payable to such Party's broker and any other aircraft brokers or other persons or entities arising from any actual or alleged relationship with such Party arising from the sale or purchase of the Aircraft.

8.17   **Force Majeure**.   Seller shall not be liable for any failure of or delay in the correction of any Inspection Discrepancies, or in the delivery of the Aircraft to Purchaser, for the period that such failure or delay is due to acts of God or the public enemy; war, insurrection or riots; fires, governmental actions; strikes or labor disputes; inability to obtain Aircraft materials, accessories, equipment, or parts from the vendors; or any other cause beyond Seller's absolute control.   Upon the occurrence of any such event, the time required for performance by Seller of its obligations arising under this Agreement shall be extended by a period equal to the duration of such event.

Purchaser shall have the right to terminate this Agreement on written notice to Seller and the Escrow Agent if such failure or delay continues for more than 30 days in the aggregate.  In that case, the Escrow Agent shall refund the Deposit and any amounts paid by Purchaser to the Escrow Agent in respect of the Purchase Price to Purchaser and thereafter, neither party shall have any obligation or liability to the other with respect to the subject matter of this Agreement other than any that expressly survive the termination of this Agreement.

8.18   **Time is of the Essence**.  Time shall be of the essence for all events contemplated hereunder.

8.19   **Agreement Negotiated**.  The Parties are sophisticated and have been represented or had the opportunity to be represented in connection with the negotiation and performance of this Agreement.  The Parties agree that no presumptions relating to the interpretation of contracts against the drafter of any particular clause should or may be applied in this case and, therefore, waive their effects.

8.20   **Confidentiality**.   The terms and conditions of this Agreement, and all writings, discussions, and negotiations in connection with the transaction contemplated by this Agreement (including, without limitation, the fact that discussions and negotiations have been conducted by the Parties), shall remain strictly confidential and shall not be disclosed by either Party, without the prior written consent of the other Party, except that each Party shall be entitled to disclose the terms and conditions of this Agreement to such Party's attorneys, accountants, consultants, and other advisors performing services for such Party with respect to or affected by the transaction contemplated by this Agreement.

8.21   **Governing Law**.  This Agreement has been negotiated and delivered in the State of Delaware and shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, without giving effect to its conflict of laws provisions.

8.22   **Marketing.**  From the date of execution of this Agreement by the Parties hereto until the earlier to occur of (i) the Closing of the sale of the Aircraft to Purchaser or (ii) the date of termination of this Agreement in accordance with its terms (the "No Shop Period"), the Aircraft shall be subject to Purchaser's exclusive right to purchase.  Neither Seller nor any agent or other person acting on its behalf will directly or indirectly solicit or entertain offers from, negotiate with or in any manner encourage, discuss, accept or consider any proposal of any person other than Purchaser relating to the acquisition, through purchase, lease or otherwise, of the Aircraft or any interest therein; provided, however, that the Parties acknowledge that certain advertising remains in place for the Aircraft which shall not be deemed to violate the terms of the foregoing restriction during the No Shop Period (for instance, as a result of lead time required for certain advertisements, the Aircraft may continue to be listed for a limited period of time after

the date hereof) and that Seller may receive unsolicited offers during the No Shop Period. Seller agrees tht it and its agents with inform all such prospective purchaser and their agents or other representatives that the Aircraft is under "contract".

*   *   *   ***Signature Page Follows***   *   *   *

**Agreement of Escrow Agent**

Purchaser and Seller hereby appoint Escrow Agent as document holder and stakeholder for the sale and purchase of the Aircraft, and Escrow Agent accepts such appointment for and in consideration of the Escrow Fee. The parties acknowledge that Escrow Agent is acting as a document holder and stakeholder only, its duties being purely ministerial, at their request and for their convenience, that Escrow Agent shall not be deemed to be the agent or trustee for either of the parties, and that Escrow Agent shall not be liable to either of the parties for any act or omission unless it involves willful misconduct or negligence on its part. Escrow Agent confirms that the Deposit and Balance of the Purchase Price as being, or shall be upon receipt, held with respect to the sale of the Aircraft as contemplated by this Agreement.

Notwithstanding the provisions contained in Section 8.21 of the Agreement, the competent courts of the State of Oklahoma or the United States District Court for the Western District of Oklahoma, USA, shall have exclusive jurisdiction to hear all disputes against the Escrow Agent and no other courts shall have any jurisdiction whatsoever in respect of such disputes against the Escrow Agent. Should a dispute arise between Purchaser and Seller relating to the Agreement or any funds or other items which are in the possession of the Escrow Agent, the Escrow Agent shall be entitled to interplead any funds or other items in its possession with the competent courts of the State of Oklahoma or the United States District Court for the Western District of Oklahoma, USA. The foregoing shall not affect the governing law and jurisdiction provisions contained in Section 8.21 of the Agreement to the extent that any dispute is between only Purchaser and Seller and does not involve the Escrow Agent in any manner.

The undersigned does hereby consent to and join in the foregoing Agreement hereby agreeing to act as Escrow Agent in accordance with the provisions of the Agreement applicable to Escrow Agent.

The Escrow Fees shall be a total of US$25,000.00 and Purchaser and Seller shall each be responsible for one-half (1/2) of said total.

**Escrow Agent:**

**INSURED AIRCRAFT TITLE SERVICE, LLC**

By:_____

Printed Name: Joan Roberts

Title: Escrow Agent

**EXHIBIT A**
**AIRCRAFT SPECIFICATION**


**Gulfstream G650**
**Serial Number 6302      Registration N440MB**

| **Airframe** | **Engines:** Rolls Royce BR725A1-12 | |
|---|---|---|
| 753 Hours Since New | #1 | #2 |
| 391 Landings Since New | 753 | 753 Hours Since New |
| | 391 | 391 Cycles Since New |

**APU:** Honeywell
626 Hours Since New


**Avionics:**
Gulfstream Planeview II
Four (4) Honeywell DU-1310 Flat Panel Display Units with Electronic Terminal Charts
Dual Automatic Flight Guidance System
Autothrottles and Autobrakes
Enhanced Vision, HUD II, EVS II
Triple Honeywell FMS with WAAS/LPV
Triple IRS System
Triple VHF Navigation System
Triple Audio Control Panels
Dual HF Communications with Selcal
Dual GPS Receivers with SBAS/WAAS
Honeywell TCAS II with change 7.1
Honeywell IntuVue 3D Weather Radar System
NEXRAD Weather Uplink Honeywell ADF Receiver
Dual Honeywell Mode S Transponders with
ADSB-Out Version 2.0
EGPWS with Windshear Detection
Cockpit Voice Recorder
Flight Data Recorder
Honeywell LSZ-860 Lightning Sensor System
FANS-1A & CPDLC Compliant
Synthetic Vision System


**Connectivity & Entertainment:**
Jet ConneX KA Band Internet with Satcom

Direct Router

GoGo Business Aviation Axxess II Iridium

Satellite Phone System

Honeywell MCS-7120 Inmarsat Satellite

Phone System

1 Hard wired handset and 4 wireless

Gulfstream CabinView Passenger Flight Info System

Wireless LAN

Three (3) external high definition cameras

One (1) dual slot Blu-ray/DVD/CD Player with

160GB media server

One (1) 17" HD LCD Monitor in Crew Rest

One (1) 12.1" HD LCD Monitor at each seat

Dual (2) 26" HD LCD Monitor in the forward bulkheads

One (1) 32" HD LCD monitor in the credenza

One (1) 16" HD LCD on a swivel mount in the state room

Media Cabinet for Apple interface with 4 HDMI

**<u>Maintenance Programs:</u>**

Engines on Rolls Royce Corporate Care

APU on Honeywell MSP

**<u>Features/Options:</u>**

Runway Awareness Advisory System (RAAS)

Lightning Sensor System (LSS)

Predictive Windshear (PWS)

XM Weather Data System

SecuraPlane 500

**EXHIBIT A-1**
**ANCILLARY ITEMS**

- Spare carpet
- Spare marble
- Maintenance runners
- Full set plates
- Glassware
- Silverware
- Engine covers
- Pitot covers
- 2 pilot headset
- 6 passenger headset
- entertainment TV devices
- cabin vacuum cleaner
- aircraft laptop
- approved MEL
- axle jack and adapter
- wheel nuts socket set
- water servicing tooling
- RAT tooling
- engine covers and all pitot covers
- Two main and two nose wheels built up spare assemblies

**EXHIBIT B**
**INSPECTION WORK SCOPE**

**(A) BORESCOPE INSPECTION OF THE ENGINES AND APU**
**(B) TEST FLIGHT, NOT TO EXCEED THREE (3) HOURS IN DURATION**
**(C) AIRCRAFT DOCUMENTS REVIEW**

**EXHIBIT C**
**TECHNICAL ACCEPTANCE LETTER**

Date:   _____, 2021

To:     Bouchard Transportation Co. Inc.
        58 S. Service Road, Suite 150
        Melville, New York 11747
        Attention: Morton S. Bouchard III

        Re:     **Completion of Inspection**

Dear Sir:

        Pursuant to that certain Aircraft Purchase Agreement (the "Agreement") dated as of the 24th day of February, 2021, by and between Bouchard Transportation Co. Inc. ("Seller") and Surebliss LLC ("Purchaser"), pertaining to that certain 2018 Gulfstream Aerospace Corp. GVI (G650) aircraft, bearing manufacturer's serial number 6302, and Federal Aviation Administration registration number N440MB (the "Aircraft"), this letter confirms that Purchaser has completed its Inspection (as such term is defined in the Agreement) of the Aircraft.

CHECK ONE:

_____   No items were discovered during the Inspection that cause the Aircraft to be out of compliance with the Delivery Condition required by Section 3.1 of the Agreement, and the Aircraft is satisfactory and is hereby accepted in accordance with the terms of the Agreement.

_____   Subject to correction or repair by Seller, at Seller's sole cost and expense, of all Inspection Discrepancies (as such term is defined in the Agreement) listed on Annex "A" hereto and the performance by Seller of all of its other obligations under the Agreement, the technical condition of the Aircraft is hereby conditionally accepted in accordance with the terms of the Agreement.

_____   The Aircraft is hereby rejected.


Capitalized terms used but not defined in this Technical Acceptance Letter have the meanings ascribed to them in the Agreement.

SINCERELY,                                      AGREED AND ACCEPTED:

Surebliss LLC                                   Bouchard Transportation Co. Inc.


By: _____            By: _____
Printed Name: Antoinette Parker                Printed Name:_____
Title:   Manager                               Title:   _____

**EXHIBIT D**
**AIRCRAFT DELIVERY RECEIPT**

Pursuant to that certain Aircraft Purchase Agreement (the "Agreement") dated as of the ____ day of February, 2021, by and between Bouchard Transportation Co. Inc. ("Seller") and Surebliss LLC ("Purchaser"), pertaining to that certain 2018 Gulfstream Aerospace Corp. GVI (G650) aircraft, bearing manufacturer's serial number 6302, and Federal Aviation Administration registration number N440MB (the "Aircraft"), Purchaser hereby acknowledges acceptance of the Aircraft from Seller, at _____ o'clock (am / pm) on the ____ day of _____, 2021, at _____ Airport, in the State of _____. The times on the Aircraft at the time of delivery are as follows:

TOTAL TIME AIRFRAME: _____ hours
TOTAL LANDINGS: _____ landings
TOTAL TIME ENGINES:
           Left Engine: _____ hours
           Right Engine: _____ hours
TOTAL ENGINE CYCLES:
           Left Engine: _____ cycles
           Right Engine: _____ cycles


**PURCHASER**:

Surebliss LLC


By: _____
Printed Name: Antoinette Parker
Title:    Manager

**EXHIBIT E**

**WARRANTY BILL OF SALE**

**KNOW ALL MEN BY THESE PRESENTS:**

Bouchard Transportation Co. Inc. ("Seller"), is the lawful owner of the full legal title to the Airframe, the APU, the Engines, the Parts, the Ancillary Items, and the Aircraft Documents described and referred to herein (all of the foregoing collectively the "Aircraft"):

**"Aircraft Documents"** means a current and validly issued United States Standard Airworthiness Certificate, and all logbooks, manuals, maintenance and inspection records, yellow tags, wiring diagrams, completion/refurbishment records, 8130-3s or equivalent for all life limited components, burn certifications, or required STC's and other technical documentation pertaining to the Airframe or any Engines that are in Seller's possession or control.

**"Airframe"** means that certain 2018 Gulfstream Aerospace Corp. GVI (G650) aircraft, bearing manufacturer's serial number 6302, and Federal Aviation Administration registration number N440MB (described on the International Registry as Gulfstream model Gulfstream GVI), together with any and all Parts incorporated or installed in or attached thereto or otherwise in Seller's possession or control.

**"Ancillary Items"** means all tool kits, spare parts, rotables (including life rafts) support equipment, engine covers, loose equipment and other equipment of whatever nature that is associated with the Airframe and the Engines identified in Exhibit A-1.

**"APU"** means the Honeywell RE220 serial number P-416 auxiliary power unit auxiliary power unit described in greater detail on Exhibit A, hereto, together with all Parts currently incorporated or installed on, attached to, or furnished with, the APU, or which have been removed from the APU but belonging thereto.

**"Engines"** means two (2) Rolls Royce model BR725A1-12 series engines bearing manufacturer's serial numbers 25713 and 25712 (described on the International Registry as ROLLS ROYCE model BR725 bearing manufacturer's serial numbers 25713 and 25712) together with any and all Parts incorporated or installed in or attached thereto or otherwise in Seller's possession and control.

**"Parts"** means all appliances, components, parts, avionics, instruments, appurtenances, accessories, furnishings or other equipment of whatever nature (other than complete Engines or engines) incorporated or installed in or attached to the Airframe or any Engine identified on Exhibit A, and all spare parts in Seller's possession and control.

**THAT**, for good and valuable consideration, receipt and adequacy of which is hereby acknowledged, Seller does as of the date provided below, grant, convey, transfer, deliver and set over all Seller's right, title and interest in and to the Aircraft unto Surebliss LLC ("Purchaser"), and unto Purchaser's successors and assigns.

**THAT**, Seller hereby represents that there is hereby conveyed to Purchaser on the date hereof, good and marketable title to the Aircraft free and clear of any and all liens, claims, and encumbrances, provided that Seller will be solely responsible to warrant and defend such title forever against all claims and demands whatsoever.

**IN WITNESS WHEREOF**, Seller has caused this instrument to be executed and delivered by its duly authorized signatory as of this ____ day of _____, 2021.

**SELLER**:
Bouchard Transportation Co. Inc.

By: _____

Printed Name:_____

Title: _____

**EXHIBIT F**
**SERVICE CONTRACTS**

**Contract Type**                               **Contract #/Reference**

1.  **Rolls Royce CorporateCare – Engines**
2.  **APU on Honeywell MSP**