

The New York Times
620 8TH AVENUE • NEW YORK, NY 10018

# PROOF OF PUBLICATION

Mar-17, 2021

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

Mar 17, 2021, NYT & Natl, pg B3

Sworn to me this 17th day of March, 2021

Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | |
|---|---|
| In re: BOUCHARD TRANSPORTATION CO., INC., *et al.*,[1] | ) Chapter 11 |
| | ) Case No. 20-34682 (DRJ) |
| Debtors. | ) (Jointly Administered) |

**NOTICE OF DEADLINES FOR THE FILING OF PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENTS UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE**

**THE CLAIMS BAR DATE IS APRIL 9, 2021,
AT 5:00 P.M. PREVAILING CENTRAL TIME
THE GOVERNMENTAL CLAIMS BAR DATE IS APRIL 26, 2021
AT 5:00 P.M. PREVAILING CENTRAL TIME**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

***Deadlines for Filing Proofs of Claim***. On March 12, 2021, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. 650] (the "Bar Date Order") establishing certain deadlines for the filing of proofs of claim, including requests for payment under section 503(b)(9) of the Bankruptcy Code (collectively, "Proofs of Claim"), in the chapter 11 cases of the following debtors and debtors in possession (collectively, the "Debtors"): **DEBTOR, CASE NO.:** Bouchard Transportation Co., Inc., 20-34682; B. No. 240 Corp., 20-34680; Tug Barbara E. Bouchard Corp., 20-34681; B. No. 295 Corp., 20-34683; Tug Bouchard Girls Corp., 20-34684; B No. 220 Corporation, 20-34721; Tug Frederick E. Bouchard Corp., 20-34722; Tug Evening Tide Corp, 20-34723; Tug J. George Betz Corporation, 20-34724; B No. 225 Corporation, 20-34725; Tug Evening Star Corp, 20-34726; Tug Jane A. Bouchard Corporation, 20-34727; B No. 230 Corporation, 20-34728; Tug Bouchard Boys Corp., 20-34729; Tug Evening Mist Corp, 20-34730; B No. 252 Corp., 20-34731; Tug Kim M. Bouchard Corp., 20-34732; Tug Evening Light Corp., 20-34733; B No. 205 Corporation, 20-34734; Tug Linda Lee Bouchard Corporation, 20-34735; B No. 272 Corp., 20-34736; Tug Donna J. Bouchard Corp., 20-34737; B No. 210 Corporation, 20-34738; Tug Evening Breeze Corp, 20-34739; B No. 260 Corporation, 20-34740; Tug Marion C. Bouchard Corp., 20-34741; B No. 280 Corporation, 20-34742; Tug Ellen S. Bouchard Corp, 20-34743; B No. 215 Corporation, 20-34744; B No. 262 Corporation, 20-34745; B No. 231 Corporation, 20-34746; B No. 282 Corporation, 20-34747; B No. 264 Corporation, 20-34748; Tug Brendan J. Bouchard Corporation, 20-34749; Tug Ralph E. Bouchard Corp, 20-34750; Tug Rhea I Bouchard Corp, 20-34751; B No. 265 Corporation, 20-34752; B No. 284 Corporation, 20-34753; B No. 233 Corporation, 20-34754; Tug Buster Bouchard Corp, 20-34755; Tug Morton S. Bouchard IV Corporation, 20-34756; B No. 270 Corp., 20-34757; Tug Robert J. Bouchard Corporation, 20-34758; B No. 285 Corporation, 20-34759; Tug Morton S. Bouchard Jr. Corp., 20-34760; Tug Captain Fred Bouchard Corp, 20-34761; Tug Danielle M. Bouchard Corporation, 20-34762; Tug Denise A. Bouchard Corp, 20-34763; B No. 235 Corporation, 20-34764; B No. 242 Corporation, 20-34765; B No. 245 Corporation, 20-34767; B No. 250 Corporation, 20-34768.

***The Bar Dates***. Pursuant to the Bar Date Order, ***all*** entities (except governmental units), including individuals, partnerships, estates, and trusts that have a claim or potential claim against the Debtors that arose prior to September 28, 2020, no matter how remote or contingent such right to payment or equitable remedy may be, ***including*** requests for payment under section 503(b)(9) of the Bankruptcy Code, MUST FILE A PROOF OF CLAIM on or before ***April 9, 2021, at 5:00 p.m., prevailing Central Time*** (the "Claims Bar Date"). Governmental entities that have a claim or potential claim against the Debtors that arose prior to September 28, 2020, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on or before ***April 26, 2021, at 5:00 p.m., prevailing Central Time*** (the "Governmental Bar Date"). All entities holding claims arising from the Debtors' rejection of executory contracts and unexpired leases are required to file Proofs of Claim by the date that is ***the later of*** (a) ***the Claims Bar Date or the Governmental Bar Date,*** as applicable, and (b) the date that is ***thirty days following entry of the order*** approving the Debtors' rejection of the applicable executory contract or unexpired lease (the "Rejection Damages Bar Date"). All entities holding claims affected by an amendment to the Debtors' Schedules are required to file Proofs of Claim by ***the later of*** (a) ***the Claims Bar Date or the Governmental Bar Date***, as applicable, and (b) ***5:00 p.m., prevailing Central Time***, on the date that is ***thirty days from the date on which the Debtors mail notice*** of the amendment to the Schedules (the "Amended Schedules Bar Date").

**ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE ON OR BEFORE THE CLAIMS BAR DATE OR THE GOVERNMENTAL BAR DATE, AS APPLICABLE, SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.**

***Filing a Proof of Claim***. Each Proof of Claim must be filed, including supporting documentation, by either (i) electronic submission through PACER (Public Access to Court Electronic Records at http://ecf.txsb.uscourts.gov), (ii) electronic submission using the interface available on the Claims and Noticing Agent's website at https://cases.stretto.com/bouchard or (iii) if submitted through non-electronic means, by U.S. Mail or other hand delivery system, so as to be ***actually received*** by the Claims and Noticing Agent on or before the Claims Bar Date or the Governmental Bar Date, or any other applicable Bar Date, at the following addresses: **If by First-Class Mail:** Bouchard Transportation Co., Inc., et al., Claims Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602; **If by Hand Delivery or Overnight Mail:** Bouchard Transportation Co., Inc., et al., Claims Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602.

***Contents of Proofs of Claim***. Each Proof of Claim must: (1) be written in legible English; (2) include a claim amount denominated in United States dollars; (3) clearly identify the Debtor against which the claim is asserted (4) conform substantially with the Proof of Claim form provided by the Debtors or Official Form 410; (5) be signed by the claimant or by an authorized agent or legal representative of the claimant on behalf of the claimant, whether such signature is an electronic signature or is ink; and (6) include as attachments any and all supporting documentation on which the claim is based. ***Please note*** that each Proof of Claim must state a claim against only one Debtor and clearly indicate the specific Debtor against which the claim is asserted. To the extent more than one Debtor is listed on the Proof of Claim, a Proof of Claim is treated as if filed only against Bouchard Transportation Co., Inc., or if a Proof of Claim is otherwise filed without identifying a specific Debtor, the Proof of Claim may be deemed as filed only against Bouchard Transportation Co., Inc. A claim that is asserted to be a legal obligation of more than one Debtor shall be filed against each such Debtor separately.

***Electronic Signatures Permitted***. Proofs of Claim signed electronically by the claimant or an authorized agent or legal representative of the claimant may be deemed acceptable for purposes of claims administration. Copies of Proofs of Claim sent by facsimile or electronic mail will not be accepted. Unless otherwise ordered by the Court, any original document containing the original signature of any party other than the party that files the Proof of Claim shall be retained by the filing party for a period of not less than five (5) years after the Debtors' case is closed, and upon request, such original document must be provided to the Court or other parties for review, pursuant to the Administrative Procedures for the Filing, Signing, and Verifying of Documents by Electronic Means in Texas Bankruptcy Courts.

***Section 503(b)(9) Requests for Payment***. Any Proof of Claim that asserts a right to payment arising under section 503(b)(9) of the Bankruptcy Code must also: (1) include the value of the goods delivered to and received by the Debtors in the twenty (20) days prior to the Petition Date; (2) attach any documentation identifying the particular invoices for which such 503(b)(9) claim is being asserted; and (3) attach documentation of any reclamation demand made to the Debtors under section 546(c) of the Bankruptcy Code (if applicable).

***Additional Information***. If you have any questions regarding the claims process and/or you wish to obtain a copy of the Bar Date Notice, a proof of claim form or related documents you may do so by: (i) calling the Debtors' restructuring hotline at 855-923-1038 (U.S./Canada) or 949-236-4792 (International); and/or (ii) visiting the Debtors' restructuring website at: https://cases.stretto.com/bouchard.

[1] Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/bouchard. The location of the Debtors' service address is: 58 South Service Road, Suite 150, Melville, New York 11747.

**LITIGATION | TECHNOLOGY**

# *Purdue Pharma Offers Plan to End Sackler Family Control and Lawsuits*

By JAN HOFFMAN and MARY WILLIAMS WALSH

In a filing that signifies the beginning of the end of the country's most notorious manufacturer of prescription opioids, Purdue Pharma submitted its bankruptcy restructuring plan just before midnight on Monday. The blueprint requires members of the billionaire Sackler family to relinquish control of the company and transforms it into a new corporation with revenue directed exclusively toward abating the addiction epidemic that its signature painkiller, OxyContin, helped create.

The plan, more than 300 pages long, is the company's formal bid to end thousands of lawsuits and includes a pledge from the Sacklers to pay $4.275 billion from their personal fortune — $1.3 billion more than their original offer — to reimburse states, municipalities, tribes and other plaintiffs for costs associated with the epidemic.

If the plan is approved by a majority of the company's creditors and Judge Robert D. Drain of federal bankruptcy court in White Plains, N.Y., payments will start pouring into three buckets: one to compensate individual plaintiffs, like families whose relatives overdosed or guardians of infants born with neonatal abstinence syndrome, as well as hospitals and insurers; another for tribes; and the third — and largest — for state and local governments, which have been devastated by the costs of a drug epidemic that has only worsened during the Covid-19 pandemic.

"With drug overdoses still at record levels, it is past time to put Purdue's assets to work addressing the crisis," said Steve Miller, chairman of Purdue's board of directors, in a statement. "We are confident this plan achieves that critical goal."

Whether the plan will be accepted remains to be seen. Since the company filed for Chapter 11 bankruptcy in 2019, 24 states and the District of Columbia have denounced it, arguing that the process would foreclose their ability to pursue legal action directly against individual Sackler family members, whose contributions, they contend, are insufficient.

Although some details of the settlement terms are still being hammered out, Purdue officials said the Sacklers would not be released from criminal investigations that could be brought by a handful of states for violating consumer protection laws. The plan does, however, release them from further civil litigation.

JANE ROSENBERG/REUTERS

**A court sketch of a virtual hearing in November showing Steve Miller, top row, second from right, the chairman of Purdue Pharma. Mr. Miller entered a guilty plea on behalf of Purdue, a maker of the painkiller OxyContin.**

The new filing, made minutes before a court-imposed deadline, is a milestone in Purdue's long, troubled history as a maker and marketer of OxyContin, the prescription painkiller that turned out to be addictive for hundreds of thousands of people. For years, federal and state authorities tried to curb Purdue's marketing tactics. In 2007, the Justice Department settled with Purdue and top executives for $634.5 million to resolve criminal charges related to its marketing practices.

Beginning in 2015, as the opioid epidemic was tearing through the country, lawsuits brought by cities, counties, states, tribes, families, hospitals and insurers were engulfing drug distributors, dispensing pharmacies and manufacturers, with Purdue chief among them. The cases almost uniformly allege that OxyContin helped lay the groundwork for the epidemic of addiction to prescription and illegal drugs that resulted in the deaths of more than 400,000 people over 20 years.

To halt the mounting civil litigation, which was costing Purdue $2 million a week in related legal fees, the company filed for bankruptcy protection in 2019.

The litigation in federal court against other companies is continuing.

The biggest difference between Purdue's earlier proposals and this latest plan is a payment increase of $1.3 billion from the Sacklers and the addition of two more years (from seven to nine) to their payment schedule.

Another notable change involves control of the new company. The initial proposal from 2019 said it would be overseen by state-appointed officials. The restructuring plan now describes it as a private corporation run by independent managers selected by the states and the local governments that sued Purdue. The largest groups of claimants — tribes and the governmental — own the company and would ensure that revenue went exclusively to programs dedicated to abating the crisis.

By 2024, the company's managers could sell to private owners, but those owners would also be bound by the same rules of conduct and direction of revenue.

While Purdue was working its way through the bankruptcy proceedings, it pleaded guilty to federal criminal charges in November for defrauding health agencies and violating anti-kickback laws.

Individual members of the Sackler family agreed to pay the federal government $225 million in civil penalties, but said in a statement that they had "acted ethically and lawfully." Although the Sacklers were not charged criminally, the Justice Department reserved the right to pursue criminal charges later.

A major goal of the new Purdue plan is to install guardrails assuring that the settlement money will go toward alleviating the epidemic, rather than being disbursed more generally to cover shortfalls in state budgets. Such disbursements were a chief criticism of the 1998 settlement that ended sprawling litigation against the big tobacco companies, to which the opioid litigation is sometimes compared.

Pushed by creditors during the bankruptcy negotiations, the company suggested in its plan that the disbursements follow recent public health principles that were signed by at least two dozen major medical, drug policy and academic institutions and that include attention to drug prevention, youth education, racial equity and transparency.

The plan will be voted on by tens of thousands of parties. Confirmation hearings will ensue, and a conclusion is expected in a few months. From the start of the bankruptcy proceedings 18 months ago, leaders of a major bloc of municipalities signaled their support, as did 24 states.

Lloyd B. Miller, who represents numerous tribes including the Navajo Nation, said his clients were on board.

"It's critical that more opioid treatment funding starts flowing into tribal communities, all the more so given the extraordinary devastation tribes have suffered during the Covid pandemic," he said.

But since 2019, when Purdue filed for bankruptcy, 24 other states — some controlled by Democrats, others by Republicans — and the District of Columbia have opposed the move, noting that Purdue has continued to profit from its OxyContin sales.

Maura Healey, the attorney general of Massachusetts, who was the first to sue individual members of the Sackler family, contended that under this plan, the Sackler payments would come from their investment returns rather than from principal.

"The Sacklers became billionaires by causing a national tragedy," Ms. Healey said in a statement. "They shouldn't be allowed to get away with it by paying a fraction of their investment returns over the next nine years and walking away richer than they are today."

Attorneys general for the opposing states said that although the plan was an improvement over earlier proposals, they still found it disappointing for several reasons. Among those, they said, the plan should be amended to establish "a prompt and orderly wind-down of the company that does not excessively entangle it with states and other creditors."

Two branches of the Sackler family — heirs of two of the brothers who founded the company — said: "Today marks an important step toward providing help to those who suffer from addiction, and we hope this proposed resolution will signal the beginning of a far-reaching effort to deliver assistance where it is needed."

***A company's revenue would go to abating the opioid crisis.***

The eldest brother, Dr. Arthur Sackler, sold his shares before OxyContin was introduced and his relatives are not part of the litigation.

A forensic audit of the Sacklers' finances, commissioned by Purdue in the course of the bankruptcy investigations, determined that from 2008 to 2017 the family earned more than $10 billion from the company. Lawyers for the family said that the full amount was not liquid: More than half went toward taxes and investments in businesses that will be sold as part of the bankruptcy agreement.

Although states and other blocs of creditors have vociferously objected to elements of the plan for 18 months, many factors seem to favor the likelihood of approval: the duration of the litigation, the exorbitant cost to all parties, the urgency of the worsening opioid crisis and the overall depletion of public health resources by the coronavirus pandemic.

The new company would continue to sell OxyContin, a painkiller that is still approved by the Food and Drug Administration under limited circumstances. But it would diversify its products to include generics and a drug to treat attention deficit hyperactivity disorder, as well as set aside new drugs to reverse overdoses and treat addiction, to be distributed on a nonprofit basis as a public health initiative.

# *Facebook Agrees to Pay For Content In Australia*

By LIVIA ALBECK-RIPKA

MELBOURNE, AUSTRALIA — Facebook has agreed to pay Rupert Murdoch's News Corp for its journalism content in Australia, a month after the social media platform temporarily blocked news links inside the country over legislation pressing digital giants to compensate publishers.

The multiyear deal, announced on Tuesday, includes news content from major Murdoch conservative news media like The Australian, a national newspaper; the news site news.com.au; and other metropolitan, regional and community publications.

Last month, Google unveiled its own three-year global agreement with News Corp to pay for the publisher's news content, and Facebook backed down, under heavy criticism, from its drastic step of blocking the sharing or viewing of news links in Australia.

Few details, including how much Facebook will pay News Corp for content, were released.

In a statement on Tuesday, Robert Thomson, chief executive of News Corp, said the agreement, which he called a "landmark," would "have a material and meaningful impact on our Australian news businesses."

News Corp leaders, Mr. Thomson added, had "led a global debate" as the rise of the digital giants impoverished the news industry. With the deal, he said, Facebook's chief executive, Mark Zuckerberg, and his team had helped "fashion a future for journalism, which has been under extreme duress."

Critics said, however, that the deal did little to guarantee the kind of public-interest journalism hailed by the Australian government when it proposed the legislation, which was approved last month.

"There's no guarantee that the public's going to benefit," said Tanya Notley, a senior lecturer in communication at Western Sydney University. She noted that the first major news companies to strike deals with Facebook were conservative and aligned with the current government.

MATTHEW ABBOTT FOR THE NEW YORK TIMES

**A deal with News Corp came a month after content was temporarily blocked.**

Others said it further emphasized the inordinate power of social media companies to control news and public information. "They are the gatekeepers to the news for public consumption," said Marc Cheong, who researches digital ethics at the University of Melbourne.

In a statement, Facebook said the agreements would help people gain access to news articles and breaking-news videos from a network of national, metropolitan, rural and suburban newsrooms.

"We are committed to bringing Facebook News to Australia," said Andrew Hunter, the head of Facebook's partnerships in Australia and New Zealand.

That was a markedly different tone from the one the tech giant struck in February, when Facebook blocked news in Australia.

At the time, William Easton, managing director of Facebook Australia and New Zealand, said of the draft Australian legislation, "The proposed law fundamentally misunderstands the relationship between our platform and publishers who use it to share news content."

While the Australian government has pointed to the consolidation of digital ad spending in companies like Google and Facebook, the tech giants say they benefit news companies by driving traffic to their sites.

Facebook has also announced preliminary pay deals with independent news organizations including Private Media, Schwartz Media and Solstice Media. But so far, it has cemented agreements only with News Corp and Seven West Media, another major conservative news company.

Sky News Australia, also owned by Mr. Murdoch, extended an existing agreement with Facebook.

# *Google to Cut Some App-Store Fees*

By JACK NICAS

Google is cutting in half its commission on developers' first $1 million in app sales, following a similar move by Apple that is aimed at appeasing developers and regulators who accuse the companies of abusing their dominance of the smartphone industry.

Google said that starting July 1, it would take 15 percent of the first $1 million developers take in from certain app sales, down from 30 percent. Google will still charge 30 percent after the first $1 million.

Apple last year said it was halving its app-store commission to 15 percent on companies that earn less than $1 million a year in app sales.

The dual actions reverse years of resistance by the companies to change their app-store commissions, which have become important to their growth.

Rivals have intensified their criticism of the rates, saying they are artificially high because the companies have a duopoly on the distribution of mobile apps. Regulators around the world have begun investigating the commissions as part of larger antitrust probes, and lawmakers in several states are considering bills that would make it more difficult for Apple and Google to impose the fees.

Apple has been largely the focus of the criticism because it forces developers to use its app store to reach iPhone users. Google's Android software allows users to download apps outside of its flagship app store, called the Play Store. Still, Android is the dominant smartphone operating system around the world, underpinning roughly 85 percent of the world's smartphones, according to IDC, a market research firm.

***A move intended to appease developers and regulators.***

Google said its change would halve the app-store fees for 99 percent of Android developers. But while Apple's and Google's moves have earned them positive headlines, they will likely have little impact on the companies' bottom lines, because most of their app-store revenues come from larger developers.

Apple's new policy, for instance, will affect roughly 98 percent of the companies that pay Apple a commission, but those developers accounted for less than 5 percent of App Store revenues last year, according to estimates from Sensor Tower, an app analytics firm.

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

In re: BOUCHARD TRANSPORTATION CO., INC., *et al.*,[1] Debtors. ) Chapter 11 ) Case No. 20-34682 (DRJ) ) (Jointly Administered)

**NOTICE OF DEADLINES FOR THE FILING OF PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENTS UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE**

**THE CLAIMS BAR DATE IS APRIL 9, 2021, AT 5:00 P.M. PREVAILING CENTRAL TIME**

**THE GOVERNMENTAL CLAIMS BAR DATE IS APRIL 26, 2021 AT 5:00 P.M. PREVAILING CENTRAL TIME**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

***Deadlines for Filing Proofs of Claim***. On March 12, 2021, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. 650] (the "Bar Date Order") establishing certain deadlines for the filing of proofs of claim, including requests for payment under section 503(b)(9) of the Bankruptcy Code (collectively, "Proofs of Claim"), in the chapter 11 cases of the following debtors and debtors in possession (collectively, the "Debtors"): **DEBTOR, CASE NO.:** Bouchard Transportation Co., Inc., 20-34682; B. No. 240 Corp., 20-34680; Tug Barbara E. Bouchard Corp., 20-34681; B. No. 295 Corp., 20-34683; Tug Bouchard Girls Corp., 20-34684; B No. 220 Corporation, 20-34721; Tug Frederick E. Bouchard Corp., 20-34722; Tug Evening Tide Corp, 20-34723; Tug J. George Betz Corporation, 20-34724; B No. 225 Corporation, 20-34725; Tug Evening Star Corp, 20-34726; Tug Jane A. Bouchard Corporation, 20-34727; B No. 230 Corporation, 20-34728; Tug Bouchard Boys Corp., 20-34729; Tug Evening Mist Corp, 20-34730; B No. 252 Corp., 20-34731; Tug Kim M. Bouchard Corp., 20-34732; Tug Evening Light Corp., 20-34733; B No. 205 Corporation, 20-34734; Tug Linda Lee Bouchard Corporation, 20-34735; B No. 272 Corp., 20-34736; Tug Donna J. Bouchard Corp., 20-34737; B No. 210 Corporation, 20-34738; Tug Evening Breeze Corp, 20-34739; B No. 260 Corporation, 20-34740; Tug Marion C. Bouchard Corp., 20-34741; B No. 280 Corporation, 20-34742; Tug Ellen S. Bouchard Corp, 20-34743; B No. 215 Corporation, 20-34744; B No. 262 Corporation, 20-34745; B No. 231 Corporation, 20-34746; B No. 282 Corporation, 20-34747; B No. 264 Corporation, 20-34748; Tug Brendan J. Bouchard Corporation, 20-34749; Tug Ralph E. Bouchard Corp, 20-34750; Tug Rhea I Bouchard Corp, 20-34751; B No. 265 Corporation, 20-34752; B No. 284 Corporation, 20-34753; B No. 233 Corporation, 20-34754; Tug Buster Bouchard Corp, 20-34755; Tug Morton S. Bouchard IV Corporation, 20-34756; B No. 270 Corp., 20-34757; Tug Robert J. Bouchard Corporation, 20-34758; B No. 285 Corporation, 20-34759; Tug Morton S. Bouchard Jr. Corp., 20-34760; Tug Captain Fred Bouchard Corp, 20-34761; Tug Danielle M. Bouchard Corporation, 20-34762; Tug Denise A. Bouchard Corp, 20-34763; B No. 235 Corporation, 20-34764; B No. 242 Corporation, 20-34765; B No. 245 Corporation, 20-34767; B No. 250 Corporation, 20-34768.

***The Bar Dates***. Pursuant to the Bar Date Order, ***all*** entities (except governmental units), including individuals, partnerships, estates, and trusts that have a claim or potential claim against the Debtors that arose prior to September 28, 2020, no matter how remote or contingent such right to payment or equitable remedy may be, ***including*** requests for payment under section 503(b)(9) of the Bankruptcy Code, MUST FILE A PROOF OF CLAIM on or before ***April 9, 2021, at 5:00 p.m., prevailing Central Time*** (the "Claims Bar Date"). Governmental entities that have a claim or potential claim against the Debtors that arose prior to September 28, 2020, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on or before ***April 26, 2021, at 5:00 p.m., prevailing Central Time*** (the "Governmental Bar Date"). All entities holding claims arising from the Debtors' rejection of executory contracts and unexpired leases are required to file Proofs of Claim by the date that is ***the later of*** (a) ***the Claims Bar Date or the Governmental Bar Date,*** as applicable, and (b) the date that is ***thirty days following entry of the order*** approving the Debtors' rejection of the applicable executory contract or unexpired lease (the "Rejection Damages Bar Date"). All entities holding claims affected by an amendment to the Debtors' Schedules are required to file Proofs of Claim by ***the later of*** (a) ***the Claims Bar Date or the Governmental Bar Date***, as applicable, and (b) ***5:00 p.m., prevailing Central Time***, on the date that is ***thirty days from the date on which the Debtors mail notice*** of the amendment to the Schedules (the "Amended Schedules Bar Date").

**ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE ON OR BEFORE THE CLAIMS BAR DATE OR THE GOVERNMENTAL BAR DATE, AS APPLICABLE, SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.**

***Filing a Proof of Claim***. Each Proof of Claim must be filed, including supporting documentation, by either (i) electronic submission through PACER (Public Access to Court Electronic Records at http://ecf.txsb.uscourts.gov), (ii) electronic submission using the interface available on the Claims and Noticing Agent's website at https://cases.stretto.com/bouchard or (iii) if submitted through non-electronic means, by U.S. Mail or other hand delivery system, so as to be ***actually received*** by the Claims and Noticing Agent on or before the Claims Bar Date or the Governmental Bar Date, or any other applicable Bar Date, at the following addresses: **If by First-Class Mail:** Bouchard Transportation Co., Inc., et al., Claims Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602; **If by Hand Delivery or Overnight Mail:** Bouchard Transportation Co., Inc., et al., Claims Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602.

***Contents of Proofs of Claim***. Each Proof of Claim must: (1) be written in legible English; (2) include a claim amount denominated in United States dollars; (3) clearly identify the Debtor against which the claim is asserted (4) conform substantially with the Proof of Claim form provided by the Debtors or Official Form 410; (5) be signed by the claimant or by an authorized agent or legal representative of the claimant on behalf of the claimant, whether such signature is an electronic signature or is ink; and (6) include as attachments any and all supporting documentation on which the claim is based. ***Please note*** that each Proof of Claim must state a claim against only one Debtor and clearly indicate the specific Debtor against which the claim is asserted. To the extent more than one Debtor is listed on the Proof of Claim, a Proof of Claim is treated as if filed only against Bouchard Transportation Co., Inc., or if a Proof of Claim is otherwise filed without identifying a specific Debtor, the Proof of Claim may be deemed as filed only against Bouchard Transportation Co., Inc. A claim that is asserted to be a legal obligation of more than one Debtor shall be filed against each such Debtor separately.

***Electronic Signatures Permitted***. Proofs of Claim signed electronically by the claimant or an authorized agent or legal representative of the claimant may be deemed acceptable for purposes of claims administration. Copies of Proofs of Claim sent by facsimile or electronic mail will not be accepted. Unless otherwise ordered by the Court, any original document containing the original signature of any party other than the party that files the Proof of Claim shall be retained by the filing party for a period of not less than five (5) years after the Debtors' case is closed, and upon request, such original document must be provided to the Court or other parties for review, pursuant to the Administrative Procedures for the Filing, Signing, and Verifying of Documents by Electronic Means in Texas Bankruptcy Courts.

***Section 503(b)(9) Requests for Payment***. Any Proof of Claim that asserts a right to payment arising under section 503(b)(9) of the Bankruptcy Code must also: (1) include the value of the goods delivered to and received by the Debtors in the twenty (20) days prior to the Petition Date; (2) attach any documentation identifying the particular invoices for which such 503(b)(9) claim is being asserted; and (3) attach documentation of any reclamation demand made to the Debtors under section 546(c) of the Bankruptcy Code (if applicable).

***Additional Information***. If you have any questions regarding the claims process and/or you wish to obtain a copy of the Bar Date Notice, a proof of claim form or related documents you may do so by: (i) calling the Debtors' restructuring hotline at 855-923-1038 (U.S./Canada) or 949-236-4792 (International); and/or (ii) visiting the Debtors' restructuring website at: https://cases.stretto.com/bouchard.

[1] Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/bouchard. The location of the Debtors' service address is: 58 South Service Road, Suite 150, Melville, New York 11747.

**NOTICE OF PUBLIC SALE**

PLEASE TAKE NOTICE THAT Crossroads Financing, LLC ("Lender") will conduct, through its agent, Hilco Streambank ("Agent"), a sale and disposition of the below described collateral by public sale in accordance with the provisions of N.Y. UCC 9-601 et seq. as follows:

**Description of Property to Be Sold:** Intellectual property, including trademarks, a domain name and goodwill (the "Property"), and inventory of RT Brands, LLC, Robert Talbott, Inc. and RTB Promotion Company, LLC. Lender has a first priority security interest in the Property. **The Property will be sold free and clear of Lender's lien in the Property.**

**Date, Hour and Place of Sale:** Auction for qualified bidders shall convene on April 13, 2021 at 12:00 p.m. Eastern Time (US), and will be conducted via a videoconference platform. Bids are due April 8, 2021 at 12:00 p.m. Eastern Time (US).

**No Warranties:** The Property will be sold "AS IS," "WHERE IS," "WITHOUT ANY WARRANTIES WHATSOEVER, EXPRESSED OR IMPLIED, INCLUDING, WITHOUT LIMITATION, A WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR OR OTHER PURPOSE." The Property is being sold without recourse to Lender, the Agent, their attorneys or representatives. Lender does not claim title to the Property being sold hereunder and disclaims any warranty of title, possession and the like in the sale.

**Participation Requirements, Information and Due Diligence and Terms of Sale:** Potential bidders interested in obtaining information regarding the Property, requirements for participation in the auction, access to the videoconference platform and the terms of the sale and submitting a bid may contact Richelle Kalnit at Hilco Streambank (rkalnit@hilcoglobal.com). **Only qualified bidders will be able to bid on the Property at the auction.** Lender is a qualified bidder and may credit bid all or a portion of its secured claim for the Property.

**Postponement of Auction:** The auction scheduled on the above date, time and location may be postponed. In such event, an announcement of postponement of the scheduled sale will be made by Lender.

Dated: March 12, 2021, Otterbourg P.C., */s/ James M. Cretella*, Attorneys for Lender, 230 Park Avenue, NY, NY 10169, (212) 905-3611

**NOTICE OF PUBLIC SALES UNDER UNIFORM COMMERCIAL CODE**

PLEASE TAKE NOTICE THAT on April 6, 2021, at the hour of 2:00 p.m. Eastern Daylight Time, or as soon thereafter as practicable, Jones Lang LaSalle, on behalf of SPT CHATSWORTH HOLDINGS, L.L.C. and/or its successors and assigns ("Secured Party") will hold a public sale virtually via online video conference (and additionally in person if, at the time of sale, applicable state and city laws and rules as well as relevant building management rules permit the same), pursuant to Section 9-610 of the Uniform Commercial Code as enacted in the State of New York, to sell to the highest qualified bidder all of the right, title and interest of HFZ 344 WEST 72ND STREET LLC ("Debtor") in the proprietary leasehold interest and shares of Chatsworth Realty Corporation appurtenant and relating to Units 1F, 1R, 301, 1101, 1208, A-6A, A-PH, A-TH, PH-E, PH-W, SL008/SL009, TH2 and TH3 (the "Collateral") in the premises commonly known as "The Chatsworth," bounded by West End Avenue, West 71st Street, West 72nd Street, and Riverside Boulevard a/k/a 340-344 West 72nd Street, New York, NY 10023 (Manhattan Block 1183, Lots 50 and 53) (collectively, the "Property"), which Collateral is pledged to secure the Loan (as defined below) with an unpaid balance due as of 12/31/20 of $78,745,218.93.

The sales are being held to enforce the rights of Secured Party under that certain Consolidated, Amended and Restated Promissory Note 1 and that certain Promissory Note 2 (collectively, the "Notes") dated as of December 31, 2012, and that certain Amended and Restated Coop Pledge and Security Agreement dated as of September 27, 2018 (the "Pledge") (the Notes and the Pledge, collectively, the "Loan"), by and among Secured Party and Debtor.

The sales will be held on a "where is, as is" basis, with reserve, and without any representations or warranties of any kind, whether express or implied. There is no warranty relating to title, possession, quiet enjoyment or the like in these dispositions. Secured Party reserves the right to sell the Collateral separately, or to sell all (or any combination) of the Collateral collectively and as an entirety in its sole and absolute discretion. Secured Party reserves the right to establish bidding procedures, to require potential bidders to tender a minimum bid deposit, to approve or reject any bids in its sole discretion, and to have potential bidders demonstrate their ability to perform and close to the satisfaction of Secured Party. Secured Party reserves the right to credit bid at the auction, to assign its bid, and to credit the purchase price against the expenses of the sales and the secured obligations. Secured Party reserves the right to adjourn, continue, or cancel the auction without further notice. The sales shall be held in accordance with the "Terms of Public Sale," which set forth (among other things) the sale procedures, the bidding deposit requirements, and the timing of settlement.

The public sale shall be conducted by Mannion Auctions, LLC, by Matthew D. Mannion, Auctioneer, NYC DCA License No. 1434494-DCA, or other such licensed auctioneer(s) as may be selected by the Secured Party, without further publication or notice.

Any parties interested in further information about the Collateral, the exact location of the sales, the requirements to be a "qualified bidder", and/or the Terms of Public Sale should visit www.344west72ndstcoopuccsale.com or contact Brett Rosenberg at 212-812-5926 or brett.rosenberg@am.jll.com.

The best employers.
The best candidates.
With postings campaigned over 1,300 sites.

T | Jobs

Find a good fit. Visit nytimes.com/jobs