**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| BOUCHARD TRANSPORTATION CO., INC., *et al.*,[1] | ) ) ) | Case No. 20-34682 (DRJ) |
| Debtors. | ) ) ) | (Jointly Administered) (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF
ORDER AUTHORIZING SECOND AMENDMENT TO FINAL DIP ORDER**

**Emergency relief has been requested.  A hearing will be conducted on this matter on April 5, 2021 at 3:30 p.m. (Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

**Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  You will be responsible for your own long-distance charges.  Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691.**

**You may view video via GoToMeeting.  To use GoToMeeting, the Court recommends that you download the free GoToMeeting application.  To connect, you should enter the meeting code "Judge Jones" in the GoToMeeting app or click the link on Judge Jones's home page on the Southern District of Texas website.  Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of the hearing.  To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu.  Select "Judges' Procedures," then "View Home Page" for Judge Jones.  Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**Relief is requested no later than April 5, 2021.**

---

[1] Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/bouchard.  The location of the Debtors' service address is:  58 South Service Road, Suite 150, Melville, NY 11747.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully state as follows in support of this motion.

### <u>Preliminary Statement</u>

1.     As described to the Court in connection with approval of the Debtors' initial DIP facility with Hartree Partners, LP ("<u>Hartree</u>"), the Debtors are in the process of conducting a top-to-bottom operational restructuring in order to completely overhaul a business that previously was unable to sustain even idle operations or otherwise satisfy payment obligations to crewmembers, suppliers, trade vendors, and other core business partners.  Through the tireless work of the Debtors' employees and advisors, the Debtors are well on their way to revitalizing the business by stabilizing operations, including:  (a) successfully regaining the certifications required to service customers; (b) repairing relationships with key counterparties; (c) successfully completing maintenance and repairs on certain vessels to return them to service; and (d) closing the sale of their aircraft.  However, in order to continue the progress that has already been made and successfully accomplish the transformational restructuring, the Debtors require a liquidity injection to fund their restructuring efforts.

2.     From the outset of these chapter 11 cases, the Debtors and their advisors have left no stone unturned in their efforts to unlock the liquidity necessary to pave a viable path to a successful reorganization and expeditious exit from chapter 11.  That process culminated in the DIP facility with Hartree, that the Court approved on a final basis on December 21, 2020.  Although the Debtors received access to the first draw amount provided by the DIP facility with Hartree, the Debtors were unable to obtain access to the second draw.  Over the course of January, February, and March, 2021, however, the Debtors and Hartree negotiated three emergency loans to fund payroll and other employee-related expenses.  The limitations on these emergency loans, however, meant the Debtors still required additional capital to, among other things, service

postpetition trade payables, continue to fund employee payroll and benefits, satisfy bankruptcy costs, and fund vessel repairs necessary to return their revenue-generating assets to ordinary course operation.

3.      To that end, the Debtors negotiated, and the Court subsequently approved, an "advance" on the aircraft sale proceeds through an incremental $5 million debtor-in-possession term loan with their prepetition secured lender, Fortress Credit Co LLC ("Fortress").   On March 15, 2021, the Debtors successfully closed the sale of their aircraft, thereby infusing the Debtors' estate with $10 million in additional liquidity (net of repaying the prepetition aircraft loan and incremental Fortress DIP facility in full).  The incremental liquidity afforded by the proceeds of the aircraft sale bought the Debtors, though insufficient to fund the entire reorganization, critical time to run a comprehensive marketing and outreach process to raise a new DIP facility that will repay Hartree and support a viable path to exit while right-sizing the Debtors' business and returning vessels to operation.

4.      Having closed on the sale of the aircraft and begun the process of developing a measured, achievable operational restart plan, the Debtors and their advisors conducted a robust and competitive replacement DIP marketing process over the course of more than two months to raise new money financing on the best available terms.  The proposed replacement DIP Facility is the product of an extensive prepetition marketing process that launched on February 24, 2021.  As described in further detail in the *Declaration of Richard W. Morgner in Support of the Debtors' Emergency Motion for Entry of an Order Amending the Final DIP Order* (the "Morgner Declaration") attached as **Exhibit A**:

- Jefferies LLC ("Jefferies") contacted or received inbound interest from approximately 130 parties interested in pursuing one or a combination of a DIP financing, exit financing, strategic partnerships, and/or asset sales.  These parties include approximately 105 private equity sponsors or financial

institutions and approximately 25 potential strategic partners operating in the Jones Act market.

- Jefferies and the Debtors' other advisors had numerous telephonic and email conversations with parties who demonstrated significant interest in providing debtor-in-possession financing or other alternative strategic solutions, of which approximately 58 parties are currently under non-disclosure agreements.

- Jefferies received substantial market feedback on the proposed debtor-in-possession financing including indications of interest from seven parties.

- To facilitate due diligence for prospective lenders, Jefferies developed and shared access to a virtual data room which contained information related to key financial, operational, and legal information of the Debtors.

5.      The Debtors received terms sheets from multiple potential replacement DIP lenders, however, after conducting several rounds of negotiations, the Debtors, in consultation with their advisors, have determined that the proposed replacement DIP proposal from JMB Capital Partners Lending, LLC ("JMB" or the "Replacement DIP Lender") is in the best interests of the Debtors and all stakeholders.  The proposed replacement DIP from JMB will provide for a secured debtor-in-possession term loan facility (the "Replacement DIP Facility"), consisting of a new money multiple draw term loan in the aggregate principal amount of up to $90 million, subject to certain conditions set forth below.

6.      Without a new DIP facility, the Debtors will be unable to operate their business, pay employees, vendors, and other suppliers, or administer these chapter 11 cases, and their ability to successfully reorganize will be jeopardized.  Importantly, the Replacement DIP Facility is the best financing option available to the Debtors at this time.   The Debtors believe that the Replacement DIP Facility is the highest and best opportunity to infuse the Debtors with sufficient liquidity to realize on their reorganizational strategy and continue the momentum toward reviving the Debtors' business.  The Replacement DIP Facility will provide a lasting solution to the Debtors' critical liquidity needs, continue to stabilize operations, and enable an expeditious path

to exit from chapter 11.  For the reasons set forth herein, the Debtors believe that entering into the Replacement DIP Facility to provide access to the necessary liquidity will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment.  The Debtors request that the Court enter the Order.

### Relief Requested

7.     The Debtors seek entry of an amended order, substantially in the attached form (the "Order"), (a) approving the Replacement DIP Facility, (b) authorizing the Debtors to enter into that certain Senior Secured Super-Priority Debtors-in-Possession Loan Agreement, substantially in the form attached to the Order as Exhibit 1 (as may be further amended, restated, supplemented, or otherwise modified from time to time, the "Replacement DIP Credit Agreement," and together with the Order, the "Replacement DIP Documents"), including the granting of liens on the Replacement DIP Collateral (as defined therein) and Superpriority claims for the benefit of the Replacement DIP Secured Parties (as defined therein), and (c) granting related relief.

### Jurisdiction and Venue

8.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

9.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The bases for the relief requested herein are sections 105, 363(b), 364(c), and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy

Rules 4001(b), (c), and (d), and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas, and the Final DIP Order.

## Background

11.     The Debtors comprise one of the nation's largest independently-owned ocean going petroleum barge companies. Since their establishment over 100 years ago, the Debtors have expanded their fleet to encompass 24 barges and 25 tugs, all with state-of-the-art equipment and fuel-efficient technologies.

12.     On September 28, 2020, and September 29, 2020 (as applicable to each Debtor, the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the Declaration of Matthew Ray of Portage Point Partners, LLC in Support of the Chapter 11 Petitions and the First Day Motions [Docket No. 79] (the "First Day Declaration"), filed on October 12, 2020.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On September 30, 2020, the Court entered orders [Docket Nos. 30, 31] authorizing procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  On February 25, 2021, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") [Docket No. 563].  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

13.     In support of this motion, the Debtors submit the Morgner Declaration.

## Replacement DIP Facility Overview

14.     While certain of the economic terms and collateral package differ between the Replacement DIP Facility and the Hartree DIP facility, the two financings have several similarities.

However, unlike the Hartree DIP facility, the Replacement DIP Facility removes many of the previous milestones that were unsustainable once the business was stabilized and the Debtors and their advisors had developed an achievable operational restart plan.  The Replacement DIP Credit Agreement is based on the DIP Credit Agreement[2] that the Court previously approved, and the Order, by and large, provides for the Replacement DIP Secured Parties (as defined therein) to "step into the shoes" of the DIP Secured Parties with respect to Court-ordered rights and protections.  A side-by-side comparison of key terms is set forth below.

| Term | Hartree DIP Facility | Replacement DIP Facility |
|---|---|---|
| **Facility Size / Relative Priorities** | $60 million secured by a first lien on nine specified vessels | $90 million secured by a first lien on all 31 vessels that are not Wells Fargo collateral and by a second lien on the Wells Fargo collateral |
| **Use of Proceeds** | Subject to the Sources and Uses attached to the Final DIP Order as Annex B. | Subject to an approved budget, of which the initial version is attached to the Order as Exhibit C. |
| **Fees** | 1.0% Structuring Fee<br><br>$3.0 million Exit Fee, subject to rebate to be agreed if the DIP Lenders provide exit financing | 2.0% Commitment Fee<br><br>5.0% Exit Fee |
| **Original Issue Discount** | 5.0% | None |
| **Interest Rate** | L + 7.00%, per annum, with LIBOR to be determined by the DIP Lender, compounded monthly and payable monthly in kind, subject to a 1.00% LIBOR floor. | 9.0%, payable in cash monthly |
| **Milestones** | To be agreed as a condition to accessing the second draw. | Borrower required to file either a stalking horse purchase agreement or plan of reorganization that repays the Replacement DIP Facility in full and is reasonably acceptable to the Replacement DIP Lenders by no later than December 31, 2021. |
| **Maturity Date** | October 22, 2021 | March 31, 2022 |

---

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Further Hearing, and (G) Granting Related Relief* [Docket No. 334], as amended, *See* [Docket No. 609] (the "Final DIP Order"), or the Order, as applicable.

| Permitted Deviations | In respect of the Sources and Uses, 25%, which shall only apply to expenses relating to (a) employees, (b) insurance, (c) maritime liens and (d) other expenses. | With respect to each Variance Test (as defined in the Replacement DIP Credit Agreement), a variance equal to or less than 25%. |
| --- | --- | --- |
| Wells Fargo Adequate Protection | Unchanged | |
| Challenge Period | Unchanged | |
| Events of Default | Unchanged | |
| Carve-Out | Unchanged | |

## The Debtors Have an Immediate Need for
## Debtor-in-Possession Financing and Use of Cash Collateral.

15.     As discussed in the Debtors' original DIP motion, in order to continue funding these chapter 11 cases as well as continue to restart operations, the Debtors require immediate access to the Replacement DIP Facility.  The Debtors' business is cash intensive, with significant costs required to fund projects and the Debtors' expansive operations, once resumed, and to satisfy obligations to vendors and employees.  As such, the Debtors require the continued access to the additional liquidity provided by the Replacement DIP Facility to, among other things, continue paying employee wages and benefits, pay undisputed trade and maritime lienholder claims, repair vessels to return them to service, fund general and corporate operating needs, and fund the administration of these chapter 11 cases.  *See* Morgner Decl. ¶ 11.  The Debtors' ability to make such payments during these chapter 11 cases is essential to their operational restart and the preservation of their assets.  *See id.*  The proposed Replacement DIP Facility will provide a much-needed liquidity injection to the Debtors' business operations and maximize the likelihood of the Debtors' ability to continue to implement a comprehensive restructuring to revitalize their business.

## Alternative Sources of Financing Are Not Available on Better Terms.

16.     As described in the Morgner Declaration, Jefferies solicited proposals from parties outside the Debtors' existing prepetition capital structure.  *See* Morgner Decl. ¶ 13.  The

prospective third-party lenders were comprised of approximately 105 private equity sponsors or other financial institutions and approximately 25 strategic partners operating in the Jones Act market.  *Id*.  Of these institutions, 58 executed non-disclosure agreements and 7, including JMB, submitted indications of interest for the Replacement DIP Facility.  *See* Morgner Decl. ¶¶ 13–14. Importantly, no party that the Debtors and Jefferies spoke to as part of the marketing process was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis.  *See* Morgner Decl. ¶ 17.

17.     The Debtors decided to focus their efforts on these indications of interest and negotiated the economics, milestones, covenants, and other provisions of the proposed financing. *See* Morgner Decl. ¶ 14.  Following this competitive process, and after conducting several rounds of negotiations, the Debtors and their advisors ultimately determined that the JMB proposal was the highest and best opportunity to infuse the Debtors with sufficient liquidity and operational flexibility to continue momentum toward reviving the Debtors' business.  *See* Morgner Decl. ¶ 15. Among other things, JMB offered the most favorable terms and conditions providing the Debtors with readily available access to cash to fund operations with limited to no operational restrictions. *Id*.

18.     Consequently, beginning on March 17, 2021, the Debtors and their advisors engaged in extensive arm's length negotiations with JMB and subsequently finalized the terms of the Replacement DIP Facility.  *See* Morgner Decl. ¶ 16.  Given the Debtors' urgent need for liquidity, the Debtors and JMB worked expeditiously to negotiate the terms of the Replacement DIP Facility so that it could be presented to the Court for approval before the Debtors' liquidity was projected to dry up in mid-April.  *Id*.  In response to the original proposal received, the Debtors and their advisors negotiated changes to key economic and structural terms of the proposal.  *Id*.

These negotiations involved numerous telephone conferences with the Debtors' management and advisors, the exchange of multiple iterations of term sheet proposals, draft credit agreements, and related documents reflecting the proposed DIP financing terms, and circulation of the proposed DIP budget and other due diligence materials to the Replacement DIP Lenders. *Id.* The Debtors were able to materially improve the terms of the Replacement DIP Facility, including with respect to fees, interest rates, milestones, and other key terms of the Replacement DIP Facility. *Id.*

19.     The Debtors continued to negotiate the terms of the Replacement DIP Credit Agreement, exchanged several drafts with the Replacement DIP Agent and its advisors, and ultimately secured favorable terms. *See* Morgner Decl. ¶ 18. Over the course of approximately one week, the Debtors and the Replacement DIP Agent finalized the terms of the Replacement DIP Credit Agreement, *id.*, the key points of which are summarized herein.

20.     The terms of the Replacement DIP Facility are reasonable, and approval of the Replacement DIP Facility is in the best interests of the Debtors' estates. The Debtors respectfully request entry of the Order approving the Replacement DIP Facility.

### Basis for Relief[3]

**I.     The Debtors Should Be Authorized to Obtain Replacement Postpetition Financing through the Replacement DIP Documents.**

    **A.     Entering Into the Replacement DIP Facility Is an Exercise of the Debtors' Sound Business Judgment.**

21.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the Replacement DIP Documents and obtain access to the Replacement DIP Facility. Courts grant considerable deference to a debtor's business judgment in obtaining

---

[3]     The legal standard and arguments set forth in the DIP Motion and presented at the First Day Hearing are incorporated herein by reference.

postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

22.    To determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

23.    To evaluate whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

24.     The terms of the Replacement DIP Facility are in the best interests of the Debtors, their estates, and are essential to facilitating a value-maximizing outcome in these chapter 11 cases. *First*, the Replacement DIP Facility ensures that the Debtors have adequate liquidity to fund the administration of these chapter 11 cases and the financial and operational flexibility necessary to realize on their operational reorganization plan.  *Second*, the Replacement DIP Facility provides the Debtors with approximately $52.7 million in working capital to fund operations (after repayment of the Hartree DIP facility).  *Third*, the Replacement DIP Facility provides the Debtors with sufficient runway to effectuate a successful reorganization.  *Fourth*, the economic terms of the Replacement DIP Facility are highly competitive and the result of an extensive, arm's-length marketing and negotiation process.  And *fifth*, the Replacement DIP Facility comes with minimal "strings" attached—a single milestone date at the end of this year and appropriate, but minimal, oversight with respect to vessel operations.  Specifically, this milestone requires the Debtors to file with the Court either a motion to sell their assets or a plan of reorganization that repays the Replacement DIP Facility in full and is reasonably acceptable to the Replacement DIP Lenders by no later than December 31, 2021.  The stated maturity date of the Replacement DIP Facility is March 31, 2022.  The Debtors' entry into the Replacement DIP Facility is a reasonable exercise of the Debtors' business judgment.

**B.      The Replacement DIP Facility Is Necessary and Appropriate under the Circumstances and Should Be Approved.**

25.     Section 105(a) of the Bankruptcy Code provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  Section 105(a) grants bankruptcy judges "***broad authority***," *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375 (2007) (emphasis added), and should be "interpreted liberally" so long as any action taken pursuant to section 105(a) is "consistent with the rest of the Bankruptcy Code."

12

*In re Zale Corp.,* 62 F.3d 746, 760 (5th Cir. 1995).  Section 105(a) permits bankruptcy courts to "fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code."  *In re Sadkin*, 36 F.3d 473, 478 (5th Cir. 1994).  The Debtors submit that approval of the Order amending the Final DIP Order is justified under section 105(a) of the Bankruptcy Code to avoid immediate and irreparable harm to the Debtors and their estates.

26.     As set forth in the Morgner Declaration, the Debtors have been unable to access the full final draw under the DIP Facility.  Consequently, the Debtors have undertaken necessary key steps to access liquidity since January 2021.  *See* Morgner Decl. ¶¶ 9–11.  In February and March, 2021, Hartree advanced a total of $1,679,697.61 in emergency loans so the Debtors could make payroll and satisfy other employee-related expenses.  *See* Morgner Decl. ¶ 9.  In addition to the emergency loans provided by Hartree, on March 5, 2021, the Debtors negotiated with Fortress, and the Court approved, an incremental $5 million DIP loan to be repaid from proceeds of the then-pending sale of the Debtors' aircraft.  *See* Morgner Decl. ¶ 10.  On March 15, 2021, the Debtors closed the aircraft sale, infusing their estates with an additional approximately $10 million of liquidity.  *See* Morgner Decl. ¶ 10.

27.     The incremental DIP loan and the plane sale proceeds were but a stopgap measure, and the Debtors forecast that, without access to the Replacement DIP Facility, they will exhaust their cash resources by mid-April.  *See* Morgner Decl. ¶ 11.  The Replacement DIP Facility represents an immediate, comprehensive, and stabilizing solution to both address this impending liquidity shortfall and pave the way to a successful reorganization.  The Replacement DIP Facility will, among other things, allow the Debtors to service postpetition trade payables, fund employee payroll, satisfy the costs of administering these chapter 11 cases, and fund vessel repairs necessary

to return their revenue-generating assets to operation.  Entry into the Replacement DIP Facility is squarely within the Debtors' reasonable business judgment.

## II.     The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents.

28.     Under the Replacement DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the Replacement DIP Agent and the Replacement DIP Lender.  In particular, as noted above, the Debtors have agreed to pay:

a.     ***Interest Rate***:  9.0%, payable in cash monthly.

b.     ***Commitment Fee***:  2% of the aggregate principal amount of the Replacement DIP Commitments.

c.     ***Exit Fee***:  5% of the aggregate principal amount of the Replacement DIP Facility, earned at the time of commitment and payable upon any mandatory or voluntary prepayment, including payment at maturity.

29.     As set forth in the Morgner Declaration, the Debtors believe that the interest and fees to be paid under the Replacement DIP Facility are consistent with the market and appropriate, particularly in light of the circumstances of these chapter 11 cases and the marketing process undertaken, and represent the best financing option presently available to the Debtors. *See* Morgner Decl. ¶ 20.  The Debtors considered the fees described above when determining in their sound business judgment that the Replacement DIP Facility is reasonable and constitutes the best actionable terms on which the Debtors can obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates.  The Court should authorize the Debtors to pay the interest and fees provided under the Replacement DIP Documents in connection with the Replacement DIP Facility.

### III.    The Court Retains Jurisdiction to Amend the Final DIP Order.

30.    The Court retains jurisdiction to enforce and interpret the terms of its own orders.

In addition, paragraph 42 of the Final DIP Order provides:

> *Retention of Jurisdiction*.  The Court shall retain jurisdiction to implement, interpret and enforce the provisions of this Final DIP Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any other order confirming any such chapter 11 plan.

31.    In addition, subparagraph 2(c)(ii) of the Final DIP Order expressly contemplates that the Court may approve amendments to the Final DIP Order, including amendments that increase the aggregate facility size, change the scheduled maturity date, modify the economic terms, or add additional collateral.  *See* Final DIP Order ¶ 2(c)(ii) (authorizing the Debtors to execute, delivery, and perform under, among other things, amendments, supplements, and other modifications to the DIP Documents and providing that Court approval of such modifications will be required in certain circumstances).  Subparagraph 2(c)(v) further authorizes the Debtors to perform "all other acts necessary, appropriate, and/or desirable under or in connection with the DIP Documents."  Approval of the Replacement DIP Facility via an amendment to the Final DIP Order is appropriate and should be approved.

### Emergency Relief Is Appropriate

32.    The Debtors have an immediate need for incremental liquidity.  The Debtors request emergency consideration of this motion because absent the relief requested, the Debtors will suffer immediate and irreparable harm, in that the Debtors may not have sufficient liquidity to, among other things, service postpetition trade payables, fund employee payroll, satisfy the costs of administering these chapter 11 cases, and fund vessel repairs necessary to return their revenue-generating assets to operation.  The Debtors request that the Court approve the relief

requested in this motion on an emergency basis by April 5, 2021, to avoid the consequences of this emergency.

### **Waiver of Stay Period Under Bankruptcy Rule 6004(h) Is Appropriate.**

33.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."  There is no reason to delay the effectiveness of the Order.  Entry into the Replacement DIP Facility is immediately necessary to address the Debtors' critical liquidity needs. Waiver of the 14-day stay period under Bankruptcy Rule 6004(h) is appropriate.

### **Notice**

34.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the Office of the U.S. Trustee; (b) counsel to the Creditors' Committee; (c) Wells Fargo Bank, National Association, and counsel thereto; (d) Hartree Partners, LP, and counsel thereto; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (i) the state attorneys general for states in which the Debtors conduct business; (j) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (k) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).  In light of the nature of the relief requested, no other or further notice need be given.

The Debtors request that the Court enter the Order, granting the relief requested in this motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
March 30, 2021

/s/ Matthew D. Cavenaugh

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:       (713) 752-4221
Email:           mcavenaugh@jw.com
                 ggraham@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (admitted *pro hac* vice)
W. Benjamin Winger (admitted *pro hac* vice)
Whitney Fogelberg (admitted *pro hac* vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:           ryan.bennett@kirkland.com
                 benjamin.winger@kirkland.com
                 whitney.fogelberg@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## **<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## **<u>Certificate of Service</u>**

I certify that on March 30, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## Exhibit A

**Morgner Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| BOUCHARD TRANSPORTATION CO., INC., *et al.*,[1] | ) | Case No. 20-34862 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

**DECLARATION OF RICHARD W. MORGNER
IN SUPPORT OF THE DEBTORS' <u>EMERGENCY</u> MOTION FOR
ENTRY OF AN ORDER AMENDING THE FINAL DIP ORDER**

I, Richard W. Morgner, hereby declare under penalty of perjury as follows:

1.      I submit this declaration (this "<u>Declaration</u>") in support of the *Debtors' Emergency Motion for Entry of an Order Authorizing Second Amendment to Final Order* (the "<u>Motion</u>"),[2] which seeks approval of an Order amending the Final DIP Order to provide for replacement postpetition financing.  Pursuant to the Order, the Debtors seek authorization to obtain a senior secured superpriority debtor-in-possession term loan credit facility, consisting of a new money multiple draw term loan in the aggregate principal amount of up to $90 million, subject to the terms of the Replacement DIP Credit Agreement.[3]

2.      The statements in this Declaration are, except where specifically noted, based on my personal knowledge or views, on information that I have from the Debtors' advisors or

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/bouchard.  The location of the Debtors' service address is:  58 South Service Road, Suite 150, Melville, NY 11747.

[2]   Capitalized terms used but not defined herein have the meanings given to such terms in the Motion or the Replacement DIP Credit Agreement, as applicable.

[3]   The material terms of the proposed Replacement DIP Facility are set forth in detail in the Motion.  For the avoidance of doubt, any description of the proposed terms of the Replacement DIP Facility herein or in the Motion is qualified in its entirety by reference to the Replacement DIP Credit Agreement.

employees working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of business. I am not being specifically compensated for this testimony other than through payments received by Jefferies LLC ("Jefferies") as a professional retained by the Debtors (including certain financing fees). If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

### Professional Background and Qualifications

3.       I am a Managing Director and Joint Global Head of the Debt Advisory & Restructuring Group at Jefferies, a global investment banking firm founded over 50 years ago, with its principal office located at 520 Madison Avenue, 17th Floor, New York, New York 10022. Jefferies is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation. Jefferies, together with its investment banking advisory affiliates, has approximately 3,900 employees located in more than 30 offices around the world. Jefferies and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.

4.       I have more than 28 years of investment banking and restructuring experience. Since joining Jefferies in 2009, I have provided investment banking expertise, and distressed mergers and acquisition and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings. Prior to joining Jefferies, I was a Managing Director and Co-Head of the mergers and acquisitions group at Miller Buckfire, where my primary responsibilities included

advising companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations.

## Retention of Jefferies

5. The Debtors engaged Jefferies to act as their investment banker in connection with the Debtors' proposed restructuring initiatives. Since its engagement, Jefferies has rendered investment banking services to the Debtors in connection with the evaluation of strategic alternatives for restructuring their debt obligations and improving their liquidity and overall financial condition. Jefferies has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to this restructuring.

6. Since Jefferies began working with the Debtors to provide assistance in connection with the Debtors' evaluation of their debtor-in-possession financing alternatives, I, along with other members of the Jefferies team and the Debtors' other restructuring advisors, have become knowledgeable about the Debtors' capital structure, business, finances, liquidity needs, and business operations.

## The Debtors' Need for the Replacement DIP Facility[4]

7. As set forth in the First Day Declaration, the Debtors commenced chapter 11 cases to, among other things, raise necessary capital to fund their operational restructuring initiatives and breathe new life into the business. Absent such new money, the Debtors had been unable to sustain even idle operations or otherwise satisfy payment obligations to crewmembers, suppliers, trade vendors, and other core business partners—let alone maintain core certifications necessary to service major customers—on a prepetition basis.

---

[4]  Further detail on the Debtors' background and operations and need for capital is set forth in the *Declaration of Matthew Ray of Portage Point Partners, LLC in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 79] and is incorporated by reference herein.

8.      The Debtors hired Jefferies to conduct a robust, competitive marketing process and engage in negotiations to raise such new money financing on the best available terms.  Those negotiations culminated in a $60 million new money financing facility entered into by the Debtors and Hartree Partners, LP ("Hartree") that the Court approved on a final basis on December 21, 2020.  The Debtors obtained access to the first draw of up to $28.8 million pursuant to the DIP facility with Hartree.  The Debtors' worked to obtain access to the second draw, however, before they were able to do so, the Debtors experienced an immediate need for incremental liquidity.  The initial $28.8 million draw under the DIP facility with Hartree—which previously had been forecast to cover expenditures through mid-November 2020—funded operations through early February 2021 and that liquidity source had since been exhausted.

9.      Accordingly, over the course of January, February, and March, 2021, the Debtors and Hartree negotiated three emergency loans to fund payroll and other employee-related expenses.  On February 3, 2021, Hartree agreed to fund $368,421.05 to cover the first payroll cycle in February while negotiations continued regarding agreed milestones that would support a final draw.  On February 25 and March 8, 2021, Hartree agreed to advance two additional emergency loans in the aggregate principal amount of $1,310,000 and $1,276.558, respectively, solely for the purposes of payroll and other employee-related expenses (together, the "Emergency Loans").

10.     In addition to the limited relief provided by the Emergency Loans, on March 5, 2021, the Debtors filed the *Debtors' Supplemental Emergency Motion for Entry of an Order (I) Approving Amendment to DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 603] whereby—after the Debtors explored, with the assistance of Jefferies, multiple alternatives from within and outside of their capital structure, and in close coordination with the Committee and Hartree—the Debtors negotiated an emergency "advance" on the sale proceeds of the Debtors'

4

aircraft through an incremental debtor-in-possession term loan with their prepetition secured lender, Fortress Credit Co LLC, in the principal amount of $5 million (the "Incremental DIP Loan").  I understand that on March 15, 2021, the Debtors consummated the sale of the aircraft and that the proceeds thereof were used to repay the Incremental DIP Loan and the prepetition aircraft loan facility in full, leaving the Debtors with approximately $10 million of incremental liquidity from the sale of the aircraft.

11.     The incremental liquidity afforded by the proceeds of the aircraft sale bought the Debtors, though insufficient to fund the entire reorganization, critical time to run a comprehensive marketing and outreach process to raise a new DIP facility that will repay Hartree and support a viable path to exit while right-sizing the Debtors' business and returning vessels to operation.  The Debtors believe they are now in need of the additional financing to be provided by the Replacement DIP Facility.  I understand that this funding need is acute, as absent access to the Replacement DIP Facility, the Debtors are projected to run out of cash by mid-April.  The Debtors' business is cash intensive, with significant costs required to fund projects and the Debtors' expansive operations, once resumed, and to satisfy obligations to vendors and employees.  As such, the Debtors require continued access to the additional liquidity provided by the Replacement DIP Facility to, among other things, continue paying employee wages and benefits, pay undisputed trade and maritime lienholder claims, repair vessels to return them to service, fund general and corporate operating need.  Based on the foregoing, I believe the Debtors' ability to make such payments during these chapter 11 cases is essential to their operational restart and the preservation of their assets.

12.     The Debtors also believe that the Replacement DIP Facility will provide a clear, strong message to their customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the Debtors have adequate liquidity to meet their current and

future obligations and return their businesses as close to the ordinary course as possible.  The proposed Replacement DIP Facility, moreover, should provide the Debtors with sufficient funds to continue administering these chapter 11 cases over the coming months and thereby enable the Debtors to continue their efforts to preserve and maximize the value of their estates through these cases.

### The Debtors' Efforts to Obtain Additional Postpetition Financing

13.     Beginning on February 24, 2021, even as the Debtors (advised by Jefferies) continued to negotiate additional Emergency Loans and the Incremental DIP Loan to address their immediate liquidity shortfalls, Jefferies started its broad outreach exploring all potential balance sheet and strategic alternatives including, but not limited to (i) third-party DIP financing, (ii) bankruptcy exit financing, (iii) strategic and commercial partnerships and (iv) asset sales.  In total, Jefferies contacted or received inbound interest from approximately 130 parties interested in pursuing one or a combination of these various balance sheet and strategic alternatives.  These parties include approximately 105 private equity sponsors or financial institutions and approximately 25 potential strategic partners operating in the Jones Act market.  Of these institutions, approximately 58 executed non-disclosure agreements and began conducting due diligence.  Jefferies, along with the Debtors' other advisors, engaged in numerous conversations with those parties who showed a significant interest in pursuing DIP financing.  Jefferies also engaged with interested strategic institutions on partnerships and other means for reviving the operations of the Debtors' fleet.

14.     Ultimately, of the foregoing parties, 7 submitted indications of interest for the Replacement DIP Facility, including JMB Capital Partners Lending, LLC ("JMB" or the "Replacement DIP Lender").  The Debtors decided to focus their efforts on these proposals and negotiated the economics, milestones, covenants, and other provisions of the proposed financing.

15.     Following this competitive process, and after conducting several rounds of negotiations, the Debtors, with Jefferies' advice, ultimately determined that the JMB proposal was the highest and best opportunity to infuse the Debtors with sufficient liquidity and operational flexibility to continue momentum toward reviving the Debtors' business.  Among other things, JMB offered the most favorable terms and conditions providing the Debtors with readily available access to cash to fund operations with limited to no operational restrictions.

16.     Beginning on March 17, 2021, the Debtors and their advisors engaged in extensive arm's-length negotiations with JMB and subsequently finalized the terms of the Replacement DIP Facility.  Given the Debtors' urgent need for liquidity, the Debtors and JMB worked expeditiously to negotiate the terms of the Replacement DIP Facility so that it could be presented to the Court for approval before the Debtors' liquidity was projected to dry up in mid-April.  In response to the original proposal received, the Debtors and their advisors negotiated changes to key economic and structural terms of the proposal.  These negotiations involved numerous telephone conferences with the Debtors' management and advisors, the exchange of multiple iterations of term sheet proposals, draft credit agreements, and related documents reflecting the proposed DIP financing terms, and circulation of the proposed DIP budget and other due diligence materials to the Replacement DIP Lenders.  The Debtors were able to materially improve the terms of the Replacement DIP Facility, including with respect to fees, interest rates, milestones, and other key terms of the Replacement DIP Facility.

17.     No potential lender was willing to provide a better offer than the Replacement DIP Facility.  Also, no party that Jefferies spoke to as part of the marketing process, and indeed no party Jefferies is aware of, was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis.  Ultimately, the Debtors and the Replacement DIP Lenders

agreed to a set of terms that should provide the Debtors with necessary access to liquidity during the pendency of these chapter 11 cases at fees and rates that the Debtors and their advisors consider to be reasonable under the circumstances.  Accordingly, for the reasons set forth herein, I believe the Replacement DIP Facility is the best replacement financing option available to the Debtors.

**<u>The Terms and Fees in Connection with the Replacement DIP Facility</u>**

18.     Jefferies assisted the Debtors in their review and negotiation of the principal economic terms of the Replacement DIP Facility.  The Debtors, with the assistance of Jefferies, continued to negotiate the terms of the Replacement DIP Credit Agreement, exchanged several drafts with the Replacement DIP Agent and its advisors, and ultimately secured favorable terms. Over the course of approximately one week, the Debtors and the Replacement DIP Agent finalized the terms of the Replacement DIP Credit Agreement, the key points of which are summarized below.

19.     As described in the Motion and Replacement DIP Credit Agreement, the Replacement DIP Facility contemplates postpetition financing in the form of a $90 million multiple draw term loan available in the following tranches: (a) an initial draw of up to $65 million drawn following entry of the Order and, (b) thereafter, one or more draws of up to an additional $25 million to be drawn subject to the Order and satisfaction of certain terms and conditions set forth in the Order.

20.     In exchange for the Replacement DIP Facility, I understand that the Debtors have agreed, subject to Court approval, to provide certain fees and conditions to the Replacement DIP Lenders pursuant to the Replacement DIP Credit Agreement.  These terms are summarized below:

| Terms | Amount |
|---|---|
| Interest Rate | 9.0% payable in cash monthly. |

| Terms | Amount |
|---|---|
| Exit Fee | 5.0% of the facility amount, earned at the time of commitment and payable upon any mandatory or voluntary prepayment, including payment of maturity. |
| Commitment Fee | 2.0% of the facility amount, earned and payable in cash at the time of the commitment. |
| Security | First lien ship mortgages on all unencumbered assets (22 vessels) and all assets that secure the DIP facility with Hartree (9 vessels) and on the Unencumbered Replacement DIP Collateral. Second lien on all assets that secure the prepetition Wells Fargo credit facility. |
| Maturity | March 31, 2022 |

Based on my knowledge of similar financings in the market, I believe that the interest rate and fees reflected in the Replacement DIP Facility are the best terms available to the Debtors under the circumstances, particularly in light of the circumstances of these chapter 11 cases and the marketing process undertaken.

## Conclusion

21.    Given the financing efforts and process described above and based on my experience as a restructuring professional and involvement in other financing transactions, I believe that the Replacement DIP Facility is the best financing option presently available to the Debtors, and that the terms of the Replacement DIP Facility are reasonable under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  March 30, 2021
New York, New York

_/s/ Richard W. Morgner_
Richard W. Morgner
Managing Director and Joint Global Head of
the Recapitalization & Restructuring Group
Jefferies LLC