> THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| BOUCHARD TRANSPORTATION CO., INC., *et al.*,[1] | ) ) Case No. 20-34682 (DRJ) |
| Debtors. | ) ) (Jointly Administered) |
| | ) |

## DISCLOSURE STATEMENT RELATING TO THE
## JOINT PLAN OF BOUCHARD TRANSPORTATION CO., INC. AND ITS
## DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:     mcavenaugh@jw.com
             ggraham@jw.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Whitney Fogelberg (admitted *pro hac* vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     ryan.bennett@kirkland.com
             whitney.fogelberg@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     christine.okike@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

---

[1]     Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/bouchard. The location of the Debtors' service address is: 58 South Service Road, Suite 150, Melville, New York 11747.

**<u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  PRIOR TO DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.  ALL HOLDERS OF CLAIMS AGAINST AND/OR EQUITY INTERESTS IN THE DEBTORS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT.

THE DEBTORS SUPPORT THE PLAN.  THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST POSSIBLE RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S CONDITIONAL APPROVAL OF THE DISCLOSURE STATEMENT FOR SOLICITATION PURPOSES DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS OR ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS <u>EXHIBIT A</u>.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND

MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN AND IN DECIDING WHETHER TO APPROVE THE THIRD-PARTY RELEASES.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN AND DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE XII OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).  IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, WHO ARE NOT ENTITLED TO VOTE ON THE PLAN, OR WHO DO NOT SUBMIT FORMS TO OPT OUT OF THE THIRD-PARTY RELEASES) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY

REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS.   FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.   <u>MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, THEREFORE, SPECULATIVE.</u>

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................................. 1

II. PRELIMINARY STATEMENT ....................................................................................... 1

III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE CHAPTER 11 PROCESS ........................................................................................... 3

    A.  What is chapter 11? ........................................................................................................ 3
    B.  Why are the Debtors sending me this Disclosure Statement? ........................................ 4
    C.  Am I entitled to vote on the Plan? .................................................................................. 4
    D.  What will I receive from the Debtors if the Plan is consummated? ................................ 5
    E.  What happens to my recovery if the Plan is not confirmed or does not go effective? ..... 8
    F.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" ........................................................................................................... 8
    G.  How will the occurrence of the All Asset Sale or the Individual Asset Sale affect my recovery under the Plan? ................................................................................................ 9
    H.  What is meant by the "Waterfall Recovery"? ................................................................. 9
    I.  What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, Professional Fee Claim, or a DIP Claim? .................................................... 9
    J.  Are any regulatory approvals required to consummate the Plan? ................................... 9
    K.  Is there potential litigation related to Confirmation of the Plan? ................................... 9
    L.  Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan? ................................................ 10
    M.  Does the Plan provide for the subordination of any Claims? ....................................... 10
    N.  What is the Litigation Trust and can I participate in it? ............................................... 11
    O.  How will the preservation of Causes of Action impact my recovery under the Plan? ... 11
    P.  Will there be releases and exculpation granted to parties in interest as part of the Plan? .............. 13
    Q.  What is the effect of the Plan on the Debtors' ongoing business? ................................ 16
    R.  What is the deadline to vote on the Plan? ..................................................................... 17
    S.  How do I vote for or against the Plan? .......................................................................... 17
    T.  Why is the Bankruptcy Court holding a Confirmation Hearing? .................................. 18
    U.  What is the purpose of the Confirmation Hearing? ...................................................... 18
    V.  Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ................................................................................................................... 18
    W.  Do the Debtors recommend voting in favor of the Plan? ............................................. 18

IV. QUESTIONS AND ANSWERS REGARDING THE DEBTORS' RESTRUCTURING PLAN ............................................................................................................................... 19

    A.  What is meant by the "Plan Transactions" and the "Sale Transaction"? ...................... 19
    B.  What are the sources of Cash and other consideration required to fund the Plan? ........ 19

V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW .......... 20

    A.  The Debtors' Corporate History. ................................................................................... 20
    B.  The Debtors' Key Assets and Operations. .................................................................... 20
    C.  The Debtors' Prepetition Capital Structure. .................................................................. 22

VI. EVENTS LEADING TO THE CHAPTER 11 FILINGS ............................................... 24

    A.  Operational Issues and Liquidity Challenges. ............................................................... 24
    B.  Maritime Liens. ............................................................................................................ 25
    C.  Prepetition Efforts to Increase Liquidity. ..................................................................... 25

**VII.   MATERIAL DEVELOPMENTS IN THE CHAPTER 11 CASES**..........................................**26**

    **A.**   First Day Relief.................................................................................................26
    **B.**   Authorization to Use Cash Collateral and Obtain Debtor in Possession Financing.....................26
    **C.**   Appointment of Official Committee ..................................................................28
    **D.**   Other Procedural and Administrative Motions ..................................................28
    **E.**   Retention of Debtor Professionals ...................................................................29
    **F.**   The Governance Orders ....................................................................................29
    **G.**   Aircraft Sale .....................................................................................................30
    **H.**   Bouchard Stipulation........................................................................................30
    **I.**   Bidding Procedures and Marketing Process......................................................30
    **J.**   Litigation Matters.............................................................................................31
    **K.**   Assumption and Rejection of Executory Contracts and Unexpired Leases ...............31
    **L.**   Claims Based on Rejection of Executory Contracts or Unexpired Leases...................32
    **M.**   Cure of Defaults...............................................................................................32

**VIII.   SOLICITATION AND VOTING PROCEDURES** ...............................................**33**

    **A.**   Holders of Claims Entitled to Vote on the Plan. ..............................................34
    **B.**   Voting Record Date. .........................................................................................34
    **C.**   Voting on the Plan.............................................................................................34
    **D.**   Ballots Not Counted..........................................................................................35

**IX.   RISK FACTORS** ......................................................................................................**35**

    **A.**   Bankruptcy Law Considerations. .....................................................................35
    **B.**   Risks Related to Recoveries under the Plan. .....................................................39
    **C.**   Risks Related to the Businesses of the Debtors and the Post-Effective Debtor. ...........40
    **D.**   Disclosure Statement Disclaimer. .....................................................................41

**X.   CONFIRMATION OF THE PLAN**........................................................................**43**

    **A.**   Requirements for Confirmation of the Plan. .....................................................43
    **B.**   Best Interests of Creditors/Liquidation Analysis. ............................................43
    **C.**   Feasibility..........................................................................................................44
    **D.**   Acceptance by Impaired Classes.......................................................................44
    **E.**   Confirmation Without Acceptance by All Impaired Classes. ............................45

**XI.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** .................................**46**

    **A.**   Introduction.......................................................................................................46
    **B.**   Certain U.S. Federal Income Tax Consequences to the Managed Debtors and the Post-Effective Debtor.........................................................................................47
    **C.**   Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Existing Equity Interests .....................................................................49
    **D.**   Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 3 Prepetition Revolving Credit Facility Secured Claims..................49
    **E.**   Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 4A General Unsecured Claims and Allowed Class 4B Prepetition Revolving Credit Facility Deficiency Claims...........................................................50
    **F.**   Character of Gain or Loss .................................................................................50
    **G.**   Market Discount................................................................................................51
    **H.**   Accrued Interest ...............................................................................................52
    **I.**   Limitation on Use of Capital Losses.................................................................52
    **J.**   Certain U.S. Federal Income Tax Considerations to the Litigation Trust ...............53
    **K.**   Reserve Accounts and Delayed Distributions ..................................................54
    **L.**   Certain U.S. Federal Income Tax Considerations to Certain Non-U.S. Holders of Claims...........54

**M.**      Information Reporting and Backup Withholding ............................................................55

**XII.**      **RECOMMENDATION** ...........................................................................................................**57**

**EXHIBITS**[2]

EXHIBIT A      Chapter 11 Plan

---

[2]    Each Exhibit is incorporated herein by reference.

## I.  INTRODUCTION

Bouchard Transportation Co., Inc. ("Bouchard") and its debtor affiliates, as debtors and debtors in possession (each a "Debtor," and collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Plan of Bouchard Transportation Co., Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated June 18, 2021 (as may be amended, supplemented, or modified from time to time, the "Plan").[3]  On September 30, 2020, the Court entered orders [Docket Nos. 30, 31] authorizing the joint administration and procedural consolidation of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.  PRELIMINARY STATEMENT

The Debtors comprise one of the nation's largest independently owned ocean-going petroleum barge companies.  Historically, the Debtors' 47 vessels serviced the Eastern Seaboard and Gulf Coast of the United States.  Bouchard traces its origins to 1916 and the heroic actions of Captain Frederick E. Bouchard during the infamous Black Tom explosion in New York Harbor in World War I.  The U.S. government bestowed a monetary award upon Captain Bouchard for salvaging two ships and for his personal bravery.  Captain Bouchard used this money to found the Bouchard Transportation Company.  Bouchard went on to become a fourth-generation, family-owned industry leader.

Despite its rich history, the Debtors' current challenges proved insurmountable on an out-of-court basis.  Those challenges began in October 2017 with a tragic explosion off the coast of Port Aransas, Texas, that claimed the lives of two crewmembers.  The Debtors fully cooperated with regulatory authorities as part of several health, safety, and environmental inspections and proceedings thereafter.  That process led to several operational improvements that enhanced the Debtors' reporting, training, inspections, oversight, and overall compliance with rules and regulations relating to health, safety, and environmental matters, including the ISM Code.[4]  Despite those best efforts, in December 2019, the Debtors' classification society, the American Bureau of Shipping ("ABS"), cancelled its longstanding contract with the Debtors.  The United States Coast Guard (the "Coast Guard") subsequently lifted the Debtors' document of compliance certification (the "DOC").  The Debtors' major customers require a DOC.

Without requisite regulatory certifications, the Debtors could not service customers or generate positive cash flow.  Out-of-court funding sources were tapped and then exhausted.  Non-core asset sales could not close on the necessary timeline.  COVID-19 adversely impacted the Debtors' efforts and industry

---

[3]  Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings given to them in the Plan.

[4]  The International Safety Management ("ISM") Code was created by the International Maritime Organization to provide an international standard for the safe management and operation of ships and for pollution prevention as part of the Convention for Safety of Life at Sea.

demand.  The Bouchard family extended a series of purported loans to the Debtors in the aggregate amount of approximately $10.1 million in 2020, but even that new money injection proved insufficient.  The Debtors' financial and liquidity profile deteriorated precipitously, leaving the Debtors unable to sustain even idle operations or otherwise satisfy payment obligations to crewmembers, suppliers, trade vendors, and other core business partners—many of whom resorted to self-help maritime remedies throughout the U.S.  The Debtors' challenges reached a crescendo with multiple vessels being scheduled for foreclosure sales in New Orleans, Florida, Texas, and New York during the September 2020 to November 2020 timeframe, with the first foreclosure sale for two vessels scheduled to occur on September 29, 2020.

Accordingly, the Debtors commenced these Chapter 11 Cases on September 28, 2020, to obtain much-needed "breathing space" with the automatic stay, raise incremental financing to pay crew members, hire employees, secure their vessels, fund operations, hire a classification society to perform a requisite safety management audit and issue a new DOC, and otherwise execute on their operational turnaround.

Beginning in late February 2021, the Debtors began a comprehensive marketing process for plan sponsorship and exit financing proposals as well as for sales of the Debtors' business or substantially all of the Debtors' assets.  Following the receipt of indications of interest from a number of, and constructive engagement with, certain bidders, on May 25, 2021, the Debtors filed a motion seeking Bankruptcy Court approval of the Bidding Procedures pursuant to which the Debtors would market and sell some or all of their assets.  The Bankruptcy Court approved the Bidding Procedures on June 8, 2021 [Docket No. 956] (the "Bidding Procedures Order"), which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as July 16 at 5:00 p.m., prevailing Central Time and set the Auction (as defined in the Bidding Procedures), if necessary, for July 19 and July 20 at 10:00 a.m., prevailing Central Time.  The Debtors anticipate that proceeds of asset sales pursuant to the Bidding Procedures, if any, will be used to, among other things, fund stakeholder recoveries in the Chapter 11 Cases pursuant to the Waterfall Recovery.

Subsequent to the contemplated sale for some or all of the Debtors' assets being consummated, subject to Bankruptcy Court approval, the Debtors will make certain distributions to creditors from the sale proceeds and then propose to either (i) liquidate remaining unpurchased assets, if any, and otherwise wind down the Debtors' businesses and/or (ii) be managed by the Purchaser in the event of an All Asset Sale.  Under chapter 11, a debtor may reorganize or liquidate its business for the benefit of its stakeholders.

The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code and applicable law.  The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates.

Generally speaking, the Plan:

- provides for the full and final resolution of funded debt obligations;

- provides for certain transactions, including the disposition of the Debtors' assets and certain distributions of proceeds, following or in connection with the consummation of one or more sale transactions;

- designates a Plan Administrator to wind down the Debtors' affairs, pay and reconcile Claims, and administer the Plan in an efficacious manner subsequent to a sale transaction;

2

- provides for the vesting of the Post-Effective Date Debtor Assets (other than the Litigation Trust Assets and the Managed Assets, as applicable) in the Post-Effective Date Debtor for the primary purpose of liquidating the Post-Effective Date Debtor Assets and winding down the Debtors' Estates;

- contemplates recoveries to Holders of Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims as is necessary to satisfy section 1129 of the Bankruptcy Code;

- contemplates recoveries to Holders of Claims in Class 3, Class 4A, Class 4B, Class 6, and Class 9 and Holders of Interests in Class 7 from the remaining proceeds of the Sale Transaction, if any, as more fully set forth in the Plan; and

- provides for the creation of a Litigation Trust for the purpose of (a) holding the Litigation Trust Assets, consisting of various Causes of Action of the Debtors or the Estates, for the benefit of the Holders of General Unsecured Claims and the Prepetition Revolving Credit Facility Deficiency Claim, if any, as Litigation Trust Beneficiaries, (b) making distributions of proceeds of the Litigation Trust Assets as provided in the Litigation Trust Agreement, (c) taking all actions and executing all agreements, instruments, and other documents necessary to perform the Litigation Trust's respective duties under the Plan and pursuant to the Litigation Trust Agreement, and (d) otherwise exercising such other powers as may be vested in the Litigation Trustee in accordance with the Plan and pursuant to the Litigation Trust Agreement, or as may be deemed by the Litigation Trustee to be necessary and proper to implement the applicable provisions of the Plan and the Litigation Trust Agreement.

The Plan will maximize value for the Debtors' estates, resolve these Chapter 11 Cases, terminate the accrual of certain expenses associated with administering the bankruptcy, and permit the Debtors to distribute value to their stakeholders in a timely and efficient manner. The Debtors believe that the Plan represents the best available alternative for their Estates and all stakeholders. Accordingly, the Debtors urge all Holders of Claims and Interests entitled to vote to accept the Plan.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE CHAPTER 11 PROCESS

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.

Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.        Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.        Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (as defined herein).  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Prepetition Revolving Credit Facility Secured Claims | Impaired | Entitled to Vote |
| 4A | General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | Prepetition Revolving Credit Facility Deficiency Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired/Unimpaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| 6 | Section 510(c) Claims | Impaired | Entitled to Vote |
| 7 | Existing Equity Interests | Impaired | Entitled to Vote |
| 8 | Intercompany Interests | Impaired/Unimpaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Entitled to Vote |

**D.       What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[5]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims[6] (in millions) | Projected Recovery Under the Plan[7] |
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the Plan Administrator, in consultation with the Post-Effective Date Debtor, either:<br><br>(i)      payment in full in Cash;<br><br>(ii)     delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;<br><br>(iii)    Reinstatement of such Allowed Other Secured Claim; or<br><br>(iv)    such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $15.8 | 100% |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the Plan Administrator in consultation with the Post-Effective Date Debtor, either:<br><br>(i)      payment in full in Cash; or | $1.0 | 100% |

---

[5]    The recoveries set forth below may change based upon changes in the amount of Claims or Interests that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

[6]    Unless otherwise indicated, the Allowed Claim amounts set forth in this table are estimates as of June 18, 2021.

[7]    The amount and nature of recoveries on account of Allowed Claims in Class 3, Class 4A, Class 4B, Class 6, and Class 8 and Allowed Interests in Class 7 will be contingent on the outcome of the Debtors' sale process, including the amount and nature of the consideration to be provided by any winning bidder or bidders in connection with a Sale Transaction.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims[6] (in millions) | Projected Recovery Under the Plan[7] |
| | | (ii)    such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| 3 | Prepetition Revolving Credit Facility Secured Claims | Except to the extent that a Holder of an Allowed Prepetition Revolving Credit Facility Secured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Prepetition Revolving Credit Facility Secured Claim, each Holder of an Allowed Prepetition Revolving Credit Facility Secured Claim shall receive:<br><br>(i)    if the All Asset Sale is consummated, its Pro Rata share of (not to exceed the amount of such Holder's Prepetition Revolving Credit Facility Secured Claim) the All Asset Sale Recovery attributable to the Prepetition Revolving Credit Facility Collateral;<br><br>(ii)    if the Individual Asset Sale is consummated, its Pro Rata share of (not to exceed the amount of such Holder's Prepetition Revolving Credit Facility Secured Claim) the Individual Asset Sale Recovery attributable to the Prepetition Revolving Credit Facility Collateral; or<br><br>(iii)    delivery of collateral securing such Holder's Prepetition Revolving Credit Facility Secured Claim. | $164.1[8] | Contingent / Unknown |
| 4A | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed General Unsecured Claim, each such Holder shall receive:<br><br>(i)    its Pro Rata share of the Litigation Trust Interests; and<br><br>(ii)    if the All Asset Sale is consummated, its Pro Rata share of (not to exceed the amount of such Holder's General Unsecured Claim, together with any postpetition interest thereon to the extent set forth in the Waterfall Recovery) the All Asset Sale Recovery; or<br><br>(iii)    if the Individual Asset Sale is consummated, its Pro Rata share of (not to exceed the amount of such Holder's General Unsecured Claim, together with any postpetition interest thereon to the extent set forth in the Waterfall Recovery) the Individual Asset Sale Recovery. | $39.1 | Contingent / Unknown |

---

[8]    This amount represents the total amount of outstanding obligations under the Prepetition Revolving Credit Facility; however, the Prepetition Revolving Credit Facility Secured Claims will consist only of that portion of such obligations that constitute Secured Claims under the Plan.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims[6] (in millions) | Projected Recovery Under the Plan[7] |
| 4B | Prepetition Revolving Credit Facility Deficiency Claims | Except to the extent that a Holder of an Allowed Prepetition Revolving Credit Facility Deficiency Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Revolving Credit Facility Deficiency Claim, each such Holder shall receive:<br><br>(i)    its Pro Rata share of the Litigation Trust Interests; and<br><br>(ii)   if the All Asset Sale is consummated, its Pro Rata share of (not to exceed the amount of such Holder's Prepetition Revolving Credit Facility Deficiency Claim, together with any postpetition interest thereon to the extent set forth in the Waterfall Recovery) the All Asset Sale Recovery; or<br><br>(iii)   if the Individual Asset Sale is consummated, its Pro Rata share of (not to exceed the amount of such Holder's Prepetition Revolving Credit Facility Deficiency Claim, together with any postpetition interest thereon to the extent set forth in the Waterfall Recovery) the Individual Asset Sale Recovery. | Contingent / Unknown | Contingent / Unknown |
| 5 | Intercompany Claims | Each Allowed Intercompany Claim shall, at the option of the applicable Debtors (or Post-Effective Date Debtor, as applicable), either on or after the Effective Date, be:<br><br>(i)    Reinstated;<br><br>(ii)   converted to equity; or<br><br>(iii)   otherwise extinguished, compromised, canceled, and released, or settled, in each case in accordance with the Restructuring Transactions Memorandum. | N/A | 100% / 0% |
| 6 | Section 510(c) Claims | Except to the extent that a Holder of an Allowed Section 510(c) Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Section 510(c) Claim, each Holder of an Allowed Section 510(c) Claim shall receive:<br><br>(i)    if the All Asset Sale is consummated, its Pro Rata share of the All Asset Sale Recovery; or<br><br>(ii)   if the Individual Asset Sale is consummated, its Pro Rata share of the Individual Asset Sale Recovery. | $40.4 | Contingent / Unknown |
| 7 | Existing Equity Interests | Except to the extent that a Holder of an Allowed Existing Equity Interest agrees to less favorable treatment of its Allowed Interest, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Equity Interest, each Holder of an Allowed Existing Equity Interest shall receive:<br><br>(i)    if the All Asset Sale is consummated, its Pro Rata share of the All Asset Sale Recovery; or<br><br>(ii)   if the Individual Asset Sale is consummated, its Pro Rata share of the Individual Asset Sale Recovery. | N/A | Contingent / Unknown |

7

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims[6] (in millions) | Projected Recovery Under the Plan[7] |
| 8 | Intercompany Interests | Holders of Intercompany Interests shall, at the option of the applicable Debtors (or Post-Effective Date Debtor, as applicable), either on or after the Effective Date, be:<br><br>(i)     Reinstated; or<br><br>(ii)    merged or contributed, or canceled and released, at the option of the Debtors, in each case, in accordance with the Restructuring Transactions Memorandum. | N/A | 100% / 0% |
| 9 | Section 510(b) Claims | Except to the extent that a Holder of an Allowed Section 510(b) Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Section 510(b) Claim, each Holder of an Allowed Section 510(b) Claim shall receive:<br><br>(i)    if the All Asset Sale is consummated, its Pro Rata share of the All Asset Sale Recovery; or<br><br>(ii)    if the Individual Asset Sale is consummated, its Pro Rata share of the Individual Asset Sale Recovery. | $0[9] | Contingent / Unknown |

The Committee believes that the aggregate costs and expenses incurred by the Debtors or the Estates to preserve or dispose of the Prepetition Revolving Credit Facility Collateral, in an amount no less than $17.69 million plus an allocable share of other administrative expenses incurred by the Debtors or the Estates in connection with these Chapter 11 Cases, including fees and expenses of the Debtors' Professionals, is recoverable from the Prepetition Revolving Credit Facility Collateral or the proceeds thereof pursuant to section 506(c) of the Bankruptcy Code, and the Committee reserves all rights in connection therewith.

**E.     What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to consummate the Plan Transactions.  It is possible that any alternative may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 43.

**F.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After

---

[9]     The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claim exists.

Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims and Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 43, for a discussion of the conditions precedent to the occurrence of the Effective date (i.e., "Consummation").

### G.    How will the occurrence of the All Asset Sale or the Individual Asset Sale affect my recovery under the Plan?

The occurrence of the All Asset Sale or the Individual Asset Sale may affect the nature of the consideration to which Holders of Allowed Claims or Interests, as applicable, are entitled to recover under the Plan. If an All Asset Sale occurs, Holders of certain Allowed Claims or Interests may receive recoveries in the form of Cash from Sale Proceeds pursuant to the Waterfall Recovery, while Holders of certain Allowed Claims or Interests may also receive recoveries in the form of a recovery on account of any Managed Assets, including any New Revolving Credit Facility and any Unsecured Claims Recovery Notes. If an Individual Asset Sale occurs, Holders of Allowed Claims and Interests may receive recoveries in the form of Cash from Sale Proceeds pursuant to the Waterfall Recovery.

### H.    What is meant by the "Waterfall Recovery"?

Generally speaking, the Waterfall Recovery provides for distribution of Sale Proceeds Recovery to Holders of Allowed Claims or Allowed Interests, as applicable, in accordance with their respective priorities and rights under applicable law. The Waterfall Recovery is more fully set forth at Article I.A.156 of the Plan.

### I.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, Professional Fee Claim, or a DIP Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. The treatments of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Professional Fee Claims, and Allowed DIP Claims are set forth in Article II of the Plan.

### J.    Are any regulatory approvals required to consummate the Plan?

Except as set forth under any definitive purchase agreements for a sale transaction, there are no known regulatory approvals that are required to consummate the Plan. To the extent there are any such regulatory approvals or other authorizations, consents, rulings, or documents necessary for consummation of the Plan, however, it is a condition precedent to the Effective Date that they should be obtained.

### K.    Is there potential litigation related to Confirmation of the Plan?

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation. *See* Article X.A of this Disclosure Statement, entitled "*Bankruptcy Law Considerations*."

If it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a Plan that has been rejected by an impaired class if it determines that the Plan

satisfies section 1129(b) of the Bankruptcy Code. *See* Article X.A of this Disclosure Statement, entitled "*Bankruptcy Law Considerations*."

**L.    Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?**

The Debtors' estimate of aggregate Allowed General Unsecured Claims is approximately $39.1 million. Each Holder of an Allowed General Unsecured Claim shall receive:  (i) its Pro Rata share of the Litigation Trust Interests; and (ii)(x) if the All Asset Sale is consummated, its Pro Rata share of (not to exceed the amount of such Holder's General Unsecured Claim) the All Asset Sale Recovery or (y) if the Individual Asset Sale is consummated, its Pro Rata share of (not to exceed the amount of such Holder's General Unsecured Claim) the Individual Asset Sale Recovery.  A recovery on account of the Litigation Trust Interests, if any, will be determined by the outcome of the Litigation Trust Causes of Action, including Causes of Action that the Debtors or their Estates may have that are based on or related to any and all actions taken by the Bouchard Interested Parties in connection with the management of the Debtors prior to and after the filing of the Chapter 11 Cases.  There is a possibility that there will ultimately be no available distribution to Holders of Allowed General Unsecured Claims.

Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information, the projected amount of General Unsecured Claims set forth herein is subject to material change (either higher or lower), which difference could materially affect Class 4A recoveries.  The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages. Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to Holders of General Unsecured Claims, and such changes could be material.

Although the Debtors have classified the Bouchard Family Loan Claims as Class 6 Section 510(c) Claims, the Bankruptcy Court may rule that subordination of the Bouchard Family Loan Claims is improper.  If the Bankruptcy Court denies subordination of the Bouchard Family Loan Claims and the Bouchard Family Loan Claims are not recharacterized as Class 7 Existing Equity Interests, the Bouchard Family Loan Claims would comprise Class 4A General Unsecured Claims (subject to any other defenses and arguments of the Debtors, the Estates, and any other party in interest), which could affect recoveries to other Holders of General Unsecured Claims, and such changes could be material.

**M.    Does the Plan provide for the subordination of any Claims?**

The Plan contemplates a Class of Claims, Class 6 (Section 510(c) Claims), containing any Claim against any of the Debtors that is subject to subordination pursuant section 510(c) of the Bankruptcy Code. The Debtors have classified the Bouchard Family Loan Claims as Section 510(c) Claims.

Section 510(c) of the Bankruptcy Code provides, in relevant part, that the Bankruptcy Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."  11 U.S.C. § 510(c)(1).  The Fifth Circuit has ruled that equitable subordination is proper where three conditions are met:  (1) "The claimant must have engaged in some type of inequitable conduct"; (2) "The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant"; and (3) "Equitable subordination of the claim must not be inconsistent with the provisions of the" federal bankruptcy regime. *Benjamin v. Diamond (In re Mobile Steel Co.)*  563 F.2d 692, 699–700 (5th Cir. 1977).

At all times relevant to the Bouchard Family Loan Claims, Mr. Bouchard had virtually universal control over the Debtors, both as their functional sole shareholder and as their primary authority figure and decisionmaker. The Debtors believe that the purported loans on which the Bouchard Family Loans Claims are based were in fact contributions of equity capital, and the Debtors further believe that Mr. Bouchard's inequitable conduct resulted in injury to the Debtors' other creditors and conferred an unfair advantage on Mr. Bouchard.

The Debtors will further demonstrate the legal and factual bases for classifying the Bouchard Family Loan Claims as Section 510(c) Claims at or prior to Confirmation.

Out of an abundance of caution, the Plan also contemplates a Class of Claims, Class 9 (Section 510(b) Claims), containing any Claim against any of the Debtors that is subject to mandatory subordination pursuant to section 510(b) of the Bankruptcy Code. The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claim exists.

**N.      What is the Litigation Trust and can I participate in it?**

The Litigation Trust is a liquidating trust that will be formed on the Effective Date for the purpose of pursuing the Litigation Trust Causes of Action. The Litigation Trust Causes of Action are (i) any Causes of Action belonging to the Debtors or their Estates that are based on or related to any and all actions taken by, or omissions of, any of the Bouchard Interested Parties in connection with the management or affairs of the Debtors, whether prior to or after the filing of the Chapter 11 Cases, (ii) Avoidance Actions to the extent not released pursuant to the terms of the Plan or the Confirmation Order or acquired by a Purchaser pursuant to the terms of an Asset Purchase Agreement, and (iii) any other Causes of Action of the Debtors or the Estates as of the Effective Date to the extent not released pursuant to the terms of the Plan or the Confirmation Order or acquired by a Purchaser pursuant to the terms of an Asset Purchase Agreement, including all Causes of Action that the Debtors or the Estates have as of the Effective Date in connection with the adversary proceeding styled as *B. No. 285 Corporation v. ETOSHA, LLC*, Adversary No. 21-03436 pending in the Bankruptcy Court. For the avoidance of doubt, the Litigation Trust Causes of Action shall not include any Claims or Causes of Action against the Independent Director, the Chief Restructuring Officer or their Related Parties (except to the extent constituting a Bouchard Interested Party), or the Debtors' Professionals. The initial funding of the Litigation Trust will be disclosed in the Plan Supplement.

On the Effective Date or as soon as reasonably practicable thereafter, the Post-Effective Date Debtor (solely in its capacity as a successor to the Debtors) and the Litigation Trustee shall execute the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan for the benefit of the Litigation Trust Beneficiaries. The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee. The powers, rights, responsibilities, and compensation of the Litigation Trustee shall be specified in the Litigation Trust Agreement. The Litigation Trustee shall hold and distribute the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement. Subject to certain limitations set forth in the Litigation Trust Agreement, each Holder of an Allowed General Unsecured Claim may receive Pro Rata distributions on account of the Litigation Trust Interests.

**O.      How will the preservation of Causes of Action impact my recovery under the Plan?**

In accordance with section 1123(b) of the Bankruptcy Code, the Post-Effective Date Debtor shall retain and may enforce all rights to commence and pursue any and all Causes of Action (except for the Litigation Trust Causes of Action, as applicable), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Post-Effective Date Debtor's rights to commence, prosecute, or settle such Causes of Action (except for the Litigation Trust Causes of Action, as

applicable) shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article X of the Plan, which shall be deemed released and waived by the Debtors and Post-Effective Date Debtor as of the Effective Date.

The Post-Effective Date Debtor may pursue such Causes of Action (except for the Litigation Trust Causes of Action, as applicable), as appropriate, in accordance with the best interests of the Post-Effective Date Debtor. **No Entity may rely on the absence of a specific reference in the Plan, the Disclosure Statement, or the Plan Supplement to any Cause of Action against it as any indication that the Debtors, the Post-Effective Date Debtor, or the Litigation Trust, as applicable, will not pursue any and all available Causes of Action against it. The Litigation Trust expressly reserves all rights to prosecute any and all Litigation Trust Causes of Action against any Entity, and the Debtors and the Post-Effective Date Debtor, as applicable, expressly reserve all rights to prosecute any and all other Causes of Action against any Entity. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the schedule(s) of Retained Causes of Action and the Litigation Trust Causes of Action must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against the Post-Effective Debtor and the Litigation Trust, without the need for any objection or responsive pleading by the Post-Effective Date Debtor and the Litigation Trust, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Litigation Trust, with respect to Litigation Trust Causes of Action, and the Post-Effective Date Debtor, with respect to other Causes of Action, may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the schedule(s) of Retained Causes of Action and Litigation Trust Causes of Action that remains unresolved by the Debtors, the Post-Effective Date Debtor, or the Litigation Trust, as applicable, and the objecting party for thirty days, such objection shall be resolved by the Bankruptcy Court. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Litigation Trust, with respect to Litigation Trust Causes of Action, and the Post-Effective Date Debtor, with respect to any other Cause of Action, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, (a) any Causes of Action (except for the Litigation Trust Causes of Action) preserved pursuant to the first paragraph of Article IV.O of the Plan that a Debtor may hold against any Entity shall vest in the Post-Effective Date Debtor and (b) any Litigation Trust Causes of Action that a Debtor may hold against any Person or Entity shall vest in the Litigation Trust. The Post-Effective Date Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action (except for Litigation Trust Causes of Action). The Post-Effective Date Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action (except for Litigation Trust Causes of Action), or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court. The Litigation Trust, through its authorized agents or representatives, shall be vested with and may exclusively enforce any and all Litigation Trust Causes of Action. The Litigation Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Litigation Trust Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**P.     Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall chapter 11 efforts and were an essential element of the negotiations among the Debtors, the Replacement DIP Lender, and the Committee with respect to the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' Chapter 11 Cases through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT OPT OUT OF THE RELEASES CONTAINED IN THE PLAN ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

**1.     Release of Liens**

**Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Post-Effective Date Debtor to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by**

the Debtors or the Post-Effective Date Debtor that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Post-Effective Date Debtor shall be entitled to make any such filings or recordings on such Holder's behalf.

2.     Debtor Release

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by each and all of the Debtors, the Post-Effective Date Debtor, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all claims, interests, obligations, rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Post-Effective Date Debtor, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, in law, equity or otherwise, that the Debtors, the Post-Effective Date Debtor, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Post-Effective Date Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in-or out-of-court restructuring efforts, intercompany transactions, the Replacement DIP Facility, the Replacement DIP Orders, the Prepetition Revolving Credit Facility, the Sale Transaction, the Asset Purchase Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, any of the foregoing and related prepetition transactions, the Disclosure Statement, the Plan, or any Plan Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan (including, for the avoidance of doubt, the Plan Supplement), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing or in the Plan, the releases set forth above do not release (1) any post-Effective Date obligations of any Person or other Entity under the Plan, the Confirmation Order, any Plan Transaction, the Asset Purchase Agreement, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan, (2) any Retained Causes of Action, or (3) any Cause of Action that is a Litigation Trust Cause of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the foregoing Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Plan Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims and Interests released by the foregoing Debtor Release; (c)

14

in the best interests of the Debtors and their Estates and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Post-Effective Date Debtor, or their respective Estates asserting any claim or Cause of Action released pursuant to the foregoing Debtor Release.

        3.        **Third-Party Release**

Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Debtor, the Post-Effective Date Debtor, and Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Post-Effective Date Debtor, or their respective Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Post-Effective Date Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Replacement DIP Facility, the Replacement DIP Orders, the Prepetition Revolving Credit Facility, the Sale Transaction, the Asset Purchase Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, any of the foregoing, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Plan Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing or in the Plan, the releases set forth above do not release any post-Effective Date obligations of any Person or Entity under the Plan, the Confirmation Order, any Plan Transaction, the Asset Purchase Agreement, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims and Interests released by the foregoing Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of

the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing Third-Party Release.

4.      Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Chapter 11 Cases, the Disclosure Statement, the Plan, consummation of the Sale Transaction, or any Plan Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.      Injunction

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtor, the Litigation Trust, the Litigation Trustee, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or

intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan; *provided, that*, for the avoidance of doubt, the Litigation Trust and the Litigation Trustee shall not be enjoined from pursuing any Litigation Trust Cause of Action; *provided further, that*, for the avoidance of doubt, to the fullest extent permissible under applicable law, any Entity is enjoined and restrained from:  (a) interfering with or otherwise impeding, directly or indirectly, the Debtors' or Post-Effective Date Debtor's business, as applicable, including but not limited to (i) the management of the Debtors' and Post-Effective Date Debtor's, as applicable, Estates and (ii) decisions concerning the purchase or sale of any assets, including the Sale Transaction, on behalf of the Debtors' and Post-Effective Date Debtor's, as applicable, Estates; (b) interfering with or otherwise impeding, directly or indirectly, the Litigation Trust Assets or the rights, powers, and duties of the Litigation Trust and Litigation Trustee; (c) otherwise violating section 362(a) of the Bankruptcy Code; (d) seeking to terminate management agreements and/or operating agreements (collectively, (a)-(d) constitute the "**Prohibited Conduct**"); (e) conspiring, colluding, or collaborating with (x) Mr. Bouchard, (y) any Entity owned and/or controlled by Mr. Bouchard, and/or (z) any person or Entity acting on behalf of Mr. Bouchard or any Entity owned and/or controlled by him, to, directly or indirectly, engage in any Prohibited Conduct; and (f) engaging in any Prohibited Conduct with respect to any of the Debtors, the Post-Effective Date Debtor, the Litigation Trust, or the Litigation Trustee.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article X.G of the Plan.

Q.     What is the effect of the Plan on the Debtors' ongoing business?

Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (*see* Article XII of the Plan). On or after the Effective Date, and unless otherwise provided in the Plan, the Post-Effective Date Debtor may operate its businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action (other than Litigation Truste Causes of Action) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

R.     What is the deadline to vote on the Plan?

The Voting Deadline is July [30], 2021, at 4:00 p.m. (prevailing Central Time).

S.     How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot containing your vote is **actually received** by the Solicitation Agent **on or before the Voting Deadline,** *i.e.*

**July [30], 2021, at 4:00 p.m., prevailing Central Time**. *See* Article VIII of this Disclosure Statement, entitled, "Solicitation and Voting Procedures," which begins on page 33 for more information.

**T.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing is currently scheduled for August [●], 2021. at _:__ _.m. (prevailing Central Time).

**U.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

**V.      Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Stretto (the "Solicitation Agent"), via one of the following methods:

*By e-mail at:*
BouchardInquiries@stretto.com

*By telephone (toll free) at:*
U.S. toll-free:  (855) 923-1038
International:  (949) 236-4792

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to Stretto at the address above or by downloading the exhibits and documents from Stretto's website at https://cases.stretto.com/bouchard/court-docket (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov (for a fee).

**W.      Do the Debtors recommend voting in favor of the Plan?**

**Yes**.  The Debtors believe that the Plan provides for a superior distribution to the Debtors' stakeholders, taken as a whole, than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims and Interests, and that other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.  Accordingly, the Debtors recommend that you vote to accept the Plan.

## IV.      QUESTIONS AND ANSWERS REGARDING THE DEBTORS' RESTRUCTURING PLAN

### A.      What is meant by the "Plan Transactions" and the "Sale Transaction"?

**The Plan Transactions**.  On and after the Confirmation Date, the Debtors or Post-Effective Date Debtor, as applicable, shall take all actions reasonably necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, which transactions may include, as applicable: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (a), pursuant to applicable state law; (d) consummation of the Sale Transaction (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Post-Effective Date Debtor, as applicable); and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan Transactions.  In the event a Restructuring Transactions Memorandum is included in the Plan Supplement, the Restructuring Transactions Memorandum shall control over any inconsistent document other than any Asset Purchase Agreement with respect to the Plan Transactions set forth in the Restructuring Transactions Memorandum.

**The Sale Transaction**.  The Debtors shall continue their sale and marketing process and solicit bids for the Sale Transaction, in accordance with the terms and conditions of the Bidding Procedures Order.  The Debtors will seek to elicit a Sale Transaction offer, if any, pursuant to the process set forth in the Bidding Procedures Order.  If the Debtors are able to secure a winning bid in accordance with the Bidding Procedures Order, Holders of certain Claims and Interests, as applicable, will be paid the Sale Proceeds Recovery as set forth in Article III of the Plan and the Sale Transaction will be consummated in accordance with terms to be set forth in the Sale Order, Confirmation Order, and Plan Supplement, as applicable.  At any point, the Debtors may terminate pursuit of the Sale Transaction in accordance with the terms of the Bidding Procedures Order.

In the event that the Debtors determine to effectuate the Sale Transaction, the Sale Order or Confirmation Order, as applicable, shall be deemed to authorize all actions as may be necessary or appropriate to effectuate the Sale Transaction, including, among other things, transferring any purchased assets and interests to be transferred to and vested in any Purchaser free and clear of all Liens, Claims, charges or other encumbrances pursuant to the terms of the Asset Purchase Agreement and authorizing the Debtors, or Post-Effective Date Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

### B.      What are the sources of Cash and other consideration required to fund the Plan?

The Debtors shall fund distributions under the Plan, as applicable, with:  (1) the Debtors' Cash on hand; (2) the Sale Proceeds, if any; and (3) if an All Asset Sale occurs, any Managed Assets, including any New Credit Facility and any Unsecured Claims Recovery Note.  The Litigation Trustee shall fund distributions on account of Litigation Trust Causes of Action to the Litigation Trust Beneficiaries (which

shall be in addition to any All Asset Sale Recovery or Individual Asset Sale Recovery to which Holders of General Unsecured Claims and Holders of Prepetition Revolving Credit Facility Deficiency Claims are entitled under Article III.B.4 and Article III.B.5 of the Plan, respectively).

Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

## V.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.   The Debtors' Corporate History.

Bouchard Transportation Co. was born from an act of heroism by its founder, Captain Frederick E. Bouchard.  While aboard the tug C. Gallagher of the Goodwin, Captain Fred Bouchard witnessed the infamous Black Tom explosion in the New York Harbor—an act of sabotage by German agents to destroy U.S.-made munitions that were to be supplied to the Allies in World War I.  Rushing into danger, Captain Fred Bouchard rescued two vessels—the 4,000-ton Brazilian steamer Tijoca Rio and the schooner George E. Elezy—and pulled several ammunition scows to safety.  The U.S. District Court honored Captain Fred Bouchard with a salvage award, as well as an award for personal bravery, which together totaled $9,000. Captain Fred Bouchard invested this money to create his own company, the Bouchard Transportation Company, incorporated in 1918.

Since its inception, four generations of Bouchard family members have carried on a philosophy of innovation, investing the company's profits into new barges and tugs to expand its fleet.  In 1931, Frederick Bouchard acquired the company's first oil barge—a sunken vessel—for $100.  By 1989, the company had grown to include nineteen barges and eight tugs, with routes that covered the entire eastern seaboard, Gulf Coast, and Great Lakes ports.  Notably, in 1992, the company overcame industry-wide challenges caused by the Oil Pollution Act of 1990 by becoming the first company to build several new 138,000 barrel double hull, flat-deck barges and state-of-the-art 6,140 horsepower tugboats, strong enough to maneuver the 400 plus foot barges.

Mirroring its heroic beginnings, the company played a key role in the 2009 rescue of the passengers onboard U.S. Airways flight 1549, following its crash-landing in the Hudson River by Captain "Sully" Sullenberger.  Answering the Coast Guard's call to action, multiple Bouchard vessels participated in the rescue, with one of the company's larger tugs creating a barrier around the airplane to keep passengers out of harm's way as they were rescued from the water.

In 2010, the company invested approximately $500 million in a major fleet expansion plan to construct the most advanced articulated tug barge vessels ("ATB Units") to be traded within the Jones Act Market.  Today, the Debtors' fleet includes 22 double-hulled barges (the "Barges") and 25 tugs (the "Tugs," and together with the Barges and the ATB Units, the "Vessels") of various sizes, capacities, and capabilities.

### B.   The Debtors' Key Assets and Operations.

#### 1.   The Debtors' Fleet.

The Debtors maintain an industry-leading fleet of 22 Barges and 25 Tugs of various sizes, capacities, and capabilities—each of which features state-of-the-art equipment and fuel efficient technologies—with services operating throughout the Eastern Seaboard and Gulf Coast of the United

States.  For the last century, the company has offered customers a variety of premium Barges, Tugs, and ATB Units to service their unique transportation needs.  The Debtors believe they maintain one of the largest, safest, and most modern ocean-going petroleum barging fleets in the coastal United States.  Over four generations, the Bouchard family has continued to manage the company and its fleet based on the founding fathers' philosophy that, as tug captains, the company must invest profits in the newest, highest quality vessels available, maintain those vessels to the highest standards, and hire and train the best seagoing employees available.

The Debtors' fleet is comprised of two different types of vessels:  Barges and Tugs.  As further explained below, certain of the Barges and Tugs comprise an articulated tug-barge unit, also known as ATB Units.

### (a)  Barges.

The Debtors own and operate a fleet of 22 double-hulled Barges of various sizes and carrying capacities.  The double-hulled Barges are all flat-deck, as opposed to trunk tank, and built between 1979 and 2019, with B. No. 252 the latest addition to the fleet.  The Barges are all ocean-going and have various carrying capacities to meet customers' needs, ranging from small Barges with 35,000 barrels ("BBLs") of carrying capacity to large Barges with 260,000 BBLs of carrying capacity.  The Barges operate in both the clean oil market (i.e., gasoline, diesel, and jet fuel) and the black oil market (i.e., asphalt, crude oil bunkers, and residential fuel oil)  Each of the Barges include topline equipment and fuel-efficient technologies that both exceed industry standards and enable the Debtors to more effectively support the needs of their customers.

When operating, the Barges are primarily maneuvered by Tugs as a component part of an ATB Unit.  The Debtors are one, if not the only, Jones Act operators to exclusively operate *manned* Barges, which, although more expensive to operate than unmanned barges, are safer and more reliable.  The Barges enable the Debtors to provide various services for their customers, including, but not limited to, the large-scale, long-distance transport of oil and clean petroleum products.

### (b)  Tugs.

The Debtors own and operate 25 ocean-going Tugs (also known as tugboats).  The Tugs are used to maneuver the Barges.  The Tugs were built between 1970 and 2019, and possess horsepower ranging from 3,000 up to 10,000.  The range of Tugs offered by the Debtors provide their customers with tailored transportation and shipment solutions to traverse and maneuver a wide array of water ways.

Four of the Tugs are used to tow Barges via wire tow lines.  The other twenty-one Tugs are ATB-capable and equipped with an intercon connecting system that allows each Tug to connect to the Barge by slotting into a notch in the stern of the Barge.  When the Tug and Barge are connected, they form an ATB Unit, as further described below.  Each ATB-capable Tug is married to a specific class of Barge.  Although the intercon connecting system is more expensive than other competitive connecting systems, the Debtors believe it is the safest and most reliable connecting system available.

### (c)  The ATB Units.

To meld the efficiency of the Tugs and Barges with the power and speed of a large, unified ship, the Debtors' Tugs and Barges are designed as component parts of the ATB Units.  The ATB Units consists of an independent Tug, acting as a detachable power module, that is connected into the stern notch of a Barge designed to fit the Tug.  The Tug and Barge are "locked" together by an articulated, or "hinged,"

connection system.  ATB Units provide various competitive advantages when compared to a traditional towing barge, including increased operational flexibility, improved speed and endurance, and safety.

### 2. The Debtors' Customers.

The Debtors' primary customers are major and minor domestic and international oil companies and oil traders.  The Debtors enjoy their role as a key component of the domestic and international oil trade ecosystem.

### 3. The Debtors' Geographic Markets.

The Debtors historically operated their Vessels predominately in the Eastern Seaboard and Gulf Coast of the United States.  As of the Petition Date, the Debtors' Vessels were not operating.  During the pendency of the Chapter 11 Cases, however, certain Vessels have returned to service.  The Vessels are anchored, moored, or otherwise stationed at or outside of various ports across the United States.

### C. The Debtors' Prepetition Capital Structure.

As of September 28, 2020 (and calculated for First Day Declaration purposes), the Debtors had approximately $229 million in aggregate principal amount of funded debt obligations.

| *Funded Debt* | *Agent / Lenders* | *Maturity* | *Approx. Principal Amount Outstanding (in USD millions)* |
|---|---|---|---|
| Secured Debt | | | |
| Prepetition Revolving Credit Facility ($165 million) | Wells Fargo, N.A. | February 7, 2020 | $164.1 million |
| Prepetition Aircraft Loan ($25 million) | Fortress Credit Co LLC | March 10, 2021 | $25 million |
| *Total Secured Debt* | | | $189.1 million |
| Unsecured Bouchard Promissory Notes | | | |
| Unsecured Bouchard Promissory Notes | Morton S. Bouchard III and Morton S. Bouchard III 2017 Family Trust (Exempt Share) | December 31, 2025 | $40.4 million |
| *Total Unsecured Debt* | | | $40.4 million |
| *Total Outstanding Funded Debt* | | | **$229.5 million** |

### 1. Prepetition Revolving Credit Facility.

On October 30, 2013, Bouchard entered into a $100 million revolving credit facility (the "Prepetition Revolving Credit Facility"), pursuant to the loan agreement by and among Bouchard, as borrower, and Wells Fargo Bank, National Association ("Wells Fargo"), as lender, as amended and

supplemented from time to time. The parties agreed to increase the Prepetition Revolving Credit Facility size to $165,000,000 on February 4, 2015. The Prepetition Revolving Credit Facility matured as of February 7, 2020. It is guaranteed by certain of Bouchard's subsidiaries and secured by ship mortgages on the following Barges and Tugs: B. No. 210; B. No. 215; B. No. 225; B. No. 242; B. No. 245; B. No. 250; B. No. 252; B. No. 260; B. No. 262; B. No. 270; B. No. 295; Bouchard Girls; Morton S. Bouchard, IV; Kim M Bouchard; Jane A. Bouchard; Brendan J. Bouchard; Danielle M. Bouchard; Evening Breeze; Evening Star. Interest under the Prepetition Revolving Credit Facility is payable as follows: (a) with respect to Eurodollar Loans (as defined thereunder), such loans bear interest at the variable market LIBOR rate, plus an Applicable Margin of 2.50% and (b) with respect to each Prime Rate Loan (as defined thereunder), such loans bear interest at the variable market Prime Rate (as established by Wells Fargo), plus an Applicable Margin of 0.00%, in either case, payable monthly.

### 2.    Prepetition Aircraft Loan.

On March 10, 2020, Bouchard entered into a $25 million term loan (the "Prepetition Aircraft Loan"), pursuant to the loan and aircraft security agreement by and among Bouchard, as borrower, and Fortress Credit Co LLC ("Fortress"), as initial lender and agent, as amended and supplemented from time to time (the "Loan and Aircraft Security Agreement"). The Prepetition Aircraft Loan had a stated maturity of March 10, 2021. The Prepetition Aircraft Loan was made for the benefit of Bouchard in connection with the refinancing of a loan secured by a certain aircraft (the "Company Aircraft") and was secured by a lien on (a) the Company Aircraft, including the airframe, the engines, and certain other parts and records; (b) any and all associated rights secured by or associated with the airframe and/or the engines, together with any related international interests and prospective international interests; (c) all of the other collateral described or referred to in the Loan and Aircraft Security Agreement or any of the other related loan documents; and (d) all proceeds of the foregoing. The proceeds of the Prepetition Aircraft Loan were used to, among other things, pay all outstanding employee back-pay, pay certain hull insurance premiums, pay P&I insurance installment obligations, and ultimately secure a temporary 90-day DOC to restart operations. During the Chapter 11 Cases, the Prepetition Aircraft Loan was repaid in full with proceeds of the sale of the Company Aircraft.

### 3.    Unsecured Bouchard Promissory Notes.

From first quarter of 2019 to third quarter of 2020, the Bouchard family made a series of purported loans to Bouchard pursuant to unsecured promissory notes in the aggregate amount of approximately $40.4 million (the "Unsecured Bouchard Promissory Notes"). Each of the promissory notes has a scheduled maturity of December 31, 2025, and carries an interest rate equal to the applicable Federal rate for the month in which loans were advanced with a range of 0.35% to 2.63% per annum. The Debtors are conducting an investigation into the nature, validity, and priority of the Unsecured Bouchard Promissory Notes and, based on the current status of the investigation, the Debtors are seeking to equitably subordinate the claims based on the Unsecured Bouchard Promissory Notes (i.e., the Bouchard Family Loan Claims) under the Plan and the Debtors may seek to recharacterize the Bouchard Family Loan Claims as equity contributions.[10] The Plan classifies the Bouchard Family Loan Claims as Class 6 Section 510(c) Claims.

---

[10]    The Debtors expressly reserve the right to seek recharacterization of the Unsecured Bouchard Promissory Notes as contributions of equity under applicable law, at equity, or otherwise.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Operational Issues and Liquidity Challenges.

#### 1.    The October 2017 Incident.

The Debtors' path to the commencement of these Chapter 11 Cases can be traced back to a tragedy in October 2017.  While preparing to get under way from anchorage to proceed into the Port of Corpus Christi, Texas, the ATB Unit Buster Bouchard/B. No. 255, caught fire and exploded off the coast of Port Aransas, Texas.  Tragically, the accident resulted in the death of two crewmembers.  Approximately 2,000 barrels of crude oil were also released from the Barge into the water or consumed by the fire and released into the atmosphere.  The resulting litigation, environmental costs, and public hearings conducted by the Coast Guard, exacerbated by general industry headwinds, ultimately precipitated a steady decline in both revenue and liquidity, severely straining operations throughout 2017 and 2018.

Following the incident, the Debtors purchased the ATB Unit M/V Evening Breeze & B. No. 252 in an effort to modernize the fleet and continue to mitigate the possibility of future safety incidents.  The new Vessels are equipped with safety equipment exceeding regulatory standards and other best-in-class technical attributes.

In spite of the Debtors' mitigation efforts, the Coast Guard and the Debtors' then-classification society, the ABS, initiated technical oversight of the Vessels in the wake of the incident.  The Debtors complied with all applicable inspections and proceedings and took proactive measures to improve the their policies and procedures.  In a 2019 survey performed by the National Transportation Safety Board ("NTSB") regarding the October 2017 incident, however, the NTSB recommended that the Debtors evaluate their safety management systems with a third party to identify possible deficiencies.  Consequently, the Debtors engaged ECM Maritime Services LLC to provide technical and operational management services.  Despite all of the steps the Debtors took to restore its industry-leading reputation for the safety and regulatory compliance of its Vessels, customers began to cancel key contracts and ABS terminated the Debtors as a client.  Subsequently, revenue declined precipitously, causing the Debtors to report operating losses in 2017, 2018, and 2019 for the first times in the company's 100-plus year history.

#### 2.    The Coast Guard Lifts the Debtors' DOC.

The Debtors' financial and operational challenges, which persisted through 2019, were amplified in late 2019 when ABS recommended that the Coast Guard lift the Debtors' DOC.  Upon ABS's recommendation, the Coast Guard lifted the Debtors' DOC because the Debtors had failed to properly maintain certain office records and certain of its policies and practices were not sufficiently followed in the field.  ABS subsequently cancelled its contract with the Debtors, leaving the Debtors without a classification society to perform the requisite safety management audit that could restore the Debtors' DOC.

Importantly, a tug and barge may still operate within the territorial waters of the United States without a DOC if the operator otherwise maintains a Coastwise Load Line Certificate issued by a recognized organization.  However, the Debtors' key and longstanding customers in the industry—who require transportation services for international cargo—would not accept the Debtors' services absent a DOC because a DOC attests that the tug and barge operator is operating within the guidelines of the governing ISM Code.  The Debtors were thus rendered functionally unable to charter or otherwise operate their fleet, and, therefore, unable to generate revenue.

The Debtors' liquidity constraints had a material adverse impact on their operations and ability to comply with all applicable laws and regulations to which the Vessels are subject.  Without the requisite

liquidity to maintain and operate its fleet at industry-leading safety standards and pay applicable docking fees, the Coast Guard issued multiple Captain of the Port Orders ("COPT Orders") throughout February 2020 in New York, Louisiana, and Texas.  The COPT Orders created further operational and financial hurdles for the Debtors.  The Debtors attempted to restore regulatory compliance through hiring DNV/GL as its new classification society to conduct and/or assist with, as the case may be, a safety management audit and certain technical and other regulatory inspections.  Dissatisfied with the safety management audit, DNV/GL canceled its contract with the Debtors, again leaving the Debtors without a classification society.

### B.     Maritime Liens.

The loss of the Debtors' DOC also led to severe liquidity constraints, impairing the Debtors' ability to fulfill their monetary obligations to their trade vendors in the ordinary course of business.  As of the Petition Date, various vendor parties asserted lien claims against the Debtors' assets, including more than $10 million in recorded maritime lien claims.  Certain of these vendors also asserted more than $6 million of asserted *custodia legis* expenses.

Prior to the Petition Date, certain of the Debtors' maritime lien creditors exercised remedies against certain Debtors and certain Vessels.  Two Vessels were arrested in federal district court and subject to interlocutory sales scheduled to take place on September 29, 2020, precipitating the urgency of the Debtors' decision to seek the protections of chapter 11.  Two other Vessels were scheduled for interlocutory sales on November 9, 2020.  Accordingly, the Debtors proactively commenced the Chapter 11 Cases, in part, to stay the value-destructive and uncoordinated sale of its core assets and obtain a breathing spell from further collection actions while the Debtors address their liquidity crises and operational stagnation.

### C.     Prepetition Efforts to Increase Liquidity.

Prior to the commencement of these Chapter 11 Cases, the Debtors took proactive steps to attempt to increase liquidity.  The Debtors searched extensively for further debt financing as their liquidity profile further deteriorated in early 2020.  For example, the Debtors proactively engaged their prepetition lender, Wells Fargo, to provide the Debtors with sufficient liquidity to pay their debt obligations to employees and trade vendors.  Wells Fargo was unwilling to lend further.  The Debtors engaged with at least twelve other commercial and investment banks as potential lenders to seek financing that would allow the Debtors to pay their employees' wages and satisfy maritime liens.  None of these lenders, however, would provide financing outside of an in-court process.

In February 2020, the Debtors engaged in extensive negotiations with Fortress to raise capital through refinancing of the Company Aircraft.  Those efforts led to a new $25 million facility being funded in March 2020 that provided incremental capital for, among other things, paying all outstanding employee back-pay, paying certain hull insurance premiums, making P&I insurance installment payments, and ultimately securing a temporary 90-day DOC to restart operations.

In late February 2020, the Debtors entered into an agreement for the sale of two 35,000 BBL barges for approximately $12 million.  Despite the Debtors' offer to lower the price of the barges, however, the asset sale ultimately failed to close due to changed circumstances caused by the COVID-19 global pandemic.  On March 14, 2020, the Debtors consummated a sale of the Tug Captain Fred Bouchard.  The Tug Captain Fred Bouchard sale generated net proceeds of approximately $1 million, substantially all of which was used to pay employee wages and benefits obligations.

On April 17, 2020, the Debtors applied for a Paycheck Protection Program Loan in the amount of $7.885 million, which was approved on April 30, 2020.  The Debtors also applied for other temporary relief available under the Coronavirus Aid, Relief, and Economic Security Act.

Additionally, from March through September 2020, the Bouchard family invested an incremental $8.2 million in the Debtors via Unsecured Bouchard Promissory Notes for the purposes of paying outstanding back-pay to the Debtors' dedicated workforce, paying off various maritime liens that allowed the Debtors to retake possession of certain Vessels, and securing a temporary 90-day DOC. In total, the Bouchard family invested approximately $10.1 million in the Debtors in 2020. After the expiration of the temporary DOC, however, the Debtors' inability to generate revenue exacerbated a liquidity crisis that functionally halted substantially all operations in Q3 2020.

On September 6, 2020, the Debtors entered into a purchase agreement for the sale of tug Evening Mist for approximately $400,000. Although the requisite survey was complete and the asset purchase agreement had been signed by the parties, the prospective buyer never signed the escrow agreement and eventually backed out of the transaction.

Further, immediately prior to the Petition Date, the Debtors engaged in extensive negotiations with their secured lenders regarding an out-of-court financing arrangement that would provide the Debtors with liquidity in the near term to satisfy maritime lien obligations and undertake key restructuring initiatives. No party was willing to provide new money on an out-of-court basis. Accordingly, the Debtors commenced the Chapter 11 Cases, in part, to access necessary near-term liquidity through DIP financing—liquidity that the Debtors otherwise would have been unable to attain.

## VII.   MATERIAL DEVELOPMENTS IN THE CHAPTER 11 CASES

### A.   First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. On October 1, 2020, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis. On October 22, 2020, the Bankruptcy Court entered orders approving certain of the First Day Motions on a final basis.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Matthew Ray of Portage Point Partners, LLC in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 79] (the "First Day Declaration"), filed on October 12, 2020. The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/bouchard/court-docket/.

### B.   Authorization to Use Cash Collateral and Obtain Debtor in Possession Financing

On October 21, 2020 the Debtors Filed the *Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 102] (the "Cash Collateral and DIP Financing Motion"), requesting that the Bankruptcy Court authorize the Debtors to use the Prepetition Collateral, including Cash Collateral, of the Prepetition Lenders under the Prepetition Loan Agreement and providing adequate protection to the Prepetition Lenders for any diminution in value of their assets in the Prepetition Collateral (each as defined in the Cash Collateral and DIP Financing Motion). The Debtors also requested, through the Cash Collateral and DIP Financing Motion, that the Bankruptcy Court authorize the Debtors to access $28.8 million of a $60 million DIP facility to be provided by Hartree

Partners, LP (the "Hartree DIP Facility").  On October 22, 2020, the Bankruptcy Court entered an order approving the Cash Collateral and DIP Financing Motion on an interim basis and authorizing the Debtors to access $28.8 million of the Hartree DIP Facility [Docket No. 141].  On December 21, 2020, the Bankruptcy Court entered the Final DIP Order [Docket No. 334], authorizing the Debtors to access the remaining $31.2 million of the $60 million Hartree DIP Facility.

After the Debtors failed to satisfy the conditions precedent to draw the remainder of the Hartree DIP Facility, on February 24, 2021, the Debtors filed the *Emergency Motion for Entry of an Order (I) Approving Amendment to DIP Credit Agreement and (II) Granting Related Relief* (the "DIP Amendment Motion") [Docket No. 550], requesting that the Court authorize an amendment to the applicable DIP credit agreement to allow the Debtors access to additional funds on a weekly basis for the purposes of payroll, employee benefits, U.S. Trustee fees, insurance, and necessary vessel repairs and maintenance (the "Emergency Loans").  The access to the additional liquidity under the DIP Amendment Motion was to end on the earlier of March 15, 2021 or the closing of the sale of the Debtors' 2018 Gulfstream G650 aircraft (the "Aircraft Sale").  On February 25, 2021, the Court entered the *Stipulation and Agreed Order by and Among the Debtors and Hartree Partners, LP, as DIP Lender with Respect to Emergency Loans* [Docket No. 560], allowing the Debtors to access certain Emergency Loans under the Hartree DIP Facility.  On March 8, 2021, the Court entered the *Second Stipulation and Agreed Order by and Among the Debtors and Hartree Partners, LP, as DIP Agent and DIP Lender with Respect to Emergency Loans* [Docket No. 614], permitting the Debtors to access additional Emergency Loans under the Hartree DIP Facility.

On March 4, 2021, the Debtors filed the *Debtors' Supplemental Emergency Motion for Entry of an Order (I) Approving Amendment to DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 603], requesting that the Bankruptcy Court authorize an additional amendment to the Final DIP Order to allow the Debtors to access a $5 million incremental DIP loan from Fortress, to be secured by a lien on the Company Aircraft (the "Incremental DIP Loan").  On March 5, 2021, the Bankruptcy Court entered an order authorizing a first amendment to the Final DIP Order [Docket No. 609], which authorized the Debtors' entry into the Incremental DIP Loan.  The Incremental DIP Loan was subsequently repaid in full using proceeds of the sale of the Company Aircraft.

On March 30, 2021, the Debtors filed the *Emergency Motion for Entry of Order Authorizing Second Amendment to Final DIP Order* [Docket No. 737], requesting that the Bankruptcy Court authorize entry into a replacement DIP agreement with JMB Capital Partners Lending, LLC, consisting of a new money multiple draw term loan in the aggregate principal amount of up to $90 million.  On April 5, 2021, the Court entered the *Interim Order Authorizing Second Amendment to Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Further Hearing, and (G) Granting Related Relief* [Docket No. 756] (the "Interim Replacement DIP Order"), approving the Debtors' entry into the Replacement DIP Facility on an interim basis.  Proceeds of the Replacement DIP Facility were used to repay the Hartree DIP Facility in full following entry of the Interim Replacement DIP Order.

On April 29, 2021, the Court entered the *Final Order Authorizing Second Amendment to Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Further Hearing, and (G) Granting Related Relief.* [Docket No. 831], approving the Debtors' entry into the Replacement DIP Facility on a final basis.

### C.    Appointment of Official Committee

On February 25, 2021, the U.S. Trustee Filed the Notice of Appointment of Committee of Unsecured Creditors [Docket No. 563], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently comprised of: (a) VT Halter Marine; (b) CRG Financial LLC; and (c) Justin Peaslee.

On March 1, 2021, the Committee Filed the Notice of Appearance and Request for Notice [Docket No. 571], identifying their proposed counsel as Ropes & Gray LLP.  The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on March 15, 2021.

On March 19, 2021, the Committee Filed the *Application to Employ Ropes & Gray LLP as Counsel to the Official Committee of Unsecured Creditors* [Docket No. 690] (the "Application to Employ Ropes & Gray").  On April 16, 2021, the Court entered an order approving the Application to Employ Ropes & Gray [Docket No. 798].

On March 22, 2021, the Committee filed the *Application to Employ Berkeley Research Group, LLC as Financial Advisor to the Official Committee of Unsecured Creditors* [Docket No. 714] (the "Application to Employ BRG").  On April 15, 2021, the Court entered an order approving the Application to Employ BRG [Docket No. 795].

On March 26, 2021, the Committee filed the *Application to Employ Clyde & Co US LLP as Maritime Counsel to the Official Committee of Unsecured Creditors* [Docket No. 730] (the "Application to Employ Clyde & Co").  On April 21, 2021, the Court entered an order approving the Application to Employ Clyde & Co [Docket No. 811].

### D.    Other Procedural and Administrative Motions

During the Chapter 11 Cases, the Debtors also Filed several other motions to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Interim Compensation Procedures Motion.  On October 27, 2020, the Debtors Filed the *Motion for (I) Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals, and (II) Granting Related Relief* [Docket No. 166] (the "Interim Compensation Motion"), seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases.  On November 24, 2020, the Bankruptcy Court entered an order approving the Interim Compensation Motion [Docket No. 241].

- Ordinary Course Professionals Motion.  On November 20, 2020, the Debtors Filed the *Motion for Entry of an Order (I) Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 238] (the "OCP Motion"), seeking authorization for the Debtors to retain and compensate certain professionals utilized in the ordinary course of business.  On December 16, 2020, the Bankruptcy Court entered an order approving the OCP Motion on a final basis [Docket No. 241].

- SOFA Extension Motion.  On September 29, 2020, the Debtors Filed the *Emergency Motion for Entry of an Order (A) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (B) Granting Related Relief* [Docket No. 27] (the "SOFA

Extension Motion"), seeking an extension of the deadlines by which the Debtors must File certain schedules of assets and liabilities and statements of financial affairs for each Debtor (the "Schedules and SOFAs") to December 11, 2020.  On October 9, 2020, the Bankruptcy Court entered an order approving the SOFA Extension Motion [Docket No. 34].  On November 20, 2020, the Debtors Filed the *Motion for Entry of an Order (A) Granting a Second Extension of Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (B) Granting Related Relief* [Docket No. 237] (the "Second SOFA Extension Motion"), seeking a second extension of the deadlines by which the Debtors must File the Schedules and SOFAs to February 9, 2021.  On December 14, 2020, the Debtors Filed a certificate of counsel stating no objections to the Second SOFA Extension Motion had been Filed and requesting the Bankruptcy Court's entry of an order granting the Second SOFA Extension Motion [Docket No. 303].  On December 16, 2020, the Bankruptcy Court entered an order approving the Second SOFA Extension Motion on a final basis [Docket No. 309].  The Debtors filed the Schedules and SOFAs on February 10, 2021.

- Claims Bar Date Motion.  On March 9, 2021, the Debtors Filed the *Emergency Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 505(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 621] (the "Claims Bar Date Motion"), seeking to establish bar dates for filing proofs of claims, an amended schedules bar date, rejection damages bar date, and approving the form and manner for filing proofs of claims.  On March 12, 2021, the Bankruptcy Court entered an order approving the Claims Bar Date Motion on a final basis [Docket No. 650].

## E.       Retention of Debtor Professionals

The Debtors Filed applications for, and the Bankruptcy Court entered orders approving, the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:

- Kirkland & Ellis LLP as legal counsel [Docket No. 242];

- Jackson Walker LLP as legal counsel [Docket No. 173];

- Jefferies LLC as investment banker [Docket No. 287]; and

- Portage Point Partners, LLC as restructuring advisor [Docket No. 165], (collectively, the "Retention Applications").

The Retention Applications were approved and orders were entered authorizing the Retention Applications on November 23, 2020 for Kirkland & Ellis LLP, Jackson Walker LLP, and Portage Point Partners, LLC, and on January 14, 2021 for Jefferies LLC.  The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases.  The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

## F.       The Governance Orders

Following hearings on February 24 and February 26, 2021, at which the Bankruptcy Court expressed concerns relating to the Chapter 11 Cases, on February 26, 2021, the Bankruptcy Court entered the *Order* [Docket No. 569] (the "February 26 Order") that, among other things, immediately removed Mr.

Bouchard from his positions as chief executive officer and director of the Debtors and appointed Matthew Ray of Portage Point Partners, LLC ("Mr. Ray") as chief restructuring officer of the Debtors.

On March 5, 2021, the Bankruptcy Court entered the *Supplemental Order to that Certain Order Entered at Docket No. 569* [Docket No. 608] (together with the February 26 Order, the "Governance Orders") that, among other things, appointed and empowered Mr. Ray and Patrick J. Bartels Jr. to serve as members of the boards of directors of each of the Debtors, with sole, full, and complete authority to act on behalf of and to govern the affairs of the Debtors.

## G.     Aircraft Sale

On November 29, 2020, the Debtors filed the *Emergency Motion for Entry of an Order (I) Establishing Certain Procedures for the Sale of the Aircraft Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Payment of Certain Transaction Expenses in Accordance with the Sale Procedures, and (III) Granting Related Relief* [Docket No. 263] (the "Aircraft Sale Motion"). On December 3, 2020, the Court entered the order approving the Aircraft Sale Motion [Docket No. 282]. On February 24, 2021 the Debtors filed the *Notice of Filing of Executed Aircraft Purchase Agreement and Order (I) Authorizing the Sale of the Aircraft Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Payment of the Transaction Expenses in Connection Therewith, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and (IV) Granting Related Relief* [Docket No. 551] (the "Aircraft Purchase Agreement"), giving notice of the Aircraft Sale to Surebliss LLC for a purchase price of $44 million. On March 5, 2021, the Court entered the *Order (I) Authorizing the Sale of the Aircraft Free and Clear of all Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Payment of the Transaction Expenses in Connection therewith, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and (IV) Granting Related Relief* [Docket No. 607] (the "Aircraft Sale Order"). On March 15, 2021, the Debtors filed the Notice of Consummation of the Aircraft Sale [Docket No. 661], giving notice that the Debtors consummated the Aircraft Sale on March 15, 2021 in accordance with the Aircraft Sale Order and the Aircraft Purchase Agreement.

## H.     Bouchard Stipulation

On April 22, 2021, in the ordinary course of business and pursuant to the Governance Orders, the Debtors and Mr. Bouchard entered in a *Stipulation By and Among Morton S. Bouchard, III and Bouchard Transportation Co., Inc., et al.* (the "Bouchard Stipulation"), pursuant to which Mr. Bouchard agreed to provide the Debtors' chief restructuring officer and the boards of directors of each of the Debtors with consultation services regarding the operation of the Debtors' businesses. As set forth in the *Reservation of Rights of the Official Committee of Unsecured Creditors Regarding the Bouchard Stipulation* [Docket No. 892] (the "Committee Reservation of Rights"), the Committee maintains that the Bouchard Stipulation was a postpetition agreement entered into outside the ordinary course of business that required Bankruptcy Court approval. Accordingly, as set forth in the Committee Reservation of Rights, the Committee reserved, and continues to reserve, all rights with respect to the Bouchard Stipulation, including, but not limited to, (a) the right to seek to recover any payments made pursuant to the Bouchard Stipulation and (b) the right to assert any claims or causes of action arising out of any breach of the terms of the Bouchard Stipulation by Mr. Bouchard.

## I.     Bidding Procedures and Marketing Process

As described above, the Debtors are conducting a marketing and Auction process for all of substantially all of their assets. The Debtors, working with Jefferies, contacted 165 potentially interested parties, including both financial and strategic counterparties. Of these potential bidders, which included certain strategic companies in the oil transportation space and a range of distressed and private equity

investors, all either reviewed a teaser document or participated in high-level discussions about a potential transaction. Ultimately, more than 73 potential bidders negotiated and executed confidentiality agreements and were provided access to a virtual dataroom containing detailed information about the Debtors' industry, business, and assets, the facts and circumstances of these Chapter 11 Cases, and the bidding process.

Under the Bidding Procedures[11] approved by the Bankruptcy Court, the deadline for the Debtors to select a Stalking Horse Bidder is July 7, 2021. The deadline for interested parties to submit Qualified Bids is July 16, 2021 at 5:00 p.m., prevailing Central Time. Qualified Bids are required to satisfy the general Bid Requirements set forth in the Bidding Procedures. Pursuant to the Bidding Procedures, if multiple competing Qualified Bids are received, the Debtors will conduct an Auction (as defined in the Bidding Procedures) on July 19 and July 20, 2021. At the first day of the Auction, the Debtors will consider bids on an individual asset basis; at the second day of the Auction, the Debtors will consider bids for substantially all of the Debtors' assets in the aggregate (or a material portion thereof). If one or both days of the Auction are canceled, the Debtors will file a notice with the Bankruptcy Court within two days of such cancellation determination. The deadline to object to the Sale Transaction is July 21, 2021, at 4:00 p.m. (prevailing Central Time).

## J.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, adversary proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

## K.    Assumption and Rejection of Executory Contracts and Unexpired Leases

The Debtors are party to a number of executory contracts. The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume, assume and assign, or reject pursuant to sections 365 or 1123 of the Bankruptcy Code. On January 5, 2021, the Debtors Filed the *Motion to Extend Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 374] seeking an extension of the time which the Debtors may assume or reject unexpired leases of nonresidential real property through July 23, 2021. On January 8, 2021, the Bankruptcy Court entered an order extending the time within which the Debtors must assume or reject unexpired leases of nonresidential real property through July 23, 2021 [Docket No. 378].

If the Sale Transaction is consummated, on the Effective Date, except as otherwise provided in the Plan, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is identified on the Assumed Executory Contracts and Unexpired Leases Schedule; (2) is the subject of a motion to assume (or assume and assign) such

---

[11]   Capitalized terms used in this paragraph but not defined herein or in the Plan have the meanings given to such terms in the Bidding Procedures Order.

Executory Contract or Unexpired Lease that is pending on the Confirmation Date; (3) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (4) is a directors and officers insurance policy; (5) is the Asset Purchase Agreement; or (6) is to be assumed by the Debtors and assigned to the Purchaser in connection with the Sale Transaction and pursuant to the Asset Purchase Agreement.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Post-Effective Date Debtor, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases List identified in Article V of the Plan and in the Plan Supplement at any time through and including forty-five (45) days after the Effective Date; provided, that the foregoing extension shall not include leases with respect to real property.  The Debtors or the Post-Effective Date Debtor, as applicable, shall provide notice of any amendments to the Rejected Executory Contracts and Unexpired Lease List or the Assumed Executory Contracts and Unexpired Leases Schedule to the parties to the Executory Contracts or Unexpired Leases affected thereby.

Although their analysis is ongoing, the Debtors currently estimate that the aggregate amount of Claims on account of rejection of Executory Contracts and Unexpired Leases may be significant.

**L.        Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court and served on the Post-Effective Debtor no later than thirty (30) days after the effective date of such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Post-Effective Date Debtor, the Estates, or their property, without the need for any objection by the Debtors or Post-Effective Date Debtor, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article X.G of the Plan, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article V of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**M.        Cure of Defaults**

Any monetary defaults under each Executory Contract or Unexpired Lease Allowed under the Plan, if any, (it being understood that the assumption and assignment of the Executory Contracts or Unexpired Leases pursuant to the Asset Purchase Agreement, if any, shall be authorized and governed by the Sale Order, and, in the event of any inconsistency between the Plan and Sale Order concerning the assumption and assignment of such Executory Contracts or Unexpired Leases, the terms of the Sale Order shall govern and control) shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Post-Effective Date Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the

Executory Contract or Unexpired Lease to be assumed or assumed and assigned, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption or as may be agreed upon by the Debtors or the Post-Effective Date Debtor, as applicable, and the contract counterparty to the Executory Contract or Unexpired Lease. For the avoidance of doubt, nothing herein shall affect any Executory Contract or Unexpired Lease that is assumed pursuant to the procedures in the Bidding Procedures Order.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for cure payments that differ from the amounts paid or proposed to be paid by the Debtors or the Post-Effective Date Debtor to a counterparty must be Filed, served, and actually received by the Debtors on or before the day that is thirty days after the Effective Date or other applicable Final Order of the Bankruptcy Court. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Post-Effective Date Debtor, without the need for any objection by the Post-Effective Date Debtor or any other party in interest or any further notice to or action, order, or approval of the Court. Any cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Post-Effective Date Debtor of the cure amount; *provided* that nothing herein shall prevent the Post-Effective Date Debtor from paying any cure despite the failure of the relevant counterparty to File such request for payment of such cure. The Post-Effective Date Debtor also may settle any cure without any further notice to or action, order, or approval of the Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, must be Filed with the Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Court at the Debtors' or Post-Effective Date Debtor's, as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

For the avoidance of doubt, the Debtors or the Post-Effective Date Debtor, as applicable, may add any Executory Contract or Unexpired Lease proposed to be assumed to the Rejected Executory Contract and Unexpired Lease List in accordance with the time limits provided by the Plan for any reason, including if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount paid or proposed to be paid by the Debtors or the Post-Effective Date Debtor, in which case such Executory Contract or Unexpired Lease is deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption. Any Proofs of Claim Filed with respect to an assumed Executory Contract or Unexpired Lease shall be deemed disallowed, without further notice to or action, order, or approval of the Bankruptcy Court.

## VIII.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

A.      **Holders of Claims Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article TIII.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?," which begins on page 5, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3, 4, 6, and 9 and Interests in Class 7  (collectively, the "Voting Classes").  The Holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 5, and 8.

B.      **Voting Record Date.**

**The Voting Record Date is [June 23], 2021** (the "Voting Record Date").  The Voting Record Date is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

C.      **Voting on the Plan.**

**The Voting Deadline is July [30], 2021, at 4:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline.  Ballots or master ballots returned by facsimile will not be counted.

1.      **Holders of Claims in Class 3 and Class 4.**

If you are a Holder of either a Prepetition Revolving Credit Facility Secured Claim or a General Unsecured Claim, you must complete, sign, and date your ballot and return it (with an original signature) *promptly* in the reply envelope enclosed therewith or via one of the following methods:

| **If sent by first-class mail, hand delivery or overnight mail:** | **If via online portal:** |
|---|---|
| Bouchard Ballot Processing c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602 | http://cases.stretto.com/bouchard |

**If you have any questions about the solicitation or voting process, please contact the Solicitation Agent at 1-855-923-1038 (toll free) or 1-949-236-4792 (international) or via electronic mail to BouchardInquiries@stretto.com.**

2.      **Holders of Claims in Class 6 and Class 9 and Interests in Class 7.**

If you are a Holder of a Section 510(c) Claim, a Section 510(b) Claim, or an Existing Equity Interest, you must complete, sign, and date your ballot and return it (with an original signature) ***promptly*** via electronic mail to the following address:

---

**If sent by electronic mail:**

BouchardInquiries@stretto.com
Subject: "Class 6 Ballot," "Class 7 Ballot," or "Class 9 Ballot" (as applicable)

---

**If you have any questions about the solicitation or voting process, please contact the Solicitation Agent at 1-855-923-1038 (toll free) or 1-949-317-1839 (international) or via electronic mail to BouchardInquiries@stretto.com.**

D.      **Ballots Not Counted.**

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), the DIP Agent, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE VIII OF THE DISCLOSURE STATEMENT WILL <u>NOT</u> BE COUNTED.**

IX.   **RISK FACTORS**

Holders of Claims and Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.      **Bankruptcy Law Considerations.**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims or Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

1.      **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity

35

interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests that each encompass Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Debtors reserve the right to object to the amount and/or classification of any Claim or Interest under the Plan. The Committee and other parties in interest may object to the amount and/or classification of any Claim or Interest under the Plan in accordance with the Bankruptcy Code.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article XII of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Allowed Claims and Allowed Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Interest or an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests. The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

Subject to the terms of the Plan, the Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment

of any Class, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 5.    Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.    Continued Risk Upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses. *See* Article IX.C of this Disclosure Statement, entitled "Risks Related to the Businesses of the Debtors and the Post-Effective Debtor," which begins on page 40. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that any chapter 11 plan, including the Plan, will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to file and solicit the Plan through June 25, 2021 and August 24, 2021 and have filed a motion seeking to extend the Debtors' exclusive right to file and solicit the Plan through August 9, 2021 and October 8, 2021 [Docket No. 961]. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

### 7.    The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly lower distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling

the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

8.      **The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan, and the Committee and other parties in interest may object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.      **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims and Allowed Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Interests to be subordinated to other Allowed Claims and Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims, Interests, and recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims and Interests may vary from the estimated Claims and Interests contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims and Interests that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Interests under the Plan.

10.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, the Post-Effective Debtor or the Plan Administrator, as applicable, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

11.     **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article XII of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not satisfied or waived, the Effective Date will not take place.

B.      **Risks Related to Recoveries under the Plan.**

1.      **The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries.**

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates.  Creditor recoveries could be materially reduced or eliminated in this instance.  In addition, the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guaranty the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

2.      **The Closing Conditions of the Sale Transaction May Not Be Satisfied.**

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction, which would prevent the Debtors from consummating the Plan.  A failure to satisfy any of the closing conditions of the Sale Transaction could prevent the Sale Transaction from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7 or dismissed.  The Debtors' sale process is ongoing and the ultimate outcome of such process is unknown at this time, which outcome will impact recovery on Allowed Claims and Interests.

3.      **Certain Tax Implications of the Plan.**

Holders of Allowed Claims and Interests should carefully review Article XI of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," which begins on page 46, to determine how the tax implications of the Plan and the Chapter 11 Cases may affect the Debtors or the Post-Effective Debtor, as applicable, and Holders of Claims and Interests, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

4.      **The Federal Income Tax Consequences of the Plan to the Debtors and Holders of Claims and Interests are Highly Complex and Uncertain.**

The federal income tax consequences of the Plan to the Debtors and Holders of Claims and Interests are highly complex and will depend on, among other things, potentially uncertain technical issues, and certain issues that cannot be known at this time and may not be known until after the Effective Date occurs.  Further, the consummation of the Plan could potentially give rise to significant tax liabilities.  These tax considerations are discussed in detail below in "Certain U.S. Federal Income Tax Consequences of the Plan," and Holders of Claims and Interests should carefully review that section of this Disclosure Statement and consult their own tax advisors regarding the tax implications of the Plan.

5.      **The Debtors May Not Be Able to Accurately Report Their Financial Results.**

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future

and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

> **6.      The Bankruptcy Court May Deny Subordination or Recharacterization of the Bouchard Family Loan Claims.**

The Plan classifies Bouchard Family Loan Claims as Class 6 Section 510(c) Claims, and, at or prior to the Confirmation Hearing, as the case may be, the Debtors may request that the Bankruptcy Court rule that the Bouchard Family Loan Claims should be subordinated pursuant to section 510(c) of the Bankruptcy Code and/or that the Unsecured Bouchard Promissory Notes should be recharacterized as equity contributions.  If the Bankruptcy Court ultimately denies subordination and/or recharacterization of the Bouchard Family Loan Claims, the Bouchard Family Loan Claims could comprise Class 4A General Unsecured Claims, which could materially dilute recoveries to Holders of General Unsecured Claims.

> **C.      Risks Related to the Businesses of the Debtors and the Post-Effective Debtor.**

> **1.      Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort effectuating the contemplated Plan Transactions instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to exit chapter 11 successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  If the chapter 11 proceedings last longer than anticipated, the Debtors may require additional debtor-in-possession financing to fund the Debtors' operations.  If the Debtors are unable to obtain such financing in those circumstances, the chances of successfully selling the Debtors' businesses may be seriously jeopardized, and, as a result, creditor recoveries may be significantly impaired.

> **2.      The Post-Effective Debtor May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Post-Effective Debtor may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Post-Effective Debtor's financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims and Interests under the Plan.  It is not possible to predict the potential litigation that the Post-Effective Debtor may become party to nor the final resolution of such litigation.  The impact of any such litigation on the Post-Effective Debtor's businesses and financial stability, however, could be material.

D.      **Disclosure Statement Disclaimer.**

1.      **The Financial Information Contained in this Disclosure Statement Has Not Been Audited.**

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2.      **Information Contained in this Disclosure Statement Is for Soliciting Votes.**

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      **This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission.**

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

4.      **This Disclosure Statement May Contain Forward Looking Statements.**

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

5.      **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6.      **No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be

deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

### 7. Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors, the Post-Effective Date Debtor, or the Litigation Trust, as applicable, may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### 8. No Waiver of Right to Object to Claim or Interest.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### 9. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

### 10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11. No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

X.      **CONFIRMATION OF THE PLAN**

A.      **Requirements for Confirmation of the Plan.**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

B.      **Best Interests of Creditors/Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, subject to any rights under section 506(c) of the Bankruptcy Code, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction.  Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims and Allowed Interests than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims and Allowed Interests with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases.  *See, e.g.*, 11 U.S.C. § 326(a) (providing for

43

compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

C.      **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

D.      **Acceptance by Impaired Classes.**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[12]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will

---

[12]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.   Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  Subject to the terms and conditions of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.   No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.   Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims or interests receive more than 100 percent of the amount of the allowed claims or allowed interests in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

45

## XI.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.      Introduction.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of certain Claims and Interests.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons using a mark-to-market method of accounting, and Holders of Claims or Interests who are themselves in bankruptcy).  Furthermore, this summary assumes that a Holder of a Claim or Interest holds only Claims or Interests in a single Class and holds a Claim or Interest only as a "capital asset" (within the meaning of section 1221 of the Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Code.  This summary does not discuss differences in tax consequences to Holders of Claims or Interests that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims or Interests are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Code) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Code).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim or Interest that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims or Interests should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**At this time, because key elements of any transaction involving a Managed Debtor are not known, the Debtors are currently unable to make any disclosure with respect to any transaction involving a Managed Debtor (including the consequences of receiving any debt or equity issued by a Managed Debtor). In the event a transaction involving a Managed Debtor is ultimately utilized, the Debtors will provide supplemental disclosure regarding the tax consequences of such a transaction.**

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

    **B.**    **Certain U.S. Federal Income Tax Consequences to the Managed Debtors and the Post-Effective Debtor.**

    **1.**    **Characterization of Plan Transactions.**

Unless a transaction with a Managed Debtor is effectuated (and, as discussed above, no discussion of such a transaction is currently included in this disclosure), the Plan generally provides that the Debtors' assets will be sold. In general, the Debtors currently anticipate that any such transaction would be treated as an asset sale for U.S. federal income tax purposes.

The discussion below assumes that (i) Bouchard Transportation Co., Inc. ("Parent") is properly classified as an electing small business corporation ("S corporation") within the meaning of Section 1361 of the Code, (ii) each of Parent's subsidiaries is properly classified as a qualified subchapter S subsidiary ("QSub") within the meaning of Section 1361(b)(3)(B) of the Code, (iii) neither Parent nor any of its subsidiaries is liable for any tax under Section 1374 of the Code and (iv) neither Parent nor any of its subsidiaries has earnings and profits. If the foregoing assumptions proved to not be true, the tax consequences outlined below could vary. In particular, the Debtors currently do not have the ability to verify whether Parent continues to be properly treated as an S corporation and that Parent's subsidiaries continue to be properly classified as QSubs because such information is outside of the Debtors' control and Parent's status as an S corporation necessarily depends on certain details regarding its direct and indirect equity ownership that the Debtors cannot currently verify.

    **2.**    **COD Income**

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b), to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. For purposes of these rules, if Parent is properly treated as an S corporation, disallowed losses and deductions at the shareholder level are treated as NOLs subject to reduction (and, in general, the Debtors would not anticipate attributes other than tax basis to exist and be available for reduction at the Debtor level). Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Code.

Under Section 108(d)(7)(A) of the Code, the Bankruptcy Exception and the Insolvency Exception are applied at the S corporation and not its shareholders. In addition, when an entity that is treated as a disregarded entity for U.S. federal income tax purposes, realizes COD Income, its regarded parent is treated as receiving such COD Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the parent level rather than at the entity level. For purposes of these rules, a disregarded entity includes a QSub. Accordingly, Parent will be treated as realizing all of the COD Income realized by the Debtors and, as a result, COD Income should not "flow up" to Holders of Interests.

### 3. Recognition of COD Income and Gain on the Sale Transaction.

Pursuant to the Sale Transaction, the Debtors will have transferred all or substantially all of their assets to the Purchaser in a transaction that is expected to be fully taxable for U.S. federal income tax purposes. The Debtors currently anticipate that such a sale could result in material taxable income, the treatment of which is discussed below, although it cannot be known with certainty whether any such taxable income would arise until the terms of any sale are determined.

Assuming that Parent qualifies as an S corporation and all of Parent's subsidiaries qualify as QSubs, any taxable income associated with the Sale Transaction will "flow up" to Holders of Interests and will not result in a federal tax liability for the Debtors. If those assumptions are not correct--and, as has been discussed elsewhere, the Debtors are currently unable to verify whether those assumptions are correct--then the Debtors may themselves have taxable income. Although in such a scenario the Debtors may also have additional tax attributes available to offset any such taxable income, and such tax attributes could be utilized to offset taxable income prior to being reduced by COD Income pursuant to the rules discussed above, the Debtors do not currently anticipate that such tax attributes would be sufficient to fully offset taxable income associated with a sale transaction. **Accordingly, if the assumptions regarding the Debtors' S corporation and QSub status are not accurate, and do not continue to be accurate for the remainder of this tax year or until all such entities are dissolved (whichever occurs first), a sale transaction may give rise to material federal income tax liability for the Debtors, which liability would constitute an administrative tax claim. Administrative tax claims cannot be subject to the administrative bar date.**

In the event Parent were to no longer be subject to treatment as an S corporation midway through the year in which a sale transaction were to occur, certain bifurcation rules would apply that would bifurcate Parent's items of gain, loss, income, and deduction between an S corporation short tax year and a C corporation short tax year. It is currently unclear how such rules would apply to the Plan and whether such bifurcation could similarly give rise to an administrative tax liability.

### C. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 7 Existing Equity Interests

Pursuant to the Plan, each Holder of an Allowed Class 7 Existing Equity Interest will receive cash (to the extent cash is available for Holders of Existing Equity Interests under the Waterfall Recovery). As discussed above, Parent should recognize gain or loss in the Sale Transaction equal to the difference between the proceeds of the sale and Parent's adjusted basis in the property sold.

Assuming the assumptions set forth above are accurate, the gain or loss from the Sale Transaction will be allocated among the U.S. Holders of Existing Equity Interests (generally in proportion to their respective ownership percentages of the shares of Parent) and will be reported by such U.S. Holders on their U.S. federal income tax returns for their respective taxable years that include the Effective Date. Gain from the Sales Transaction allocated to a U.S. Holder of an Existing Equity Interest will increase such U.S. Holder's tax basis in his, her or its Existing Equity Interest, while loss allocated to such U.S. Holder will decrease such U.S. Holder's tax basis in his, her or its Existing Equity Interest. The amount of gain or loss from the Sale Transaction will depend on Parent's tax basis in the assets sold. The character of any such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors including which assets of the Parent are held as capital assets and whether and to what extent any gain on their sale represents the recapture of prior depreciation or amortization. A U.S. Holder of an Existing Equity Interest's ability to deduct a loss, if any, on the Sale Transaction is subject to various limitations. In addition, to the extent a U.S. Holder of an Existing Equity Interest has previously-suspended or delayed losses allocated to it from Parent, it is possible that such losses may be able to be utilized to offset any gain allocated to such U.S. Holder as a result of the Sale Transaction. As discussed above, COD Income should not be allocated to a U.S. Holder of an Existing Equity Interest.

Distributions by Parent to Existing Equity Interest Holders of Cash pursuant to the Waterfall Recovery should be tax-free to the extent such distribution does exceed an Existing Equity Interest Holder's tax basis in its Parent stock, and such tax-free distribution will reduce such U.S. Holder's stock tax basis. Any distribution in excess of such U.S. Holder's stock tax basis will be treated as gain from the sale or exchange of property.

Following the consummation of the Plan, U.S. Holders of Existing Equity Interests may be entitled to claim a loss with respect to any remaining tax basis in their Parent stock. The ability to utilize such loss to offset any gain allocated from a Sale Transaction will depend, among other things, on the character of the gain from such Sale Transaction.

The tax consequences of the Plan to U.S. Holders of Existing Equity Interests may be extremely complex, and such Holders should consult his, her, or its own tax advisor regarding the consequences of the Plan.

### D. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 3 Prepetition Revolving Credit Facility Secured Claims.

Pursuant to the Plan, each Holder of an Allowed Class 3 Prepetition Revolving Credit Facility Secured Claim will receive (i) cash (to the extent cash is available for Holders of Class 3 Prepetition Revolving Credit Facility Secured Claims under the Waterfall Recovery) and (ii) delivery of collateral securing such Holder's Prepetition Revolving Credit Facility Secured Claim.

Each such U.S. Holder's exchange of its Class 3 Claims for such consideration should be treated as a taxable exchange under Section 1001 of the Code. Accordingly, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or original issue discount, if any), such U.S. Holder should recognize gain or loss equal to the (a) sum of (i) any Cash received and (ii) the fair market

value of any collateral received minus (b) the U.S. Holder's adjusted tax basis in its Class 3 Claim.  Such U.S. Holder's tax basis in any collateral received should equal the fair market value of such property as of the Effective Date, and such U.S. Holder's holding period in such property received should begin on the day after the Effective Date.

E.    **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 4A General Unsecured Claims and Allowed Class 4B Prepetition Revolving Credit Facility Deficiency Claims.**

Pursuant to the Plan, each Holder of an Allowed Class 4A General Unsecured Claim or Class 4B Revolving Credit Facility Deficiency Claim will receive (i) its Pro Rata share of the Litigation Trust Interests and (ii) cash (to the extent cash is available for Holders of Class 4A General Unsecured Claims and Class 4B Prepetition Revolving Credit Facility Claims under the Waterfall Recovery).

Each such U.S. Holder's exchange of its Class 4A or Class 4B Claims for such consideration should be treated as a taxable exchange under Section 1001 of the Code. Accordingly, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or original issue discount, if any), such U.S. Holder should recognize gain or loss equal to the (a) sum of (i) any Cash received and (ii) the fair market value of such U.S. Holder's share of the Litigation Trust Assets minus (b) the Holder's adjusted tax basis in its Class 4A or Class 4B Claim.  Such U.S. Holder's tax basis in their share of the Litigation Trust Assets received should equal the fair market value of such property as of the Effective Date, and such U.S. Holder's holding period in such Litigation Trust Assets received should begin on the day after the Effective Date.

The U.S. federal income tax obligations of holders with respect to their beneficial interest in the Litigation Trust are discussed below.

F.    **Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 6 Section 510(c) Claims.**

Pursuant to the Plan, each Holder of an Allowed Class 6 Section 510(c) Claim will receive cash (to the extent cash is available for Holders of Class 6 Section 510(c) Claims under the Waterfall Recovery).

If the Section 510(c) Claims are respected as debt for U.S. federal income tax purposes, each Holder should be treated as receiving cash in repayment of its debt.  Accordingly, such Holder generally should recognize gain only to the extent that the amount of cash received exceeds such Holder's basis in the debt, and would recognize loss only to the extent that the basis in the debt exceeds the amount of cash received.

If the Section 510(c) Claims are recharacterized as equity for U.S. federal income tax purposes, the tax consequences of the Plan to Holders of Section 510(c) Claims would be similar to what is described in "Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 7 Existing Equity Interests" above.  Holders of Section 510(c) Claims should consult their own tax advisors regarding the tax classification of their Section 510(c) Claims.

G.    **Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 9 Section 510(b) Claims.**

Pursuant to the Plan, each Holder (if any) of an Allowed Class 9 Section 510(b) Claim will receive cash (to the extent cash is available for Holders of Class 9 Section 510(b) Claims under the Waterfall Recovery).

The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claim exists.  In the event the Debtors become aware that a valid Section 510(b) Claim exists, the Debtors will provide supplemental disclosure regarding the tax consequences of the Plan Transactions to Holders of Section 510(b) Claims.

## H.      Character of Gain or Loss

Where gain or loss is recognized by a Holder of a Claim or Existing Equity Interest upon the exchange of its Allowed Claim or Existing Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Allowed Claim or Existing Equity Interest constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated.  Each Holder of an Allowed Claim or Existing Equity Interest is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim or Existing Equity Interest.

Holders of Allowed Claims or Existing Equity Interests who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

**HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE PROPER ALLOCATION OF THE CONSIDERATION RECEIVED BY THEM UNDER THE PLAN AND THE U.S. FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

## I.      Market Discount.

Under the "market discount" provisions of sections 1276 through 1278 of the Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount" ("OID"), its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

Under Section 451 of the Code, accrual method United States persons that prepare an "applicable financial statement" generally would be required to include certain items of income, such as OID (but not market discount), into gross income no later than the time such amounts are reflected on such a financial

statement.  This could result in income recognition differing from that which would otherwise result from the rules described below.  The U.S. Department of the Treasury has released final regulations that would exclude from this rule any item of gross income for which a taxpayer uses a special method of accounting required by certain sections of the Code, including, income subject to the timing rules for OID and de minimis OID, income under the contingent payment debt instrument rules, income under the variable debt instrument rules, income and gain associated with an integrated transaction, accrued market discount, and de minimis market discount.  These regulations apply to taxable years beginning on or after January 1, 2021, although taxpayers have the option to apply the rules in the final regulations to taxable years beginning after December 31, 2017 and before January 1, 2021 (provided that such rules are applied in their entirety and in a consistent manner to all subsequent taxable years).  Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

### J.      Accrued Interest

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income.  Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for Holders.

### K.      Limitation on Use of Capital Losses

A Holder of a Claim or Existing Equity Interest who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on the use of such capital losses.  For a non-corporate Holder, capital losses may be used to offset any capital gains recognized (without regard to holding periods), and also ordinary income recognized to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of such capital losses over such capital gains.  A non-corporate Holder may carry over unused capital losses recognized and apply them against future capital gains recognized and a portion of their ordinary income recognized for an unlimited number of years.  For corporate Holders, capital losses recognized may only be used to offset capital gains recognized.  A corporate Holder that recognizes more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

L.       **Certain U.S. Federal Income Tax Considerations to the Litigation Trust**

For U.S. federal income tax purposes, the Debtors intend that (a) the Litigation Trust be treated as (x) a "liquidating trust" pursuant to the Code, as amended, and the Treasury Regulations, including Treasury Regulation section 301.7701-4(d), with no objective or authority to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust and (y) a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671-677 of the Code, and (b) the Litigation Trust Beneficiaries shall be treated as the grantors of the Litigation Trust and as the deemed owners of the Litigation Trust Assets. Accordingly, for U.S. federal income tax purposes, it is intended that each beneficiary (including, to the extent the Litigation Trust Assets are allocable to Disputed Claims, the Disputed Claims Reserve) of the Litigation Trust be treated as if they had received a distribution of an undivided interest in the Litigation Trust Assets and then contributed such undivided interest to the Litigation Trust. Other than with respect to any assets of the Litigation Trust Assets that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of Litigation Trust Assets to applicable Holders of Claims prior to the contribution of such assets to the Litigation Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

No request for a ruling from the IRS will be sought on the classification of the Litigation Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust. If the IRS were to challenge successfully the classification of the Litigation Trust as a grantor trust, the federal income tax consequences to the Litigation Trust and the Litigation Trust Beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Litigation Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets and make such valuation available to the beneficiaries of the Litigation Trust. Each of the Debtors, Litigation Trustee, and the Litigation Trust Beneficiaries shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

The Litigation Trustee shall provide the Post-Effective Date Debtor, as transferor to the Litigation Trust, with any statements or reports required by Treasury Regulation section 1.671-4 or other applicable Treasury Regulations, to enable the Post-Effective Date Debtor to calculate tax obligations and attributes arising from the Litigation Trust.

The Litigation Trust shall in no event be dissolved later than five years from the creation of such Litigation Trust unless the Bankruptcy Court, upon motion within the 6-month period prior to the fifth anniversary (or within the 6-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five years with a private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

The tax consequences of holding interests in the Litigation Trust are not dependent on distributions of any Cash or other proceeds. Holders of such interests in the Litigation Trust will be required to report on their U.S. federal income tax returns their share of the Litigation Trust's items of income, gain, loss, deduction, and credit in the year recognized by the Litigation Trust. This requirement may result in such Holders being subject to tax on their allocable share of the Litigation Trust's taxable income prior to

receiving any Cash distributions from the Litigation Trust.  In general, a distribution of Cash by the Litigation Trust will not be separately taxable to a holder of a beneficial interest in the Litigation Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Litigation Trust).

As discussed above and below, an interest in the Litigation Trust may be contributed to a Disputed Claims Reserve and subject to tax in the manner set forth below.

### M.       Reserve Accounts and Delayed Distributions

The Plan provides that certain distributions may be delayed while contingent, unliquidated, or disputed Claims or Interests are addressed.  Pending the resolution of such Claims or Interests, a portion of the property to be received by holders of Claims or Interests (including an interest in the Litigation Trust) may be deposited into various reserve accounts described in the Plan (including the Disputed Claims Reserve, but for the avoidance of doubt, not including the Professional Fee Escrow Account).  The property that is subject to delayed distribution will be subject to "disputed ownership fund" treatment under section 1.468B-9 of the Treasury Regulations.  Pursuant to such treatment, a separate federal income tax return shall be filed with the IRS with respect to such accounts.  Such accounts will be liable, as an entity, for taxes, including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution.  Such taxes shall be paid out of the assets of such accounts (and reductions shall be made to amounts disbursed from such accounts to account for the need to pay such taxes).  To the extent property is not distributed to Holders of applicable Claims or Interests on the Effective Date but, instead, is transferred to such accounts, although not free from doubt, Holders should not recognize any gain or loss on the date that the property is so transferred.  Instead, gain or loss in an amount equal to: (a) the amount of Cash and fair value of property actually distributed to such Holder from such account, less (b) the Holder's adjusted tax basis of its Claim or Interest when and to the extent property is actually distributed to such Holder.

To the extent that a Holder receives distributions respect to a Claim or Interest from such account subsequent to the Effective Date, such Holder may recognize additional gain (if such Holder is in a gain position) and a portion of such distribution may be treated as imputed interest income.  In addition, it is possible that the recognition of any loss realized by a Holder may be deferred until all payments have been made out of the applicable account to all eligible Holders.  Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such Holders in respect of their Claims or Interests due to the receipt of property in a taxable year subsequent to the taxable year in which the Effective Date occurs.  The discussion herein assumes that the installment method does not apply.

### N.       Certain U.S. Federal Income Tax Considerations to Certain Non-U.S. Holders of Claims

#### 1.       Gain Recognition

Whether a Non-U.S. Holder realizes gain or loss on the exchange of its Claim and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Plan Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder

of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable and does not qualify for deferral, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

## 2. Payments of Interest (Including Accrued but Unpaid Interest)

Payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but unpaid interest on a Claim generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Debtors, (iii) the Non-U.S. Holder is not a controlled foreign corporation related to the Debtors actually or constructively through the ownership rules under Section 864(d)(4) of the Code, and (iv) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to such interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

## O. Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from distributions or payments. The Debtors will comply with all applicable reporting requirements of the Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S.

Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. FOR THE AVOIDANCE OF DOUBT, THE FOREGOING SUMMARY DOES NOT PURPORT TO EXPLAIN ANY ELEMENT OF A TRANSACTION INVOLVING A MANAGED DEBTOR, INCLUDING THE CONSEQUENCES OF RECEIVING ANY DEBT OR EQUITY ISSUED BY A MANAGED DEBTOR, THE TAX CONSEQUENCES TO ANY MANAGED DEBTOR OR TO THE DEBTORS OF CREATING A MANAGED DEBTOR, OR THE TAX CONSEQUENCES OF OWNING OR DISPOSING OF ANY DEBT OR EQUITY ISSUED BY A MANAGED DEBTOR. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  June 18, 2021

Bouchard Transportation Co., Inc.
on behalf of itself and all other Debtors

*/s/ Matthew Ray*
Matthew Ray
Chief Restructuring Officer of the Debtors

<u>**Exhibit A**</u>

**Chapter 11 Plan**

Filed at Docket No. 988