IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>BOUCHARD TRANSPORTATION CO., INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 20-34682 (DRJ)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 907** |

**OBJECTION OF CREDITORS 507 SUMMIT LLC AND PEAK CREDIT LLC,
TO DEBTORS' MOTION TO SELL WELLS FARGO COLLATERAL**

Creditors 507 Summit LLC ("507") and Peak Credit LLC ("Peak") object to the sale motion insofar as it seeks an Order approving the sale of the Wells Fargo Collateral, as defined in the Final DIP Order [Docket No. 334],[1] and state:

**BACKGROUND**

1.  The Debtors commenced these cases on September 28-29, 2020.

2.  As of said dates, none of the Debtors' vessels were operating. Some vessels were subsequently returned to service [Docket No. 1048 (disclosure statement), § V.B.3]; however, the vast majority were not.

3.  In April 2021, 507 and Peak engaged Debtors' counsel Ryan Bennett about confirming a plan that would cram down Wells Fargo's claim, pursuant to section 1129(b)(2)(A), with strategic partners contributing cash sufficient to return all of Debtors' vessels to service and

---

[1] 507 and Peak purchased claims secured by maritime liens on the Debtors' vessels, including the vessels constituting Wells Fargo Collateral, and have filed proofs of claim pursuant to Rule 3001(e)(1). The Debtors have taken the position that the maritime liens on vessels constituting Wells Fargo Collateral are junior to Wells Fargo's preferred mortgage lien, and therefore said collateral may be sold free and clear of said maritime liens in which case the related claims would be treated as unsecured under their proposed plan.

emerge from bankruptcy, thereby permitting a reorganization that would result in realization of the Debtors' going concern value for the benefit of their creditors.

4. Though initially receptive to the proposal, the Debtors decided to pursue a different course. On May 25th the Debtors moved to sell some or all of their vessels on an emergency basis [Docket No. 907], and the bid procedures order was entered June 8th [Docket No. 956].

5. On July 18th, the Debtors gave notice [Docket No. 1077] of their having designated their initial DIP lender as stalking horse purchaser as to vessels encumbered by liens securing the DIP obligations ("DIP Collateral").

6. On July 26th, the Debtors gave notice [Docket No. 1114] that following the auction, they selected the bids submitted by (a) the replacement DIP lender, JMB Capital Lending Partners, LLC, providing for the purchase of the DIP Collateral for $115 million, as the successful bid for said collateral; and (b) Rose Cay GP, LLC, providing for the purchase of the Wells Fargo Collateral for $130 million, as the successful bid for said collateral.

7. The Rose Cay bid provides for $100 million of the purchase price to be satisfied by a credit bid by Wells Fargo, with the $30 million balance to be paid in cash [Docket No. 1100, ¶19] by Pennantia, LLC.

8. The June monthly operating report [Docket No. 1099] provides that at month end, the Debtors had approximately $19 million in cash, and postpetition debt of around $104 million, principally comprised of obligations in respect of the fully drawn, $90 million replacement DIP loan [Docket No. 836] and additional, accrued professional fees. This and prior reports imply a professional fee burn rate of around $4 million/month.

9. It is anticipated that professional fees and amounts needed to fund the Wind Down and Initial Litigation Trust Cash Amount (as defined in the plan, Docket No. 1049) will consume

virtually all value, in excess of DIP obligations, generated by the DIP Collateral sale. As to the Wells Fargo Collateral, its contemplated sale will not generate value for creditors other than Wells Fargo, except to the extent that the cash purchase price is surcharged [Docket No. 1100], as the amount of its claim far exceeds the purchase price.

10. Stated differently, because sale proceeds may only be distributed in accordance with the "Waterfall Recovery" (Plan § III.B.4(b)(ii)-(iii)), Court approval of the two proposed sales will yield little if any value for unsecured creditors, absent a major surcharge. Indeed, the disclosure statement (at § III.L) acknowledged "[t]here is a possibility that there will ultimately be no available distribution to Holders of Allowed General Unsecured Claims."[2]

11. However, an alternative restructuring is available that would deliver value to unsecured creditors, a term sheet for which is attached as Exhibit 1. In a nutshell, an alternative plan can be proposed, under which:

- Vesting. The Wells Fargo Collateral, and any other estate property not being sold, would vest in the reorganized Debtors, free and clear of liens, claims and interests (except as otherwise provided).

- Cramdown Loan. Wells Fargo would be given a 5-year, first lien cramdown loan in the amount of its claim (less amounts surcharged, if any), bearing interest (paid in kind for the first 2 years, and in cash thereafter) at the current

---

[2] The Debtors' plan also provides for unsecured creditors to share pro rata in litigation trust interests, in addition to receiving their pro rata share of the sale proceeds following payment of everyone ahead of them in the "Waterfall Recovery"; and for assignment of avoidance claims and claims against the "Bouchard Interested Parties" to the trust [Docket No. 1102, Exhibit B]. However, the disclosure statement does not describe potential insider causes of action or attribute value to them or the preference claims.

rate under its facility[3] plus 25 bps ("Cramdown Rate"), subject to a 5.25%/year cap. Its deficiency claim ($34-$64 million, depending on surcharge litigation), which would otherwise "blow out" the roughly $39 million unsecured claims pool (per the summary of expected recoveries in the disclosure statement), would be eliminated.

- Plan Sponsor Contribution for New Equity and Exit Loan. Plan sponsors would contribute $35 million—$4 million for new equity, and $31 million in the form of a second lien exit loan, to fund payment of allowed administrative and priority claims and operating expenses anticipated to be incurred in returning the Debtors' remaining vessels to service. The exit loan would mature 1 year after the Cramdown Loan, and bear interest (paid in kind for the first 2 years, and in cash thereafter, like the Cramdown Loan) at the Cramdown Rate plus 250 bps.

- Unsecured Creditor Recovery. Rather than chancing recoveries on preference claims and unspecified claims against insiders, unsecured creditors would receive takeback paper in the principal amount equal to 50% of their respective allowed claims, bearing interest of 3.25%/year (fixed, paid in kind) and maturing at the same time as the Plan Sponsor Exit Loan, plus 100% of litigation trust interests.

---

[3] Per the disclosure statement, "Interest under the Prepetition Revolving Credit Facility is payable as follows: (a) with respect to Eurodollar Loans (as defined thereunder), such loans bear interest at the variable market LIBOR rate, plus an Applicable Margin of 2.50% and (b) with respect to each Prime Rate Loan (as defined thereunder), such loans bear interest at the variable market Prime Rate … plus an Applicable Margin of 0.00%."

- <u>No Wind Down Costs</u>. This reorganization proposal eliminates the need for a plan administrator and associated wind down budget/amount.

12. Annexed as <u>Exhibits 2-3</u> are declarations from principals for the contemplated plan sponsors, attesting as to their present financial ability and willingness to perform on terms provided in the term sheet, subject to receipt of data confirming certain assumptions upon which the Plan Term Sheet is premised and additional diligence, without the need to delay the confirmation hearing presently scheduled for August 18, 2021.

## **ARGUMENT**

13. The Debtors and committee have a duty to maximize estate value. *In re Mortgage & Realty Trust*, 212 B.R. 649 (Bankr. C.D. Cal. 1997) (citing *In re Kaiser Steel Corp.*, 84 B.R. 202, 205 (Bankr. D. Colo. 1988)) ("The debtor in possession and the committee of creditors share a duty to maximize the debtor's estate"); *In re Eastman Kodak Co.*, No. 12-10202, 2012 WL 2501071, at *3 (Bankr. S.D.N.Y. June 28, 2012) (the "unsecured creditors' committee has a duty to maximize the value of the Kodak estates").

14. That the Court previously entered the bid procedures order herein, does not require that it approve a section 363 sale of the Wells Fargo Collateral, thereby assuring virtually no (if any) recovery for unsecured creditors herein. Indeed, the bid procedures themselves repeatedly state that nothing therein shall serve to prevent rejection of an otherwise qualified bid, termination of the sale process and pursuit of "alternate proposals for sales or other restructuring transactions" in furtherance of fiduciary duties [Docket No. 956, search "fiduciary"].

15. 507 and Peak believe their restructuring proposal is confirmable, and it also has the provisional backing of plan sponsors capable of performing.

16. The only conceivable confirmation dispute presented is appropriate cramdown terms. In this regard, as to cramdown under section 1129(b)(2)(A)(i), courts consider what an

efficient market would produce; and where none can be established courts start with the "risk free" rate, and "then add a supplemental 'risk adjustment' [typically in the range of 1% to 3%] to account for 'such factors as the circumstances of the estate, the nature of the security and the duration and feasibility of the reorganization plan.'" *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 332-33 (5th Cir. 2013) (quoting *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004)).

17. Here, a market rate can be inferred from plan sponsor's agreement to loan $31 million to the reorganized Debtors, on substantially identical terms as Wells Fargo would be receiving save they would be paid an extra 250 bps to compensate for receiving a junior lien. Absent a market rate, the proposed cramdown rate passes muster in that this Court has approved use of the Treasury rate as the "risk free" rate (*In re Vasquez*, No. 12-30834, 2012 WL 3762981, at *2 (Bankr. S.D. Tex. Aug. 29, 2012)) (presently .71% for 5-year Treasuries) thus implying a risk-adjustment on the high end of the typical range, out of an abundance of caution, even though collateral value and plan feasibility improve under this proposal in that cash is being contributed to return vessels to operation and the plan sponsors have every reason to ensure said return is completed expeditiously given their contemplated position in the post-confirmation capital structure. *See Texas Grand Prairie*, 710 F.3d at 334-35 (affirming adoption of 1.75% risk adjustment when the lender's "collateral was stable or appreciating, and … the Debtors' proposed cramdown plan would be tight but feasible").

18. Alternatively, given the terms governing the prepetition revolving credit facility (described in Footnote 3, *supra*), the proposed cramdown loan should be deemed to provide the indubitable equivalent of Wells Fargo's claim, under section 1129(b)(2)(A)(iii). *E.g.*, *In re DBSD N. Am., Inc.*, 419 B.R. 179, 209 (Bankr. S.D.N.Y. 2009) (4-year PIK loan provided indubitable equivalent where "the Plan contemplates the payment of interest at the same rate as the contract

rate under the Prepetition Facility"), *aff'd*, No. 09-cv-10156, 2010 WL 1233109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds*, 634 F.3d 79 (2d Cir. 2011). *See also Matter of Thru, Inc.*, 782 Fed. App'x 339, 341 (5th Cir. 2019) (affirming order approving use of applicable rate under nonbankruptcy law (federal judgment rate) in determining cramdown requirements were satisfied).

19. As to payment term, courts regularly approve cramdown loans with 5-year maturities. Indeed, longer payment terms are not uncommon. *E.g.*, *Thru*, 782 Fed. App'x at 341 (plan provided for $2.3 million judgment to be paid over 6.5 years); *In re Texas Star Refreshments, LLC*, 494 B.R. 684 (Bankr. N.D. Tex. 2013) (approving 7-year repayment period); *see also In re East Lansing 30 Associates*, 47 B.R. 593, 596 (Bankr. W.D. Mich. 1985) ("extension of payment (i.e., for seven years in the instant case) appears within the permissible limits as conceived by the prior jurisprudence").

20. Finally, implementation of this restructuring proposal would not require re-solicitation, in that the Wells Fargo deficiency claim is being eliminated, and every other creditors' position is materially improving relative to that under the current plan, given the outcome of the Debtors' sales process. *See In re Mangia Pizza Invs., LP*, 480 B.R. 669, 689 (Bankr. W.D. Tex. 2012) (quoting *In re Dow Corning Corp.*, 237 B.R. 374, 378 (E.D. Mich. 1999)) ("anyone who voted to accept the previous plan will be deemed to have accepted the modified plan if the modified plan 'does not adversely change the treatment of [that creditor's] claim'."); *In re Cape Quarry, LLC*, No. 19-12367, 2020 WL 64749334, at *2 (Bankr. E.D. La. Nov. 17, 2020) ("an improvement to the position of the creditors affected by the modification will not require resolicitation of a modified plan").

## **CONCLUSION**

21. In light of the foregoing, the Debtors should terminate the sale process as to the Wells Fargo Collateral, and propose an amended plan that implements the annexed term sheet. If the Debtors elect not to do so, the sale motion should be denied pending determination by the committee, whose rights and powers under section 1103(c)(3) include proposing its own plan and pursuing confirmation thereof as may be in the best interests of unsecured creditors, as to whether the annexed restructuring proposal is agreeable and superior to that which would be achieved under the Debtors' liquidating plan following the sale of the DIP and Wells Fargo Collateral, assuming arguendo the Debtors' plan is confirmable.

Dated:  Houston, Texas
       July 28, 2021

Respectfully submitted,

/s/ Deirdre Carey Brown
Deirdre Carey Brown
FORSHEY PROSTOK LLP
1990 Post Oak Boulevard, Suite 2400
Houston, Texas 77056 (832) 536-6910
dbrown@forsheyprostok.com
- and -
Jeffrey Chubak
AMINI LLC

131 West 35th Street, 12th Floor New York, New York 10001
(212) 490-4700
jchubak@aminillc.com
*pro hac vice pending*
*Attorneys for Creditors 507 Summit LLC and Peak Credit LLC*