Execution Version

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JULY 18, 2021**

**BY AND BETWEEN**

**HARTREE PARTNERS, LP, AS PURCHASER,**

**AND**

**BOUCHARD TRANSPORTATION CO., INC., AS THE COMPANY,**

**AND**

**THE OTHER SELLERS NAMED HEREIN**

---

# TABLE OF CONTENTS

**Page**

**Article I PURCHASE AND SALE OF THE ACQUIRED ASSETS** ...............................................5

    1.1     Purchase and Sale of the Acquired Assets ..................................................5

**Article II CONSIDERATION; PAYMENT; CLOSING** ......................................................6

    2.1     Consideration; Payment ...........................................................................6
    2.2     Deposit .....................................................................................................6
    2.3     Closing .....................................................................................................7
    2.4     Closing Deliveries by Seller ....................................................................7
    2.5     Closing Deliveries by Purchaser ..............................................................8
    2.6     Withholding .............................................................................................8

**Article III REPRESENTATIONS AND WARRANTIES OF SELLER** ....................................8

    3.1     Organization and Qualification ................................................................8
    3.2     Authorization of Agreement ....................................................................9
    3.3     Conflicts; Consents .................................................................................9
    3.4     Title to Acquired Assets ..........................................................................9
    3.5     Permits; Compliance with Laws ..............................................................9
    3.6     Citizenship of Seller; Documentation of the Vessels .............................10
    3.7     Pending Claims; Insurance .....................................................................10
    3.8     Brokers ....................................................................................................10
    3.9     No Other Representations or Warranties ..................................................10

**Article IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** .............................11

    4.1     Organization and Qualification ................................................................11
    4.2     Authorization of Agreement ....................................................................11
    4.3     Conflicts; Consents .................................................................................11
    4.4     Financing.................................................................................................12
    4.5     Brokers ....................................................................................................12
    4.6     No Litigation ...........................................................................................12
    4.7     No Additional Representations or Warranties ..........................................12

**Article V BANKRUPTCY COURT MATTERS** ...............................................................12

    5.1     Bankruptcy Actions ................................................................................12
    5.2     Sale Order ................................................................................................13

**Article VI COVENANTS AND AGREEMENTS** ..............................................................14

    6.1     Conduct of Seller ....................................................................................14
    6.2     Access to Information ..............................................................................14
    6.3     Regulatory Approvals ..............................................................................15
    6.4     Reasonable Efforts; Cooperation .............................................................15
    6.5     Notification of Certain Matters ................................................................16
    6.6     Further Assurances...................................................................................17

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 6.7 | Insurance Matters | 17 |
| 6.8 | Expense Reimbursement and Break-Up Fee | 17 |
| 6.9 | Minimum Overbid | 17 |
| 6.10 | Acknowledgment by Purchaser | 17 |

**Article VII CONDITIONS TO CLOSING** ..................................................................**19**

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 19 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 19 |
| 7.3 | Conditions Precedent to the Obligations of the Company | 19 |
| 7.4 | Waiver of Conditions | 20 |

**Article VIII TERMINATION** ..........................................................................................**20**

| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 20 |
| 8.2 | Automatic Termination | 21 |
| 8.3 | Effect of Termination | 21 |

**Article IX TAXES** ............................................................................................................**22**

| | | |
|---|---|---|
| 9.1 | Transfer Taxes | 22 |
| 9.2 | Allocation of Purchase Price | 23 |
| 9.3 | Cooperation | 23 |

**Article X MISCELLANEOUS** ..........................................................................................**23**

| | | |
|---|---|---|
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 23 |
| 10.2 | Expenses | 24 |
| 10.3 | Notices | 24 |
| 10.4 | Binding Effect; Assignment | 25 |
| 10.5 | Amendment and Waiver | 25 |
| 10.6 | Third Party Beneficiaries | 26 |
| 10.7 | Non-Recourse | 26 |
| 10.8 | Severability | 26 |
| 10.9 | Construction | 26 |
| 10.10 | Schedules | 26 |
| 10.11 | Complete Agreement | 27 |
| 10.12 | Specific Performance | 27 |
| 10.13 | Jurisdiction and Exclusive Venue | 28 |
| 10.14 | Governing Law; Waiver of Jury Trial | 28 |
| 10.15 | No Right of Set-Off | 29 |
| 10.16 | Counterparts and PDF | 29 |
| 10.17 | Publicity | 29 |
| 10.18 | Bulk Sales Laws | 30 |
| 10.19 | Fiduciary Obligations | 30 |

## <u>TABLE OF CONTENTS</u>

**Page**

**Article XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ............................30**
    11.1    Certain Definitions .................................................................................30
    11.2    Index of Defined Terms ..........................................................................34
    11.3    Rules of Interpretation ...........................................................................35

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of July 16, 2021, by and among Hartree Partners, LP, a Delaware limited partnership (together with any Purchaser Designee, "Purchaser"), Bouchard Transportation Co., Inc., a New York corporation (the "Company") and the Subsidiaries of the Company that are indicated on the signature pages attached hereto (together with the Company, the "Seller"). Purchaser and Seller are referred to herein individually as a "Party" and collectively as the "Parties". Capitalized terms used in herein shall have the meanings set forth herein or in Article XI.

## RECITALS

WHEREAS, on September 28 and 29, 2020, the Company filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes as *In re Bouchard Transportation Co., Inc., et al.*, case number 20-34682 (DRJ) (collectively, the "Bankruptcy Case"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, 365, 1129 and 1141 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court (together, the "Bankruptcy Rules"), all on the terms and subject to the conditions set forth in this Agreement and the Sale Order and subject to entry of the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and intending to be legally bound hereby, Purchaser and Seller hereby agree as follows.

## ARTICLE I

### PURCHASE AND SALE OF THE ACQUIRED ASSETS

1.1     Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, 365, 1129 and 1141 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest as of the Closing in and to the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means only the following assets of Seller:

(a)     each of the barges and tugs identified on Annex A hereto, together with all engines, machinery, masts, boats, anchors, cables, chains, rigging, tackle, apparel, winches, capstans, outfit, tools, pumps, gears, furnishings, appliances, fittings, navigation and communications equipment, computers, spare and replacement parts and equipment, lubricating oils, fuels, stores, and all other appurtenances (collectively, "Spare Parts") belonging to the

respective tugs and barges listed in <u>Annex A</u> whether or not on board as of the Closing Date, including, for the avoidance of doubt, any Spare Parts held in warehouses or other onshore storage as of the Closing Date (such barges and tugs and Spare Parts, collectively, the "<u>Vessels</u>"); and

(b)   all third party property and casualty insurance proceeds remaining after payment to any party to whom damage was caused, to the extent receivable by the Purchaser or the Seller (whether before or after the Closing Date) in respect of the Vessels on account of a claim made on or after the date hereof.

# ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1   <u>Consideration; Payment</u>.

(a)   The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: a cash payment of $110,000,000 (the "<u>Cash Payment</u>").

(b)   At the Closing, Purchaser shall deliver, or cause to be delivered, to the Company the Cash Payment *less* the Deposit (the "<u>Closing Date Payment</u>"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party at least two (2) Business Days prior to the date such payment is to be made.

2.2   <u>Deposit</u>.

(a)   On or prior to the date hereof, Purchaser has made an earnest money deposit (the "<u>Deposit</u>") into escrow with a designee of the Company in accordance with the Bidding Procedures Order in the amount of ten percent (10%) of the Cash Payment by wire transfer of immediately available funds. The Deposit shall not be subject to any lien, attachment, setoff, trustee process, or any other judicial process of any creditor of any Seller, Debtor or any other Person, including the escrow agent, and shall be applied against payment of the Purchase Price on the Closing Date, or otherwise distributed to the Company or Purchaser in accordance with the terms of this Agreement.

(b)   If this Agreement has been terminated by the Company pursuant to <u>Section 8.1(e)</u> or <u>8.1(g)</u> (or by Purchaser pursuant to <u>Section 8.1(b)</u> or <u>8.1(c)</u>, in each case in circumstances where the Company would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u> or <u>8.1(g)</u>), then the Company shall retain the Deposit.

(c)   If this Agreement has been terminated for any other reason, including under <u>Section 8.2</u>, other than as contemplated by <u>Section 2.2(b)</u>, then the Deposit shall be returned to Purchaser within two (2)  Business Days after such termination.

(d)   The Parties agree that the Company's right to retain the Deposit, as set forth herein, is not a penalty, but rather is liquidated damages in a reasonable amount that will

compensate Seller for their respective efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

2.3     Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, and the consummation of the other transactions contemplated by this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 300 North LaSalle Street, Chicago, Illinois 60654) at 8:00 a.m. Central Time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing), or at such other place and time as the Parties may agree. The date on which the Closing actually occurs is referred to herein as the "Closing Date".

2.4     Closing Deliveries by Seller. At or prior to the Closing, Seller shall deliver to Purchaser:

(a)     a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)     United States Coast Guard form CG-1340 bill of sale for each purchased Vessel substantially in the form of Exhibit B (the "USCG Bill of Sale") duly executed and acknowledged by Seller before a notary public;

(c)     the original Certificate of Documentation issued for each Vessel by the United States Coast Guard, together with copies of any form CG-1280, Application for Renewal, submitted with respect to any Vessel for which the Company has received a Vessel Renewal Notification or whose Certificate of Documentation will expire within thirty days after the date of Closing;

(d)     the original Certificate of Inspection for each Vessel issued by the United States Coast Guard, together with the originals of all additional Operating Certificates for each Vessel. For purposes of this paragraph, "Operating Certificate" shall be means (i) the Certificate of Inspection issued for a Vessel by the United States Coast Guard, (ii) if a Vessel is subject to load line regulations, the Load Line Certificate for such Vessel issued by the American Bureau of Shipping (ABS) or other authorized classification society, and (iii) any other certificate issued by or on behalf of any governmental authority required for the operation of each Vessel by Seller;

(e)     proof of insurance evidencing continuous hull and machinery, as well as continuous protection and indemnity, pollution and other liability insurance coverage with respect to each Vessel and their operations for all periods prior to the Closing Date and a copy of any claims made with respect to the Acquired Assets on or after the date hereof;

(f)     a certified copy of the Sale Order, as entered by the Bankruptcy Court, and meeting the conditions of Section 5.2 of this Agreement;

7

(g)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(h)     such other usual and customary documents as may be reasonably required by Purchaser in connection with the sale and purchase of each Vessel.

2.5     <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) the Company:

(a)     the Purchase Price, in the form of the Closing Date Payment;

(b)     the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6     <u>Withholding</u>. Purchaser shall not be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from a change in Law after the date hereof. Purchaser and Seller shall cooperate in good faith to reduce or otherwise eliminate any such withholding obligation to the extent permitted by applicable Law.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Schedules delivered by the Company concurrently herewith and Sections 6.5(a) and 10.10, Seller represents and warrants to Purchaser as follows as of the date hereof.

3.1     <u>Organization and Qualification</u>. Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

3.2     <u>Authorization of Agreement</u>. The execution, delivery, and performance of this Agreement by Seller, and the consummation by Seller of the transactions contemplated hereby, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by Seller. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly and validly executed and delivered by Seller, and, assuming this Agreement is a valid and binding obligation of Purchaser, this Agreement constitutes a valid and

binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by the application of bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, or other Laws relating to or affecting creditors' rights or general principles of equity (whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions").

3.3    Conflicts; Consents.

(a)    Except as set forth on Schedule 3.3(a) and assuming that (y) requisite Bankruptcy Court approvals are obtained, and (z) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 3.3(b) are made, given or obtained (as applicable), the execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of the Company; (ii) violate any Law applicable to the Company or by which any property or asset of the Company is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any property or asset of the Company under, any material Contract; except, in each case, for any such violations, breaches, defaults or other occurrences that are not material to the Acquired Assets taken as a whole.

(b)    Except as set forth on Schedule 3.3(b), Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the transactions contemplated hereby, except (i) requisite Bankruptcy Court approvals, (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not material to the Acquired Assets taken as a whole, or (iii) as may be necessary as a result of any facts or circumstances relating to Purchaser or any of its Affiliates.

3.4    Title to Acquired Assets.  Immediately prior to Closing, Seller will have, and, upon delivery to Purchaser on the Closing Date of the instruments of transfer contemplated by Section 2.4, and upon entry of the Sale Order, Seller will thereby transfer to Purchaser and Purchaser will (subject to Section 2.5) be vested, to the maximum extent permitted by sections 363 and 365 of the Bankruptcy Code, with good, valid and marketable title to, all of the Acquired Assets, free and clear of all Encumbrances, except for Permitted Encumbrances.

3.5    Permits; Compliance with Laws. Except as set forth on Schedule 3.5, or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, to the Knowledge of Sellers (a) the Company is and has been since January 1, 2020, in compliance in all material respects with all applicable Laws with respect to the ownership and operation of the Acquired Assets, and (b) the Company holds all licenses, franchises, permits, certificates, approvals and authorizations from Governmental Bodies necessary for the operation of the Acquired Assets (collectively, "Permits").

3.6    Citizenship of Seller; Documentation of the Vessels. Each Seller is a citizen of the United States authorized to own vessels operating in the coastwise trade within the meaning of 46

U.S.C. §50501. Each Vessel is of U.S. build within the meaning of 46 C.F.R. §67.97, and has not undergone rebuilding as defined in 46 C.F.R. §67.177 outside the United States. On the Closing Date, each Vessel will be duly documented in the name of the respective Seller under the flag of the United States and, except as set forth on Schedule 3.6, eligible to engage in the coastwise trade.

3.7     Pending Claims; Insurance.

(a)     Except as set forth on Schedule 3.7, to the best of Seller's knowledge, there are no Actions at Law, in admiralty or in equity, against any Seller, or against the Vessels *in rem* (including any counterclaim, any arbitration proceeding, or any administrative or other proceeding or investigation by or before any Governmental Body), whether pending or threatened, which could give rise to a lien, attachment, seizure, forfeiture, or other encumbrance against the Vessels, or which otherwise relate to, or materially affect the Vessels.  Any potential liability of any Seller or the Vessels *in rem* that may be imposed as the result of any such Action that concerns a casualty involving the Vessels or the discharge or release of any hazardous material or substance from the Vessels in violation of applicable Law is covered by insurance issued by good and solvent underwriters, and there has been no denial of coverage or reservation of rights by such underwriter with respect to such Actions, except as set forth on Schedule 3.7.

(b)     Seller maintains the insurance policies set forth on Schedule 3.7, which Schedule sets forth all insurance policies covering the Acquired Assets (including policies providing property, casualty, pollution, liability and workers' compensation coverage). Such policies are in full force and effect and will continue in full force and effect up to and until the Closing Date. Seller has paid all premiums on such policies due and payable prior to the Closing Date. To the best of Seller's knowledge, Seller is not aware of and has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

3.8     Brokers. Except as set forth on Schedule 3.8, there is no investment banker, broker, finder or other such intermediary that has been retained by, or has been authorized to act on behalf of, the Company and is entitled to a fee or commission in connection with the transactions contemplated by this Agreement from the Company.

3.9     No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (it being understood that Purchaser and the Purchaser Group have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither the Company nor any other Person on behalf of the Company makes, and neither Purchaser nor any member of the Purchaser Group has relied on, the accuracy or completeness of any express or implied representation or warranty with respect to the Company or any of its Subsidiaries, the Acquired Assets or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in ant projections, any confidential information memorandum or similar document, or in any diligence materials, including in any dataroom or datasite or elsewhere) to Purchaser or any of its Affiliates or Advisors on behalf of the Company or any of its Affiliates or Advisors. Without limiting the foregoing, neither the Company nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person,

resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors or any discussions with respect to any of the foregoing information.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Company as follows as.

4.1     <u>Organization and Qualification</u>. Purchaser (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

4.2     <u>Authorization of Agreement</u>. The execution, delivery and performance of this Agreement by Purchaser, and the consummation by Purchaser of the transactions contemplated hereby, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by Purchaser. This Agreement has been duly and validly executed and delivered by Purchaser, and, assuming this Agreement is a valid and binding obligation of Seller, this Agreement constitutes a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as limited by the Enforceability Exceptions.

4.3     <u>Conflicts; Consents</u>.

(a)     Except as set forth on <u>Schedule 4.3(a)</u> and assuming that the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3(b)</u> are made, given or obtained (as applicable), the execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of Purchaser; (ii) violate any Law applicable to Purchaser or by which any property or asset of Purchaser is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance on any property or asset of Purchaser under, Contract; except, in each case, for any such violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

11

(b)     Except as set forth on <u>Schedule 4.3(b)</u>, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

4.4     <u>Financing</u>. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price and to consummate all of the other transactions contemplated by this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the transactions contemplated by this Agreement.

4.5     <u>Brokers</u>. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.6     <u>No Litigation</u>. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

4.7     <u>No Additional Representations or Warranties</u>. Except for the representations and warranties contained in this <u>Article IV</u>, Seller acknowledges that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Seller by Purchaser.

## ARTICLE V

### BANKRUPTCY COURT MATTERS

5.1     <u>Bankruptcy Actions</u>.

(a)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, the Company shall use reasonable best efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(b)     Purchaser shall promptly take all actions as are reasonably requested by the Company to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court for the purposes of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

(c)     Each of the Company and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and (ii) keep the other

reasonably apprised of the status of material matters related to the transactions contemplated by this Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court or any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement.

(d)     The Company's obligations under this Agreement and in connection with the transactions contemplated hereby and thereby are subject to entry of and, to the extent entered, the Sale Order. Nothing in this Agreement shall require the Company to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

(e)     If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "<u>Successful Bidder</u>") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "<u>Backup Bidder</u>") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) until the Outside Date. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and the Company shall consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction).

5.2     <u>Sale Order</u>. (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement and the documents to be delivered by Seller pursuant to this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement; (b) identify all Vessels included in the Acquired Assets by name and official number; (c) direct the United States Coast Guard, National Vessel Documentation Center, and other appropriate filing offices to remove and discharge of record any Encumbrances (other than Permitted Encumbrances); and (d) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code.

## ARTICLE VI

### COVENANTS AND AGREEMENTS

6.1     <u>Conduct of Seller</u>. Until the earlier of the termination of this Agreement and the Closing, except (w) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (x) as required by applicable Law, (y) as otherwise required by or reasonably necessary to carry out the terms of this Agreement or as set forth on <u>Schedule 6.1</u> or (z) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall operate the Acquired Assets only in the Ordinary Course and shall not:

(a)     sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any material portion of the Acquired Assets;

13

(b)      subject any portion of the Acquired Assets that is material to the Company and its Subsidiaries taken as a whole to any Encumbrance, except for Permitted Encumbrances; or

(c)      agree or commit to do any of the foregoing.

Nothing contained in this Agreement is intended to give Purchaser or its affiliates, directly or indirectly, the right to control or direct the business of Seller prior to the Closing.

6.2      <u>Access to Information</u>.

(a)      From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), the Company will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of the Company and its Subsidiaries with respect to the Acquired Assets, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets as Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement; <u>provided</u> that (i) such access does not unreasonably interfere with the normal operations of the Company and its Subsidiaries, (ii) such access will occur in such a manner as the Company reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to Jefferies LLC or such other Person(s) as the Company may designate in writing from time to time and (iv) nothing herein will require the Company to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to the Company or any of its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (B) would require the Company or any of its Subsidiaries to disclose any financial or proprietary information of or regarding the Affiliates of the Company or otherwise disclose information regarding the Affiliates of the Company that the Company deems to be commercially sensitive, (C) would waive any legal privilege or (D) would be in violation of applicable Laws or the provisions of any agreement to which the Company or any of its Subsidiaries is a party; <u>provided</u> that, in the event that the Company withholds access or information in reliance on the foregoing clause (C) or (D), the Company shall provide (to the extent possible without waiving or violating the applicable legal privilege, Law or contractual provision) notice to Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of the applicable legal privilege, Law or contractual provision.

(b)      The information provided pursuant to this <u>Section 6.2</u> will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by all the terms and conditions of the Confidentiality Agreement. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. The Company makes no representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)      Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender,

14

noteholder or other material business relation of the Company or its Subsidiaries prior to the Closing with respect to the Company, its Subsidiaries, their business or the transactions contemplated by this Agreement without the prior consent of the Company for each such contact.

6.3     <u>Regulatory Approvals</u>.

(a)     The Company will (i) make or cause to be made all filings and submissions required to be made by the Company under any applicable Laws for the consummation of the transactions contemplated by this Agreement set forth on <u>Schedule 6.3</u>, (ii) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with the foregoing and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)     Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the transactions contemplated by this Agreement, (ii) cooperate with the Company in exchanging such information and providing such assistance as the Company may reasonably request in connection with all of the foregoing, and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

6.4     <u>Reasonable Efforts; Cooperation</u>.

(a)     Subject to the other terms of this Agreement provisions hereof, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder.  Other than with respect to the payment of insurance premiums or calls pursuant to <u>Section 6.7</u>, the "reasonable best efforts" of the Company will not require the Company or any of its Subsidiaries, Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)     The obligations of the Company pursuant to this Agreement, including this <u>Section 6.4</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and each of Seller's obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.5    Notification of Certain Matters.

(a)    The Company will promptly notify Purchaser of: (i) any notice or other communication from any Person alleging or providing notice of a maritime lien or claim against the Vessels or alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; and (iii) promptly upon discovery thereof, any variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause, any of the representations and warranties contained in Article III to be untrue or inaccurate such that the condition set forth in Section 7.2(a) not to be satisfied. If the subject matter of any such notification required by the previous sentence requires any change in the Schedules, the Company shall deliver to Purchaser prior to the Closing a supplement to such Schedule (the "Updated Schedules") with such change; provided that in no event will any Updated Schedule serve to amend, supplement or modify the Schedules for purposes of Section 7.2(a); provided further that if the Closing occurs, the Updated Schedules will be considered and deemed to be part of the Schedules for all purposes under this Agreement, and each reference in this Agreement to a particular Schedule will mean such Schedule in, or as updated by, the Updated Schedules.

(b)    Purchaser will promptly notify the Company of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; (iii) any Actions relating to or involving or otherwise affecting Purchaser or its Affiliates that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.6 or that relate to the transactions contemplated by this Agreement; and (iv) any breach or inaccuracy of any representation or warranty contained in this Agreement at any time during the term hereof that could reasonably be expected to cause the conditions set forth in Article VII not to be satisfied; provided that the delivery of any notice pursuant to this Section 6.5(a) will not limit the remedies available to Seller under or with respect to this Agreement.

6.6    Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

6.7    Insurance Matters. Purchaser acknowledges that, upon Closing, all insurance coverage provided in relation to the Acquired Assets that is maintained by the Company or any of its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage with respect to the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies. Prior to Closing, or as soon as reasonably practicable after Closing, Seller will (a) pay all insurance premiums or calls that are or will be due and owing as of the Closing for any insurance it

maintained on the Acquired Assets and (b) submit a claim to the relevant insurer with respect to any damage to or loss of any Vessel that is within the coverage of the relevant insurance policy.

6.8 <u>Expense Reimbursement and Break-Up Fee</u>. Notwithstanding anything in this Agreement to the contrary, the Debtors agree, on a joint and several basis, to pay Purchaser the Expense Reimbursement and Break-Up Fee in the event this Agreement is terminated as provided in <u>Section 8.3</u>. The Parties acknowledge and agree that the terms and conditions set forth in <u>Section 8.3</u> with respect to the payment of the Expense Reimbursement and Break-Up Fee shall become operative upon the approval (or deemed approval under the Bidding Procedures Order) of this Agreement and the Break-Up Fee and the Expense Reimbursement by the Bankruptcy Court.

6.9 <u>Minimum Overbid</u>. In connection with the Auction, Seller agrees that that any minimum overbid with respect to all of the Acquired Assets shall be no less than $500,000 more than the Purchase Price, *plus* the Break-Up Fee *plus* the Expense Reimbursement. In the event of any credit bid, such credit bid must include payment, in full and in cash, of the Expense Reimbursement and Break-Up Fee.

6.10 <u>Acknowledgment by Purchaser</u>.

(a) Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, condition, operations, liabilities, and prospects of the Company with respect to the Acquired Assets, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, Seller, any Subsidiary, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in any dataroom, any information presentation, or any projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the representations and warranties made by Seller to Purchaser in <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "<u>Express Representations</u>") (it being agreed that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the transactions contemplated by this Agreement; and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (1) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in any dataroom, information presentation, projections, meetings, calls or correspondence with management of the Company and its Subsidiaries, any of the Seller Parties or any other Person on behalf of the Company, its Subsidiaries or any of the Seller Parties or any of their respective Affiliates or Advisors and (2) any other statement relating to the historical, current or future business, condition, results of

17

operations, assets, liabilities, properties, contracts, and prospects of the Company or any of its Subsidiaries, or the quality, quantity or condition of the Company's or its Subsidiaries' assets, are, in each case, specifically disclaimed by the Company, on its behalf and on behalf of the Seller Parties, and Seller. Purchaser, on its own behalf and on behalf of the Purchaser Group: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither the Company, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding the Company, its Subsidiaries or any of their respective assets (including the Acquired Assets), Liabilities or operations and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of the Company's or its Subsidiaries' business, operations, assets, liabilities, prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.10, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in any information presentation, dataroom, or projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

(c)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.10 (i) require performance after Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years; and (ii) are an integral part of the transactions contemplated by this Agreement and that, without these agreements set forth in this Section 6.10, Seller would not enter into this Agreement.

## ARTICLE VII

### CONDITIONS TO CLOSING

7.1    Conditions Precedent to the Obligations of Purchaser and Seller. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    No court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been

vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; and

(b)     the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not be subject to any stay or injunction pending appeal.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Seller in <u>Article III</u> shall be true and correct as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; <u>provided</u> that the representations set forth in <u>Sections 3.1</u>, <u>3.2</u>, and <u>3.9</u> will be true and correct in all material respects;

(b)     Seller shall have performed in all material respects all of the covenants and agreements required to be performed by Seller under this Agreement at or prior to the Closing; and

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u>.

7.3     <u>Conditions Precedent to the Obligations of the Company</u>. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby;

(b)     Purchaser shall have performed in all material respects all of the covenants and agreements required to be performed by it under this Agreement at or prior to the Closing; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 2.5</u>.

7.4     Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

# ARTICLE VIII

## TERMINATION

8.1     Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of the Company and Purchaser;

(b)     by written notice of either Purchaser or the Company, upon the issuance by any Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Order was caused by the breach or action or inaction of such Party;

(c)     by written notice of either Purchaser or the Company, if the Closing shall not have occurred on or before August 15, 2021 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by the material breach or action or inaction of such Party;

(d)     by written notice of either Purchaser or the Company, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Bankruptcy Case;

(e)     by written notice from the Company to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that if such breach is curable by Purchaser then the Company may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (i) two (2) Business Days prior to the Outside Date and (ii) thirty (30) days after the Company notifies Purchaser of such breach;

(f)     by written notice from Purchaser to the Company, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the

date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies the Company of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

       (g)     by written notice from the Company to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3;

       (h)     by written notice from the Company to Purchaser, if Seller or the board of directors of Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

       (i)     by written notice of either Purchaser or the Company, if (i) Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; or

       (j)     by written notice from Purchaser to the Company, if (i) the Auction shall not have been completed and a Successful Bidder with respect to each of the Acquired Assets shall not have been selected pursuant to the Bidding Procedures Order by July 21, 2021 or (ii) the Bankruptcy Court Shall have not entered the Sale Order by July 28, 2021.

     8.2    Automatic Termination. This Agreement shall automatically terminate, without any action or notice by any Party, if (a) this Agreement and the Break-Up Fee and the Expense Reimbursement are not approved (or deemed approved under the Bidding Procedures Order) by the Bankruptcy Court prior to the date that is three (3) Business Days after the date hereof or (b) Purchaser is not designated as either the Successful Bidder or the Backup Bidder with respect to all of the Acquired Assets at the Auction, in each case unless otherwise agreed by Purchaser in writing in its sole discretion.

     8.3    Effect of Termination.

       (a)     In the event of termination of this Agreement pursuant to Section 8.1 or Section 8.2, this Agreement shall forthwith become void and there shall be no liability on the part of any Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, this Section 8.3, and Article X shall survive any such termination; provided, further that no termination will relieve Purchaser from any liability for damages (including damages based on the loss of the economic benefits of the transactions contemplated by this Agreement, including the Cash Payment, to Seller), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder).

       (b)     Seller shall pay to Purchaser the Expense Reimbursement and Break-Up Fee by wire transfer of immediately available funds upon the earlier to occur of: (i) regardless of

whether or not this Agreement has been terminated, the consummation of any sale of the Acquired Assets to any Person other than Purchaser (other than following the termination of this Agreement by the Company pursuant to <u>Section 8.1(e)</u> or <u>8.1(g)</u> (or by Purchaser pursuant to <u>Section 8.1(b)</u> or <u>8.1(c)</u>, in each case in circumstances where the Company would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u> or <u>8.1(g)</u>)), in which case payment of the Expense Reimbursement and Break-Up Fee shall be paid to Purchaser within three (3) Business Days of consummation of such transaction; and (ii) termination of this Agreement (x) by Purchaser under <u>Section 8.1(f)</u> or <u>8.1(j)</u>, (y) by either Purchaser or the Company under <u>Section 8.1(i)</u> or <u>Section 8.1(h)</u>, or (z) by the Company pursuant to <u>Section 8.1(b)</u>, <u>8.1(c)</u>, or <u>8.1(d)</u>, in each case in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to <u>Section 8.1(f)</u>, in which case payment of the Expense Reimbursement and Break-Up Fee shall be paid to Purchaser promptly (and in any event no later than three (3) Business Days following notice from Purchaser or the Company, as applicable, of such event); <u>provided</u> that if Seller fails to pay any amounts due to Purchaser pursuant to this <u>Section 8.3</u> within the time period specified herein, Seller shall pay the costs and expenses (including reasonable legal fees and expenses) incurred by Purchaser in connection with any action or proceeding taken to collect payment of such amounts.

(c)     The Parties acknowledge and agree that any payment of the Break-Up Fee and the Expense Reimbursement described in this <u>Section 8.3</u> shall constitute liquidated damages (and not a penalty) and shall be deemed to be the sole and exclusive remedy of Purchaser and any other Person against Seller in connection with this Agreement and the transactions contemplated hereby. The Parties acknowledge and agree that (i) the agreements contained in this <u>Section 8.3</u> are an integral part of this Agreement and the transactions contemplated hereby and (ii) in light of the difficulty of accurately determining actual damages with respect to the foregoing, the right to any such payment of the Break-Up Fee and the Expense Reimbursement constitute a reasonable estimate of the damages that will compensate Purchaser in the circumstances in which such fees are payable for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated by this Agreement.

## ARTICLE IX

### TAXES

9.1     <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, or other Taxes and recording charges payable by reason of the sale of the Acquired Assets under this Agreement or the transactions contemplated hereby (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes. Seller and Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes.

9.2     <u>Allocation of Purchase Price</u>. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price among the Acquired Assets in accordance with the methodology set forth in <u>Schedule 9.2</u> (the

"Allocation Methodology").[1] As soon as commercially practicable, but no later than forty-five (45) days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as Purchase Price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "Allocation"). If Sellers deliver a written objection within thirty (30) days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers shall negotiate in good faith to resolve any such objection, and, if Sellers and Purchaser cannot resolve such dispute within thirty (30) days of Purchaser's receipt of Sellers' objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and Sellers shall resolve such dispute and the resolution of such dispute shall be final and binding on the Parties. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

9.3     Cooperation. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

# ARTICLE X

## MISCELLANEOUS

10.1     Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this Section 10.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement.  Purchaser and the Seller Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this Section 10.1(a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement.

10.2     Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 8.3), all fees, costs and expenses (including

---

[1]     Purchaser to propose Allocation Methodology.

fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to Section 9.1.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, if transmitted prior to 5:00 p.m. local time of the recipient on a Business Day, otherwise on the next succeeding Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

Hartree Partners, LP
1185 Avenue of the Americas
New York, NY 10036
Attention:    Jacob Thride
Email:        jthride@hartreepartners.com

with a copy to (which shall not constitute notice):

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attention:    Christopher Guhin
              Frank Merola
              Allison Miller
Email:        cguhin@stroock.com
              fmerola@stroock.com
              amiller@stroock.com


Notices to Seller:

Bouchard Transportation Co., Inc.
58 South Service Road
Suite 150
Melville, New York 11747
Attention:    Matthew Ray
Email:        mray@pppllc.com

and

24

Portage Point Partners
300 North LaSalle
Suite 1420
Chicago, Illinois 60654
Attention:     Matthew Ray
Email:         mray@pppllc.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:     Ryan Blaine Bennett, P.C.
               Steve Toth
               Whitney Fogelberg
Email:         rbennettt@kirkland.com
               steve.toth@kirkland.com
               whitney.fogelberg@kirkland.com

10.4    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order and any other order of the Bankruptcy Court approving this Agreement, the Break-Up Fee and the Expense Reimbursement (with respect to the matters covered thereby) and the entry and terms of the Sale Order (with respect to all other provisions herein), Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; <u>provided</u> that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and the Company, and any attempted assignment or delegation without such prior written consent shall be null and void.

10.5    <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Company or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    <u>Third Party Beneficiaries</u>. Except for the Seller Parties, which are intended third party beneficiaries of this Agreement and shall be entitled to enforce the terms of this Agreement as if a direct party hereto, and except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this

25

Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party or any Subsidiary of Seller will have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Disclosure Statement will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course or consistent with past practice, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, Updated Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

26

10.11  <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12  <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Seller pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.12</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, *plus* ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty of Seller made herein.

10.13  <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) in the event the Bankruptcy Case is closed, or if the Bankruptcy Court is unwilling or unable to hear such Action, in the United States District Court for the Southern District of Texas (or, if the United States District Court for the Southern District of Texas declines

27

to accept jurisdiction over a particular matter, any state or federal court within the state of New York) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to this agreement to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the United States Code, including Chapter 313 of Title 46, to the extent applicable, or the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of New York applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of New York or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of New York to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one Party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manner and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such contract will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

10.17   Publicity. Neither the Company nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or the Company, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or the Company lists securities, provided that the Party intending to make such release shall use its best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any liens or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.19   Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its respective directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, Seller

29

retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of their estates.

## ARTICLE XI

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1  Certain Definitions.

(a)  "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(b)  "Advisors" means, with respect to any Person, the accountants, attorneys, consultants, advisors, investment bankers, or other representatives of such Person.

(c)  "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)  "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition, in each case, pursuant to which the Acquired Assets are to be transferred to any Person other than Purchaser or any of its Affiliates, or any plan of reorganization that does not contemplate or that does not permit the sale of the Acquired Assets to Purchaser pursuant to this Agreement.

(e)  "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(f)  "Bidding Procedures Order" means an Order in the form attached hereto as Exhibit C.

(g)  "Break-Up Fee" means a cash amount equal to three percent (3%) of the Cash Payment.

(h)  "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(i)     "Code" means the United States Internal Revenue Code of 1986, as amended.

(j)     "Confidentiality Agreement" means that certain letter agreement, dated as of September 30, 2020, by and between the Company and Hartree Partners, LP.

(k)     "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(l)     "Contract" means any contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, license or other agreement that is binding upon a Person or its property.

(m)    "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(n)     "Expense Reimbursement" means an amount equal to $1,500,000 on account of the reasonable out-of-pocket costs, fees and expenses of Purchaser (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses and all filing fees under the HSR Act) related to the transactions contemplated by this Agreement, which amount shall constitute a superpriority administrative expense of Debtors with priority over any and all administrative expenses of any kind, including those specified in sections 503(b) or 507(b) of the Bankruptcy Code.

(o)     "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(p)     "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(q)     "Governmental Body" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(r)     "knowledge" or "knowledge of the Company" or "knowledge of Seller" means the actual knowledge of Matthew Ray and Patrick Bartels, as directors of the Seller.

(s)     "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation,

31

ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(t)     "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(u)     "Material Adverse Effect" means any event, change, occurrence, or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on the Acquired Assets, taken as whole; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or economic conditions affecting the industry in which the Company and its Subsidiaries operate, (ii) Effects in, arising from or relating to national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (iii) Effects in, arising from or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, contract or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement), (iv) Effects in, arising from or relating to changes in, GAAP, (v) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body, (vi) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or (D) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of Purchaser, including the impact thereof on the relationships, contractual or otherwise, of the business of the Company or any of its Subsidiaries with employees, customers, lessors, suppliers, vendors or other commercial partners, (vii) Effects in, arising from or relating to any existing event, occurrence, or circumstance with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules, (viii) Effects that arise from any seasonal fluctuations in the business, (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (x) the effect of any action taken by the Purchaser or its Affiliates with respect to the transactions completed by this Agreement or the financing thereof or

32

any breach by the Purchaser of this Agreement (xi) the matters set forth on the Schedules and any changes or developments in, or effects or results arising from or relating to, matters expressly set forth on the Schedules, or (xii) (A) the commencement or pendency of the Bankruptcy Case, (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the reorganization of Seller, or (3) the Bidding Procedures Order; or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller or its Subsidiaries in compliance therewith; except in the case of the clauses (i), (ii), or (iii), to the extent such Effects have a materially disproportionate impact on the Acquired Assets, as compared to other participants engaged in the industries and geographies in which Seller operate.

(v)     "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any Order entered by the Bankruptcy Court in the Bankruptcy Case.

(w)     "Ordinary Course" means the ordinary and usual course of operations of the Acquired Assets taken as a whole taking into account the commencement of the Bankruptcy Case.

(x)     "Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable or being contested in good faith; (ii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable; (iii) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets; (iv) any Encumbrances set forth on Schedule 11.1(x) and (v) any Encumbrances that will be removed or released by operation of the Sale Order.

(y)     "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(z)     "Purchaser Designee" means one or more Persons designated by Hartree Partners, LP to purchase or take possession of one or more of the Purchased Assets at the Closing, as designated by Hartree Partners, LP to the Seller no less than three (3) Business Days prior to the Closing Date.

(aa)     "Purchaser Group" means Purchaser, any Affiliate of Purchaser, and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(bb)     "Sale Order" means an order substantially in the form attached hereto as Exhibit D and otherwise reasonably acceptable to the Parties.

(cc)     "Seller Parties" means Seller and the Company's Subsidiaries and each of their respective former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(dd) "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(ee) "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ff) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

11.2   Index of Defined Terms.

| | | | |
|---|---|---|---|
| Acquired Assets | 5 | Deposit | 6 |
| Agreement | 5 | Enforceability Exceptions | 8 |
| Assignment and Assumption Agreement | 7 | Express Representations | 16 |
| Backup Bidder | 12 | Outside Date | 19 |
| Bankruptcy Case | 5 | Parties | 5 |
| Bankruptcy Code | 5 | Party | 5 |
| Bankruptcy Court | 5 | Permits | 9 |
| Bankruptcy Rules | 5 | Purchase Price | 6 |
| Cash Payment | 6 | Purchaser | 5 |
| Chosen Courts | 26 | Seller | 5 |
| Closing | 7 | Successful Bidder | 12 |
| Closing Date | 7 | Transfer Taxes | 21 |
| Closing Date Payment | 6 | Updated Schedules | 15 |
| Company | 5 | Vessel | 6 |

11.3   Rules of Interpretation. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a) Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)      The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)      Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)      The words "to the extent" shall mean "the degree by which" and not "if."

(e)      When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)      Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)      The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)      All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)      All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)      Any reference to any agreement or contract will be a reference to such agreement or contract, as amended, modified, supplemented or waived.

(k)      Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

[*Signature page(s) follow.*]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLER:**

**BOUCHARD TRANSPORTATION CO., INC.,
on behalf of itself and each of the other Sellers
set forth below**

By: *Matthew D Ray*
Name: Matthew Ray
Title: Chief Restructuring Officer

**B. NO. 205 CORP.**
**B. NO. 220 CORP.**
**B. NO. 230 CORP.**
**B. NO. 231 CORPORATION**
**B. NO. 233 CORPORATION**
**B. NO. 235 CORP.**
**B. NO. 240 CORP.**
**B. NO. 264 CORP.**
**B. NO. 272 CORP.**
**B. NO. 280 CORPORATION**
**B. NO. 282 CORPORATION**
**B. NO. 284 CORP.**
**TUG-BARBARA E. BOUCHARD,
CORP.**
**TUG BOUCHARD BOYS CORP.**
**TUG BUSTER BOUCHARD
CORPORATION**
**TUG DENISE A. BOUCHARD CORP.**
**TUG DONNA J. BOUCHARD CORP.**
**MOTOR TUG ELLEN S. BOUCHARD,
INC.**
**TUG EVENING LIGHT CORP.**
**TUG EVENING MIST CORP.**
**TUG EVENING TIDE CORPORATION**
**TUG FREDERICK E. BOUCHARD
CORP.**
**TUG J. GEORGE BETZ, CORP.**
**TUG LINDA LEE BOUCHARD CORP.**
**TUG MORTON S. BOUCHARD JR.
CORP.**

**TUG RALPH E. BOUCHARD
CORPORATION**
**TUG RHEA I. BOUCHARD INC.**
**TUG ROBERT J. BOUCHARD CORP.**
**TUG MARION C. BOUCHARD
CORPORATION**

*[Signature page to Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**PURCHASER:**</u>

**HARTREE PARTNERS, LP**

By: _____

Name: Stephen M. Hendel

Title: Managing Director

<u>ANNEX A</u>

**LIST OF VESSELS**

| No. | Vessel Description | Legal Owner |
|-----|--------------------|-------------|
| 1. | B. NO. 205, OFFICIAL NO. 1257375 | B. NO. 205 CORP. |
| 2. | B. NO. 220, OFFICIAL NO. 1087420 | B. NO. 220 CORP. |
| 3. | B. NO. 230, OFFICIAL NO. 991746 | B. NO. 230 CORP. |
| 4. | B. NO. 231, OFFICIAL NO. 1198671 | B. NO. 231 CORPORATION |
| 5. | B. NO. 233, OFFICIAL NO. 1209484 | B. NO. 233 CORPORATION |
| 6. | B. NO. 235, OFFICIAL NO. 1031170 | B. NO. 235 CORP. |
| 7. | B. NO. 240, OFFICIAL NO. 998038 | B. NO. 240 CORP. |
| 8. | B. NO. 264, OFFICIAL NO. 1225718 | B. NO. 264 CORP. |
| 9. | B. NO. 272, OFFICIAL NO. 1257375 | B. NO. 272 CORP. |
| 10. | B. NO. 280, OFFICIAL NO. 1181626 | B. NO. 280 CORPORATION |
| 11. | B NO 282, OFFICIAL NO. 1204610 | B. NO. 282 CORP. |
| 12. | B NO 284, OFFICIAL NO. 1216341 | B. NO. 284 CORP. |
| 13. | EVENING LIGHT, OFFICIAL NO. 563653 | TUG EVENING LIGHT CORP. |
| 14. | EVENING MIST, OFFICIAL NO. 576930 | TUG EVENING MIST CORP. |
| 15. | EVENING TIDE, OFFICIAL NO. 527153 | TUG EVENING TIDE CORPORATION |
| 16. | BARBARA E BOUCHARD, OFFICIAL NO. 981712 | BARBARA E. BOUCHARD, CORP. |
| 17. | BOUCHARD BOYS, OFFICIAL NO. 565304 | TUG BOUCHARD BOYS CORP. |
| 18. | BUSTER BOUCHARD, OFFICIAL NO. 605961 | TUG BUSTER BOUCHARD CORPORATION |
| 19. | DENISE A. BOUCHARD, OFFICIAL NO. 1251312 | TUG DENISE A. BOUCHARD CORP. |
| 20. | DONNA J. BOUCHARD, OFFICIAL NO. 1257374 | TUG DONNA J. BOUCHARD CORP. |
| 21. | ELLEN S. BOUCHARD, OFFICIAL NO. 644590 | MOTOR TUG ELLEN S. BOUCHARD, INC. |
| 22. | FREDERICK E. BOUCHARD, OFFICIAL NO. 1265316 | TUG FREDERICK E. BOUCHARD CORP. |
| 23. | LINDA LEE BOUCHARD, OFFICIAL NO. 1189191 | TUG LINDA LEE BOUCHARD CORP. |
| 24. | MORTON S. BOUCHARD JR., OFFICIAL NO. 1265315 | TUG MORTON S. BOUCHARD JR. CORP. |
| 25. | RALPH E. BOUCHARD, OFFICIAL NO. 923248 | TUG RALPH E. BOUCHARD CORPORATION |
| 26. | ROBERT J. BOUCHARD, OFFICIAL NO. 999393 | TUG ROBERT J. BOUCHARD, CORP. |
| 27. | MARION C. BOUCHARD, OFFICIAL NO. 615650 | TUG MARION C. BOUCHARD CORPORATION |
| 28. | J. GEORGE BETZ, OFFICIAL NO. 1035211 | TUG J. GEORGE BETZ, CORP. |
| 29. | RHEA I. BOUCHARD, OFFICIAL NO. 649048 | TUG RHEA I. BOUCHARD INC. |